**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC | § | |
| A Mississippi Limited Liability | § | |
| Corporation | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 08-CV-00062-MCW |
| | § | Judge Williams |
| | § | |
| THE UNITED STATES | § | |
| Defendant. | § | |

## FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THE COURT OF FEDERAL CLAIMS:

## INTRODUCTION.

1. This is a complaint for declaratory and injunctive relief, money damages, and attorneys fees, expenses, and costs under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief based on declaratory judgment), 1491(b) (declaratory and injunctive relief and monetary damages limited to bid preparation and proposal costs) and 2412 (attorneys fees, expenses, and costs).

## JURISDICTION AND VENUE.

2. Jurisdiction of the Court of Federal Claims over this action is conferred by 28 U.S.C. §§ 1491(b)(1). RKR is objecting to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement." *Id*. With respect to the clause conferring jurisdiction over all objections to "the award of a contract," an objection to an unlawful non-award is necessarily subsumed within the clause. RKR objects that the award of a contract was precluded by unlawful corrective action, resulting in no award to an eligible offeror. RKR objects in the alternative that the lawful

completion of the procurement process for the solicitation was precluded by unlawful corrective action, resulting in no award to an eligible offeror. The unlawful corrective action is an unlawful cancellation of the solicitation.

3. RKR, as an aggrieved offeror with a substantial chance of receiving the contract award, is an interested party and has standing to bring this case. An actual, justiciable controversy exists between RKR and THE UNITED STATES. The requested relief is proper under the statutes cited in ¶ 1.

## **PARTIES.**

4. Plaintiff RKR JOINT VENTURE, LLC is a Mississippi limited liability corporation with current articles of incorporation on file with the Mississippi Secretary of State. The joint venture consists of Rothe Development Corporation, K-Mar Industries, Inc., and Rohmann Services, Inc. RKR's principal place of business is located at 10401 Boney Ave Suite B, Diberville, MS 39540.

5. Defendant THE UNITED STATES and its agencies and departments are engaged in procurement.

## **FACTUAL AND PROCEDURAL BACKGROUND.**

### I. THE SOLICITATION

#### *A. Subject Matter, Applicable Evaluation Procedures, Term, and Pricing*

6. On August 16, 2002, Defendant United States Department of the Air Force ("Air Force") issued Solicitation F41689-02-R-0049 ("the solicitation"), a contract for a Base Operating Support Cost Study (Little BOS) at Keesler Air Force Base, MS. A0001.

7. Little BOS includes Communications and Information Technology, Multimedia Services and Publishing Management service requirements. A0078-79.

8. The solicitation is a negotiated procurement. A0001.

9. The solicitation is designated as a small business set-aside pursuant to OMB Circular A-76 (Aug. 1983) and its March 1996 Supplemental Handbook (both Rev. 1999). A0002; A0075, ¶ M903.

10. The solicitation contains a five month mobilization period, a one year basic performance period, nine option years, and a six month option to extend. The total potential duration of the contract is just under eleven years; the total non-optional duration is seventeen months. A0003 ¶ B1, A0026 ¶ F12.

11. The solicitation is Cost Plus Award Fee/Award Term then converting (through negotiations) to Fixed Price Award Fee (FPAF)/Award Term during option year three. A0036-0037, ¶ H938. “It is anticipated that adequate workload data will be available after the performance of the second option year for the service provider to predict a realistic cost to perform the remaining option years with minimal cost risk to the service provider.” *Id.*

12. The value of the contract to be awarded exceeds $50 million. A2129.

*B. Configuration Changes to the Network to Occur Over the Life of the Contract*

13. Numerous amendments to the solicitation were announced and incorporated between the date the solicitation was issued, August 16, 2002, to the date offers were due, on or about June 24, 2004, and are reflected as such on the top right portion of the pages. *E.g.*, A0003.

