**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC | § | |
| A Mississippi Limited Liability | § | |
| Corporation | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 08-CV-00062-MCW |
| | § | Judge Williams |
| THE UNITED STATES | § | |
| Defendant. | § | |

**RKR'S MOTION FOR PARTIAL JUDGMENT**

TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ v

I. INTRODUCTION ........ 1

A. ISSUES AND QUESTIONS PRESENTED ........ 1

B. STATEMENT OF THE CASE ........ 2

ARGUMENT ........ 4

II. STANDARD OF REVIEW ........ 4

III. CANCELLATION WAS UNLAWFUL ........ 5

A. *Summary of the Argument: Why the Cancellation Was Unlawful* ........ 5

B. *The CO's Primary Alleged Ground For Cancellation is Unlawful Because the Solicitation is Clear In RKR's Favor* ........ 7

1. Principles of interpretation ........ 7

2. The plain language of the solicitation trumps the primary alleged ground for cancellation ........ 8

a. The solicitation clearly and unambiguously anticipated configuration changes to the network ........ 9

b. Configuration changes to the network included AFNETOPS ........ 9

c. The solicitation clearly and unambiguously anticipated that the configuration changes to the network would occur over the life of the contract ........ 12

3. Any unclarified alleged ambiguity in the solicitation must be construed against the government. ........ 15

C. *In the Alternative, the Primary Alleged Ground For Cancellation is Unlawful Because the Government's Inconsistent Clarifications of the Solicitation are Irreconcilable* ........ 16

1. Part of the government's first clarification agreed with the plain language of the solicitation ....................17

2. The government's second clarification, irreconcilable with the first, assumes AFNETOPS is not an anticipated configuration change ....................18

3. The inability to issue a solicitation with AFNETOPS as a requirement further undermines the government's litigation position ....................19

D. *The CO's Other Grounds Should Be Summarily Rejected As Unlawful* ....................21

E. *Detailed Examination of the CO's Determination and Findings (D&F) Shows That Each Lacks a Rational Basis* ....................21

F. *The CO Failed to Properly Apply FAR 15.206(e) Requirements for Cancellation* ....................34

1. Cancellation was not mandatory ....................34

2. Certain revisions may also be made without amendment ....................36

IV. THE REQUESTED RELIEF IS PROPER ....................37

A. *Permanent Injunctive Relief is Proper* ....................37

1. Irreparable injury ....................37

2. Balancing of harms ....................38

3. The public interest is served ....................39

B. *Permanent Injunctive Relief is Proper* ....................39

V. CONCLUSION ....................39

CERTIFICATE OF SERVICE ....................40

APPENDIX… ....................Post

1. Appeal Authority Response to RKR Joint Venture LLC Appeal .................... Tab 1

2. GAO Decision in B-299856 .................... Tab 2

3. First Declaration of Dale Patenaude .................... Tab 3

4. Second Declaration of Dale Patenaude .................... Tab 4

5. No. 7 Nash & Cibinic Reports ¶ 36 .......... Tab 5

6. Extracts from Nash & Cibinic, Formation of Government Contracts .......... Tab 6

7. Extracts from Nash, Schooner, O'Brien, The Government Contracts Reference Book .......... Tab 7

8. Extracts from Cibinic, Nash & O'Brien, Competitive Negotiation– The Source Selection Process (2d. ed. 1999) .......... Tab 8

9. Briefing Papers (Jan. 2008)–2007 Procurement Review at 78-79 .......... Tab 9

TABLE OF AUTHORITIES

Case Law:

*ACR Elecs. Inc*., B-232130.2 (Dec. 9, 1988), 88-2 CPD ¶ 577 ....................................................5

*Atkins Enters, Inc.*, Comp. Gen. Dec. B-241047, 91-1 CPD ¶ 42 .........................................24, 35

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345 (Fed.Cir. 2004) ..............................7

*Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988)........................................................7

*California Marine Cleaning, Inc. v. U.S*., 42 Fed.Cl. 281 (1998) ..............................................37

*CCL, Inc.*, Comp. Gen. Dec. B-251527, 93-1 CPD ¶ 354 ..........................................................28

*Cygnus Corp. v. U.S*., 72 Fed. Cl. 380 (2006) ..............................................................................4

*Defense Group, Inc.*, Comp. Gen. Dec. B-253795, 94-1 CPD ¶ 196 ....................................24, 35

*FMC Corp. v. United States*, 3 F.3d 424 (Fed.Cir.1993)...........................................................37

*Galen Medical Associates v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) ...............................5

*Great Lakes Dock & Dredge Co. v. U.S*., 60 Fed. Cl. 350 (2004)..................................... 5, 37-39

*Heritage of America, LLC v. U.S.*, 77 Fed. Cl. 66 (2007) ..........................................................5

*HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327 (Fed.Cir.2004). .....................................................15

*Jowett, Inc. v. United States*, 234 F.3d 1365 (Fed.Cir.2000)........................................................8

*Loral Fairchild Corp*., Comp. Gen. Dec. B-242957.2, 91-2 CPD ¶ 218 ..................................35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29 (1983).............4, 19

*Overstreet Electric Co. v. U.S*., 47 Fed. Cl. 728 (2000) ...................................................5, 37, 39

*Precision Images, LLC v. U.S*., 79 Fed. Cl. 598 (2007) ......................................................29, 30

*SMS Data Prods. Group. v. Austin*, 940 F.2d 1514 (Fed. Cir. 1991) ..........................................35

Statutes and Other Authorities:

5 U.S.C. § 706(2)(A)....................................................................................................4
28 U.S.C § 1491(b) ..................................................................................................4, 39
10 U.S.C. § 2461.........................................................................................................28

29 C.F.R. 4.5(a)(2).......................................................................................................27

FAR provisions (48 C.F.R. ___)

FAR 14.401-1(a)(1) .......................................................................................................4
FAR 15.206(e) ........................................................................................... 29, 34-37
FAR 52.215-1(f)(1).......................................................................................................4
FAR 22-404-5(2)(i).......................................................................................................27

RCFC 52.1 ...................................................................................................................1
RCFC 56 .....................................................................................................................1
Fed. R. Civ. P. 41(a)(1)(ii)...........................................................................................3

Feldman, 1 Government Contract Awards: Negotiation and Sealed Bidding § 7:18......................4
Nash & Cibinic, Formation of Government Contracts 636 (3d ed.1998).......................................5
No. 7 Nash & Cibinic Rep. ¶ 36 ......................................................................................5
Cibinic & Nash, Formation of Government Contracts 1471 ........................................................27
Nash, Schooner, O'Brien, The Government Contracts Reference Book (1998) ..........................35
Cibinic, Nash & O'Brien, Competitive Negotiation– The Source Selection Process (2d. ed. 1999) ...................................................................................................35, 36

ACRONYMS

8AF – Eighth Air Force
AETC – Air Education and Training Command
AFB – Air Force Base
AFNETOPS – Air Force Network Operations
BOS – Base Operating Support
C2 – Command and Control
CCR – Central Contractor Registration
CLIN – Contract Line Item Number
CO – Contracting Officer
CONOPS – Concept of Operations
D&F – Decisions and Findings
FTE – Full Time Equivalent
GAO – Government Accountability Office
IT – Information Technology
MAJCOM – Major Command
MEO – Most Efficient Organization

NCC – Network Control Center
NOSC – Network Operations and Security Center
OMB – Office of Management and Budget
PRD - Performance Requirements Document
RKR – RKR Joint Venture, LLC
RFP – Request for Proposals
SAF – Secretary of the Air Force
SOF – Statement of Facts

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability<br>Corporation<br>Plaintiff, | §<br>§<br>§<br>§<br>§ | |
| VS. | §<br>§ | NO. 08-CV-00062-MCW<br>Judge Williams |
| THE UNITED STATES<br>Defendant. | §<br>§ | |

**RKR'S MOTION FOR PARTIAL JUDGMENT**

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

Pursuant to RCFC 52.1(b) and 56,[1] Plaintiff RKR JOINT VENTURE, LLC ("RKR") files its Motion for Partial Judgment on the Administrative Record, accompanied by its Statement of Facts ("SOF") filed concurrently, and states as follows:

I. INTRODUCTION

*A. Issues and Questions Presented*

RKR moves for final judgment on all issues and theories of recovery regarding its first claim for relief in its Amended Complaint, Dkt #31 at ¶ 99-101. RKR moves for partial judgment on its second claim for relief and requests that the court set aside the unlawful cancellation of the solicitation. Amended Complaint, Dkt #31 at ¶ 102-103. The questions presented are:

1. Is the Contracting Officer's decision to cancel the solicitation arbitrary, capricious, or otherwise not in accordance with law?

2. Should the Court grant the relief requested by RKR?

[1] RCFC 56 is invoked in the event the Court denies RKR's motion for leave to supplement the administrative record with the first and second declarations of Dale Patenaude, being filed concurrently, but still wishes to consider the declarations for all or a portion of the relief sought. *See* 2006 Comment to Rule 52.1 at ¶ 2. The declarations are also attached in the appendix to this motion. If the Court declines to consider the declarations at all, RKR moves under RCFC 52.1.

