23 May 2007

MEMORANDUM FOR RKR JOINT VENTURE (RKR)

FROM: Keesler Administrative Appeal Process Authority
245 Davis Ave E, Ste 200
Barksdale AFB, LA 71110-2279

SUBJECT: Keesler Air Force Base Administrative Appeal Response

1. The Administrative Appeal Process Review Team reviewed RKR Joint Venture (RKR) appeal of the Keesler Little BOS cost comparison study. Below is the Air Force's position regarding your appeal:

**a. Item #1:** Incorrect Federal Income Tax Calculation.

**Air Force response.** RKR appeal item #1 was accepted as an appealable item but not substantiated.

**Discussion.** Upon review of the Federal Income Tax calculations it can be substantiated the Government did not use the tax code listed in the solicitation. When the latest industry codes and calculated tax rates were compiled on 1 August 2005, they were loaded into the cost comparison software program prior to the cost comparison. The previously published code selected by the contracting officer was no longer listed and the Government analyst selected the default code---"Misc. Not Elsewhere Classified."

The industry codes and calculated tax rates are published by the Internal Revenue Service. The A-76 study software (COMPARE) uses the published codes from the Internal Revenue Service in Table 14. This is a mandated table that is provided to the users of the software program and adding "user-defined" industry codes or uncontrolled rates to the table is not permissible. The tax table 14 is not all inclusive of every industry code in the North American Industrial Classification System. The tax rate calculations are based on statistical sound samples on Corporate Tax Filings and often consolidate like industries to produce the appropriate data.

There are situations that arise where the exact industry code does not appear on the list (Table 14). In this case, the Government followed the customary practice and complied with OMB Circular A-76 policy to find the closest industry code or use "Misc Services, not elsewhere classified" tax code. This tax code selection is a joint decision made by the contracting officer and manpower representative when the time costs are compared and reviewed by an independent auditor.

As such, the government followed established procedures regarding selection of the Federal Income Tax. The procedures followed by the government provided a fair evaluation. Additionally, if the Federal Income Tax code in the solicitation were to be used, assuming it was inclusive of Table 14, the contractor bid would still be insufficient to overcome the $4,972,800 bid difference to overturn the initial in-house decision.

**b. Item #2:** The Most Efficient Organization (MEO) is not compliant with the Performance Requirements Document (PRD) in respect to the Network Operations SC1B work section.

**Air Force response.** RKR appeal item #2 was accepted as an appealable item but cannot be substantiated.

**Discussion.** RKR appeal alleges the MEO did not properly staff Network Operations. It further states the MEO improperly applied a Network Operations Security Center (NOSC) Centric method as its staffing strategy. Our examination revealed there were areas in the PRD and the MEO Management Plan which mentioned Network Control Center (NCC) Reengineering or NOSC-centric within the documents. The PRD referenced NCC reengineering offered insight to future Air Force plans that may be of interest to the selected service provider. In fact the MEO Management Plan does reference "touch maintenance," however, does not refer to how the MEO will staff the Network Operations.

Exhibits in the RKR appeal reference several instances where they allege as examples of MEO utilizing NOSC-centric methodology. However, the lead paragraph of both sections mentions Network Operations have been adequately staffed to respond to both surge and day-to-day requiremens on a 24/7 basis if necessary.

Additionally, the Management Plan goes on to explain, "…the PRD identified the following initiatives that could impact workload; however, the impact could not be quantified:

- AETC is currently reengineering the base Network Control Centers (NCC) command-wide. The goal of the AETC NCC Reengineering initiative is to implement a NOSC centric enterprise network within AETC. The NOSC centric network will standardize and streamline network operations throughout the command. AETC NOSC has the authority to direct standardized network configurations, restoration of network services, patching of security vulnerabilities, and coordinate the response to network outages or intrusion attempts."

This statement demonstrates the MEO is aware of potential changes to current operations, but those changes or NOSC-centric operations were not quantified in the Management Plan. Thus the MEO staffing is based upon the PRD requirements.

**c. Item #3:** The MEO used the incorrect grade levels for staffing the Quality Assurance Evaluator (QAE) function for the MEO subcontracts.

