**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE,<br>A Mississippi Limited Liability Corporation,<br><br>Plaintiff<br><br>VS.<br><br>THE UNITED STATES,<br><br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 08CV-00062-MCW<br>Judge Williams |

**FIRST DECLARATION OF DALE PATENAUDE**

Pursuant to 28 U.S.C. § 1746, I, Dale Patenaude, declare as follows:

1. My name is Dale Patenaude. I am a resident of Bexar County, Texas. I am over the age of twenty-one years, am competent to testify, and state that the following is of my own personal knowledge, true and correct.

2. I am the Vice President of RKR Joint Venture LLC ("RKR"), a Mississippi limited liability corporation, and the Vice President of Rothe Development Corporation, a Texas corporation and one of the joint venture member companies. In this declaration, I declare as an officer on behalf of RKR, as a member of its management team, and as one of the persons directly involved in the preparation of RKR's offer in response to the solicitation in this case.

3. I am experienced in the industry and with Air Force communications and information technology contracts in particular. I have been Vice President of Rothe Development Corporation since April 15, 1997. Prior to that time I worked as a consultant from 1991-1997 and as an employee from 1972 to 1990. I have managed government communications and IT contracts since 1972. I hold a bachelor of science degree in electrical engineering from the University of Texas. I have over 30 years of Government contract management experience since 1972 and consider myself an expert in all the foregoing matters. Between RKR Joint Venture LLC and Rothe Development Corporation, my companies have bid on several hundred government contracts in the past two decades, up to $ 100 million in value. I have attended numerous pre-bid conferences and have a through understanding of the small business contractors involved in furnishing communications and information technology services to the government. As Vice President of Rothe Development and RKR, I assist in preparing the bid proposals, and assist in negotiations with the project owner and/or general contractor. This combined experience has given me special expertise in formulating

bids and proposals for government contracts, and in performing the mathematical calculations necessary for those tasks.

4. The purpose of this declaration and accompanying attachments is to provide facts and context concerning the statements made by the Air Force to RKR over the course of the offer submission and evaluation process, from the date the solicitation was released on November 12, 2002, through the cancellation of the solicitation on January 7, 2008.

5. Each RKR team member brought certain skill sets and past performance into the newly formed joint venture. The interests of the parties in any profit or loss and their respective shares in the joint venture were naturally the subject of negotiation between myself and the other members of the management team. As RKR was formed in order to offer a proposal for the Keesler Little BOS it was natural to appropriate the shares along the lines of the respective capabilities of the companies.

6. Rothe Development Corporation had the technical capability and past performance to perform the Communications and Information Technology ("Comm & IT") portion of the contract. [The acronyms I use in this declaration have the same meaning as defined in this case and throughout the procurement and appeals process for this solicitation]. K-Mar Corporation had the capability to perform the Visual Information portion. Rohmann Services, Inc., had experience and past performance in the Publication Management portion. Collectively, we constructed a "rough order of magnitude" to estimate the staffing levels of the Little BOS solicitation. We used this rough order of magnitude to determine the relative splits among the companies. The share structure agreed upon is as follows:

| | |
|---|---|
| Rothe | 40% |
| KMI | 30% |
| RSI | 30% |

7. I felt good about the percentage I negotiated for Rothe. However, I knew that the AETC Re-engineering Initiative would come into play at some point in the life of the contract and that my percentage could be questioned.

8. At that point in time of July 2003 there was some uncertainty as to when the Air Force would implement the initiative. I made an educated guess that the implementation would probably take place sometime in the second or third option year of the contract. Then I re-calculated the respective splits after the initiative was implemented. In order to do this I had to anticipate the extent of the reduction in workload that would take place. Through research and discussions with the other RKR management team members, I estimated that 66% of the NCC would ultimately be reduced.

9. Since that I time I found that the Air Force numbers do not really apply to contracted NCC's. Rothe Development, has provided full staffing of the NCC at Minneapolis Air Reserve Station since 1989 and full staffing of the NCC at Columbus (Mississippi) Air Force Base since 2002. Contracted NCC's such as the one my company Rothe has at

Columbus AFB, Mississippi, have a much smaller reduction because Rothe is more efficient than the government. At Columbus when AFNETOPS was implemented (AETC NOSC Centric changed to AFNETOPS), Rothe only lost 2 staff positions out of 17 on the contract.

