**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability<br>Corporation<br>Plaintiff, | §<br>§<br>§<br>§<br>§ | |
| VS. | §<br>§ | NO. 08-CV-00062-MCW<br>Judge Williams |
| THE UNITED STATES<br>Defendant. | §<br>§ | |

## RKR'S PROPOSED STATEMENT OF FACTS

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

Pursuant to RCFC 52.1(b) and 56, Plaintiff RKR JOINT VENTURE, LLC ("RKR") files its Statement of Facts to accompany its Motion for Partial Judgment on the Administrative Record, and states as follows:

### I. THE SOLICITATION

*A. Subject Matter, Applicable Evaluation Procedures, Term, and Pricing*

1. On August 16, 2002, Defendant United States Department of the Air Force ("Air Force") issued Solicitation F41689-02-R-0049 ("the solicitation"), a contract for a Base Operating Support Cost Study (Little BOS) at Keesler Air Force Base, MS. A0001.[1]

2. Little BOS includes Communications and Information Technology, Multimedia Services and Publishing Management service requirements. A0078-79.

3. The solicitation is a negotiated procurement. A0001.

4. The solicitation is designated as a small business set-aside pursuant to OMB Circular A-76 (Aug. 1983) and its March 1996 Supplemental Handbook (both Rev. 1999). A0002; A0075, ¶ M903.

---

[1] References to the numbered portions of the Administrative Record appear as A____.

5. The solicitation contains a five month mobilization period, a one year basic performance period, nine option years, and a six month option to extend. The total potential duration of the contract is just under eleven years; the total non-optional duration is seventeen months. A0003 ¶ B1, A0026 ¶ F12.

6. The solicitation was for a Cost Plus Award Fee/Award Term then converting (through negotiations) to Fixed Price Award Fee (FPAF)/Award Term during option year three. A0036-0037, ¶ H938.

7. The value of the contract to be awarded exceeds $50 million. A1968-1970.

*B. Acquisition Strategy*

Snapshot in time requirements

8. Numerous amendments to the solicitation were announced and incorporated between the date the solicitation was issued, August 16, 2002, to the date offers were due, on or about June 24, 2004, and are reflected as such on the top right portion of the pages. *E.g.*, A0003.

9. The government's acquisition strategy was based upon a "snapshot in time," meaning it had decided to freeze, or stop updating, the solicitation with amendments, and to evaluate proposals and prices based upon a specified date-in-time. Depo. of Ron Mortag at 109-110; Joint Decl. Attachment 4 at 2.

10. Responsive proposals were to be made in terms of the existing "date in time" requirements. A1350 ¶2 ("The Keesler PRD [performance requirements document] was developed in Apr 02 which included all communication requirements for that date in time").

11. The government specifically instructed offerors, on September 25, 2003, to base their proposal staffing and prices only on existing requirements, and not on future changes to the requirements. A1154. The solicitation contains no language directing the offerors to include

anything other than the existing date in time requirements set forth. RKR's offer was in terms of the existing "date in time" requirements.

Cost-plus contract and award fee plan

12. Later, after award, workload and price changes would be accomplished through the operation of the cost-plus contract. A0036 ¶H938. Clause H-938 states:

> It is anticipated that adequate workload data will be available after the performance of the second option year for the service provided to predict a realistic cost to perform the remaining option years ... the resultant contract will be converted from cost plus award fee to fixed price award fee during the third option period. … The PCO [procuring contracting officer] and the service provided will negotiated a fair and reasonable price based on cost and workload data obtained in prior years.

A0036-A0037. The contracting officer ("CO") explained that this type of "Section H" clause was used to identify workload contingencies. Depo. of Ron Mortag at 28-29.

13. The CO admitted that the solicitation was written as a cost-plus contract with an initial two-year period to determine what the workload and its costs were going to be, and that then a fixed-price contract would be negotiated based upon the new workload and personnel cost data. Depo. of Ron Mortag at 116:11-14; A0232.

14. The CO explained the rationale for "the conversion from a cost type contract to a fixed price arrangement" as follows: "The strategy behind that was that there would be enough cost and work load data to support a conversion to a fixed price arrangement at the end of year two." Depo. of Ron Mortag at 26:8-11.