14. Paragraph 7.4.5 of Amendment 11, entitled “Network Management Responsibilities,” reads in part:

> The [Air Force Network Operations and Security Center, or AFNOSC] will direct configuration changes to the network to either enhance security or improve communications across the entire Air Force. Similarly, the [Air Education and Training Command Network Operations and Security

> Center, or AETC NOSC] will direct configuration changes to the network to either enhance security or improve communications across the entire command.

A0165.

15. Paragraph 7.4.5 directed offerors to assume, when submitting their proposals, that any configuration changes to the network would be directed by the government during the life of the contract, consistent with other solicitation clauses. *See* A0043 (incorporating 48 C.F.R. § 52.243-2, Alternate II, which states, in relevant part, “The Contracting Officer may at any time, by written order . . . make changes within the general scope of this contract in any one or more of the following: (1) Description of services to be performed”, and 48 C.F.R. § 52.249-6, Termination for Convenience, “The Government may terminate performance of work under this contract in whole or, from time to time, in part, if (1) The Contracting Officer determines that a termination is in the Government’s interest”).

16. “The network” is the voice and data network and related administrative and support functions for Keesler AFB and a nearby Air National Guard base, as defined at A0144 ¶ 7.1.

17. The directors of the configuration changes identified in the solicitation were to be AFNOSC and AETC NOSC. A0165.

18. The directors of the configuration changes were, at the time of solicitation issuance and proposal submission, overseeing an ongoing “NOSC-centric” planning process to consolidate and reconfigure the network under their control, including administrative and support functions. A0168. This initiative was also known as

"[Network Control Center, or NCC] Reengineering" as set forth in Paragraph 7.4.11 of the solicitation:

> AETC is presently reengineering the base network control centers (NCCs) commandwide. The goal of the AETC Network Control Center (NCC) Reengineering initiative is to implement a Network Operations and Security Center (NOSC) centric enterprise network within AETC. This NOSC centric network will standardize and streamline network operations throughout the command.

A0168.

19. The government confirmed, in response to a question from RKR, that the configuration changes to the network referenced as a long term goal in the solicitation involved the NOSC-centric initiative (NCC Reengineering). A1154.

20. The government specifically instructed offerors to base the network operations portion of their proposals only on Section 7.1 of Amendment 11, and not on future configuration changes to the network, such as the NOSC-centric initiative (NCC Reengineering). A1154. The solicitation contains no language directing the offerors to bid anything other than the existing requirements set forth. By the contracting officer's own admission in his decision, responsive proposals were to be made in terms of the existing "date in time" requirements. A1350 ¶ 2 ("The Keesler PRD was developed in Apr 02 which included all communication requirements for that date in time").

21. RKR's offer was in terms of the existing "date in time" requirements.

22. Paragraph 7.4.5 of Amendment 11, entitled "Network Management Responsibilities," further reads in part:

> Keesler AFB, as a part of the Air Force enterprise network, employs a multi-tier support system for network management: unit-level Workgroup Managers, Functional System Administrators, the [Network Control Center, or NCC], the [Air Education and Training Command Network Operations and Security Center, or AETC NOSC], and finally the Air

> Force [Network Operations and Security Center, or AFNOSC]. To support this concept of operations, the Service Provider is expected to assume [Workgroup Manager/Functional System Administrator, or WM/FSA] duties ***only*** in areas where current [Communications and Information Technology, or C&IT] positions are included in the study.

(emphasis added). A0165.

23. Paragraph 7.4.5 directed offerors to assume workgroup management positions in its proposal for existing Communications and Information Technology workgroup management duties, but directed offerors *not* to increase or decrease the number of workgroup management positions based on the offeror's estimate of what future configuration changes to the network may be directed over the life of the contract. *Id*.

24. Paragraphs 7.1.1, 7.1.1.1.1, and 7.1.1.1.4 of Amendment 11 directed RKR to be able to accommodate ongoing mission change and planning processes that affected the configuration of the network, including the management of that configuration. A0144-0145.