*B. Statement of the Case*

The contested solicitation, issued by the Air Force, was a negotiated procurement, and included communications and information technology, multimedia, and publishing management service requirements. RKR Statement of Facts (filed concurrently) ("SOF") ¶1-3. The solicitation was issued pursuant to Office of Management and Budget (OMB) Circular No. A–76, ''Performance of Commercial Activities,'' which "establishes Federal policy for the performance of recurring commercial activities" and provides "procedures for determining whether recurring commercial activities should be operated under contract with commercial sources, in-house using Government facilities and personnel, or through interservice support agreements." OMB Circular No. A-76—Revised Supplemental Handbook (March 1996). The solicitation was issued in August 2002, and the A-76 process was proceeding on schedule through August 2005, when the government selected RKR, a joint venture based in D'Iberville, MS, to compete against the Air Force's own civilian contractor, known as the "Most Efficient Organization," or MEO. SOF ¶ 69-72.

The government tentatively selected the MEO as the awardee in August 2005. Due to the effects of Hurricane Katrina on the performance location, Kessler Air Force Base, MS, that award was delayed and reaffirmed in early 2007.[2] SOF ¶ 73-75.The government selected the MEO as the awardee, but has never awarded the contract.[3] *Id*. ¶ 75.

---

2 The parties agree that Hurricane Katrina had no effect on this solicitation other than this delay. A0944.

3 The government has since disclaimed any intent to award to the MEO. *See* No. 07-630 Dkt #19 at 5n.4.

RKR timely filed an administrative appeal, which was rejected, and a timely bid protest at the Government Accountability Office, B-299856.[4] The grounds for appeal included that the MEO's proposal did not conform to solicitation staffing requirements.

As further set forth in RKR's Statement of Facts, SOF ¶ 77-104, the government stated its intent to cancel the solicitation for the first time during the GAO protest, and after stating its reasons and over RKR's objections, the bid protest was dismissed by GAO. RKR then filed a bid protest in this Court, No. 07-630C. Seeking to supplement the administrative record, RKR noted that the solicitation had not in fact been cancelled yet through a decision and findings by the appropriate person, in this case, the contracting officer ("CO"). The government moved to dismiss RKR's claims as unripe. The parties agreed to stay the case until the CO issued his decision and findings, which he did on January 7, 2008. The parties agreed to and filed a stipulation of voluntary dismissal without prejudice to re-filing pursuant to Fed. R. Civ. P. 41(a)(1)(ii) on January 23, 2008. The Court dismissed No. 07-630C without prejudice on January 24, 2008, and did not enter any judgment on the merits.

RKR re-filed its bid protest as this case on January 29, 2008. Following argument on March 19, 2008, the Court granted, in part, RKR's motion for leave to supplement the administrative record, Dkt #11, permitting RKR to supplement the record with documents relied upon by the government in the administrative appeal and with respect to the statement of intention to cancel made before GAO. The Court also permitted RKR and the government to

---

4 Included in the Appendix to this brief as **Exhibits 1 and 2**, respectively.

depose the CO, Mr. Ron Mortag, and the head of the administrative appeal authority, Major General John W. Maluda.[5] RKR has also moved to supplement the record with two declarations.[6]

Based on the foregoing supplementation, RKR presents this motion to the Court.

II. STANDARD OF REVIEW

A protesting party is entitled to judgment as a matter of law if an agency's actions, findings, or conclusions in connection with a procurement are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(1) & (4); 5 U.S.C. § 706(2)(A). Under this rational basis standard, the challenged actions, findings, and conclusions are evaluated against the full administrative record. *Cygnus Corp. v. U.S.*, 72 Fed. Cl. 380, 384 (2006). ("No matter how reasonable we find the agency's justification . . . if the reasons are not supported in the administrative record, then we have no choice but to rule in favor of the Plaintiff").

The familiar rational basis factors articulated by the U.S. Supreme Court in *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), control the Court's analysis here, and are unaffected by the FAR. Unlike for sealed bids, there is no applicable FAR provision setting forth a concrete cancellation standard for a negotiated procurement. *Compare* FAR 14.401-1(a)(1) (requiring "compelling reason" to cancel solicitation for sealed bids) *with* FAR 52.215-1(f)(1) (general clause "The government may reject any or all proposals if such action is in the government's interest"); Feldman, 1 Government Contract Awards: Negotiation and Sealed Bidding § 7:18 ("the regulations provide little overall guidance on the standards and procedures for RFP cancellation"). Nevertheless, the case law principle that

---

5 The statement of intent to cancel made by agency counsel to GAO contains several grounds substantially similar, if not identical, to those relied upon by the contracting officer. *Compare* A0772-0774 and A0942-0944 *with* A1016-1021.

6 Additional copies are attached in the Appendix as **Exhibits 3 and 4**.

disfavors cancellation of solicitations for sealed bids[7] applies with equal force to this negotiated procurement case. In procurements using sealed bids, competitive positions are exposed as a result of the public opening of bids, while in negotiated procurements there is usually no public opening. *ACR Elecs. Inc*., B-232130.2; B-232130.3, Dec. 9, 1988, 88-2 CPD ¶ 577, cited in No. 7 Nash & Cibinic Rep. ¶ 36 at 2 (see extract at Appendix **Exhibit 5**). The case at hand was not the typical negotiated procurement, because there was a public disclosure of proposal prices, required by the A-76 study process. SOF ¶ 72. RKR's and the MEO's competitive positions were exposed during the public review period. As a result of the public disclosure, RKR is disadvantaged during any resolicitation just as if this had been a sealed-bid procurement.[8] Thus, the cancellation here "should not be permitted except for cogent reasons." *Great Lakes Dock & Dredge Co. v. U.S*., 60 Fed. Cl. 350, 360 (2004).

---

[7] *See e.g*., *Great Lakes Dock & Dredge Co. v. U.S*., 60 Fed. Cl. 350, 360 (2004); *See also* John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts 636 (3d ed.1998) (extract at Appendix **Exhibit 6**); *Overstreet Electric Co. v. U.S*., 47 Fed. Cl. 728, 732 (2000).

[8] Although RKR easily satisfies the prejudice standard, as the sole offeror selected to compete with the MEO, SOF ¶ 71, the Court need not evaluate it in an award context until the threshold wrongful agency action is adjudicated and the cancelled solicitation is restored. In the award context, application of the "prejudice" standard is premature for this motion. To the extent a protesting party must show prejudice in a cancellation case, it is in the sense that what is held to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law must be fairly traceable to an injury for which relief may be afforded under 28 U.S.C. § 1491(b)(2). *See Galen Medical Associates, Inc. v. U.S*., 369 F.3d 1324, 1330 (Fed. Cir. 2004) (noting not every regulatory provision is actionable by bid protestor). These injuries may differ depending on context and relief sought. *See e.g*., *Heritage of America, LLC v. U.S.,* 77 Fed. Cl. 66, 77 (2007) (noting that "tailored relief has been approved by this court where the plaintiff in a bid protest case has been found to have been prejudiced by wrongful agency action, but where it is not clear that, absent the wrongful conduct, the plaintiff would have received the contract," and citing cases).

## III. CANCELLATION WAS UNLAWFUL

*A. Summary of the Argument: Why the Cancellation Was Unlawful*

The CO's primary ground for cancellation is that an initiative called AFNETOPS suddenly ripened, causing configuration changes to the communications and IT network at Keesler AFB that were not included in the solicitation and that make the solicitation out-of-date.[9] A1016-1017, ¶ 3-4. As shown in Part III.B, the plain language of the solicitation shows that such configuration changes were anticipated as a requirement (A147 ¶ 7.1.4.3) and a long-range goal and requirement on a ten-year contract (A165 ¶ 7.4.5). In the alternative, as shown in Part III.C, the government has taken inconsistent and irreconcilable positions on whether the solicitation anticipated configuration changes to the network that would include AFNETOPS. In either case, allegations of a significant change in the solicitation's requirements due to the ripening of AFNETOPS lack a rational basis, rendering cancellation on that ground unlawful.

The CO's other alleged grounds for cancellation are unsupported by the record, presume an interpretation of the solicitation that is contrary to its plain language, and/or can be accommodated by the solicitation's cost-plus acquisition strategy, as summarized in Part III.D and discussed with significant examination in Part III.E. Therefore, the cancellation should be set aside as unlawful. Further, as discussed in Part III.F, the CO erroneously applied a standard that

---

[9] The CO erroneously claims AFNETOPS will "*likely* affect a significant portion of the workload" required by the Little BOS contract. (emphasis added) A1016-1017, ¶ 3&4. The CO claims AFNETOPS will "completely overhaul and change the delivery of network services from a base, post, camp, station/major command (MAJCOM) centric concept of operations to a centralized or enterprise-centric concept of operations (AFNETOPS CONOPS)." A1018, ¶ 6. According to the CO, the AFNETOPS Transformation, when considered in conjunction with the AETC Communication Enterprise Transformation Program (previously known as the AETC Reengineering Initiative), which he describes in paragraph 7, is responsible for either a 57% or 63% reduction in workload over that shown in the Performance Requirements Document (PRD). A1017-18, ¶¶ 3, 5a, 8. The CO also speculates, without record support, that "other upcoming changes in the information technology program" "could affect as much as 82% of the Keesler Little BOS PRD by the time I could make award." A1017, ¶ 5a; A1346.

led him to conclude that amendment or cancellation was required, when in fact no amendment or cancellation is needed to accommodate AFNETOPS configuration changes or any of the CO's other alleged grounds. RKR's position is supported by the repeated statements of Major General John W. Maluda, the Air Force expert for AFNETOPS and NOSC-centric operations, as those terms apply to this case, in his May 2, 2008 deposition that a contract could have been and still could be performed pursuant to the solicitation here and that, directly and by implication, there was no reason for cancellation. SOF ¶ 106-109.