**Air Force response.** RKR appeal item #3 was accepted as an appealable item but was not substantiated.

**Discussion.** Chapter 3 of the MEO Management Plan section 3.2.1.7. states:

"Project Support (SC1) will be staffed with 12 personnel as set forth in Attachment 6, MEO Personnel Analysis. Staffing was based, in part, on the Operational Audit (OA) and Standard Indirect Allowance Model as discussed under paragraphs 3.1.2 and 3.1.4. The OA recommended a staffing of SC1 at 10.394 (fractional manpower) which was rounded down to 10. Project Support was staffed with two Quality Assurance Evaluators (QAEs) for the Multimedia subcontract, consistent with current operations."

The actual positions included in the cost comparison found that SC1 was staffed with 12 positions. Two additional positions with the grade structure of GS-12 and GS-11 representing the QAE requirements were included under "Keesler AFB MS" as positions 6001 and 6002. The backup personnel cost spreadsheet that cross-walks to the data entries for the cost comparison (personnel Line 1) referenced the 6001 and 6002 positions as the QAE positions. Therefore, the grade structure for staffing the QAE function for the MEO subcontracts is consistent with A-76 policy.

**d. Item #4:** The MEO failed to provide the manpower to perform the duties of producing the reports required by the PRD listed in Appendices 7.c and 8.c and to adequately perform Quality Control Management functions.

**Air Force response.** RKR appeal item #4 was accepted as an appealable item but was not substantiated.

**Discussion.** Appellant alleges two errors committed by the MEO: a) the SC1 requirement should be rounded up to 10.4 and, b) the manpower provided is inadequate to perform quality control functions.

a. Mapping the MEO Management Plan to the actual entries on Line 1 of the MEO cost estimate is sometimes challenging. However, analysis of the cost comparison data found 12 positions to include the MEO Manager assigned to SC1 when the operational audit calculated 10.394 required. Additionally, scheduled overtime hours were included as other pay for three GS-09 positions. Therefore, the 10.394 staffing requirement was increased to 11 positions, the MEO manager position was added to increase the SC1 staffing total to 12 positions, and an additional allowance factor at management's discretion was included as scheduled overtime thereby exceeding the operational audit minimum staffing calculations for SC1. As a result, the submitted allegation is not supportable when the actual staffing included in the cost comparison is examined.

b. The second issue is whether the Quality Control (QC) Plan is effective at performing the requirements in the PRD. A side issue is whether the MEO planned on utilizing subcontract QAEs to perform the internal QC work for the entire MEO. According to the MEO Quality Control Plan, "the MEO Chief has executive responsibility for the development and maintenance of the quality system, overseeing the day-to-day operations for the quality system, and interacting directly with the government on quality and performance management issues. Primary responsibility for implementing the quality system resides with the functional area supervisors. The supervisors ensure that documented procedures define the specific responsibilities, authorities, and relationships of personnel who manage, perform,

or verify work that affects quality." The QC Plan provides that QAEs will monitor subcontractor performance. Additionally, our examination of documents did not provide evidence the QAEs were being used for other than QAE purpose. In summary, the PRD does not require a separate QC organization and the QC Plan provided by the MEO is sufficient.

**e. Item #5:** The MEO training dollars allocated are not consistent with requirements of the PRD or reality. Correction of this issue will adjust the MEO IHCE in this area to reflect an increase of approximately $398,960.

**Air Force response.** RKR appeal item #5 was accepted as an appealable item but cannot be substantiated.

**Discussion.** Contrary to appellant's assertion, the MEO training dollars are consistent with the requirements of the PRD. The proposed MEO will be made up of all civilian, fully-qualified, incumbent workforce at the start of the service. Obviously, these employees would not require the same amount of training as a completely new workforce. The resultant training cost estimate may seem low to a private sector provider; however, the methodology used to determine the training cost is sound and rational.

2. In summary, the Administrative Appeal Process Team finds the competition was conducted fairly and concurs with the decision to select the MEO (in-house) as the selected service provider for the Keesler AFB Little BOS function. The determinations set forth herein constitute a final Administrative Appeal Process decision.

John W. Maluda

JOHN W. MALUDA, Major General, USAF
Keesler Administrative Appeal Process Authority