10. I then reduced Rothe's NCC staffing by 66% and re-calculated the overall split. After making the reduction, Rothe's percentage would drop to about 30%. No one choose to attempt to negotiate any changes in the share structure based upon the future implementation of the initiative and I certainly did not suggest it.

11. The Keesler Little BOS RFP initially indicated that the AETC reengineering initiative and its effect on the workload was to be a consideration for bidders. In fact, the initial solicitation released on November 12, 2002 contained information on the initiative. In Amendment 11, section 7.1 was modified to remove the AETC reengineering initiative but it was left in the RFP in section 7.4.11 (AR 168). Although the language of the solicitation was clear that the initiative was not to be bid upon, RKR submitted a question to the contracting officer to confirm that was really what the contracting officer meant. In other words, did RKR have to price its bid on the reengineering initiative? The answer from the contracting officer clarified that RKR was NOT to bid the AETC reengineering initiative, but that the reference to that initiative was left in the RFP for future reference (AR 467 & 468). It was clear to the management of RKR Joint Venture that the initiative was a "long term goal" that would be implemented at some point over the 10 years of the contract. It was also clear that the intent was to utilize a "snapshot in time" approach in order to have an accurate and fair cost comparison between the government's MEO and the private sector offeror.

12. It was clear to me in September of 2003, when the Air Force posted a response to a question which was posed by RKR, that the initiative was still a "long-range goal," as that was exactly what the Air Force's response stated. I saw no need to revisit the share structure question because I knew this was going to happen. I had anticipated prior to September 2003 that the change would be at or about 66% of the workload in the Network Control Center area, and saw no reason to alter this estimate. Much later, after submission of proposals, I would see a much smaller reduction during implementation of AFNETOPS on Rothe's contract at Columbus AFB in 2005.

13. The Contracting Officer's response to RKR's question was clear and unambiguous. The initiative was not to be included in the bid but it was retained in section 7.4 as a "long term goal". Before Amendment 11 was issued I had discussions with other members of the RKR management team about which "out year" of the contract RKR should begin reducing its staffing in anticipation of the implementation of the initiative. The Contracting Officer's response to RKR's question clarified the issue. I had full confidence that the AETC reengineering initiative was going to happen over the life of any awarded contract. It was just not to be costed and included for the snapshot in time approach being used. I looked at the structure of the contract, specifically at clause H-938 (AR 37-38) where the first two years were cost plus. After the first two years, there would be a negotiation in the third year to convert to a fixed price contract after the

requirements were stabilized. I was certain that after those initial two years that the AETC reengineering initiative would be mostly if not entirely implemented as far as its effect on the local NCC workload at Keesler AFB. This has proven true because the contract was originally set to begin on October 1, 2006 and the anticipated "ripening" of the initiative has actually occurred within the two year time frame originally anticipated. Furthermore, an AETC Reengineering briefing presentation attached as **Attachment 1** provides further insight into the status of the reengineering initiative as of June 2004. Therefore, I, just like all offerors or potential offerors, did not just "reasonably anticipate" the future implementation of the initiative, but was firmly convinced that the initiative would most certainly be implemented during the course of the contract.

14. I recognized that the AETC NCC Reengineering was developed to transition from a Base-centric to a Major Command (MAJCOM)-centric network operation. AFNetOps changed the focus from a MAJCOM-centric to an Air Force centric network operation. However, NCC reengineering is still the foundation for the AFNetOps transformation effort as it was in the AETC reengineering initiative. These two transformations/initiatives pursued the same goals in regards to the effect of the staffing at the local base level NCCs such as Keesler. They are both interrelated and interdependent, one upon the other. The bottom line is that the Comm & IT workload that is at issue here, is work that must be performed at the local base level which in effect is almost identical to the Comm & IT workload whether the reductions were produced as a result of the envisioned AETC NCC Reengineering or its transformation to include AFNetOps transformation.

15. The requirements of the early AETC reengineering initiative accomplish 83% of total manning reductions that can be attributed to the AFNetOps "end state" staffing. In fact, the latest revision of the AETC CONOPS (Functional Concept of Operations) FOR AETC ENTERPRISE TRANSFORMATION dated September 5, 2007 (see AR 1408) has the exact same impact on the workload requirements as does AFNetOps.