15. The cost-plus-award-fee contract prescribed by the solicitation, A0036, A0055, A0064, is defined by FAR 16.405-2(a) as a cost-reimbursement contract, which FAR 16.301-1 in turn defines as a contract that provides for payment to the contractor of allowable incurred costs to the extent provided in the contract. FAR 16.301-2 emphasizes that cost-reimbursement

contracts are used when requirements for contract performance are uncertain: "Cost-reimbursement contracts are suitable for use only when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract."

16. The Award Fee Plan, A0227–A0249, also recognized that the cost of performance would stabilize over the course of the contract.

17. Paragraph 1 of the Award-Fee Plan states:

> After several years of contract performance, the costs should stabilize, allowing for conversion to fixed price award fee for the remainder of the contract -- option year 4 and all out years. The fixed price that is negotiated shall not exceed the total estimated cost for each corresponding year, ***as adjusted for AF-approved baseline work scope changes***.

A0232 (emphasis added).

18. Paragraph 4.4.2 of the Award Fee Plan indicates that the metrics may be modified "as the mission and priorities of the base evolve." A0255. This is consistent with operation of the cost-plus contract.

19. The contracting officer testified that the Air Force also contemplated that the contract could be modified after award, if necessary, to accommodate any changes; he agreed that "The PWS [Performance Work Statement] is a snapshot in time of what the government currently is doing and would like to have accessed [sic – assessed]. Later if deemed necessary and funding is available the contract or the LOO [Letter of Obligation for the MEO] can be modified." Depo. of Ron Mortag at 38:9-16.

20. The solicitation also incorporated 48 C.F.R. § 52.243-2, Alternate II, which states, in relevant part, "The Contracting Officer may at any time, by written order . . . make changes within the general scope of this contract in any one or more of the following: (1) Description of services to be performed", and 48 C.F.R. § 52.249-6, Termination for Convenience, "The

Government may terminate performance of work under this contract in whole or, from time to time, in part, if (1) The Contracting Officer determines that a termination is in the Government's interest"). A0043.

*C. Configuration Changes in Communications and Information Technology to Occur Over the Life of the Contract*

21. The cancelled solicitation included (1) existing requirements as of the date specified by the government, upon which the offerors were to propose a price, and (2) projected configuration changes to the network, which were to occur over the life of the contract, but upon which proposal prices were not to be based. A1154.

22. "The network" is the voice and data network and related administrative and support functions for Keesler AFB and a nearby Air National Guard base, as defined at A144 ¶ 7.1.

23. The directors of the configuration changes identified in the solicitation were to be AFNOSC and AETC NOSC. A0165. AETC [Air Education and Training Command] is a major command, or MAJCOM.

24. The directors of the configuration changes were, at the time of solicitation issuance and proposal submission, overseeing an ongoing "NOSC-centric" planning process to consolidate and reconfigure the network under their control, including administrative and support functions. A0168 ¶ 7.4.11.

25. The government confirmed, in response to a question from RKR, that the configuration changes to the network referenced in the solicitation involved the NOSC-centric initiative. A1154.

26. The current CO, Ron Mortag, believed "that's why the previous contracting officer put in some sort of clause to identify the fact that this [major] command [MAJCOM] was

moving toward something but none of the specifics were identified yet." Depo. of Ron Mortag at 11:15-19.

27. The solicitation's "requirements" concerning the initiative are set forth at A0147 ¶7.1.4.3, which mandates that the service provider "shall implement configuration and security changes to comply with Air Force and MAJCOM directives as necessary." The plain language states they are to be implemented throughout the life of the contract as they occur. *Id*.

28. The offerors knew, when formulating their proposals, that the staffing requirements would be reduced over time as a result of configuration changes to the network. A1352; Second Decl. of Ken Lee ¶ 5; Joint Declaration, Attachment 7.

29. The offerors also knew that the government had the right to reduce the staffing requirements for any given task to zero, if that was the result of the configuration changes to the network. A0043. Workload reductions could take place through operation of the cost-plus contract during the first two years of performance.

*D. AFNETOPS and the NOSC-centric Initiative*

30. AFNETOPS has been in the planning stages for many years, even as early as 1996. Depo. of Maj. Gen. John W. Maluda at 91:9-12.