25. Paragraph 7.1.1 of Amendment 11, entitled "Plans and Implementation Services," states:

> The service provider shall provide detailed plans and supporting budgets, that outline implementation activities to maintain infrastructure related to [Communication and Information Technology, or C&IT] systems in response to the changing mission of Keesler AFB.

A0144.

26. A task required at Paragraph 7.1.1.1.1 of Amendment 11 is to "Schedule, forecast, document and implement downward directed and upward driven C&IT programs and projects." A0144.

27. A task required at Paragraph 7.1.1.1.4 of Amendment 11 acknowledges an ongoing planning process over the life of the contract:

> Provide configuration management by participation in the planning, acquisition, management, and control of C&IT resources. Provide input to strategic planning processes to promote the most cost-effective technology options for improvement of operations. Make recommendations for technology insertion and provide inputs to the C&IT planning process.

A0145.

28. The offerors knew, when formulating their proposals, that the staffing requirements would be reduced over time as a result of configuration changes to the network.

29. The offerors also knew that the government had the right to reduce the staffing requirements for any given task to zero, if that was the result of the configuration changes to the network. A0043 (incorporating 48 C.F.R. § 52.243-2, Alternate II (changes); 48 C.F.R. § 52.249-6 (termination for convenience in whole or part)).

*C. AFNETOPS and the NOSC-centric Initiative (NCC Reengineering)*

30. AFNETOPS has been in the planning stages for many years. A departmental directive, Air Force Instruction (AFI) 33-115 V1, 2 July 1999 edition addressed the centralized format for communication security as implemented by AFNETOPS.

31. After the solicitation was issued, but before proposals were submitted, the government made an internal announcement on July 3, 2003, not announced to the offerors. A1352.

32. The government announced that it would, "in synchronization with our ongoing information operations initiatives," reorganize the various Air Force networks "under the control of a single Air Force commander," consistent with the Air Force's current command and control policy (or "C2 process"). *Id.*

33. The announcement expressly noted that the reorganization, to be known as AFNETOPS, would "include the 8AF [Eighth Air Force] initiative for a centralized AF NET Operations Security Center (AFNOSC)." *Id.*

34. The government's internal announcement did not indicate that the NOSC-centric initiative would change in any way other than being folded into the AFNETOPS organizational structure.

35. The Air Force's decision to fold AFNOSC into AFNETOPS did not result in any additional amendment to the solicitation. At no time prior to the GAO bid protest in July of 2007, *infra*, was there any indication that cancellation was warranted as a result of configuration changes due to AFNETOPS.

36. Agency counsel's first letter to GAO stating the reasons for the intended cancellation mentions only that "there was, and is currently underway, an initiative" and makes no distinction between AFNETOPS and the NOSC-centric initiative. A0772.

37. The GAO found that configuration changes due to the "NOSC-centric initiative" had been underway since before the time of bidding. A0995-0996.

38. The GAO found that as between the "NOSC-centric initiative" and the "AFNETOPS" structure it was folded into, there was "no dispute that both terms refer, generally, to the same centralization concept." A0996 n.3.

39. AFNETOPS will not be fully implemented until some time between 2012 and 2020. *See* Dkt #22, citing A1359 ("the final step—integration of most airborne and space networks—will occur in the 2012-2020 timeframe").

40. The government does not intend to resolicit until AFNETOPS is fully implemented. A1016 ¶ 3 ("The Air Force Component Competitive Sourcing Official

(CCSO) in AF/A1 took immediate corrective action upon initial review of the GAO protest. The CCSO decided not to implement the MEO. Further, the CCSO did not envision rescheduling the competition until the on-going AFNETOPS Transformation is complete and recommended the contracting officer consider cancellation of the solicitation”).

## II. THE AIR FORCE’S EVALUATION

41. Following the submission of bid proposals, the Air Force narrowed the field of bidders to one by conducting the A-76 Cost Comparison Study.