*B. The CO's Primary Alleged Ground For Cancellation is Unlawful Because the Solicitation is Clear In RKR's Favor*

1. Principles of interpretation.

The reasonableness, and thus, lawfulness of the cancellation here primarily turns on how the solicitation's requirements are read, were read, and should have been read by the government. A few principles guide the Court's reading.

Notably, because cancellation is disfavored as a corrective action, *see* discussion, *supra*, Part II, the Court should not strain to read the solicitation in a manner that would justify a decision to cancel.[10]

With that skepticism in mind, the applicability of contract interpretation cases is well established.[11] Thus,

> We begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an

---

[10] The CO's discretion or deference thereto is irrelevant here because the lawfulness of this cancellation does not turn on negotiations or mere judgment calls during the procurement process by the CO. The issue is the meaning of the solicitation itself, and the government's litigation position is entitled to no deference. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-213 (1988).

[11] *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 n. 4 (Fed.Cir. 2004) ("The principles governing interpretation of government contracts apply with equal force to the interpretation of solicitations issued by the government for such contracts").

> alternative meaning. In addition, we must interpret the [solicitation] in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted).

2. The plain language of the solicitation trumps the primary alleged ground for cancellation.

What the government has done is a shell game with the configuration changes to the network, as diagrammed below in Figure 1.

FIGURE 1: Manipulation of Network Configuration Changes




The cancelled solicitation included (1) existing requirements as of the date specified by the government ("date in time"), upon which the offerors were to propose a price, and (2) projected configuration changes to the network, which were to occur over the life of the contract, but upon which proposal prices were not to be based. SOF ¶ 21. RKR will show that (a) the solicitation clearly and unambiguously anticipated configuration changes to the network; (b) these changes included AFNETOPS; and (c) the solicitation clearly and unambiguously anticipated that these changes would occur over the life of the contract.

a. The solicitation clearly and unambiguously anticipated configuration changes to the network.

"The network" is the voice and data network and related administrative and support functions for Keesler AFB, MS, as defined at A144 ¶ 7.1. SOF ¶ 22.

The solicitation's "requirements" concerning configuration changes to the network are set forth at A0147 ¶7.1.4.3, which mandates that the service provider "shall implement configuration and security changes to comply with Air Force and MAJCOM directives as necessary." SOF ¶ 27. Paragraph 7.1.4.3 *required* offerors to be able to respond to and implement such directives.

Paragraph 7.4.5, entitled "Network Management Responsibilities," further reads in part:

> The AFNOSC will direct configuration changes to the network to either enhance security or improve communications across the entire Air Force. Similarly, the AETC NOSC will direct configuration changes to the network to either enhance security or improve communications across the entire command.

A0165; SOF ¶ 63.

Paragraph 7.4.5 thus also placed offerors on notice that future configuration changes to the network would be directed by the government.

Paragraphs 7.1.1, 7.1.1.1.1, and 7.1.1.1.4 of Amendment 11 further directed offerors to be able to accommodate ongoing mission change and planning processes that affected the configuration of the network, including the management of that configuration. SOF ¶ 65-68.

The offerors knew, when formulating their proposals, that the staffing requirements would be reduced over time as a result of configuration changes to the network. *Id*. ¶ 28. The offerors also knew that the government had the right to reduce the staffing requirements for any given task to zero, if that was the result of the configuration changes to the network. *Id*. ¶ 20, 29.

b. Configuration changes to the network included AFNETOPS.

The directors of the configuration changes identified in the solicitation were to be AFNOSC and AETC NOSC. *Id*. ¶¶ 23 & 63. AETC is a major command, or MAJCOM. *Id*. ¶ 23.

The directors of the configuration changes were, at the time of solicitation issuance and proposal submission, overseeing an ongoing "NOSC-centric" planning process to consolidate and reconfigure the network under their control, including administrative and support functions. SOF ¶¶ 24, 38.

This NOSC-centric initiative evolved into AFNETOPS, as anticipated in the solicitation as argued herein. The government admits the configuration changes to the network referenced in the solicitation were to involve the NOSC-centric initiative. *Id*. ¶ 25. The government also admits that the solicitation contained "some sort of clause to identify the fact that this [major] command [MAJCOM] was moving toward something but none of the specifics were identified yet." Depo. of Ron Mortag at 11:15-19; SOF ¶ 26. That "something" was the NOSC-centric initiative that became AFNETOPS.

After the solicitation was issued, but before proposals were submitted, the government made an internal announcement on July 3, 2003, not announced to the offerors. SOF ¶ 32. The government announced that it would, "in synchronization with our ongoing information operations initiatives," reorganize the various Air Force networks "under the control of a single Air Force commander," consistent with the Air Force's current command and control policy (or "C2 process"). *Id*. ¶ 33. The announcement expressly noted that the reorganization, to be known as AFNETOPS, would "include the 8AF [Eighth Air Force] initiative for a centralized AF NET Operations Security Center (AFNOSC)." *Id*. ¶ 34. *See also* SOF ¶ 63 (Paragraph 7.4.5 of solicitation referencing AFNOSC as one of the directors of configuration changes).

AFNOSC, now referred to as AFNETOPS, has been in the planning stages for many years, even as early as 1996. SOF ¶¶ 30, 45. Before AFNETOPS, the centralization concept was embodied under 17 MAJCOM NOSCs [major command network operations and security

centers]. *Id*. ¶ 46. AFNETOPS is merely "the continuing evolution from MAJCOM centric to AF centric network operations." *Id*. ¶ 47. AFNETOPS first consolidated those 17 down to ten, and then further plans to consolidate the ten NOSCs down to two "I-NOSCs" [integrated NOSCs]. *Id*. ¶¶ 41-43 & 46; *See also* charts, depicting the MAJCOM NOSCs at A1430, A0169, and the AFNOSC and I-NOSCs at A1599. This switch in organizational structure is to occur at an organization located away from Keesler AFB—at the AETC NOSC, at Randolph AFB, Texas—and away from where the Little BOS will be performed. SOF ¶ 41.

More specifically, the difference between the NOSC-centric and AFNETOPS transformations does not occur on Keesler AFB through this solicitation, but where the electrons leaving Keesler AFB through the IT system end up (i.e., either at Randolph AFB in Texas, for AETC NOSC-centric, or at the single designated centralized command center, for AFNETOPS and the I-NOSCs). A0927; SOF ¶ 42-43. But, the ultimate destination of the electrons has no impact on local Keesler AFB workload or operations, or on this solicitation.

Indeed, the workload reductions at Keesler AFB (caused by the NOSC-centric or AFNetOps initiative) are the same whether the electrons travel to Randolph AFB or to Washington, D.C. There is no difference between AFNETOPS and the NOSC-centric initiative of this solicitation at the local base level, such as Keesler AFB.[12] The government's internal announcement of AFNETOPS did not indicate that the NOSC-centric initiative would be folded

---

12 The government's rendition of alleged change due to AFNETOPS erroneously compares AFNETOPS against the requirements of the solicitation that were to be bid, instead of against the NOSC-centric initiative. The government's comparison is irrelevant. The government admits the solicitation anticipated the NOSC-centric initiative. SOF ¶ 25. It is not difficult to imagine a possible *effect*, if one pretends that the *cause* of those effects (allegedly, AFNETOPS) is separate from what the solicitation anticipated: a configuration change that will occur over the life of the contract. Regardless of whether the government's alleged change is 63% or 57%, or 10%, it is irrelevant. Nevertheless, RKR will present evidence, *infra*, Part III.E and Appx. Exh. 3, First Decl. of Dale Patenaude at ¶ 8-29, further undermining the government's allegations of change.

into the AFNETOPS organizational structure in any other way. *Id*. ¶ 35. No changes were made to the solicitation, nor were any necessary, as a result of AFNETOPS. *Id*. ¶ 36. Prior to the announcement of intent to cancel, agency counsel made no distinction between AFNETOPS and the NOSC-centric initiative before the GAO. *Id*. ¶ 37. GAO itself found that there was "no dispute that both terms refer, generally, to the same centralization concept." *Id*. ¶ 39.

c. The solicitation clearly and unambiguously anticipated that the configuration changes to the network would occur over the life of the contract.

There could be no difference between the effect of the NOSC-centric initiative compared to AFNETOPS, because the government's acquisition strategy, expressed through the solicitation, requires all such configuration changes to the network by phasing them in and altering the requirements over the life of the cost-plus contract.

The Air Force used an acquisition strategy based upon a "snapshot in time" or "date in time," meaning the Air Force had decided to freeze, or stop updating, the solicitation with amendments, and evaluate proposals and prices based upon a specified date-in-time; later, after award, workload and price changes would be accomplished through the operation of the cost-plus contract. SOF ¶ 8-12. The CO admitted that the solicitation was written as a cost-plus contract with an initial two-year period to determine what the NOSC-centric workload and its costs were going to be, and that then a fixed-price contract would be negotiated based upon the new workload and personnel cost data. SOF ¶ 13. Thus, any workload reductions due to configuration changes to the network could take place through operation of the cost-plus contract during the first two years of performance.