16. **Attachment 2** shows the NCC functions RKR originally bid under Column 1. Column 2 shows the duties that were envisioned to be performed under the AETC Reengineering Initiative. Column 3 shows the duties as assigned by the AETC Reengineering CONOPS dated November 2006. This version of this document states in paragraph 4.1 page 8 that the roles and responsibilities are modeled after the standard titles/descriptions detailed in Air Force Instructions and AFNetOps P-Plan. Column 4 shows the functions as they will be assigned at the AFNetOps "Projected End State".

17. The effective change in staffing from the original AETC reengineering plan (under Column 2 **Attachment 2**) as compared to the impact of the AFNetOps end state (Column 4 **Attachment 2**) staffing is only 2 people. In other words, the original AETC Reengineering Initiative would reduce RKR's staffing by 12 FTEs. The "ripening" or the morphing of the initiative into AFNetOps only requires a further reduction of 2 FTEs. That staffing difference of 2 people amounts to only 2.3% of RKR's original total

bid for the Keesler workload. This change was also reasonably anticipated as I knew there would be some changes to the initiative as it matured.

18. The AETC/A6 analysis used by Mr. Mortag referenced changes due to PLANS functions (at AR 1019 paragraph numbered as #8) going to AFCyber Command. The PLANS function at all local bases have been fluctuating since the demise of the Air Force Communications Command in 1991. Since that time, these responsibilities have shifted from the bases to the commands and now to 38th EIG (Engineering Group) at Tinker Air Force Base. Change has been and is a constant in the PLANS function and was predicted by RKR. I am intimately aware of these and other ongoing changes because my company, Rothe Development, has provided full staffing of the NCC at Minneapolis Air Reserve Station since 1989 and full staffing of the NCC at Columbus (Mississippi) Air Force Base since 2002. Both of these NCCs operate under full Air Force infrastructure rules, regulations, and policies. Therefore, I have first hand knowledge of the constant change in technology and how it affects the integration, consolidation, and reengineering of resources to include the PLANS functions. The AETC/A6 analysis contains no definitive data of how the PLANS realignment is going to effect the actual staffing at the Keesler NCC beyond the AFNetOps and AETC reengineering effect already discussed.

19. The AETC/A6 analysis does not mention what technology will be used to affect the Telephone Inside/Outside Maintenance requirement. The Keesler RFP did not contain any CLINs for telephone operators therefore RKR's bid is unaffected by any telephone operator consolidations the AETC/A6 references. Technological advances such as Voice Over IP (VOIP) could affect the telephone function staffing. However, VOIP has been around since 1976 and has been in commercial use since the 1990's. RKR certainly anticipated the impact due to Voice Over IP issues for the Keesler Little BOS because RKR included it in page 19 of its proposal. **Attachment 3**. The use of VOIP or other similar technology does not mean that there will no longer be a need for onsite administration of phone equipment, replacement, management etc.

20. As RKR's GAO protest progressed, I learned that the Air Force had abandoned their July 9, 2007 "five reasons" for cancellation for that of the changed requirements on their August 2, 2007 response to the GAO's request for all information. The main thrust of their response is the letter from General Lord wherein he stated the requirements of the solicitation have changed 57 percent as a result of AFNetOps (AR 948).

21. The facts show that General Lord's analysis was based upon the groups within the Unit Manning Document (the government authorized positions before the bid took place). If one member of the group was affected by a potential AFNETOPS reduction the entire group was counted. General Lord took 79 people (the entire Government NCC and Helpdesk) and divided by 138 to get 57%.

22. The A-6 Analysis followed the same methods as stated in his note on page AR 1346:

Note: The percentages that are referenced above are based on a breakout of all the workload requirements prior to AFNetOps which were identified by our subject matter experts and comparing them to changes made by AFNetOps Transformation. The Unit Manning Document (UMD) was used to identify the functional manpower requirements that will be affected by Enterprise Transformation, AFNetOps, and Cyber Command plans (BNCC, Information Protection, Information Systems, Plans/Implementation, etc) and dividing by the 138 positions which were under study.