31. Air Force Instruction (AFI) 33-115, "Network Management" (May 24, 2006 ed.), is included in the solicitation as a directive required to be followed. A0174. AFI 33-115, at Figure 2.1, shows the AFNETOPS Command Relationship. This figure indicates that, from the local base-Network Control Center ("NCC") perspective, the transformations that have occurred and will occur are above the local NCC base-level and are in other states. A1599. The government admits these transformations are not yet complete. Depo. of Maj. Gen. John W. Maluda at 107-108, 132-133.

32. After the solicitation was issued, but before proposals were submitted, the government made an internal announcement on July 3, 2003, not announced to the offerors. A1352.

33. The government announced that it would, "in synchronization with our ongoing information operations initiatives," reorganize the various Air Force networks "under the control of a single Air Force commander," consistent with the Air Force's current command and control policy (or "C2 process"). A1352.

34. The announcement expressly noted that the reorganization, to be known as AFNETOPS, would "include the 8AF [Eighth Air Force] initiative for a centralized AF NET Operations Security Center (AFNOSC)." A1352.

35. The government's internal announcement did not indicate that the NOSC-centric initiative would change in any way other than being folded into the AFNETOPS organizational structure.

36. The government's decision to fold AFNOSC into AFNETOPS did not result in any additional amendment to the solicitation. At no time prior to the GAO bid protest in July of 2007, *infra*, was there any indication that cancellation was warranted as a result of configuration changes due to AFNETOPS.

37. Agency counsel's first letter to GAO stating the reasons for the intended cancellation mentions only that "there was, and is currently underway, an initiative" and makes no distinction between AFNETOPS and the NOSC-centric initiative. A0772.

38. The GAO found that configuration changes due to the "NOSC-centric initiative" had been underway since before the time of bidding. A0995-0996.

39. The GAO found that as between the "NOSC-centric initiative" and the "AFNETOPS" structure it was folded into, there was "no dispute that both terms refer, generally, to the same centralization concept." A0996 n.3.

40. The CO admitted he did not have "enough of a working knowledge of it [AFNETOPS] to have any idea what its relationship would be to the necessity to wait two years to go to a fixed price contract." Depo. of Ron Mortag at 28. He "couldn't say [he] was really familiar with the concept" of AFNETOPS. Depo. of Ron Mortag at 49. However, he believed the solicitation did include a contingency clause that talked about the potential impact of AFNETOPS. *Id.*

41. AFNETOPS will remove control over certain functions from 17 decentralized MAJCOM NOSCs [major command network operations and security centers] and centralize it under two "I-NOSCs" [integrated NOSCs]. *See* ¶ 42-50 *infra*. This switch in organizational structure is to occur at an organization located away from Keesler AFB—at the AETC NOSC, at Randolph AFB, Texas—and away from where the Little BOS will be performed. *Id.*

42. As of July 2007, the Air Force defined the "Concept of Operations & Milestones" of AFNETOPS:

> The end state of AFNetOps is to centrally operate all Air Force systems from the I-NOSCs/ESUs [Integrated Network Operations & Security Centers/Enterprise Services Units]. [Para.5.3.1.4] . . . The two I-NOSCs represent a functional capability to fulfill the VCSAF [Vice-Chief-of-Staff of the Air Force] direction to consolidate AF network operations and services previously performed by the MAJCOM [major command] NOSCs. The I-NOSCs will perform the security and operations functions. They will . . . centralize those aspects of network security previously performed by the MAJCOM NOSCs . . . They will exercise control over the base-level Network Control Centers (NCCs). . . . The I-NOSC's enterprise services function will centralize management of Air Force core services presently provided by the MAJCOM NOSCs. [Para. 5.3.2]

A1403. *See also* A1376, A1377, A1370 & A1371.