42. The Results of the OMB A-76 Cost Comparison Study were signed and approved by Major General William T. Lord on August 17, 2005. A1968-1971.

43. On 18 August 2005, the Kessler Little BOS Source Selection Authority selected RKR as the sole winning offeror to be used for cost comparison against the In-House Cost Estimate for the MEO. A0993. RKR was subsequently notified that the results of the Cost Comparison Study favored the MEO. A1016 ¶ 2.

44. A Notice to Offerors posted September 8, 2005 postponed further cost study between RKR and the MEO due to Hurricane Katrina. A0993.

45. Following that hiatus, a Notice to Offerors was posted on January 19, 2007 stating that further cost studies of the RKR and MEO bids had resumed. A0993.

46. The Air Force decided to award the contract to the MEO in the days thereafter and announced the selection of the MEO as the awardee. A0993. No actual award has ever occurred.

47. The proposals as opened and made public were for RKR of $59,691,967 and for the MEO of $ 54,719,167. A1970.

## III. THE ADMINISTRATIVE APPEAL

48. On March 29, 2007, RKR timely filed an administrative appeal of the Air Force decision to award the contract for the solicitation to the MEO. A2143.

49. RKR's administrative appeal was reviewed by Major General John W. Maluda in his capacity as the Keesler Administrative Appeal Authority. A2275.

50. At the time, Major General Maluda was also Vice Commander, 8th Air Force and was involved in the ongoing planning and implementation of AFNETOPS, including development of the AFNETOPS Program Action Directive, A2326, and the AETC Enterprise Transformation Functional Concept of Operations (CONOPS), A1355.

51. The CONOPS document "explains the AF Network Operations (AFNetOps) conceptual framework and details how the AFNetOps Commander will provide Service-level command and control (C2) over AF networks." A1358. The Contracting Officer states in his cancellation decision that "the [CONOPS] document is the document which outlines AETC [Network Control Center, or NCC] Reengineering efforts." A1347. This is the same NCC Reengineering that is mentioned (1) in the solicitation, ¶ 18, *supra* (citing A0168 ¶ 7.4.11), (2) in RKR's question to the contracting officer, A1154, (3) in the MEO Management Plan, A1164 & 1171, and (4) in Major General Maluda's administrative appeal decision, A2273. There is no difference in how the solicitation accommodates AFNETOPS as opposed to NCC Reengineering or the NOSC-centric initiative as a configuration change to occur to the network over the life of the contract.

52. RKR's administrative appeal was denied by letter from Major General Maluda dated May 23, 2007. A2272-2275.

53. The administrative appeal found that the MEO acknowledged future configuration changes to the network from a NOSC-centric or similar initiative, *see* A1164, 1166-67, 1171, but still met the date in time requirements of the solicitation. A2273.

54. The letter denying the appeal gave every indication that the contract for the solicitation would be awarded to the MEO and would be performed, stating "the Administrative Appeal Process Team . . . concurs with the decision to select the MEO (in-house) as the selected service provider." A2275.

IV. SUBSEQUENT APPEALS AND LITIGATION

55. Following denial of its administrative appeal, RKR filed a GAO bid protest on or about June 7, 2007. A1027.

56. On July 2, 2007, without responding to the merits of RKR's bid protest, the Air Force stated its intent to cancel the solicitation to the GAO, but did not state any reason. A0770.

57. Internal documents leading up to the government's announcement of intent to cancel the solicitation admitted that the MEO's proposal was not based on the same requirements and assumptions as private sector offers, instead assuming the configuration changes as part of the requirements. A1026; A1024 ("I recommend your contracting officer also cancel the solicitation because ambiguity substantially affected competition").

58. On or about July 2, 2007 RKR objected at the GAO to the Air Force's intent to cancel the solicitation for failure to state any reason. A0771.