Further, the solicitation's Award Fee Plan recognized that the cost of performance would stabilize once the new NOSC-centric workload was determined, and that additional adjustments could be made to accommodate changes to the scope of work. SOF ¶ 16-19. In fact, FAR

provisions authorizing such adjustments to the scope of work were expressly incorporated. SOF ¶ 20.

Given the government's specific instruction to offerors to propose prices only on existing requirements as of the date specified by the government, and not on configuration changes to the network projected to occur over the life of the contract, A1154, there can be no doubt that the solicitation language regarding configuration changes identified in Part III.B.2.a, *supra*, applies to *all* configuration changes that would occur over the life of the contract. The requirement for offerors to respond to Air Force directives regarding configuration changes in Paragraph 7.1, and more specifically Paragraph 7.1.4.3, at the "core" of the transformation effort, SOF ¶¶ 27, 57, certainly draws no distinction; nor do any of the other provisions that refer explicitly to configuration changes to the network discussed in Part III.B.2.a. In fact, the original solicitation, prior to amendment, indicated, as a requirement for the offerors to base their pricing on, a specific degree of manning reductions that would result from the NOSC-centric initiative. SOF ¶ 58. This requirement was *removed* in an amendment, leaving only Paragraph 7.1.4.3, which *required* the offeror to implement *any and all* configuration changes when requested over the life of the contract. SOF ¶ 59.

Finally, in furtherance of the solicitation's acquisition strategy, the solicitation contains numerous other provisions requiring the service provider to adapt to evolving requirements. *Id.* ¶ 51-55, 65-68. Maj. Gen. Maluda also testified that AFNETOPS' requirements continue to evolve, *id*. ¶¶ 31, 106, yet the CO's decision draws no distinction between why the solicitation would contain an acquisition strategy with evolutionary provisions to accommodate the NOSC-centric initiative but not AFNETOPS.

However, after RKR filed its GAO protest, the government arbitrarily decided to abandon

this acquisition strategy in mid-competition, suggesting that only a resolicitation that included AFNETOPS as a requirement for offerors to base their proposals on was adequate. A1019 ¶8, A1021. In order to accomplish this, the government had to, and did, allege that a "significant change" had occurred, when, in fact, nothing had changed.

The government did not inform offerors at the time of proposal submission that AFNETOPS would in any way alter the fact that configuration changes to the network would occur over the life of the contract; indeed, there was no reason to, because as noted previously, such configuration changes were not to be included in proposals as they were not existing "date in time" requirements. SOF ¶ 8-12. The Air Force's contemporaneous and subsequent actions bear this out: the Air Force did not cancel the solicitation until more than four years after the announcement of AFNETOPS. *Id*. ¶¶ 32, 84.

Major General John W. Maluda[13] testified that existing operations at Keesler had not changed for several years. He described that Keesler AFB's network control center (or "NCC" including the help desk) interfaces with the NOSC. Depo. of Maj. Gen. John W. Maluda at 146. He stated "the final locations the total manning and funding of the consolidated help desk has not yet been determined," and "whoever is running the network control center at Keesler is still doing whatever they did back in May of 2007 – and as they did in May of 2006 and 2005." Depo. of Maj. Gen. John W. Maluda at 132-133; SOF ¶¶ 31, 106.

Maj. Gen. Maluda stated that both RKR and the MEO could have kept up with the configuration changes over the life of the contract, specifically including those changes due to AFNETOPS. SOF ¶ 108. He was unable to identify any "quantum leap" or significant change in

---

13 Major General Maluda states his unchallenged qualifications as "an expert" and "senior leader" in AFNETOPS, Depo. of Maj. Gen. John W. Maluda at 93:14-15, 141:17, and regards himself as a knowledgeable person in AFNETOPS who has "been involved as much or more than anybody else." *Id*. at 90-91.

the evolution of AFNETOPS between his administrative appeal decision and the cancellation. *Id*. ¶ 109. It follows that there was no such change in AFNETOPS and therefore no effect on a solicitation that treated AFNETOPS the same as any other network configuration change anticipated over the life of the contract. The CO's decision and the agency's allegation of significant change on this ground lack a rational basis, are not coherent and reasonable and cannot support cancellation.

3. Any unclarified alleged ambiguity in the solicitation must be construed against the government.

Following the administrative appeal, the government alleged that the solicitation was ambiguous and had not been clarified. *Compare* SOF ¶88 *with* ¶107. When choosing between competing interpretations of an alleged ambiguous contract provision, the general rule is *contra proferentem*, which requires ambiguities in a document to be resolved against the drafter. *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed.Cir.2004).

The patent ambiguity doctrine, however, is an exception to the general rule that requires construing ambiguities against the contractor where the ambiguities are "so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Id.*

A patent ambiguity does not exist here. As previously noted, the government's internal announcement of AFNETOPS was not communicated to the offerors. SOF ¶ 32. A reasonable offeror would read the solicitation as (a) anticipating all existing configuration change and consolidation programs, including the existing NOSC-centric initiative[14] and (b) directing offerors not to base their proposals on such programs, but on existing "date in time"

---

[14] GAO acknowledged that configuration changes due to the "NOSC-centric initiative" had been underway since before the time of proposal submission. SOF ¶ 38. The GAO found that as between the "NOSC-centric initiative" and the "AFNETOPS" structure it was folded into, there was "no dispute that both terms refer, generally, to the same centralization concept." *Id*. ¶ 39.

requirements. A reasonable offeror knew that all requirements that would enable them to base their proposal on the NOSC-centric initiative had been stripped out of the solicitation by amendment, SOF ¶ 58-59, and that only a requirement to implement the initiative's configuration changes over the life of the contract remained in Paragraph 7.1.4.3. *Id*.

Even assuming that an alleged ambiguity were patent, RKR fulfilled its duty to discover and inquire about it by submitting a question on whether the NOSC-centric initiative was to be included in proposals, or whether only existing requirements were to be proposed. A1154. The government's answer was to include only existing requirements and that all other changes with respect to the NOSC-centric initiative would occur during the life of the contract. A1154.[15]

Because there is no patent ambiguity, or, in the alternative, because RKR fulfilled its duty to determine if there was a patent ambiguity with respect to configuration changes to the network, any ambiguity in the solicitation as to whether "configuration changes" includes AFNETOPS must be construed against the government under *contra proferentem*. Therefore, just as with plain language, the CO's reliance on a contrary interpretation lacks a rational basis.

*C. In the Alternative, the Primary Alleged Ground For Cancellation is Unlawful Because the Government's Inconsistent Clarifications of the Solicitation are Irreconcilable*

Through the disposition of the administrative appeal, the government asserted:

a. There was no reason to cancel the solicitation; A2275
b. The NOSC-centric configuration change (then called "AETC Re-engineering Initiative") was anticipated over the life of the contract within the plain language of the solicitation; SOF ¶ 107.
c. The MEO's proposal met the requirements of the solicitation. A2272.

After RKR filed a GAO protest, the government's position became:

a. The solicitation must be cancelled because it is ambiguous; A0772; SOF ¶ 88.

---

[15] It was clear to RKR that the solicitation included anticipated NOSC-centric operations in the future that were not to be bid. The question was merely to get independent, written confirmation of the obvious. Appx. Exh. 3, First Decl. of Dale Patenaude at ¶ 11-12.

b. The government refused to admit whether AFNETOPS may or may not be a configuration change anticipated to occur over the life of the contract within the meaning of the solicitation, but the government intends for it to serve as the requirements for a new solicitation; A0942-0943.
c. The MEO's proposal did not meet the requirements of the solicitation due to understaffing. A0772; SOF ¶ 85, 88.

In this Court, the government's position has become:

a. A rational basis supports cancellation of the solicitation;
b. AFNETOPS is clearly not a configuration change anticipated to occur over the life of the contract within the plain meaning of the solicitation, and thus it can serve as the requirements for a new solicitation; Dkt #15-1 at 2 and 4-5.
c. There is no intention to award to the MEO or RKR. *See* No. 07-630 Dkt #19 at 5 n.4.

The government's fluctuating clarifications of the solicitation are so inconsistent and erroneous they cannot be believed or accepted as rational. Thus, there can be no rational basis for the cancellation decision; the procuring officials abused their discretion in manufacturing multiple, conflicting "clarifications"; and there can be no "rational connection between the facts found and the choice made" to cancel the solicitation. The Court should set aside the cancellation for these reasons.

1. Part of the government's first clarification agreed with the plain language of the solicitation.

The NOSC-centric initiative was clearly identified in the solicitation itself as a configuration change to the network to occur over the life of the contract.[16] SOF ¶¶ 27, 59, 63.