23. Neither of the methods ever included the subcontractors the MEO used in their bid. There are twenty-eight Contractor Man-year Equivalents listed in the UMD. (AR 1678). When these are added to the 138 civilian and military positions, the total is 164. It is the 164 figure that should have been used as the denominator in their respective calculations, not the 138. But regardless of those figures, they in and of themselves do not mean that the entire contract changes by either General Lord's 57 percent or the AETC/A6's 63 percent. General Lord's 57 percent only refers to the number of FTEs that are "subject to the effect" of the initiative.

24. The AETC/A6 stated in his report that (AR 1346):

Our analysis of AFNetOps and C&I Enterprise Transformation implementation of all AETC bases indicates that roughly 37% of workload will remain at base level for touch maintenance support, while 63% of the workload will be pulled into centralized AFNetOps.

25. The A6 finding is similar to what I anticipated at the time of proposal, to the extent it reflects configuration changes that, under the solicitation, were anticipated to occur at the direction of the Air Force over the life of the contract. When I and the other RKR management team members were trying to determine the reduced staffing in the "out years" (before the Contracting Officer answered RKR's question) we were using the figure of 66% as our "best estimate". However, the important issue is that RKR's 66% or the AETC/A6's 63% does not apply to the entire workforce. It only applied to the areas where the "affected workload" exists. It does not apply to the Photographer in the Visual Information subcontract. It only applies to the affected areas which happen to be the NCC and Helpdesk areas. That is why I find the position taken by the Air Force to be so troublesome. They are stating that the percentages apply to the whole contract and the truth is that they do not.

26. Cancellation is going to cost the Air Force more money to conduct the new study and they will continue to lose the savings associated with implementing the MEO or awarding to RKR.

27. I did in fact believe and understand the initiative was going to be implemented. I was aware of the impact that implementing the initiative would have. I did not just "reasonably anticipate" the eventual implementation of the initiative, I actually accepted as fact that it would come about. I feel confident any qualified offeror would have also

anticipated the initiative that was clearly identified as a future configuration change to occur over the life of the contract. This is especially true because this is a 10 year contract.

28. The Air Force had spent much time, effort, energy and money on the solicitation. The solicitation was, in fact, the second attempt to proceed with the A-76 cost study. The first attempt was halted due to one or more protests filed concerning the solicitation itself. With this second attempt to proceed, the due date for receipt of proposals kept getting pushed further and further back. The Air Force finally decided to stop issuing amendment after amendment and to proceed with the competition on a "baseline" or "snapshot in time" approach. An excerpt about the BOS contract from the Keesler News of November 21, 2007 stated: (**Attachment 4**)

> "The reason we stopped updating it was that every time we put in an amendment to change a process, it caused extra costs to the bidders when they had to recalculate and restructure their bids," Mr. Mooers continued. "AETC and Keesler made a decision to freeze it so we could get through the process with a level playing field and get the bids on the table."

29. The actual effect of the fully implemented AETC Reengineering Initiative/AFNetOps upon RKR's staffing and resulting price decrease is only 10 percent of the total contract value. RKR staffed the affected areas with 24 FTEs. After the implementation of AFNetOps RKR's staffing in this area would be reduced by 14 FTEs. (See **Attachment 2**). It is ironic that this reduction in staffing matched the forecasted reductions of General Lord (AR 948) and the AETC/A6's report (AR 1346). One of the items the Air Force has failed to consider is that these changes only affect some portions of the Communications and IT section of the contract. While the changes may be between 57 and 63 percent of the Communications and IT requirements, they have no impact on other portions of the contract. **Attachment 5** shows the effect of the reductions RKR would implement by reducing staffing in the affected areas by over 58 percent. Yet these changes affect the overall contract value, in dollars, by only 10.2 percent. **Attachment 5** clearly demonstrates that an "apple to apples" comparison between the MEO and RKR can take place. Using the Air Force's own figures of a 57 to 63 percent reduction, the inverse would likewise apply to have the MEO increase their staffing by that amount in order to meet the snapshot in time requirement that was adhered to by RKR. Since the MEO bid was understated due to their reliance upon the initiative, it is only logical that the required increase in their staffing would conform to the figures the Air Force has provided.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this, the 2nd (second) day of July, 2008.

Dale Patenaude

DALE PATENAUDE