43. The "United States Air Force Network Operations Functional Concept," A1355 explains the time horizons:

> The migration from today's decentralized construct to the formation of a fully operational and funded end-state (i.e., AFNETOPS forces provided C2 [command and control] over terrestrial, airborne and space [communications] nets) is expected to be a multi-year endeavor. . . . The first step of this transformation occurred on 5 Jul 06 [when] the 67th Network Warfare Wing . . . was given authority over all forces and resources formerly assigned to the MAJCOM . . . NOSCs. . . . The next step is . . . directing consolidation of MAJCOM NOSC network security and enterprise core services into the I-NOSCs . . . targeted for 2008. . . . The final step—integration of most airborne and space networks—will occur in the 2012-2020 timeframe.

A1359; Depo. of John W. Maluda at 121.

44. Major General Maluda personally edited the "United States Air Force Network Operations Functional Concept," A1355. He testified that, at Keesler AFB, the final step is not applicable. Depo. of John W. Maluda at 101:11-12, 122.

45. The concept of moving work away from the Base Network Control Center to a remote location is not new. A0996n.3.

46. Before AFNETOPS, the centralization concept was embodied under 17 MAJCOM NOSCs. AFNETOPS first consolidated those 17 down to ten, and then further plans to consolidate the ten NOSCs down to two "I-NOSCs" [integrated NOSCs]. A0977-0978; A1599. *See also* charts, depicting the MAJCOM NOSCs at A1430, A0169, and the AFNOSC and I-NOSCs at A1599.

47. AFNETOPS is "the continuing evolution from MAJCOM centric to AF centric network operations." A1351.

48. The consolidation of the MAJCOM NOSCs into I-NOSCs has already begun and is scheduled for completion in 2008–2010 timeframe. A1359 ¶ 2.)

49. Base level Network Control Center ("NCC") manpower will be reduced and commensurately sized to perform limited touch-maintenance only. (A1371 ¶ 8.2.3)

50. Touch-maintenance at the base-level NCC at Keesler AFB will be performed whether there is a MAJCOM NOSC (i.e., AETC NOSC) or an I-NOSC. The only difference is whether the work will be directed by the MAJCOM NOSC's Communication Coordination Center (MCCC) at Randoph Air Force Base, Texas, or the Air Force's I-NOSC in Washington, D.C. A1413.

*E. Solicitation References to Configuration Changes in Communications and Information Technology That Accommodate the NOSC-centric initiative and AFNETOPS*

51. The solicitation contains numerous references that indicate NOSC-centric changes like AFNETOPS are covered and anticipated. *See* ¶ 52-68 *infra*.

52. Paragraph 1.3.1 states the contractor will perform services "while adapting to changing AF/DoD/Congressional dictates within time-frames specified by Keesler AFB." A0083.

53. Paragraph 1.3.4.1 states: "The mission of Keesler AFB changes as the needs of the Air Force evolve… support organizations delivering services such as information technology, telecommunications… must be organized and managed in such a way that they can adapt to these evolving requirements without degrading service levels and at a reasonable cost to the Government." A0084-A0085.

54. Paragraph 1.3.5 requires the contractor to "identify, promote, and introduce innovations that add customer value and increase service level while maintaining ***or decreasing costs***." A0085 (emphasis added).

55. Paragraph 2.1 states in part "The service provider shall . . . adapt to changing requirements of [Keesler Air Force Base]." A0090.

56. Section 7.1 of the solicitation contains the requirements that the service provider must meet. A0144-0153; A1039 (quoting A1154).

57. Paragraph 7.1.4 is considered the "core" of the Enterprise transformation effort. A1347.

58. Prior to amendment, the original solicitation specifically indicated the degree of labor reductions that would be associated with the net-centric initiative, as only a "caretaker" staff would be required for the Network Control Center. A0803.

59. After amendment, the initiative was removed as a requirement, except for the provision under the "requirements" portion of the PRD in Paragraph 7.1.4.3, which mandates that the service provider implement "configuration and security changes to comply with Air Force and MAJCOM directives" when requested over the life of the contract. A0147 ¶ 7.1.4.3.

60. AFNETOPS directs configuration changes. A1358; A1447 ¶ 4.411. All offerors were aware of the significant staffing reductions that would take place over the life of the contract as this initiative ripened and that they would be required to implement such reductions pursuant to Paragraph 7.1.4.3. Second Decl. of Ken Lee ¶ 5; Joint Declaration, Attachment 7.