59. On or about July 9, 2007, agency counsel responded. A0772.

60. In this response, the government again admitted "there is an ambiguity in the solicitation's language concerning the staffing of Network Operations (SC1B) work center, which comprises a significant amount of the work," that had not been clarified. *Id*. The government further again admitted that "the MEO appears to have been understated" and requires revision. *Id*.

61. In this response, the government stated five alleged reasons for cancellation of the solicitation: (1) ambiguity; (2) revisions made necessary by the passage of time to periods of performance, wage and tax rates, and property lists; (3) the expiration of the study period; (4) the need to utilize the old A-76 procedures if revisions were made instead of cancellation; and (5) additional information requirements Congress had imposed since the solicitation was issued. A0772-0774.

62. On or about July 16, 2007 RKR responded in opposition at the GAO and requested that its protest issues be deemed admitted. A0789.

63. On July 30, 2007, the GAO submitted an additional information request to the government. A0938.

64. The GAO questioned whether the solicitation contained an ambiguity such that an offeror might base its proposal on a NOSC-centric initiative rather than existing "date-in-time" requirements. A0939.

65. In the July 9, 2007 response, the government mentioned only that "there was, and is currently underway, an initiative that would centralize certain operations and will significantly change personnel requirements," and made no distinction between AFNETOPS and the NOSC-centric initiative (NCC Reengineering). A0772.

66. In its July 30, 2007 information request, the GAO did not expressly ask for further information on whether the solicitation was ambiguous as to whether AFNETOPS was a configuration change. A0938-0940.

67. But, just as with a NOSC-centric initiative, if an offeror based its proposal on AFNETOPS, it would be contrary to the government's instructions, A1154. It would likewise affect the staffing in the Network Operations work center within the meaning of the ambiguity the government admitted.

68. Rather than respond to the GAO's question, on August 2, 2007, agency counsel said it was moot because the government submitted a sixth and different alleged reason for cancellation. A0942 & n.1.

69. The sixth alleged reason was a declaration from Major General William T. Lord regarding the alleged significant effect of AFNETOPS on existing network communications and information technology requirements of the solicitation.

70. In its August 2, 2007 letter, the government added a "more bidders" argument, A0943 & n.4, and restated its study period expiration procedural bar argument. A0943-0944.

71. In its August 2, 2007 letter, the government admitted to GAO that several of the justifications in that letter and the July 9, 2007 letter would not apply if AFNETOPS was an anticipated configuration change to occur during the life of the contract instead of a brand new requirement. A0944 & n.6.

72. On August 13, 2007 RKR responded to the sixth alleged reason for cancellation, stating, in summary, that the solicitation encompassed the needs of the Air Force. A0949.

73. GAO dismissed the RKR protest because of the Air Force's intent to cancel the solicitation. A0993; *RKR Joint Venture, LLC*, B-299856 (Aug. 29, 2007).

74. On August 24, 2007, RKR initiated bid protest litigation at the Court of Federal Claims in *RKR Joint Venture LLC v. U.S.*, No. 07-630 (Judge Williams).

75. In the course of the litigation, RKR raised the issue the contracting officer had not actually cancelled the solicitation in accordance with Federal Acquisition Regulations. THE UNITED STATES filed a motion to dismiss in response. The parties agreed to await a determination by the contracting officer.

76. On January 7, 2008, the contracting officer issued his findings and determination for cancellation of the solicitation. A1016.

77. The parties agreed to and filed a stipulation of voluntary dismissal without prejudice to re-filing pursuant to Fed. R. Civ. P. 41(a)(1)(ii) on January 23, 2008. The Court dismissed the case without prejudice on January 24, 2008.

78. RKR re-filed its bid protest in this case on January 29, 2008.

V. FACTUAL CONTENTIONS

79. AFNETOPS does not affect any requirement of the solicitation because configuration changes to the network—including AFNETOPS, the NOSC-centric initiative, or NCC Reengineering (equivalents, the government admits, as far as this solicitation is concerned, *see* ¶ 51 *supra*)—were anticipated to occur at the direction of the government over the life of the contract.