This interpretation was implicitly ratified at least four times; first on July 3, 2003, when no changes to the solicitation were made as a result of the government's internal announcement of AFNETOPS; second on September 25, 2003, when the government specifically instructed

[16] As established *supra*, Part III.B, the solicitation's "configuration change" language included all such changes to the network due to centralization and consolidation programs, even after the NOSC-centric initiative was folded into AFNETOPS. There is no contrary evidence in the record that would support a limitation or distinction between the NOSC-centric initiative and AFNETOPS for that language.

offerors that "Section 7.1 contains the requirements the service provider must meet and Section 7.4 simply offers an insight to the Air Force's future plans"; third on August 17, 2005, when Maj. Gen. William T. Lord[17] approved the results of the cost comparison and the selection of the MEO as the low offeror; and fourth on May 23, 2007 by Maj. Gen. John W. Maluda's disposition of the administrative appeal, concurring with General Lord's decision to select the MEO as the awardee, although that selection is contested by RKR. SOF ¶¶ 11, 32, 70, 82. At no time was there any indication that cancellation was warranted as a result of configuration changes due to AFNETOPS. *Id.*

2. The government's second clarification, irreconcilable with the first, assumes AFNETOPS is not an anticipated configuration change.

During RKR's bid protest before the GAO, B-299856, the government switched its position and decided to cancel the solicitation. SOF ¶ 84.

From this switch sprung an evolving series of justifications for cancellation, SOF ¶ 84-102, culminating in the CO's written findings and the government's litigation position(s) before this Court.

The government's justifications, findings, and litigation positions ultimately assume the conclusion that AFNETOPS does not fall within the plain language of the solicitation anticipating configuration changes.[18] Therefore, the comparisons the government makes—between AFNETOPS and existing requirements, *see e.g.*, A0948, A1016-1017, A1019—do not address the relevant questions: whether there is in fact a provision to incorporate any and all

---

[17] Maj. Gen. Lord submitted a letter stating the government's intent to cancel two years later before the GAO.

[18] The government argued before GAO in July 2007 that this turn of events occurred because the AFNETOPS requirements suddenly "ripened" after the administrative appeal decision in May, not March, 2007. A0944. There is no record evidence of any such ripening at any time. Maj. Gen. Maluda could not identify any. SOF ¶ 109. The only event that transpired was RKR filing its GAO protest.

configuration changes directed by the Air Force or AETC, *see* SOF ¶ 27 (citing Paragraph 7.1.4.3), and if a difference exists between the effect of AFNETOPS and the NOSC-centric initiative on this solicitation.[19]

That largely terminates the inquiry, because without record evidence addressing the relevant questions there is no reason to believe the government's position—that AFNETOPS was not a configuration change, even though the NOSC-centric initiative it included admittedly was. An agency's action lacks a rational basis if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual*, 463 U.S. 29, 43 (1983). Here, the government has failed to consider or document a necessary element of its primary argument for cancellation.

3. The changing technological requirements of AFNETOPS further undermines the government's litigation position.

The government has no intention of resoliciting at this time because it has no idea what the new requirements should be; they have not been established or definitized yet.[20] The AFNETOPS planning process has been ongoing since 1996, and key elements have yet to be determined. SOF ¶ 30-31, 106. Indeed, when dealing with technology, or practically anything else for that matter, the process will always be one of continuous change, by whatever name. That was the whole point of designating the changes as configuration changes to be phased in over the life of the contract in the original solicitation. *See* SOF ¶¶ 12-19 & 52-68 (noting cost-

---

19 The government's proposed "significance test" is impossible to apply unless the solicitation is clear in the government's favor—i.e., AFNETOPS is completely separate from the "configuration changes" and is measured against existing requirements—which it is not, as the government itself stated to GAO when it argued the solicitation was ambiguous. A0772.

20 The agency's argument was: "The Air Force Component Competitive Sourcing Official (CCSO) in AF/A1 took immediate corrective action upon initial review of the GAO protest. The CCSO decided not to implement the MEO. Further, the CCSO did not envision rescheduling the competition until the on-going AFNetOps Transformation is complete and recommended the contracting officer consider cancellation of the solicitation." SOF ¶ 105. That is pure pretext.

plus acquisition strategy and solicitation provisions structured to accommodate changes to the network). The cost-plus-award-fee contract specified in the solicitation was chosen by the acquisition planners precisely because it could accommodate uncertainties such as those posed by the prospective changes attributable to the NOSC-centric and AFNetOps transformations. Now, mid-stream in an acquisition, the CO's cancellation decision contradicts this sound acquisition strategy—for no good or coherent reason, as the uncertain needs have not changed—to the financial and competitive disadvantage of RKR.

An offeror cannot wait indefinitely to show what the record here does not contradict—when the relevant comparison between AFNETOPS and the NOSC-centric initiative is made, there is no difference between the effect of one or the other on this solicitation. Even if AFNETOPS' final requirements were fully identified and definitized at this time, the fact that they would not be fully implemented for years—a *de facto* return to the cancelled solicitation, which clearly shows it never should have been cancelled at all.

The apparent pretext in this case is that cancellation puts the incumbent government personnel in the performance of the needed services with the same flexibility, RKR argues, as was provided for by the solicitation.[21] It does so for the period of time necessary to resolicit the requirements, which is also the time the agency incorrectly claims is crucial to implement a configuration change involving AFNETOPS that would have otherwise been implemented during the life of the contract, as provided for by the cost-plus and award fee elements of the solicitation. This juxtaposition clearly defines the disingenuousness of the agency's position to

---

[21] The cancellation prolongs incumbent government personnel in the performance of the needed services—at far greater cost and far higher staffing levels than either RKR or the MEO have proposed. Those savings to the government are lost the longer the incumbent government personnel remain in place, contrary to the whole point of opening this contract to competition under the A-76 process. The two years it would take to resolicit under the A-76 process would only add to that cost. *See* SOF ¶ 117 (OMB letter to DoD urging completion of A-76 process).

cancel because the contract allegedly could not meet the agency's needs. It is overwhelmingly clear that any changes due to AFNETOPS are the natural progression of business whether continuing without a contract or within the confines of a contract pursuant to the solicitation.

*D. The CO's Other Grounds Should Be Summarily Rejected As Unlawful*.

The government cannot reasonably raise two diametrically opposite interpretations of a solicitation between the time it is issued and then at the time of litigation. While RKR will respond extensively to each of the other grounds alleged to merit cancellation in Part III.E, *infra*, the Court has the opportunity to dispose of the CO's other grounds summarily because they simply resolve delays and effects of delays resulting from the government's unlawful shift in interpretation against the offerors. That is impermissible when the government's interpretation or shift in interpretation itself lacks a rational basis.

The CO's cancellation findings bear more than a passing resemblance to the litigation positions agency counsel presented to the GAO. *Compare* A1017-1021 *with* A0772-773 and A0942-944.[22] That is significant because the government admitted to GAO that several of those justifications would not apply if AFNETOPS was an anticipated configuration change to occur during the life of the contract instead of a brand new requirement. A0944 & n.6.

*E. Detailed Examination of the CO's Determination and Findings (D&F) Shows That Each Lacks a Rational Basis*

The CO's D&F runs counter to the evidence, and many of the findings in the decision are implausible, especially with regard to his conclusions that multiple changes require amending the solicitation. *See* A1017-1021.

1. <u>Alleged GAO agreement</u>. In paragraph 4 of the findings, the CO states, "The GAO

---

[22] There is some indication that the only people the CO spoke with during his D&F preparation were agency counsel, as indicated in the agency counsel response to RKR's questioning. Depo. of Ron Mortag at 44:17-45-2.

agreed [with the Air Force Component Competitive Sourcing Official (CCSO)] that cancellation was reasonable giving the prospective change in requirements due to the AFNETOPS transformation." This statement is erroneous, as the GAO did not agree. The GAO made a comment that was expressly limited by the paucity of evidence in the record at that point: "Based on the record here, we are unable to question the reasonableness of the agency's decision to cancel the solicitation due to the fact that it no longer reflects the agency's actual requirements." A0996.

2. <u>63% Change, 57% Change, 82% Change, and "Out of Date."</u> In paragraph 3, the CO states that the "current solicitation is out of date because . . . AFNETOPS will likely affect a significant portion of the workload [in the PRD – Performance Requirements Document]." In his deposition, the CO clarified that he was referring to estimates for workload reduction made by General Lord (SAF/XCT) and AETC/A6. Depo. of Ron Mortag at 112.

Finding 5a and Findings 7-8 do not make the relevant comparison and assume an interpretation of the solicitation that is foreclosed for the reasons given above in Parts III.B–C.

In paragraph 5a of the cancellation decision, the CO states that AETC/A6 determined that the AFNETOPS and AETC Communications Enterprise Transformation initiatives would require a "63% … change of the PRD" and that "other upcoming changes in the information technology program could affect as much as 82% of the … PRD by the time I could make award." A1017. In paragraph 6, the CO claims General Lord anticipated 57% of the solicitation's requirements would be changed.

These are erroneous statements, which the CO partially corrects in paragraph 8. The latter paragraph notes that AETC/A6 found that 63% of the workload, not of the PRD, would be pulled out of the affected work areas to a remote location. *See also* Depo. of Ron Mortag at

106:25. The CO admits General Lord's 57% refers to a workload reduction, not a percentage of PRD or solicitation requirements. *Id*. at 106:17-25. The AETC/A6 memo, from which the CO's conclusory comment about the 82% of changes was adopted, makes it clear that the 82% is referring to another unknown source of speculative reduction of something relating to the government's theory for cancellation. A1356. However, the Air Force's AFNETOPS expert, General Maluda, testified that prior to his deposition he had no knowledge of the 57% or either of the other figures. Depo. of John W. Maluda at 128:1-7.