61. Paragraph 7.4.5 of Amendment 11, entitled "Network Management Responsibilities," reads in part:

> Keesler AFB, as a part of the Air Force enterprise network, employs a multi-tier support system for network management: unit-level Workgroup Managers, Functional System Administrators, the [Network Control Center, or NCC], the [Air Education and Training Command Network Operations and Security Center, or AETC NOSC], and finally the Air Force [Network Operations and Security Center, or AFNOSC]. To support this concept of operations, the Service Provider is expected to assume [Workgroup Manager/Functional System Administrator, or WM/FSA] duties ***only*** in areas where current [Communications and Information Technology, or C&IT] positions are included in the study.

(emphasis added). A0165.

62. Paragraph 7.4.5 thus directed RKR to assume management positions in its proposal only for existing Communications and Information Technology management positions.

63. Paragraph 7.4.5 of Amendment 11, entitled "Network Management Responsibilities," further reads in part:

> The AFNOSC will direct configuration changes to the network to either enhance security or improve communications across the entire Air Force. Similarly, the AETC NOSC will direct configuration changes to the network to either enhance security or improve communications across the entire command.

A0165.

64. Paragraph 7.4.5 thus directed RKR to assume, when submitting its proposal, that any configuration changes to the network, including changes involving existing Communications and Information Technology management positions or staff below them, would be directed by the government during the life of the contract.

65. Paragraphs 7.1.1, 7.1.1.1.1, and 7.1.1.1.4 of Amendment 11 directed RKR to be able to accommodate ongoing mission change and planning processes that affected the configuration of the network, including the management of that configuration. A0144-0145.

66. Paragraph 7.1.1 of Amendment 11, entitled "Plans and Implementation Services," states:

> The service provider shall provide detailed plans and supporting budgets, that outline implementation activities to maintain infrastructure related to [Communication and Information Technology, or C&IT] systems in response to the changing mission of Keesler AFB.

A0144.

67. A task required at Paragraph 7.1.1.1.1 of Amendment 11 is to "Schedule, forecast, document and implement downward directed and upward driven C&IT programs and projects." A0144.

68. A task required at Paragraph 7.1.1.1.4 of Amendment 11 acknowledges an ongoing planning process over the life of the contract:

> Provide configuration management by participation in the planning, acquisition, management, and control of C&IT resources. Provide input to strategic planning processes to promote the most cost-effective technology options for improvement of operations. Make recommendations for technology insertion and provide inputs to the C&IT planning process.

A0145.

## II. THE AIR FORCE'S EVALUATION

69. Following the submission of bid proposals, the Air Force narrowed the field of bidders to one by conducting the A-76 Cost Comparison Study.

70. The Results of the OMB A-76 Cost Comparison Study were signed and approved by Major General William T. Lord on August 17, 2005. A1968-1971.

71. On 17 August 2005, the Kessler Little BOS Source Selection Authority selected RKR as the sole winning offeror to be used for cost comparison against the In-House Cost Estimate for the MEO. A1971.

72. RKR was subsequently notified that the results of the Cost Comparison Study favored the MEO. RKR's price was exposed to the public in a manner that exceeds the normal exposure experienced in the opening of a public bid, as RKR's price was posted on the internet for an extended period of time. A0829, A1968.

73. The government postponed further cost study on RKR and the MEO's offers due to Hurricane Katrina, but then submitted a request to resume cost study on April 17, 2006, A2071, noting "There are no significant changes to the workload as described in the BOS solicitations." A2074.

74. Approval to resume cost study on RKR and the MEO's offers was granted on January 8, 2007. A2142.

75. The Air Force decided to award the contract to the MEO in the days thereafter and announced the selection of the MEO as the awardee on February 26, 2007. A0829. No actual award has ever occurred.

76. The proposals as opened and made public were for RKR of $59,691,967 and for the MEO of $ 54,719,167. A1968-1970.

## III. THE ADMINISTRATIVE APPEAL

77. On March 29, 2007, RKR timely filed an administrative appeal of the Air Force decision to award the contract for the solicitation to the MEO. A2143.

78. RKR's administrative appeal was reviewed by Major General John W. Maluda in his capacity as the Keesler Administrative Appeal Authority. A2275.