**The Unlawful Corrective Action: Unlawful Cancellation**




80. AFNETOPS has no effect whatsoever on the multimedia services, publishing management, or general administrative requirements for this solicitation.

81. The requirements for a new solicitation using AFNETOPS cannot be definitized because the AFNETOPS planning process is ongoing. Final manning and funding are not determined and command and control ("C2") relationships are still evolving.

82. The government can identify no specific evolution or quantum leap in AFNETOPS affecting this solicitation that occurred between the administrative appeal

decision of May 29, 2007 and the announcement of intent to cancel before GAO in July 2007.

83. The government can identify no specific evolution or quantum leap in AFNETOPS affecting this solicitation that occurred between the administrative appeal decision of May 29, 2007 and contracting officer's decision on January 7, 2008.

84. RKR's interpretation of the solicitation is that configuration changes to the network will occur at the direction of the government over the life of the contract, and that the solicitation clauses supporting that interpretation include *all* such configuration changes.

85. The government's litigation interpretation of the solicitation is that any configuration change not specifically identified in a solicitation clause is excluded from being anticipated by the solicitation, even if the only relevant difference between a configuration change specifically identified and one not specifically identified is the nomenclature (i.e., AFNETOPS vs. NCC Reengineering or NOSC-centric initiative).

86. The government ratified RKR's interpretation of the solicitation at least three times: (1) when it did not amend the solicitation following the 3 July 2003 internal announcement of AFNETOPS, A1352; (2) when it found that there were "no significant changes to the workload" when resuming the cost comparison between RKR and the MEO, following a hiatus due to Hurricane Katrina, A2074; and (3) when Major General Maluda reviewed the administrative appeal, and found that the solicitation was not ambiguous and that the award of a contract should be made to the successful offeror. A2275.

87. The government's litigation interpretation of the solicitation is further undermined by its earlier admissions that the solicitation is ambiguous and that the MEO did not bid the requirements. A0772, A1024, A1026.

88. The government can identify no document supporting its litigation interpretation of the solicitation clauses at issue. The government can identify no document supporting a distinction between AFNETOPS, the NOSC-centric initiative, and NCC Reengineering with respect to their effect on reducing staffing levels for network operations requirements in this solicitation over time.

89. The workload in the solicitation was subject to reduction over time. This was the whole reason why the contract was cost plus shifting to fixed price after 2 years. Per A0036 (¶ H937-38), configuration changes the government now alleges support cancellation would have occurred right on schedule within the two year time period had the contract been awarded on schedule in October 2006. *See also* AFI 33-115 (May 2006 ed.); AFNETOPS CONOPS, A1355 (Oct. 2006); AFNETOPS PAD, A2326 (July 2007).

90. There was no lawful reason to cancel this solicitation.

91. There is no basis to resolicit it.

92. The RFP did not require RKR to submit a single lump sum price, but rather required RKR to provide separate line item prices. A0004-A0029.

93. A-76 contractors represent significant cost savings over the incumbent, which would be retained during a two year A-76 resolicitation.

**INJURY TO PLAINTIFF.**

94. RKR was injured when the award of a contract which it has a substantial chance of receiving did not occur because the solicitation was cancelled.

95. RKR was injured when the procurement process for the solicitation was not lawfully completed, remains so injured, and will continue to be injured until the procurement process is lawfully completed.

96. RKR has also suffered injury from the conduct of THE UNITED STATES during the subsequent administrative appeal, GAO appeal, and litigation, which unduly prolonged the process and which was pretextual in nature. THE UNITED STATES has caused a loss to the integrity of its public procurement system that impairs RKR's future participation in that system.

97. Given the cancellation of the solicitation, RKR was also injured and placed at a competitive disadvantage in any resolicitation when its proposal was unsealed prior to the cancellation.