At any rate, it only takes a few paragraphs in the entire PRD, not 63%, 57%, or 82% of it, to describe the workload numbers potentially affected. Specifically, out of 455 pages in the PRD, only the equivalent of four pages have workload data on them that would be affected by an AFNETOPS change. SOF ¶ 116.

The affected work areas are limited to the NCC and Helpdesk areas (i.e., some portions of the Communications and Information Technology areas) and do not include the rest of the contract requirements. A1346-1349; SOF ¶ 115; First Decl. of Dale Patenaude at ¶ 25.

In fact, if the AETC Reengineering and AFNETOPS transformations were fully implemented, the effect upon RKR's staffing and resulting price decrease in its offer would be only 10.2% of the total contract value. First Decl. of Dale Patenaude at ¶ 29. RKR's proposed total price of $64,167,279.01 would decrease to $57,606,349.29. *See id*. This is because RKR proposed staffing the affected areas with 24 personnel out of a total of 86 (FTEs). *Id*. ¶ 22-23. The configuration changes would reduce this number by 14 down to 10. The validity of this argument is shown by the fact that this reduction matches that apparently forecast by General Lord at A0948, and the AETC/A6 at A1346. *See also* First Decl. of Dale Patenaude at ¶ 12, 24, & 25.

Decreasing overall contract effort by 12.3% has been held not to require a cancellation. *Defense Group, Inc.*, Comp. Gen. Dec. B-253795, 94-1 CPD ¶ 196. Nor has decreasing a performance schedule from 690 to 630 days and from eight to two phases (75% reduction in phases) been held to require cancellation. *Atkins Enters, Inc.*, Comp. Gen. Dec. B-241047, 91-1 CPD ¶ 42. A 10.2% dollar change in RKR's overall contract effort would be far less than these changes.

However, the irrelevance of all the foregoing alleged changes is evident when the clear language of the solicitation shows that no amendment or cancellation is necessary to accommodate the CO's alleged anticipated workload changes. The RFP contemplated changes by its provisions referencing the NOSC-centric transformation, which is now known as the AETC Communications Enterprise Transformation, A1346, and the open-ended configuration changes. *See* Part III.B, *supra*, and SOF ¶¶ 12-19 & 52-68. In addition, the acquisition strategy of using a "snapshot in time" and a cost-plus contract required offerors to ignore these workload changes when preparing their proposals. *Id*.

3. Significant Changes to PRD. The CO alleged in paragraph 10 of his decision that the changes to the PRD caused by AFNETOPS were so significant that he could not "simply adjust the [nonconforming] MEO prices," A1019, and proceed with the evaluation of proposals. In paragraph 9, the CO similarly states he can find "no basis for … [RKR's] contention that the PRD scope changes are minimal." However, he was asked repeatedly in his deposition what those significant changes were, and he could not identify any of them. Depo. of Ron Mortag at 75-76. He was asked if he had any opinions of his own regarding where the Air Force needs were today with the NOSC-centric changes that were covered in the solicitation, and he said no. Depo. of Ron Mortag at 76. He was asked several times what the 57% figure in his cancellation

decision pertained to, and repeatedly said he didn't know. Depo. of Ron Mortag at 75.

The vague and indefinite references to unsupported "significant changes" are conclusory and unsupported by the record. Major General Maluda, an expert in AFNETOPS, Depo. of Maj. Gen. John W. Maluda at 90-91, 93:14-15, 141:17, could not list any changes when asked, *id*. at 104:15-17, 138-140, but agreed that AFNETOPS was still in a developmental stage at the present time. *Id*. at 102:8-12. General Maluda was also the administrative appeal authority for the A-76 study, pursuant to AFI 38-203. *Id*. at 50:2-10. He in effect stated that the solicitation as written could accommodate change. *Id*. at 108. General Maluda was asked whether, based upon what he saw in the solicitation and the proposals submitted, either RKR or the MEO could have kept up with the AFNetOPs changes occurring over the past three years and into the next year; he replied that both "could do the job." *Id*. at 108:16:22, 154:12-22. General Maluda agreed that, as Air Force planners in the future further refine what the AFNETOPS command and control ("C2") relationships are, bases like Keesler that fall under AFNETOPS will comply with those refinements. *Id*. at 133:18-21.

4. New Start Date. Finding 5b, a conclusory alleged need to shorten the performance period due to delays by the government, does not justify further delays for resolicitation and recompetition here. Again, resolicitation would preserve the incumbent government personnel for that time, indefinitely, the same time the agency claims is crucial to implement AFNETOPS, which would have otherwise been implemented during the life of the contract, as provided for by this solicitation. The CO claims the RFP must be amended because the start date must be delayed to October 2008. This is contradicted by examining the following facts. The RFP, paragraph H-937, provides for revision of the start date for the Little BOS to match that of the Big BOS: "The service provider start date will be the same for both requirements. In the event

the start date is revised on either requirement, the other will be revised to the same date." A0036. Paragraph H-937 provides that the procurements for the two contracts would be further linked in that "The cost comparisons will be conducted and the results announced on the same day." The CO stated, "The primary reason that you try to keep them on the same schedule is for RIF [reduction-in-force] purposes." Depo. of Ron Mortag at 113.

The Big BOS cost comparison and procurement were completed and the contract was awarded to Computer Sciences Corporation. The contract start date, originally set for October 2006 as it was for the Little BOS, has been revised to February 2009. Depo. of Ron Mortag at 104–105. To comply with the solicitation, the start date for the Little BOS should also be revised to February 2009.

According to the same CO, Ron Mortag, who made the decision to cancel the Little BOS solicitation, the new start date for the Big BOS was revised without any amendment to the solicitation. Depo. of Ron Mortag at 112-113. As stated in the discussion of law above, this can be accomplished the same way it was for the Big BOS, or through operation of the cost-plus contract. By the CO's own admission, such changes can be accommodated without amending the solicitation under a cost-plus-award-fee contract, which is the type of contract prescribed for both the Big and Little BOS. Depo. of Ron Mortag at 112– 113.

5. Updated Wage Rates & Inflation Factors. Findings 5c and 5e, the conclusory alleged need to update wage and inflation rates, and property lists, affect each offer equally and would be handled during negotiations with the successful offeror during contract performance. The CO states, "The wage rates and inflation factors must be updated for the new anticipated performance period." He states he would have to obtain new wage rates from the Department of Labor and the MEO and let RKR and the MEO update their prices.

These statements are a pretext and run counter to the evidence, for four independent reasons. First, Department of Labor wage rates and inflation factors regularly and frequently change throughout every solicitation, and new wage rates are automatically incorporated into a contract to be effective on the date of contract award, pursuant to 29 C.F.R. 4.5(a)(2) and FAR 22-404-5(2)(i). Cibinic & Nash, Formation of Government Contracts 1471 (3d ed., 1998) (see extract at Appx Exh. 6).

Second, the acquisition strategy was based upon a "date in time" or "snapshot in time" and wage-rate and inflation changes outside of that "date or snapshot" were not to be considered; after award, workload and price changes would be accomplished through the operation of the cost-plus contract. SOF ¶ 8-15; Depo. of Ron Mortag at 109-110, 113-116.

Third, the CO admitted that the solicitation was written with an initial two-year period as a cost-plus contract to determine what the workload and its costs were going to be, which would include the number and wage rates of the personnel, and that then a fixed-price contract would be negotiated based upon the new workload and personnel cost data. Depo. of Ron Mortag at 115-116.

Fourth, the Big BOS faces the same alleged changes with regard to wage rates and inflation factors as the Little BOS, and yet the Air Force made no associated amendments to its solicitation prior to award, as admitted by CO Mortag. Instead, the Air Force relied upon the fact that the cost-plus construct could lawfully accommodate such changes without an amendment to the solicitation. Depo. of Ron Mortag at 112-113.

6. "Mission Impact" Criterion. The government's alleged statutory changes argument in Findings 5d and 11 are based on its flawed premise that the solicitation does not accommodate AFNETOPS as a configuration change, and need not be considered further. The CO states that

10 U.S.C. § 2461, enacted in 2006, now requires adding a "mission impact" criterion to the solicitation's evaluation criteria, when new prices are compared. However, he admits that adding such a criterion is necessary only if he has to "amend the solicitation and obtain new prices."

For all of the reasons above, neither a solicitation amendment nor new prices are necessary. New prices are not part of the process for a "date-in-time" evaluation, and the cost-plus contracting strategy accommodates cost and price changes without amending the solicitation. See *CCL, Inc.*, Comp. Gen. Dec. B-251527, 93-1 CPD ¶ 354, (revised prices submitted by an offeror during negotiations superseded the original price offered, but they were not considered a new offer).

7**.** New Property List. In paragraph 5e, the CO makes a conclusory assertion that the list of property to be provided by the government has changed, since the solicitation is sensitive to information technology changes, and this requires an amendment establishing a new property list and new prices. The property list named communications equipment and gear.

The list was located in Keesler's Technical Library. A0024, A0095. Standard procedures required an awardee to conduct a joint inventory with the government prior to work start to finalize the list. A0270. The awardee is responsible for updating the list, so that at the end of contract performance all government-furnished equipment would be returned to the government. This list has no effect on contract price, because the equipment for the contract has separate CLINs [contract line item numbers] for Modernization and Maintenance of Government-Furnished IT Equipment (A0005, CLIN X007) and Replacement of Government-Furnished BOS Support Equipment (A0005, CLIN X008). The cost for these CLINs was provided by the government as a "wash cost" to be used by all offerors, including the MEO. This is another

important aspect that has been overlooked by the agency, constituting a fatal error under rational basis review. *See e.g.*, *Precision Images, LLC v. U.S.*, 79 Fed. Cl. 598, 614-615 (2007).