79. At the time, Major General Maluda was also Vice Commander, 8th Air Force and Air Force Network Operations, or AFNETOPS.

80. The foregoing administrative appeal was denied by letter from Major General Maluda dated May 23, 2007. A2272-2275.

81. The administrative appeal found that the MEO acknowledged future configuration changes to the network from a NOSC-centric or similar initiative, *see* A1164, 1166-67, 1171, but still met the date in time requirements of the solicitation. A2273.

82. The letter denying the appeal gave every indication that the contract for the solicitation would be awarded to the MEO and would be performed, stating "the Administrative Appeal Process Team . . . concurs with the decision to select the MEO (in-house) as the selected service provider." A2275.

## IV. SUBSEQUENT APPEALS AND LITIGATION

83. Following denial of its administrative appeal, RKR filed a GAO bid protest on or about June 7, 2007. A1027.

84. On July 2, 2007, without responding to the merits of RKR's bid protest, the Air Force stated its intent to cancel the solicitation to the GAO, but did not state any reason. A0770.

85. Internal documents leading up to the government's announcement of intent to cancel the solicitation strongly implied that the MEO's proposal was not based on the same requirements and assumptions as private sector offers, instead assuming the configuration changes as part of the requirements:

> Lesson Learned: The bifurcated process in the "old" A-79 prevented the contracting officer and Source Selection Authority from reviewing the MEO staffing and costing proposals and adequately sharing information with the Independent Review Office (IRO) to ensure the MEO was based on the same requirements and assumptions as private sector offers.

A1026.

> I recommend your contracting officer also cancel the solicitation because ambiguity substantially affected competition.

A1024.

86. On or about July 2, 2007 RKR objected at the GAO to the Air Force's intent to cancel the solicitation for failure to state any reason. A0771.

87. On or about July 9, 2007, agency counsel responded. A0772.

88. In its July 9, 2007 response, the government stated "there is an ambiguity in the solicitation's language concerning the staffing of Network Operations (SC1B) work center, which comprises a significant amount of the work," that had not been clarified. A0772. The government admitted that "the MEO appears to have been understated" and requires revision. *Id*.

89. In its July 9, 2007 response, the government further stated five alleged reasons for cancellation of the solicitation: (1) ambiguity; (2) revisions made necessary by the passage of time to periods of performance, wage and tax rates, and property lists; (3) the expiration of the study period; (4) the need to utilize the old A-76 procedures if revisions were made instead of cancellation; and (5) additional information requirements Congress had imposed since the solicitation was issued. A0772-0774.

90. On or about July 16, 2007 RKR responded in opposition at the GAO and requested that its protest issues be deemed admitted. A0789.

91. On July 30, 2007, the GAO submitted an additional information request to the government. A0938.

92. The GAO questioned whether the solicitation contained an ambiguity such that an offeror might base its proposal on a NOSC-centric initiative rather than existing "date-in-time" requirements. A0938-0939.

93. In the July 9, 2007 response, the government had mentioned only that "there was, and is currently underway, an initiative that would centralize certain operations and will significantly change personnel requirements," and made no distinction between AFNETOPS and the NOSC-centric initiative. A0772.

94. Rather than respond to the GAO's question, on August 2, 2007, agency counsel said it was moot because the government submitted a sixth and different alleged reason for cancellation. A0942 & n.1.

95. The sixth alleged reason was a declaration from Major General William T. Lord regarding the alleged significant effect of AFNETOPS on existing network communications and

information technology requirements of the solicitation, without identifying whether the effect he referred to concerned manning, contract price, equipment changes, or some other aspect. A0948.

96. In its August 2, 2007 letter, the government added a "more bidders" argument, A0943 & n.4, and restated its study period expiration procedural bar argument. A0943-0944.

97. In its August 2, 2007 letter, the government admitted to GAO that several of the justifications in that letter and the July 9, 2007 letter would not apply if AFNETOPS was an anticipated configuration change to occur during the life of the contract instead of a brand new requirement. A0944 & n.6.

98. On August 13, 2007 RKR responded to the sixth alleged reason for cancellation, stating, in summary, that the solicitation encompassed the needs of the Air Force, including AFNETOPS. A0949.