98. In preparing its bid proposal, RKR incurred bid preparation and proposal costs and expenses, including without limitation, personnel and overtime costs and material expenses.

## FIRST CLAIM FOR RELIEF

(Declaratory judgment and monetary damages)

99. RKR hereby incorporates all preceding paragraphs.

100. THE UNITED STATES's cancellation of the solicitation unlawfully precluded a contract award to an eligible offeror and/or unlawfully prevented the completion of a lawful procurement process for the solicitation. Pursuant to 28 U.S.C. §§ 2201, 1491(b)(2), and 1491(b)(4), the Court is requested to adjudge, decree, and declare same.

101. Pursuant to 28 U.S.C. § 1491(b)(2), the Court is requested to order THE UNITED STATES to award RKR its bid preparation and proposal costs.

**SECOND CLAIM FOR RELIEF**

(Injunctive relief to set aside cancellation and compel lawful completion of the procurement process with restrictions)

102. RKR hereby incorporates all preceding paragraphs.

103. Pursuant to 28 U.S.C. §§ 2202 and 1491(b)(2) the Court is requested to set aside the unlawful cancellation of the solicitation.

104. Pursuant to 28 U.S.C. §§ 2202 and 1491(b)(2) the Court is requested to compel THE UNITED STATES to reopen, proceed with and complete the evaluation of only the two proposals that were the subject of the Keesler Little BOS cost comparison study—RKR's and the MEO's—utilizing the solicitation as it existed prior to its cancellation.

105. Pursuant to 28 U.S.C. §§ 2202 and 1491(b)(2) the Court is requested to permanently restrict THE UNITED STATES from awarding the contract to the MEO, because the MEO's proposal does not meet the requirements of the solicitation as it existed prior to its cancellation, as admitted by the government, A0772, 1024, & 1026, and/or as shown by RKR. In the alternative, the Court is requested to compel THE UNITED STATES to make such changes to the Keesler Little BOS cost comparison study as the Court finds necessary to make the MEO's proposal conform to the requirements of the solicitation as it existed prior to its cancellation.

**THIRD CLAIM FOR RELIEF**

(Attorneys Fees Pursuant to 28 U.S.C. § 2412)

106. RKR hereby incorporates all preceding paragraphs.

107. RKR has been forced to retain attorneys to vindicate its rights in the procurement process for the solicitation

108. RKR satisfies all party requirements under 28 U.S.C. § 2412.

109. The position of THE UNITED STATES is not substantially justified.

110. Pursuant to 28 U.S.C. § 2412, the Court is requested to award costs and reasonable attorneys' fees and expenses.

**PRAYER FOR RELIEF**

WHEREFORE, RKR JOINT VENTURE, LLC respectfully requests that this Court:

1. Declare that THE UNITED STATES's cancellation of the solicitation unlawfully precluded a contract award to an eligible offeror and/or unlawfully prevented the completion of a lawful procurement process for the solicitation;

2. Enter judgment against and order THE UNITED STATES to award RKR its bid preparation and proposal costs;

3. Set aside the unlawful cancellation of the solicitation;

4. Compel THE UNITED STATES to reopen, proceed with and complete the evaluation of the two proposals (and only the two proposals) that were the subject of the Keesler Little BOS cost comparison study—RKR's and the MEO's—utilizing the solicitation as it existed prior to its cancellation;

5. Permanently restrict THE UNITED STATES from awarding the contract to the MEO, or in the alternative, compel THE UNITED STATES to make such changes to the Keesler Little BOS cost comparison study as the Court finds necessary to make the MEO's proposal conform to the requirements of the solicitation as it existed prior to its cancellation;

6. Award Plaintiff its costs of this action and attorneys' fees and expenses; and

7. Grant such other relief as the Court deems just and proper.

DATED May 16, 2008

Respectfully submitted,

/s/ David F. Barton /s/

David F. Barton, Attorney-in-Charge
Tex. State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 100
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com