When questioned in his deposition about what the changes were that affected such equipment and gear, the CO claimed the changes were written in the AETC/A6 analysis. When RKR's counsel pointed out there was nothing in the A6 analysis that "applied to specific equipment in any manner that would give … any inclination … what the significance of those changes would be," the CO apologized and deflected the question. When pressed, the CO indicated that the changes in equipment and gear were not significant to his cancellation decision, but that changes in workload were: "I'm sorry . . . Again we'd probably have to consult with an A6 technical person. But what is significant for the purposes of my D&F is where they identify the difference in percentage of workload." Depo. of Ron Mortag at 87.

For all of the reasons above, neither a solicitation amendment nor new prices are necessary to accommodate any changes in the property list.

8. <u>Number of Prospective Offerors</u>. Finding 10 contains a diversionary allegation that cancellation was mandatory under FAR 15.206(e). That assumes the same significance test and conclusion about AFNETOPS relative to the solicitation that RKR has shown to be foreclosed. *See* Note 12, *supra*. Ignoring that, the CO's only other justification for more bidders in Finding 10 is fairness. The government has not shown that either RKR or the MEO's bid for any of the requirements was unreasonable. So there is no need for new bidders. If the solicitation permits configuration changes to be implemented during contract performance and the government's interpretation shift is unlawful, there is no reason the offers made by RKR and the MEO should not be evaluated against the requirements that existed as of the date in time of the solicitation.

Considering the placement of this finding in the D&F it is obvious the CO regarded this as a key reason for cancellation, yet his facts lack record support as will be shown.

The CO claims the number of prospective small-business offerors attending the pre-proposal site visit for Sheppard AFB is indicative of increased competition likely to occur if a "smaller, less complex workload" were contracted for Keesler AFB. A1019. He compares the roster from the July 2007 site visit for a similar A-76 study at Sheppard AFB to the two contractors who submitted proposals for Keesler's Little BOS, and erroneously concludes that 10 qualified small businesses attending Sheppard's site visit showed interest in the contract, more than at Keesler. He states in his deposition that he would need more than two small businesses attending Keesler's site visit before he considered the competition adequate for the small-business set-aside. Depo of Ron Mortag at 23 (FAR requires at least two for a small-business set-aside).

The CO's decision indicates he failed to examine the roster of attendees at the Keesler Little BOS site visit, and he thus "entirely failed to consider an important aspect of the problem," a fatal error under rational basis review. *Precision Images,* 79 Fed. Cl. at 614-615. The rosters alone show 20 qualified small businesses attending Keesler's site visit, compared to 10 at Sheppard. Appx. Exh. 4, Second Decl. of Dale Patenaude Attachment 4-1; SOF ¶ 113. Therefore, interested contractors at the Little BOS site visit already exceeded the number at the Sheppard AFB site visit. But the rosters do not tell the entire story. The CO has misinterpreted the evidence before him.

The Keesler site visit was attended by RKR's President, Ken Lee, and Vice-President, Dale Patenaude. Appx. Exh. 4, Second Decl. of Dale Patenaude at ¶ 6. Mr. Lee is also President of the small business K-Mar Industries, Inc., one of the RKR Joint Venture members, and Mr.

Patenaude is Vice-President of small business Rothe Development Corp., another one of the RKR Joint Venture members. *Id*. at ¶ 2. Mr. Patenaude and a K-Mar Vice-President also attended the Sheppard site visit. *Id*. at ¶ 6.

As Mr. Patenaude explains in his declaration, K-Mar and Rothe Development were planning to team with two other small-business attendees, RSI and Rothe Enterprises, to consider making a proposal for the Sheppard contract, and they met one-on-one with CO Mortag about this. *Id*. at ¶ 21. It was necessary for these four small businesses to team together because, as Mr. Patenaude has also explained, no one of them had all of the expertise necessary to perform all of the contract requirements. Appx. Exh. 3, First Decl. of Dale Patenaude at 5.

This reduces the number of other alleged small-business prospective offerors at the Sheppard site visit down to six, but, contrary to the CO's claim of fact, these six were not qualified to make a proposal on the Sheppard or Keesler contract. Second Decl. of Dale Patenaude at ¶ 11-28 & Attachments; SOF ¶ 112-113. They do not qualify for the following reasons, which may be ascertained from a review of public records: Raytheon, MAT (McLane Advanced Technologies), Rome Research Corporation, and LCI (Leader Communications) are large businesses; C2 Technologies, FSI (Facilities Services Management, Inc.), and MTCI (Management Training Consultants) have no communications or information technology experience that would qualify them to make a proposal as the prime contractor; C2 Technologies' experience is in training; FSI's main area of expertise is housing and facility maintenance; MTCI's main area of expertise is training; Phoenix Management is a large business specializing in fuels, logistics, and supply; Shaw Infrastructure is a large business that performs civil engineering and building construction. *Id.*

From this analysis, it is clear there was at most one qualified small businesses other than

RKR's team attending the Sheppard site visit, and the CO's finding to the contrary is erroneous. *Id*.

This evidence shows, contrary to the CO's unfounded claims, that resoliciting would not increase competition or fairness. As Mr. Patenaude, speaking as Vice-President of Rothe Development and RKR, attests, "it is likely to be difficult to interest bidders in any solicitation at Keesler after the debacle of the contested cancellation in this case . . . [and the unfair treatment of RKR], who already expended its sweat and equity in bidding . . ., expecting a fair evaluation, which it has been denied." Second Decl. of Dale Patenaude at ¶ 31. Mr. Patenaude explains the government will not be treated more fairly by a recompetition, "as it continues to pay higher rates with more people than what it would have if RKR had been awarded the contract." Second Decl. of Dale Patenaude at ¶ 31.

9. <u>Appropriations Act and Anti-Deficiency Act</u>. In paragraph 11, the CO claims he is concerned that reopening discussions and amending the solicitation would "violate the time barriers" in the Defense Appropriations Act, and this violation would in turn violate the Anti-Deficiency Act, although this concern is unsupported by legal precedent or even a firm conviction by the CO of its reliability. However, he resolves his own concern by conceding, "If reopening were a consequence of correcting errors identified in a protest or appeal, arguably, there would be no violation of this [the Defense Appropriations] statute." A1020. Such reasoning is totally irrational.

As explained throughout this motion, there is no need to reopen discussions or amend the solicitation; even the GAO indicated as much in their critical questioning in its Request for Additional Information where it asked the Air Force to give its justification why changes could not be made to the MEO's offer to meet performance standards at this time. A0939.

Even if discussions were reopened after the Air Force adjusted the MEO's offer, it would be as a consequence of correcting the error of not adjusting the MEO's offer to conform to the solicitation requirements, and, as the CO concedes, there would be no violation of either act.

10. COMPARE Software Program. Because there is no other reason to resolicit—and also no reason why the new A-76 guidance should be applied to this solicitation as opposed to the A-76 guidance it was issued under—the alleged need to rescore the offers with new software in Finding 12 is also irrelevant. OMB A-76 1999 does not require the use of the COMPARE software. SOF ¶ 110. In any case, because the government has admitted the MEO did not bid the requirements, A0772, 1024, & 1026, rescoring will be unnecessary.

In paragraph 12, the CO states that, if he has to amend the solicitation, obtain revised proposals, and re-run COMPARE, the computer software program that helps evaluate prices, he will be required to amend the solicitation to convert to the new, May 2003 OMB procedures. However, the CO ignores the fact that no amendment is required to adjust the staffing levels in the MEO's offer, no revised proposal would be required from RKR, and there is no need to re-run COMPARE. A simple pen-and-ink change can be made to correct the MEO's price on the COMPARE spreadsheet that has already been run. General Maluda agreed that everything necessary was already done at the time to perform the cost comparison study required by the A-76 study. Depo. of Maj. Gen. John W. Maluda at 62-63.

The COMPARE software is not integral to determining the outcome of an A-76 competition under the OMB rules governing this procurement. It is merely a database program that calculates an output depending upon input. A0812-0813. The same results could be achieved using an EXCEL spreadsheet or even by using pen and paper. There is no prohibition to making corrections by hand to a COMPARE cost form.

As noted above, use of COMPARE was not required under the pre-May-2003 (OMB A-76 1999) rules under which the present competition was conducted. SOF ¶ 110. The government did not contest this fact during RKR's GAO protest, A0462. An agency's election to use a piece of software that was not required by the OMB rules is not a reasonable excuse to cancel the solicitation and subject a contractor to the resulting severe financial and anti-competitive effects.

*F. The CO Failed to Properly Apply FAR 15.206(e) Requirements for Cancellation*.

FAR 15.206(e) supplies a standard to determine when cancellation or amendment of a negotiated procurement solicitation is *mandatory*.[23] It does not supply the standard to review the cancellation decision in this case. *See* Part II, *supra*. Nevertheless, the CO relied on FAR 15.206(e) in his cancellation decision, and his erroneous application of it is further evidence that that the cancellation here lacks a rational basis.