99. GAO dismissed the RKR protest because of the Air Force's intent to cancel the solicitation. A0993; *RKR Joint Venture, LLC*, B-299856 (Aug. 29, 2007).

100. On August 24, 2007, RKR initiated bid protest litigation at the Court of Federal Claims in *RKR Joint Venture LLC v. U.S.*, No. 07-630 (Judge Williams).

101. In the course of the litigation, RKR raised the issue the contracting officer had not actually cancelled the solicitation in accordance with Federal Acquisition Regulations. THE UNITED STATES filed a motion to dismiss in response. The parties agreed to await a determination by the contracting officer.

102. On January 7, 2008, the contracting officer issued his findings and determination for cancellation of the solicitation. A1016.

103. The parties agreed to and filed a stipulation of voluntary dismissal without prejudice to re-filing pursuant to Fed. R. Civ. P. 41(a)(1)(ii) on January 23, 2008. The Court dismissed the case without prejudice on January 24, 2008.

104. RKR re-filed its bid protest in this case on January 29, 2008.

105. The government does not intend to resolicit until AFNETOPS is fully implemented. A1016 ¶ 3 ("The Air Force Component Competitive Sourcing Official (CCSO) in AF/A1 took immediate corrective action upon initial review of the GAO protest. The CCSO decided not to implement the MEO. Further, the CCSO did not envision rescheduling the competition until the on-going AFNETOPS Transformation is complete and recommended the contracting officer consider cancellation of the solicitation").

106. Major elements of AFNETOPS, including the final locations and manning of consolidated help desk functions, and command and control ("C2") relationships, have not yet been determined. A2343, A2347-2350, Depo. of Maj. Gen. John W. Maluda at 131:16-22 and 132-133.

## V. OTHER FACTS

107. Both the CO and Major General Maluda testified that the solicitation's requirements were clear. Depo of Ron Mortag at 45:10-12; Depo. of Maj. Gen. John W. Maluda at 112:1-17.

108. Based on the government's evaluation of their proposals, either RKR or the MEO could have kept up with evolving configuration changes to the network, including changes specifically due to AFNETOPS, over the life of the contract. Depo. of Maj. Gen. John W. Maluda at 108.

109. There was no "quantum leap" or significant change in the evolution of AFNETOPS between the time of the administrative appeal decision and the time of cancellation. Depo. of Maj. Gen. John W. Maluda at 140-142.

110. OMB A-76 1999 does not require the use of the COMPARE software. A0462.

111. The Government Furnished Property List is not part of the solicitation package. This information was located in the Technical Library. A0024; A0095 ¶ 2.1.9.

112. There was at most one other qualified small businesses other than RKR's team attending the Shepard Air Force Base site visit. Second Decl. of Dale Patenaude, ¶ 27, 30.

113. The Keesler site-visit attendee list shows there were 20 small businesses and three large businesses attending that were interested in performing the communications and information technology work. Second Decl. of Dale Patenaude Attachment 4-1.

114. The RFP did not require RKR to submit a single lump sum price, but rather required RKR to provide separate line item prices. A0004-A0029.

115. AFNETOPS does not affect multimedia services, publishing management, or general administrative requirements for this solicitation.

116. An analysis performed as part of the CO's determination and findings indicates that only two of the thirteen service areas set out in the solicitation's requirements, Section 7.1 of the Performance Requirements Document, will be fully affected by AFNETOPS, with two additional service areas partially affected. A1346-1349. The two fully affected areas are Infrastructure Management (7.1.2) and Data Network Operations and Management (7.1.4). *Id*.

117. According to the Office of the President, Office of Management and Budget, cancellation of the solicitation and the initiation of a new competition would continue to delay

efficiencies and savings gained from competition at a significant increase cost to the taxpayer. The Air Force has already invested a great amount of resources in the competition. A1601.

DATED July 3, 2008.

Respectfully submitted,

/s/
David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 100
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded in compliance with the Federal Rules of Civil Procedure to all counsel of record as set out below, on this the 3d day of July, 2008, as follows:

Will Rayel
Trial Attorney
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 12100
Washington, DC 20530 (20005 for FedEx)
phone: (202) 616-0302
facsimile: (202) 307-0972

***VIA E-FILING***

/s/
David F. Barton