1. Cancellation was not mandatory.

The CO misapplied the test for cancellation in FAR 15.206(e) that he said he followed.[24]

Because implementing configuration changes, like AFNETOPS, were included in the solicitation as a requirement and as a long-range goal, they were reasonably anticipated by

---

[23] FAR 15.206(e) provides:

> If, in the judgment of the contracting officer, based on market research or otherwise, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition.

[24] The CO stated he made his "findings and determination for cancellation" in accordance with "FAR 15.206(e)(1)" [sic]. In paragraph 11, the CO states that the following changes are so substantial that a new solicitation is required: "changes … required by the passage of time, changes in information technology, and substantial transformation of the way the Air Force and AETC do business." A1020.

prospective offerors. A0147 ¶7.1.4.3; SOF ¶ 27. Moreover, the government itself relieved prospective offerors of any potential surprise when it specifically told them not to include the NOSC-centric initiative in their offers. SOF ¶ 11.

The CO's other grounds are insubstantial. To merit cancellation under FAR 15.206(e), a necessary change must be "so substantial that it warrants complete revision of the RFP." Nash, Schooner, O'Brien, The Government Contracts Reference Book 72 (1998) (see extract at Appendix **Exhibit 7**). There must also be proof that the change is "so substantial" that "additional sources likely would have submitted offers had the substance of the amendment been known to them." A1020. There is no evidence to support any of these requirements.

In interpreting the provision, the Comptroller General has stated that changes necessary to warrant cancellation would have to significantly alter the purpose or nature of the contract or change the field of competition. *Loral Fairchild Corp.*, Comp. Gen. Dec. B-242957.2, 91-2 CPD ¶ 218. Nash and Cibinic have concluded: "A number of cases have held that cancellation and resolicitation was not required even though significant changes were made." Cibinic, et al., Competitive Negotiation–The Source Selection Process, at 704 (extract at Appendix **Exhibit 8**).

Changes not requiring cancellation have included shortening construction schedules, *Atkins Enters, Inc.*, Comp. Gen. Dec. B-241047, 91-1 CPD ¶ 42, decreasing the overall contract effort, *Defense Group, Inc.*, Comp. Gen. Dec. B-253795, 94-1 CPD ¶ 196, and changing the solicitation by advancing the commercial availability date of laptop computers, *SMS Data Prods. Group. v. Austin*, 940 F.2d 1514 (Fed. Cir. 1991). The changes in these cases are similar or exceed in magnitude to the changes in start date, wage rates, inflation factors, and property list alleged by the CO in RKR's case, even if they were in fact supported, which they are not. In fact, the same CO was aware that the same or similar problems were resolved in the companion

procurement, Keesler's Big BOS, without amendment or cancellation of the solicitation. Depo. of Ron Mortag at 112-113; Part III.E.4, *supra*.

It can be seen from the analysis in Parts III.E, *supra*, that none of the alleged changes are so substantial as to exceed what prospective offerors reasonably could have anticipated, and none "significantly alter the purpose or nature of the contract." In particular, the configuration changes that may be precipitated by the AFNETOPS initiative or the tentative future Cyber Command Field Operating Agency construct, and the corresponding speculation about either a 63% or 57% workload reduction, were written into the solicitation as a long-term goal to be anticipated by the offerors. The offerors did anticipate such configuration changes. SOF ¶ 28-29. Likewise, the evidence described above in Part III.E.8 (concerning lack of qualified prospective offerors at Sheppard AFB) shows no additional sources likely would have submitted offers had the substance of the change been known to them. Hence, cancellation is not appropriate under the test set forth in FAR 15.206(e).

2. Certain revisions may also be made without amendment.

Changes do not always require amendment of a request for proposals. Amendments are not required if changes would not "have a significant impact on competition." Cibinic, Nash & O'Brien, Competitive Negotiation – The Source Selection Process 704 (2d ed. 1999) (extract at Appx. Ex. 8). Because offerors were specifically instructed not to include the future configuration changes in their proposals, SOF ¶ 11, there could be no impact from any future configuration change, including AFNETOPS, on the competition between RKR and the MEO for the award here, and thus no need for amendment. *But see* A0772, 1024, & 1026 and SOF ¶ 85, 88 (government admissions that MEO did not limit its proposal to date in time requirements). Additionally, no amendments are required to accomplish the illusory changes alleged in the CO's

other grounds for cancellation.

Therefore, FAR 15.206(e) requirements for cancellation have not been met. While possibly conclusive by itself, it clearly is further evidence that the cancellation lacks a rational basis, given the CO's misapplication of the FAR provision.

## IV. THE RELIEF REQUESTED IS PROPER

### *A. Permanent Injunctive Relief is Proper*

A court may issue a permanent injunction if plaintiff establishes that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the injunction serves the public interest. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993). Assuming the cancellation is held unlawful, resulting in actual success on the merits, RKR analyzes the remaining three elements as follows:

1. Irreparable injury

The deprivation of potential profits has been found to constitute irreparable harm. *E.g.*, *Overstreet Electric Co. v. U.S.*, 47 Fed. Cl. 728, 744 (2000); *Great Lakes Dock & Dredge Co. v. U.S.*, 60 Fed. Cl. 350, 369 (2004). The government's unlawful actions have prevented the contract from being awarded to RKR, and RKR has been deprived of the profits that would result from performance.

The denial of the right of a contractor to have its bid fairly and lawfully considered also constitutes irreparable injury experienced by RKR. *Overstreet Elec.*, 47 Fed.Cl. at 744 n. 25; *Great Lakes* 60 Fed. Cl. at 370. Absent injunctive relief, RKR's proposal will be a "sitting duck," serving as a target during resolicitation. *See California Marine Cleaning, Inc. v. U.S.*, 42

Fed.Cl. 281, 292 (1998); *Great Lakes* 60 Fed. Cl. at 370. RKR's proposal and pricing have been publicly disclosed, putting RKR at a financial and competitive disadvantage. SOF ¶ 72; A0829, 1969, 1970. Additionally, being denied the ability to establish a past performance record is evidence of irreparable injury. Past performance is a key component of all bid evaluations, especially in negotiated procurements. Briefing Papers (Jan. 2008)–2007 Procurement Review at 78-79 (see extract at Appendix **Exhibit 9**).

The government cannot simply tear up the A-76 solicitation and overturn the chess board years after offers have been received simply because it finds it more convenient—without any other justification in the record—to deal with itself and avoid competition for the work under the A-76 process. *See* A1410-1411 (discussing government's desire to avoid A-76 process during AFNETOPS transformation).

2. Balancing of harms

The government experiences no harm from setting aside the cancellation because it could not articulate a lawful, i.e., rational justification for the cancellation. There is no such rational justification and thus no potential harm. Even if it is true that the presence of A-76 contractors "limits the efficiencies of consolidation," as the government complains, A1410, or causes some other such alleged harm, there is no evidence of it in the record. Meanwhile, RKR has been harmed and will experience harm in any resolicitation because its prices have been made public. SOF ¶ 72, 114. The government experiences no harm because any and all configuration changes are delineated as requirements (A147 ¶ 7.1.4.3) and consolidation programs can be accomplished through the cost-plus contract. (Part III.B.2.c, *supra*).

3. The public interest is served

It is well-established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations. *See, e.g.*, *Great Lakes*, 60 Fed. Cl. at 370. The government's attempt to cancel for arbitrary reasons undermines the integrity of the procurement process. *See Overstreet Elec*., 47 Fed.Cl. at 744. Granting an injunction setting aside the improper cancellation serves the public interest.

*B. Award of Bid Preparation and Proposal Costs is Proper*

RKR has requested an award of bid preparation and proposal costs. Dkt # 31 at ¶ 101. If the Court finds that the government's actions, findings, or conclusions in connection with cancellation are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," bid preparation and protest costs may be awarded. 28 U.S.C. § 1491(b)(1), (2) & (4). This is so even if the Court does not issue a permanent injunction setting aside the cancellation.

If the Court finds that an award of bid preparation and proposal costs is proper, RKR will submit those costs for approval in a separate filing.

V. CONCLUSION

In view of the administrative record, pleadings on file, and authorities cited, RKR is entitled to judgment as set forth in this motion. RKR requests that the Court:

1. Rule orally on this motion at the September 24, 2008 hearing, with written opinion to follow, in order to expedite any further proceedings that may be necessary;

2. Adjudge, decree, and declare that THE UNITED STATES's cancellation of the solicitation unlawfully precluded a contract award to an eligible offeror and/or unlawfully prevented the completion of a lawful procurement process for the solicitation;

3. Order THE UNITED STATES to award RKR its bid preparation and proposal costs, in an amount to be determined by further proceedings in this Court;

4. Set aside and permanently enjoin the unlawful cancellation of the solicitation;

5. Direct further proceedings in this Court as may be necessary; and

6. Grant such other relief as the Court deems proper.

DATED July 3, 2008.

Respectfully submitted,

_________/s/______________________

David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 100
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded in compliance with the Federal Rules of Civil Procedure to all counsel of record as set out below, on this the 3d day of July, 2008, as follows:

Will Rayel
Trial Attorney
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 12100
Washington, DC 20530 (20005 for FedEx)
phone: (202) 616-0302
facsimile: (202) 307-0972

***VIA E-FILING***

________/s/_________________________

David F. Barton