# ATTACHMENT 1

# CIRCULAR NO. A–76
# Revised Supplemental Handbook

# PERFORMANCE OF COMMERCIAL ACTIVITIES

**EXECUTIVE OFFICE OF THE PRESIDENT**

**OFFICE OF MANAGEMENT AND BUDGET**

**MARCH 1996**

**(UPDATED THROUGH TRANSMITTAL MEMORANDUM 20, JUNE 1999)**

# Table of Contents

| | Page |
|---|---|
| **INTRODUCTION** | **iii** |
| **PART I—POLICY IMPLEMENTATION** | **1** |
| **PART II—PREPARING THE COST COMPARISON ESTIMATES** | **15** |
| **APPENDICES:** | |
| 1. DEFINITION OF TERMS | 35 |
| 2. COMMERCIAL ACTIVITIES INVENTORY | 38 |
| 3. USEFUL LIFE AND DISPOSAL VALUES | 45 |
| 4. TAX TABLES | 52 |
| 5. OFPP POLICY LETTER 92–1, ''INHERENTLY GOVERNMENTAL FUNCTIONS'' | 55 |
| 6. AVIATION COMPETITIONS | 62 |
| 7. MOTOR VEHICLE COMPETITIONS | 69 |

# Introduction

The August 1983 Office of Management and Budget (OMB) Circular No. A–76, *"Performance of Commercial Activities,"* establishes Federal policy for the performance of recurring commercial activities. This Supplement replaces the Handbook issued with the 1983 Circular and provides updated guidance and procedures for determining whether recurring commercial activities should be operated under contract with commercial sources, in-house using Government facilities and personnel, or through interservice support agreements (ISSAs). The Revised Supplemental Handbook is an integral part of the 1983 Circular.

As noted in the Vice President's Third Report of the National Performance Review, *"Common Sense Government: Works Better and Costs Less,"* (September 1995), Americans want to ''get their money's worth'' and want a Government that is more businesslike and better managed. The reinvention of Government begins by focusing on core mission competencies and service requirements. Thus, the reinvention process must consider a wide range of options, including: the consolidation, restructuring or reengineering of activities, privatization options, make or buy decisions, the adoption of better business management practices, the development of joint ventures with the private sector, asset sales, the possible devolution of activities to State and local governments and the termination of obsolete services or programs. In the context of this larger reinvention effort, the scope of this Supplemental Handbook is limited to the conversion of recurring commercial activities to or from in-house, contract or ISSA performance. Circular A–76 is not designed to simply contract out. Rather, it is designed to: (1) balance the interests of the parties to a make or buy cost comparison, (2) provide a level playing field between public and private offerors to a competition, and (3) encourage competition and choice in the management and performance of commercial activities. It is designed to empower Federal managers to make sound and justifiable business decisions.

Reliable cost and performance information is crucial to the effective management of Government operations and to the conduct of competitions between public or private sector offerors. Unfortunately, this information has not been generally available and has often been found to be unreliable. The Chief Financial Officers Act of 1990 (CFO Act) includes among the functions of chief financial officers ''the development and reporting of cost information'' and ''the systematic measurement of performance.'' This includes performance by in-house, contract or ISSA resources. In July 1993, Congress passed the Government Performance and Results Act (GPRA), which mandates performance measurement by Federal agencies. The Statement of Federal Financial Accounting Concepts No. 1, *"Objectives of Federal Financial Reporting (1993),"* stated that one of the objectives of Federal financial reporting is to provide useful information to assist in assessing the budget integrity, operating performance, stewardship, and control of the Federal Government. In 1995, the Federal Accounting Standards Advisory Board (FASAB) recommended standards for managerial cost accounting, which were approved by the Director of OMB, the Secretary of the Treasury and the Comptroller General. These standards were issued as the Statement of Federal Accounting Standards No. 4, *"Managerial Cost Accounting Standards for the Federal Government."* This Supplement relies on the managerial cost accounting and performance standards established in support of the CFO Act, GPRA, and the Federal Accounting Standards, as they are developed and implemented. Cost and performance information developed for cost comparisons required by the Circular and this Supplement should be drawn from the data base established by these standards and adjusted as appropriate.

The Circular and this Supplement are not intended and should not be construed to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers or any person. It should not be construed to create any substantive or procedural basis on which to challenge any agency action or inaction, except as set forth in Part I, Chapter 3, Paragraph K, of this Supplement and as set forth in Appendix 2, Paragraph G, consistent with Section 3 of the Federal Activities Inventory Reform Act of 1998 (FAIR Act, P.L. 105–270).

This Supplement is divided into two parts (with a table of contents at the beginning of each Part) as follows:

Part I *Policy Implementation*

Sets forth the principles and procedures for implementing OMB Circular A–76.

Part II *Preparing the Cost Comparison Estimates*

Provides instructions for calculating the financial advantage to the Government of acquiring a product or service through in-house, contract or interservice support agreement resources.

Appendices

| | |
|---|---|
| *Definition of Terms* | Defines terms within the context of OMB Circular A–76. |
| *Commercial Activities Inventory* | Provides information and reporting guidance. |
| *Useful Life and Disposal Values* | Provides useful expected life and disposal values for equipment. |
| *Tax Tables* | Provides Federal tax rate tables for use in A–76 cost comparisons by industry type. |
| *OFPP Policy Letter 92–1* | Provides guidance and criteria for determining whether activities may be considered inherently governmental and not subject to the requirements of the Circular or this Supplement. |
| *Aviation/Motor Vehicle* | Provides sector-specific alternatives to the cost comparison methodologies in Part II. |

# PART I

# POLICY IMPLEMENTATION

# Table of Contents


| | Page |
|---|---|
| Chapter 1—General Provisions: | |
| A. General | 3 |
| B. Inherently Governmental Activities | 3 |
| C. Government Performance of Commercial Activities | 3 |
| 1. National Defense or Intelligence Security | 3 |
| 2. Patient Care | 3 |
| 3. Core Capability | 3 |
| 4. Research and Development | 3 |
| 5. No Satisfactory Commercial Source | 3 |
| 6. Functions with 10 or Fewer FTE | 3 |
| 7. Meet Performance Standard | 4 |
| 8. Lower Cost | 4 |
| 9. Temporary Authorization for In-House Performance | 4 |
| D. Contract Performance of Commercial Activities | 4 |
| 1. Contracted Activities | 4 |
| 2. New Requirements | 4 |
| 3. Severable Expansions | 4 |
| 4. Interservice Support Agreements (ISSA) | 4 |
| 5. Activities With 10 or Fewer FTE | 4 |
| 6. Activities with 11 or More FTE | 4 |
| 7. Activities Performed by the Military | 5 |
| 8. Preferential Procurement Programs | 5 |
| 9. Lower Cost | 5 |
| E. Agency Cost Comparison Waivers | 5 |
| F. Commercial Activities Inventory | 5 |
| G. Review of Documents | 5 |
| 1. Access to Supporting Documents | 5 |
| 2. Appeals of Agency Decisions | 6 |
| H. Personnel Considerations | 6 |
| I. Relationship to the Budget | 6 |
| Chapter 2—Interservice Support Agreements (ISSA): | |
| A. General | 8 |
| B. Specific | 8 |
| Chapter 3—Cost Comparisons: | |
| A. General | 10 |
| B. Cost Comparison Study Team | 10 |
| C. Performance Work Statements | 10 |
| D. Quality Assurance Surveillance Plans | 11 |
| E. Management Plans | 11 |
| F. Safeguarding the MEO | 11 |
| G. Solicitations | 11 |
| H. Methods of Procurement | 12 |
| I. The Independent Review | 12 |
| J. Evaluation of Bids and Tentative Decisions | 12 |
| K. Appeals of Tentative Waiver and Cost Comparison Decisions | 13 |
| L. Post-MEO Performance Review | 14 |

# Chapter 1—General Provisions

**A. General**

This Part sets forth the principles and procedures for managing the Government's acquisition of recurring commercial support activities, implementing the ''Federal Activities Inventory Reform Act of 1998'' (''The FAIR Act''), P.L. 105-270, and Circular A–76. Exhibit 1 summarizes the conditions that permit conversion to or from in-house, contract or Inter-Service Support Agreement (ISSA) performance. The requirements of the FAIR Act apply to the following executive agencies: (1) an executive department named in 5 USC 101, (2) a military department named in 5 USC 102, and (3) an independent establishment as defined in 5 USC 104. The requirements of the FAIR Act do not apply to: (1) the General Accounting Office, (2) a Government corporation or a Government controlled corporation as defined in 5 USC 103, (3) a non-appropriated funds instrumentality if all of its employees are referred to in 5 USC 2105(c), or (4) Depot-level maintenance and repair of the Department of Defense as defined in 10 USC 2460.

**B. Inherently Governmental Activities**

1. Inherently Governmental activities are not subject to the FAIR Act, Circular A–76 or this Supplemental Handbook. As a matter of policy, an inherently Governmental activity is one that is so intimately related to the exercise of the public interest as to mandate performance by Federal employees. The Office of Federal Procurement Policy (OFPP) Policy Letter 92-1, dated September 23, 1992 (*Federal Register,* September 30, 1992, page 45096), provides guidance on the identification of inherently Governmental activities (see Appendix 5). This guidance conforms to the definition provided at Section 5, paragraph 2, of the FAIR Act.

2. The decision that a particular function is inherently governmental or commercial rests on a number of factors, including: the level of Federal control required, the ministerial nature of the function, certain statutory provisions, and distinguishing between recurring operations and oversight. Statutory authority to perform a function is not, itself, sufficient to warrant continued in-house performance as an inherently governmental function. The full range of issues addressed by the OFPP Policy Letter 92–1 must be considered. As provided by the Policy Letter, OMB remains available to resolve agency concerns in this determination.

**C. Government Performance of Commercial Activities**

Consistent with paragraph 8. of the Circular, cost comparisons are not required to convert the following activities to or from in-house, contract or ISSA (The application of these conditions should be reviewed by the official in paragraph 9.a. of the Circular, or designee, as a part of the annual inventory of commercial activities.):

1. *National Defense or Intelligence Security.*—Commercial activities may be performed by in-house, contract or ISSA, without cost comparison, when required to assure the national defense or national intelligence security. The Secretary of Defense, or designee, approves requests for conversions on the basis of the national defense. The Director of Central Intelligence, or designee, approves conversions on the basis of national security.

2. *Patient Care.*—As provided by paragraph 8.c. of the Circular, commercial activities at Government-owned hospitals or other health facilities may be performed by in-house, contract or ISSA, without cost comparison, when needed to maintain the quality of direct patient care.

3. *Core Capability.*—A minimum core capability of specialized, scientific or technical in-house or contract employees and related commercial workload, may be maintained, without cost comparison, to ensure that the Government has the necessary capabilities to fulfill its mission responsibilities or meet emergency requirements.

4. *Research and Development.*—As provided by paragraph 7.c.(7) of the Circular, research and development activities may be performed by in-house, contract or ISSA without cost comparison. Recurring and severable activities that are performed in support of direct research and development are subject to the cost comparison requirements of this Supplement.

5. *No Satisfactory Commercial Source Available.*—

a. If a commercial activity could be contracted, but there is no commercial source, the activity is to be operated using the Government's Most Efficient Organization (MEO).

b. Efforts to solicit commercial interest are to be documented, to include: (1) consideration of preferential and non-preferential procurement and (2) a determination that the solicitation did not limit commercial participation.

6. *Functions With 10 or Fewer FTE.*—Activities involving 10 or fewer FTE may be converted from contract

to in-house or ISSA, without cost comparison, if the contracting officer determines that performance is unsatisfactory or that fair and reasonable prices cannot be otherwise obtained.

7. *Meet Performance Standard.*—

a. Performance by in-house, contract or ISSA may be authorized if an agency demonstrates that performance meets or exceeds generally recognized industry performance and cost standards.

b. Competitions based upon output and cost performance measures must reflect the agency's fully allocated costs of performance and must be certified as being in full compliance with the Statement of Federal Accounting Standards No.4, *"Managerial Cost Accounting Standards for the Federal Government."* The cost comparability procedures described in this Supplement, such as those related to fringe benefit factors, must also be considered in assessing the comparability of Government and private sector performance measures and costs. Adjustments to Government and private sector performance measures and costs may be required. Performance standards should be monitored in conjunction with the Chief Financial Officers Act (CFO Act) and the Government Performance Results Act of 1993 (GPRA).

c. A full description of the standards, performance measures, costs and adjustments made will be developed by the agency and made available to the public upon request. The use of selected standards, performance measures and adjustments are subject to the administrative appeal procedures provided at Part I, Chapter 3, paragraph K, of this Supplement.

8. *Lower Cost.*—In-house, contract or ISSA performance of a commercial activity may be warranted by the results of a cost comparison conducted in accordance with the procedures described in this Supplement.

9. *Temporary Authorizations for In-House Performance.*—If a contractor defaults or is otherwise terminated, agencies should seek interim contract support. If interim contract performance is not feasible, in-house or ISSA performance of a ''contracted'' activity may be authorized, on a temporary and emergency basis. As soon as possible, but not later than at the end of the next contract option period, a replacement contract should be awarded or a new requirements cost comparison completed to justify permanent conversion to in-house performance.

**D. Contract Performance of Commercial Activities**

As a matter of policy, the Government shall acquire non-recurring commercial activities through contracts with the private sector. The acquisition of a recurring commercial activity by contract may be warranted under the following conditions (The application of these conditions should be reviewed by the official in paragraph 9.a. of the Circular, or designee.):

1. *Contracted Activities.*—An activity obtained through a competitively awarded contract will continue to be obtained by contract as long as the quality of service is acceptable and competitive prices are fair and reasonable. If the Government believes that quality is unacceptable or prices appear unreasonable, a cost comparison is conducted to justify conversion to in-house or ISSA performance.

2. *New Requirements.*—A new requirement will be obtained by a competitively awarded contract. If there is reason to believe that contract service quality or prices may be unreasonable, a cost comparison is conducted to justify conversion to in-house or ISSA performance.

3. *Severable Expansions.*—Severable expansions of existing in-house, contracted or ISSA performed activities are obtained by a competitively awarded contract. If the expansion is not severable, a review of the entire activity, including the proposed expansion, is conducted for potential contract performance. If there is reason to believe that contract service quality or prices may be unreasonable, a cost comparison is conducted to justify conversion to in-house or ISSA performance.

4. *Interservice Support Agreements (ISSA).*—

a. Commercial activities may be performed by in-house or contract resources or through ISSAs as provided by law and Part I, Chapter 2 of this Supplement.

b. In responding to interservice support requests, potential agency service providers will certify that their reimbursable cost estimates reflect the full competitive costs to the Government as defined in this Supplement.

5. *Activities With 10 or Fewer FTE.*—Commercial activities involving 10 or fewer FTE may be performed by in-house, contract or ISSA performance, without cost comparison, if the contracting officer determines that offerors will provide required levels of service quality at fair and reasonable prices.

6. *Activities of 11 or More FTE.*—Commercial activities may be converted to contract or ISSA, without cost comparison, if fair and reasonable prices can be obtained through competitive award and all directly affected Federal employees serving on permanent appointments are reassigned to other comparable Federal positions for which they are qualified. In no case, shall any commercial activity be modified,

reorganized, divided or in any way changed for the purpose of circumventing the requirements of this paragraph or this Supplement.

7. *Activities Performed by the Military.*—

a. The official in paragraph 9.a. of the Circular, or designee, may authorize the direct conversion of activities performed by uniformed military service personnel to contract performance, without cost comparison, if the contracting officer determines that fair and reasonable prices can be obtained from qualified commercial sources.

b. If a cost comparison is conducted or otherwise required to convert to ISSA performance, the uniformed military positions included in the Government's in-house cost estimate are cost at the standard composite rate for uniformed personnel published by the DOD or other applicable agency Comptroller. The Comptroller will also establish the number of productive hours for uniformed personnel (see Part II, Chapter 2, paragraph B, ''Personnel'').

c. Civilian personnel will be cost as provided by this Supplement. While the uniformed positions may or may not be converted to civilian positions as a part of this process, the conversion of in-house civilian positions to uniformed positions is not authorized.

8. *Preferential Procurement Programs.*—A commercial activity of any size that is performed by Federal employees may be converted to contract performance, without cost comparison—even if it results in adverse employee actions, if the contract is awarded to a preferential procurement source at a fair market price. At the agency's discretion, a cost comparison may be conducted.

9. *Lower Cost.*—Contract or ISSA performance of a recurring commercial activity may be authorized by the results of a cost comparison conducted in accordance with the procedures described in this Supplement.

**E. Agency Cost Comparison Waivers**

1. The official in paragraph 9.a. of the Circular may authorize cost comparison waivers and direct conversions to or from in-house, contract or ISSA performance. ISSA cost comparison waivers may be granted by the requesting agency only.

2. Within the Department of Defense, the authority to issue general cost comparison waivers may be delegated to the Service Assistant Secretary or Departmental Agency Head, without further delegation.

3. Waivers shall be granted only as follows:

a. A written cost comparison waiver will be prepared and signed by the authorized waiver official. The waiver will be accompanied by a detailed determination that the conversion meets the following requirements:

(1) The conversion will result in a significant financial or service quality improvement and a finding that the conversion will not serve to reduce significantly the level or quality of competition in the future award or performance of work; or

(2) The waiver will establish why in-house or contract offers have no reasonable expectation of winning a competition conducted under the cost comparison procedures of this Supplement.

4. These general-function A–76 cost comparison waivers are subject to the administrative appeal procedures provided at Part I, Chapter 3, paragraph K, of this Supplement. While the justification for a waiver is subject to appeal, a decision not to issue a waiver is not subject to appeal.

5. Federal employees adversely affected by a decision to waive a cost comparison shall be afforded the same personnel considerations provided at Paragraph H of this Chapter.

6. Cost comparison waivers are granted to Department of Defense and other Federal installations scheduled for closure or in cases where functions are designated for termination on specified dates.

**F. Commercial Activities Inventory**

As required by the FAIR Act, Circular A–76 and this Supplemental Handbook, each agency will maintain a detailed inventory of all in-house commercial activities performed by its Government employees. This inventory, as described at Appendix 2 of this Supplement, and any supplemental information requested by OMB, will be submitted not later than June 30 of each year. Agencies should, as appropriate, permit employee involvement in the development of this Commercial Activities Inventory.

**G. Review of Documents**

1. *Access to Supporting Documentation.*—

a. At the earliest possible stages of development, consistent with procurement and conflict of interest requirements, affected parties will have the opportunity to fully participate in the development of supporting documents and proposals, including the development of performance standards, performance work statements, management plans, and the development of in-house and contract cost estimates.

b. Upon issuance, a solicitation used in the conduct of a cost comparison will be made available to directly affected Federal employees or their representatives for comment. The employees or their represent-

atives will be given sufficient time to review the document and submit comments before final receipt of offers from the private sector. Private sector offerors shall comment as provided by the Federal Acquisition Regulations (FAR).

2. *Appeals of Agency Decisions.*—As provided by the Circular and this Supplement at Part I, Chapter 3, paragraph K, agencies shall make all relevant documents available for review as a part of the administrative appeal process. The detailed documentation shall include, at a minimum, the in-house cost estimate, with detailed supporting data, the completed cost comparison form itself, and the management plan.

**H. Personnel Considerations**

1. Adversely affected Federal employees are employees identified for release from their competitive level by an agency, in accordance with 5 CFR Part 351 and Chapter 35 of Title 5, United States Code, as a direct result of a decision to convert to contract, ISSA performance or the agency's Most Efficient Organization (MEO).

2. Federal employees and existing Federal support contract employees adversely affected by a decision to convert to contract or ISSA performance have the Right-of-First-Refusal for jobs for which they are qualified that are created by the award of the conversion.

a. A standard clause is included in direct conversion and A–76 cost comparison solicitations notifying potential contractors of this requirement (see FAR 52.207–3). The Right-of-First-Refusal is afforded to all Federal employees adversely affected by the decision to convert to contract performance.

b. Executive Order 12933, ''Non-Displacement of Qualified Workers Under Certain Contracts,'' dated October 20, 1994, also provides the Right-of-First-Refusal to contract employees (see FAR 7.305 (c)). As a matter of policy, the Right-of-First-Refusal offered at FAR 52.207–3 is superior.

c. Personnel officers should work with the contracting officer and employees to implement these provisions.

3. Agencies should exert maximum efforts to find available positions for Federal employees adversely affected by conversion decisions, including:

a. giving priority consideration for available positions within the agency;

b. establishing a reemployment priority list and an effective placement program;

c. paying reasonable costs for training and relocation that contribute directly to placement, and

d. coordinating with the Office of Personnel Management (OPM) to ensure employees have access to placement programs, including the OPM-operated Displaced Employee Program (DEP) and the Interagency Placement Assistance Program (IPAP).

4. Agencies should notify employees affected as soon as possible of an impending cost comparison and keep them informed of its progress at every major milestone of the process.

**I. Relationship to the Budget**

1. Workload and resulting cost estimates will be consistent with the President's Budget covering the performance period. New or expanded work requirements, ISSAs and conversions of existing work to or from in-house or contract performance should be identified.

2. Agencies should include in each annual budget submission the savings from changes in the method of obtaining commercial activities. These savings will be submitted in accordance with the instructions of OMB Circular No. A–11, *''Preparation and Submission of Budget Estimates.''* Changes in the method of performance should be timed to conform with the budget process.

3. Agencies may request OMB approval to retain or redistribute budget savings to other critical missions.

# EXHIBIT 1

## CONDITIONS PERMITTING GOVERNMENT PERFORMANCE OF COMMERCIAL ACTIVITIES

1. ***National Defense or Intelligence Security.*** The Secretary of Defense, or designee, approves national defense justifications. The Director of Central Intelligence, or designee, approves national security justifications.
2. ***Patient Care.*** Commercial activities at Government-owned hospitals or other health facilities may be performed by in-house, ISSA or contract employees when needed to maintain the quality of direct patient care.
3. ***Core Capability.*** A core capability of in-house and contract resources may be warranted for certain functional areas.
4. ***Research and Development.*** Research and development activities may be converted to or from in-house, contract or ISSA without cost comparison. Severable support activities are subject to the cost comparison provisions of this Supplement.
5. ***No Satisfactory Commercial Source Available.*** Agencies will solicit private sector interest and certify that the solicitation did not restrict or otherwise limit competition.
6. ***Functions With 10 or Fewer FTE.*** May be converted to or from in-house, contract or ISSA, without a cost comparison, if the contracting officer determines that reasonable prices cannot otherwise be obtained.
7. ***Meet Performance Standard.*** Agencies may demonstrate that the activity meets or exceeds generally recognized industry cost and performance standards, after all adjustments required by this Supplement.
8. ***Lower Cost.*** Results of a cost comparison demonstrate that in-house performance is less costly.
9. ***Temporary Authorization.*** Temporary emergency performance may be warranted not to exceed the next full contract option year.

## CONDITIONS PERMITTING CONTRACT PERFORMANCE OF COMMERCIAL ACTIVITIES

1. ***Contracted Activities.*** Should be obtained by contract, unless a cost comparison demonstrates that in-house or ISSA performance is more cost effective.
2. ***New Requirement.*** Should be obtained by contract, unless contract quality or price appear unreasonable. A cost comparison is performed to convert the activity to in-house or ISSA performance.
3. ***Severable Expansions.*** Same as above.
4. ***ISSAs.*** Commercial activities should not be performed through new or expanded ISSAs, except as provided by law or this Supplement.
5. ***Activities With 10 or Fewer FTE.*** May be converted to or from in-house, contract or ISSA, without a cost comparison.
6. ***Activities with 11 or More FTE.*** May be converted to contract or ISSA, without cost comparison, if fair and reasonable contract prices can be obtained by competitive award *and* all directly affected Federal employees on permanent appointments can be reassigned to other comparable Federal positions.
7. ***Activities Performed by the Military.*** Activities performed by military (uniformed) personnel may be converted to contract without cost comparison. Military positions included in cost comparisons are cost at the composite rates provided by the DOD or other appropriate agency Comptroller.
8. ***Preferential Procurement Programs.*** Contract performance may be granted, without cost comparison, if the contract is awarded to a preferential procurement program.
9. ***Lower Cost.*** Conversion to contract is required if a cost comparison indicates that contract performance is the lower cost alternative.

# Chapter 2—Interservice Support Agreements (ISSA)

## A. General

1. In accordance with the provisions of the Federal Property and Administrative Services Act of 1949, the Economy Act of 1932 (31 USC 1535), and the Government Management Reform Act of 1994 (103 USC 356), excess property and common administrative services available from other Federal departments or agencies may be used, *unless* the needed product or service can be obtained more economically through agency or private sector resources. The cost principles and competition procedures established by this Supplement are to be used to determine when services should be performed by in-house, contract or interservice support agreement (ISSA) resources.

2. Federal agencies shall not provide commercial activities to the private sector. OMB approval or specific statutory authority is required to deviate from this policy.

3. In accordance with OMB Circular A–97, ''*Rules and Regulations Permitting Federal Agencies to Provide Specialized or Technical Services to State and Local Units of Government*,'' Federal agencies must conduct cost comparisons prior to offering to provide or receive commercial services to or from State or local government agencies. This requirement does not, however, apply to exceptional emergency circumstances such as disaster relief requirements.

4. In accordance with OMB Circular A–126, ''*Improving the Management and Use of Government Aircraft*,'' dated May 22, 1992, agencies will conduct approved cost comparisons before retaining, purchasing or otherwise providing, directly or through ISSAs, Federal aircraft or aviation services (see Appendix 6).

5. In recognition of Government-wide downsizing and reinvention efforts, the cost comparison requirements of this Supplemental Handbook shall not apply to any ISSA consolidations, where the transfer of work is accomplished prior to October 1, 1997, unless that consolidation includes the conversion of work to or from contract performance and such conversion is not otherwise authorized by this Supplemental Handbook.

a. Effective October 1, 1997, the cost comparison requirements of this Supplemental Handbook will not apply to existing or renewed ISSAs or to the consolidation of commercial or other services within a Department or agency, unless that consolidation includes the conversion of work to or from in-house or contract performance. New, expanded or transferred work requirements will be authorized for performance by an ISSA only as provided by the cost comparison or other provisions of this Supplemental Handbook.

6. The cost comparison provisions of this Chapter do not apply to the performance of inherently governmental functions, such as reimbursable procurement or contract administration services.

## B. Specific

1. The prospective providing agency will furnish the requesting agency a firm price or reimbursable rate for the requested new or expanded product or service. The prospective provider will also issue a certification that its price or reimbursable rate is calculated in accordance with Part II of this Supplement. This cost estimate will then be compared by the requesting agency to an in-house and/or a commercial offer, also calculated or adjusted in accordance with this Supplement. A contract shall be awarded by the requesting agency, if the commercial offer is more economical.

a. If the prospective provider is responding to a formal solicitation issued by the requesting agency, the prospective provider shall submit to the requesting agency a synopsis, management plan and Government cost estimate developed in accordance with this Supplement. A complete response, as required by the Federal Acquisition Regulations (FAR), is not required.

(1) Under no condition, shall the requesting agency cancel or otherwise delay bid opening or contract award in order to permit an agency to submit an ISSA price or reimbursable rate.

(2) The requesting agency may accept or reject the prospective provider's offer as technically qualified or unqualified as it deems appropriate and without appeal. Prospective providers who submit a technically acceptable offer shall compete with private sector and other in-house offers.

b. Agencies that wish to provide a commercial activity to another Department or agency may petition the agency to conduct a cost comparison.

c. At the sole discretion of the requesting agency, the prospective provider may submit performance standard data, as provided by Chapter 1, paragraph C.7. of this Part. The prospective provider shall certify that all necessary adjustments to its performance measures and cost standards have been made. The requesting agency shall review the documentation for these adjustments and make similar adjustments to

the private and other in-house offers based upon the submission of performance measures.

2. Competitions between a requesting agency, private sector offeror and a potential ISSA provider may require special performance and price adjustments to ensure that all competitors are treated equitably. These performance and price adjustments, include:

—Contract Price
—Contract Administration Costs
—Additional Costs
—One-time Conversion Costs
—Gain/Loss on Disposal/Transfer of Assets
—Federal Income Taxes
—Other Adjustment Costs
—Minimum Differential Costs

3. Proposals to obtain new or expanded products or services from another Government agency or private sector offeror, including ISSA proposals, will be published in the *Commerce Business Daily*.

4. An agency that is currently obtaining a commercial support service from another Department or agency may, with proper notification, terminate that relationship and convert directly to contract performance without cost comparison. If, however, the agency wishes to perform that work directly with in-house resources, it will need to justify that decision through a cost comparison for a ''new requirement.'' Again, this provision does not apply to the performance of inherently governmental activities.

5. Agencies will not retain, create or expand capacity for the purpose of providing new or expanded levels of interservice support services, unless justified by the cost comparison requirements of this Supplement.

a. Once an interservice support provider has competed its entire interservice support workload with the private sector, that provider may provide new or expanded interservice support work—of the same type—to other agencies, without further review or cost comparison on its or the requesting agency's part. This ability to offer services, without cost comparison, will continue until the providing agency has increased its capability and total workload by the lesser of (1) the expansion requirements of this Supplement or (2) more than 65 FTE are added to the in-house capability, at which time another full review or individual cost comparisons are required.

b. Paragraph 5.a. notwithstanding, if a new or expanded ISSA results in a general conversion of work to or from in-house or contract performance and a cost comparison has not previously justified the provider's method of performance, a cost comparison is required.

6. Cost comparisons conducted to justify ISSAs are subject to independent review and appeal. Prior to bid opening, the requesting agency's Independent Review Officer shall review all Government bids for compliance with the requirements of this Supplement. Appeals shall be conducted in accordance with Chapter 3, paragraph K, of this Part.

# Chapter 3—Cost Comparisons

## A. General

1. Except as provided in Chapter 1 of this Part, agencies will conduct cost comparisons when activities do not meet established performance standards, when agencies believe fair and reasonable prices cannot be obtained from qualified commercial sources, or as otherwise provided to permit the conversion of work to or from in-house, contract or interservice support agreement (ISSA) performance. Detailed guidance on the conduct of cost comparisons is contained in Part II of this Supplement.

2. In consolidating activities for cost comparison, agencies should take existing industry structures, contract administration and other management considerations into account.

3. In general, the cost comparison process consists of six major components. They are: (1) the development of a Performance Work Statement (PWS) and Quality Assurance Surveillance Plan (QASP); (2) the performance of a management study to determine the Government's Most Efficient Organization (MEO); (3) the development of an in-house Government cost estimate; (4) issuance of the Request for Proposal (RFP) or Invitation for Bid (IFB); (5) the comparison of the in-house bid against a proposed contract or ISSA price, and (6) the Administrative Appeal Process, which is designed to assure that all costs entered on the Cost Comparison Form (CCF) are fair, accurate and calculated in accordance with Part II of this Supplement.

4. Cost comparisons should be completed within eighteen months for a single activity (or thirty-six months for multiple activities) from the cost comparison start date, i.e., public or union notification and designation of the study team. Agencies are to provide an annual report to OMB on all cost comparisons that exceed these time frames, including a description of the problems encountered, remedial actions, status and expected completion date.

## B. The Cost Comparison Study Team

1. Generally, a central or field agency study team should be formed. Over time, the team may include individuals with expertise in management analysis, position classification, work measurement, value engineering (see OMB Circular A–131), industrial engineering, cost analysis, procurement and the technical aspects of the activity under study. The team should document mission requirements and seek new and innovative ways to provide the required products or services.

2. Agencies are encouraged to seek training on the policies and procedures of Circular A–76 and this Supplement, and to ensure that the skills necessary to prepare the Performance Work Statement, in-house management plan and cost estimate are available. Joint training for employees and their representatives is encouraged.

3. Procurement restrictions prohibit Federal procurement officials from subsequently working for a contractor on a procurement in which the procurement official was involved. ''Procurement official'' in this sense includes personnel in the commercial activity who are directly and substantially involved in preparing or approving the PWS, management plan, the in-house cost estimate, or supporting the source selection evaluation process. (See FAR 3.104–4(h)(3) and 41 USC 423.)

a. Employees who participate or provide data to support the development of the various study elements, but do not review, approve or have direct knowledge of the final performance work statement, performance standards, MEO, in-house or contract cost estimates are not considered ''procurement officials'' and are not affected by this restriction.

b. The participation of functional experts is essential to the quality of the cost comparison. However, when participation on the study team could adversely affect their rights under the Right-of-First-Refusal or the opportunity for future employment with the contractor, employees should be given the option to decline participation.

c. At a minimum, certifying officials for the PWS and Management Plan, the Independent Review Officer(s), those who sign the cost comparison form and the Administrative Appeal Authority are considered procurement officials.

## C. Performance Work Statements

1. Performance Work Statements (PWS) should be developed for all activities being resolicited for contract or scheduled for direct conversion to or from in-house, contract or ISSA performance.

2. The PWS defines what is being requested, the performance standards and measures, and timeframes required. It provides the technical performance sections of the Request for Proposals (RFP) or Invitation for Bid (IFB) issued by the contracting officer.

3. In the development of the PWS, agencies should refer to the Office of Federal Procurement Policy's (OFPP) Policy Letter 91–2, ''Service Contracting,'' dated April 9, 1991; OFPP Policy Letter 93–1, ''Management Oversight of Service Contracting,'' dated May 18, 1994, and the OFPP Best Practices Guide to Performance-Based Service Contracting.

4. Special care should be taken when developing the PWS to ensure that it does not limit service options, arbitrarily increase risk, reduce competition, unnecessarily violate industry service or service grouping norms or omit statutory or regulatory requirements without full justification. The PWS should be performance-oriented, specifying what outputs or measures are desired and limiting directions as to how the results are achieved. Agencies should not consider a PWS that limits the options available for providing the required product or service, or otherwise unnecessarily restricts private sector participation as being in compliance with Circular A–76 or this Supplement.

**D. Quality Assurance Surveillance Plans**

1. The Quality Assurance Surveillance Plan (QASP) describes the methods of inspection to be used, the reports required and the resources to be employed with estimated work-hours. Although the QASP accompanies the PWS to the Independent Review Officer (IRO) for a cost comparison, it need not be included as a part of the solicitation or provided to private sector offerors. In-house, contract and ISSA offerors should develop their offers based upon the requirements of the PWS alone. The QASP process is supplemented with periodic Post-MEO Performance Reviews.

**E. Management Plans**

1. The Management Plan describes the Government's Most Efficient Organization (MEO) and is the basis of the Government's in-house cost estimates. The Management Plan, which must reflect the scope of the Performance Work Statement, should identify the organizational structures, staffing and operating procedures, equipment, transition and inspection plans necessary to ensure that the in-house activity is performed in an efficient and cost effective manner.

2. Agencies may consider existing management reinvention, consolidation, re-engineering, personnel classification, market and other analyses in the identification and development of the MEO.

3. The Management Plan is certified as reflecting the Government's Most Efficient Organization (MEO). The certifying official may be any technically competent individual: (a) organizationally independent of the function under study or (b) at least two levels above the most senior official included in the in-house cost estimate. The certifying official must also be able to commit to the provision of necessary resources to perform the activity. Such certification is made before the review of bids or proposals.

4. The Management Plan will document the assumptions used in the development of the MEO and in-house cost estimate, including:

a. *Summary*. An overall comparison of the current organization with the MEO and a review of any special initiatives or assumptions, including equipment or productivity changes.

b. *The Quality Assurance Surveillance Plan (QASP)*. A description of the Government's in-house Quality Assurance Surveillance Plan and how it will differ, including resources, if services are provided by ISSA or contract, and why.

c. *Assets*. When existing assets used by the Government's MEO are not provided to the ISSA or contractor for use, an analysis of the benefits to the Government may be warranted.

d. *Transition Plan*. A plan for the transition to or from current organizational structure to MEO, contract or ISSA performance—designed to minimize disruption, adverse impacts, capitalization and start-up requirements.

e. *In-house Cost Estimate*. A description of all costs associated with the performance of the MEO, calculated in accordance with Part II of this Supplement.

**F. Safeguarding the MEO**

1. The Management Plan and the MEO are considered procurement sensitive documents until a tentative decision is reached, e.g., at bid opening and completion of the cost comparison form.

2. The Management Plan, MEO and in-house cost estimate are delivered as sealed documents to the contracting officer prior to the due date for the receipt of bids or technical proposals. The period available to deliver contract offers will be extended until the MEO and the in-house cost estimates are sealed. No private sector offer is opened or otherwise reviewed prior to the sealing of the Government's in-house cost estimate.

**G. Solicitations**

1. The contracting officer reviews the PWS to ensure that it is adequate and appropriate to serve as

a basis for award. The Contracting Officer issues a solicitation based on the PWS.

2. The contracting officer, when contracting by sealed bid, inserts in cost comparison solicitations the provision at FAR 52.207–1, Notice of Cost Comparison (Sealed Bid).

3. The contracting officer, when contracting by competitive negotiation or source selection, inserts in cost comparison solicitations the provision at FAR 52.207–2, Notice of Cost Comparison (Negotiated).

4. The contracting officer inserts the clauses at FAR 52.207–3 and 7.305, the Right-of-First-Refusal of Employment, in all direct conversion and cost comparison solicitations.

## H. Methods of Procurement

1. All competitive methods of Federal procurement provided by the FAR are appropriate for cost comparison under the Circular and this Supplement. This includes: sealed bid, two-step, source selection and other competitive qualifications-based or negotiated procurement techniques.

2. In selecting the method of procurement and contract type, the contracting officer analyzes the PWS and applies the guidance contained in OFPP Policy Letter 91-2 and FAR Part 16.

3. Source Selection or negotiated procurement techniques may be used for some A–76 Cost Comparisons. To ensure equity in the cost comparison process, the following guidelines are provided:

a. In addition to the PWS, Management Plan and in-house cost estimate, the Government, like the private sector offerors, shall submit the Technical Performance Plan required by the solicitation to the A–76 Independent Review Officer (IRO). The Technical Performance Plan reflects the MEO and is sealed prior to the consideration of any part of any contract offer.

b. As required by the FAR, the Government should establish a Source Selection Authority, including assurances that there are no potential conflicts of interest in the membership of the Authority.

c. The Authority reviews contract and ISSA offers and identifies that offer which represents the ''best overall value to the Government.'' This contract offer competes with the Government's in-house cost estimate.

d. With the selection of the competitive offer, the contracting officer submits to the Authority the Government's in-house Management Plan, which must comply with the technical proposal requirements of the solicitation. The Authority evaluates the in-house offer and assesses whether or not the same level of performance and performance quality will be achieved. The Authority should not review or have access to the in-house cost estimate.

e. The Government makes all changes necessary to meet the performance standards accepted by the Authority. Revised cost estimates are resubmitted to the IRO for acceptance. This will assure that the Government's in-house cost estimate is based upon the same scope of work and performance levels as the best value contract offer.

## I. The Independent Review

1. The Government's cost estimates are certified in writing by the agency's A–76 Independent Review Officer (IRO), or designee, as being in full compliance with the procedures and requirements described in this Supplement. The IRO should be a qualified person from an impartial activity that is organizationally independent of the commercial activity being studied and the activity preparing the cost comparison.

2. The PWS, Management Plan, QASP and all Government developed cost estimates, with supporting documentation, are forwarded to the agency IRO, or designee, for review. This is done prior to submission of the Cost Comparison Form (CCF) and supporting data to the contracting officer.

3. The IRO acts as an independent authority to:

a. ensure that the data contained in the Management Plan reasonably establish the Government's ability to perform the PWS within the resources provided by the MEO, and

b. ensure that all costs entered on the CCF are fully justified and calculated in accordance with the procedures described in Part II of this Supplement.

## J. Evaluation of Bids and Tentative Decisions

1. For sealed bid procurements, the contracting officer opens the bids, including the Government's in-house cost estimate, and enters the price of the apparent low offeror on the Cost Comparison Form (CCF). After all necessary adjustments are made and the CCF is completed, the contracting officer announces the tentative decision, subject to evaluation of bids for responsiveness, responsibility and resolution of possible administrative appeals. The appeal period begins when access to the completed CCF, and all supporting documentation, is provided to affected parties for review, usually the day of bid opening.

2. If, as a result of an appeal or other problem, the selected competitive offeror is other than the previously announced apparent low bidder, the CCF

is revised. All affected parties should be notified of any such revision.

3. For a negotiated or best value procurement, after selection of the private sector's most advantageous proposal, and all necessary adjustments have been made to ensure that the Government's in-house cost estimate and the other offers are based upon the same scope of work and performance standards, the contracting officer opens the Government's in-house cost estimate, and completes the CCF.

4. If, after contract start, the cost comparison ''winner'' is found to be unresponsive or otherwise unable to perform, the Government should seek a reaffirmation of bids received from the in-house, private sector and ISSA, as appropriate, to the cost comparison solicitation. Adjustments, limited to time delays or inflation, should be accommodated for all offerors. The CCF is then recalculated and award made to the next lowest bidder.

**K. Appeals of Tentative Waiver and Cost Comparison Decisions**

1. Following a tentative waiver or A–76 cost comparison decision, the A–76 Administrative Appeals process is invoked. To be eligible for review under the A–76 Administrative Appeals process, appeals must:

a. Be submitted by an eligible appellant.

b. In the case of a waiver, be received by the official in paragraph 9.a. of the Circular, or designee. In the case of a tentative cost comparison decision, be received by the contracting officer. In either case, the appeal must be received in writing and within 20 calendar days after the date that all supporting documentation is made publicly available. The agency may extend the appeal period to a maximum of 30 days if the cost comparison is particularly complex.

c. Address specific questions regarding an agency's compliance with the requirements and procedures of this Circular, factual questions regarding agency justifications to waive a cost comparison, or address specific questions regarding the costs entered by the Government on the applicable Cost Comparison Form and set forth the rationale for questioning those items.

d. Identify specific instances of agency denials of information not otherwise protected by law or regulation.

e. Demonstrate that the items appealed, individually or in aggregate, would reverse the tentative decision.

2. An eligible appellant is defined as:

a. Federal employees (or their representatives) and existing Federal contractors affected by a tentative decision to waive a cost comparison;

b. Federal employees (or their representatives) and contractors that have submitted formal bids or offers who would be affected by a tentative decision to convert to or from in-house, contract or ISSA performance as a result of a cost comparison; or

c. agencies that have submitted formal offers to compete for the right to provide services through ISSAs.

3. With receipt of an eligible appeal, the official designated in paragraph 9.a. of the Circular, or designee, assigns an official(s) to serve as the A–76 Administrative Appeal Authority for that appeal. The individual(s) selected must be: (a) two levels above the official who signed the waiver, in the case of a cost comparison waiver authorized under Chapter 1, paragraph E, of this Part; or (b) independent of the activity under review or at least two organizational levels above the official who certified the Government's Management Plan and MEO, in the case of a tentative cost comparison appeal.

4. The Appeal Authority ensures that the cost items challenged in the appeal are properly accounted for in accordance with the procedures of Part II of this Supplement. The Authority also ensures that all participants to the cost comparison process have appropriate access to the decision process.

5. If significant problems with the waiver justification or cost comparison estimates are found, such that the tentative decision may be unsupported or is in error, the Appeal Authority corrects the error and cost comparison, if applicable, and the agency proceeds according to the amended decision. The Authority will not review any item not formally challenged by an eligible appellant.

6. Agency A–76 Administrative Appeal procedures do not apply to questions concerning:

a. the selection of one contract offeror or another for competition with the in-house cost estimate;

b. award to one contractor in preference to another;

c. Government management decisions involving the Government's certified in-house MEO, and

d. the policies or procedures contained in the Circular and this Supplement.

7. The procedure does not authorize an appeal outside the agency or judicial review, nor does it authorize sequential appeals. The appeal process provides reasonable assurances that decisions to waive the cost comparison requirements of this Supplement

are properly reviewed and that the cost comparison requirements of this Supplement are properly adhered to, when applicable. Therefore, all directly affected parties are expected to submit their appeals within the initial appeal period.

8. The appeals procedure should provide for a final decision within 30 days of receipt of the appeal by the Appeal Authority.

**L. Post-MEO Performance Review**

1. When services are performed in-house as a result of a cost comparison, including those involving an ISSA, a formal review and inspection of the Most Efficient Organization (MEO) should be conducted. Typically, this review should be conducted following the end of the first full year of performance.

2. The Post-MEO Performance Review confirms that the MEO has been implemented in accordance with the Transition Plan, establishes the MEO's ability to perform the services of the PWS and confirms that actual costs are within the estimates contained in the in-house estimate. Adjustments may be made for formal mission or scope of work changes.

3. Post-MEO Reviews will be conducted at the direction of the official in paragraph 9.a. of the Circular, or designee, but must be independent of the most senior official included in the Government's in-house or ISSA cost estimate. Post-MEO Performance Reviews will be conducted on not less than 20 percent of the functions performed by the Government as a result of a cost comparison.

4. MEO implementation may be measured in terms of the FTE, grade structure and the contract support included in the Transition and Management Plan.

5. MEO performance may be measured in terms of workload, responsiveness and quality of work. Special inspections and a review of the activity's implementation of the Quality Assurance Surveillance Plan may be necessary.

6. Cost conformance may be determined by an analysis of actual labor and material costs against the Personnel, Material, and Other Specifically Attributable costs on the final CCF. Care should be taken to assure that adjustments are made for retained or saved pay and for fringe benefit factors when using actual cost records.

7. Minor cost or performance deficiencies may be corrected to maintain the integrity of the cost comparison process. A period of time consistent with that given to a contractor may be given to the in-house or ISSA activity to correct any deficiencies found. Failure to correct deficiencies that would individually or in aggregate invalidate the original cost comparison, or any finding of a significant deviation from the requirements of the PWS, shall result in the following:

As with a contract default, if an in-house or ISSA failure to perform is identified, including failure to implement the MEO as provided by the Transition Plan, the contracting officer will award the work to next lowest offerer who participated in the cost comparison, if feasible. If award to the next lowest offeror is not feasible the contracting officer will immediately resolicit to conduct a revised and updated cost comparison.

8. An annual list of Post-MEO Performance Review certifications will be made available to the public upon request. This list will identify the total number of cost comparisons completed since the issuance of this Revised Supplemental Handbook and the number of Post-MEO Performance Reviews completed.

# PART II

# PREPARING THE COST COMPARISON ESTIMATES

# Table of Contents


| | Page |
|---|---|
| Chapter 1—Implementation Instructions | |
| A. General | 17 |
| B. Organization | 17 |
| Chapter 2—Developing the Cost of Government Performance | |
| A. General | 18 |
| 1. Overview | 18 |
| 2. Standard Cost Factors | 18 |
| 3. Common Costs | 18 |
| 4. Retained and Save Pay | 18 |
| 5. Cost of Conducting a Cost Comparison | 18 |
| 6. Proration of Performance Periods | 18 |
| 7. In-House Costs | 18 |
| 8. Minimum Cost Differentials | 19 |
| 9. Rounding Rule | 19 |
| 10. Inflation | 19 |
| 11. Other ISSA Adjustments | 19 |
| B. Personnel (Line 1) | 19 |
| C. Material and Supply (Line 2) | 21 |
| D. Other Specifically Attributable (Line 3) | 21 |
| 1. Overview | 21 |
| 2. Depreciation | 22 |
| 3. Cost of Capital | 22 |
| 4. Rent | 22 |
| 5. Maintenance and Repair | 22 |
| 6. Utilities | 22 |
| 7. Insurance | 23 |
| 8. Travel | 23 |
| 9. MEO Subcontract Costs | 23 |
| 10. Other Costs. | 23 |
| E. Overhead (Line 4) | 23 |
| F. Additional (Line 5) | 23 |
| G. Total Cost—In-House Performance (Line 6) | 24 |
| Chapter 3—Developing the Cost of Contract Performance | |
| A. General | 25 |
| B. Contract Price (Line 7) | 25 |
| 1. Overview | 25 |
| 2. Contract Types | 25 |
| 3. Tax Exempt Organizations | 25 |
| 4. Procurement Preference Eligible Organizations | 25 |
| C. Contract Administration (Line 8) | 25 |
| D. Additional (Line 9) | 26 |
| E. One-Time Conversion (Line 10) | 26 |
| 1. Overview | 26 |
| 2. Material Related Costs | 26 |
| 3. Labor Related Costs | 26 |
| 4. Other Costs. | 26 |
| 5. One-Time Cost Computation | 26 |
| F. Gain from the Disposal/Transfer of Assets (Line 11) | 26 |
| G. Federal Income Tax (Line 12) | 27 |
| H. Total Cost—Contract Performance (Line 13) | 27 |
| Chapter 4—Calculating the Cost Comparison Decision | |
| A. Conversion Differential (Line 14) | 28 |
| B. Adjusted Total In-house Cost (Line 15) | 28 |
| C. Adjusted Total Contract Cost (Line 16) | 28 |
| D. The Cost Comparison Decision (Lines 17/18) | 28 |
| Chapter 5—Streamlined Cost Comparisons for Activities with 65 FTE or Less | |
| A. General | 31 |
| B. Procedure | 31 |

# Chapter 1—Implementation Instructions

**A. General**

1. Part II provides generic and streamlined cost comparison guidance to comply with the provisions of the FAIR Act and Circular A–76. This includes guidance for developing in-house costs based upon the Government's Most Efficient Organization (MEO) and other adjustments to the contract and inter-service support agreement (ISSA) price. It also sets out the principles for development of cost-based performance standards or other measures that are comparable to those used by commercial sources. Appendices 6 and 7 provide sector-specific cost comparison guidance.

2. The guidance provided by this Part relies on the managerial cost accounting and performance standards established in support of the CFO Act, GPRA and Federal Accounting Standards. Cost and performance information developed for competitions subject to the Circular and this Supplement should be drawn from the data base established by these standards and adjusted as appropriate. This guidance is to be used by Federal agencies to ensure that cost comparisons are fair and reasonable.

3. A cost comparison between in-house, contract or ISSA performance seems straight-forward, but, in fact, is complicated by the very different ways Government agencies and commercial sources account for cost. For example, the Government buys capital equipment and may recognize the entire expense when payment is made. The commercial sector may borrow funds and recognize the expense of capital equipment as it is used. All costs incurred by commercial sources are ultimately charged to a ''customer,'' whereas agency costs may be met by several different appropriations accounts, revolving funds or mixes thereof. Insurance is a real cost of doing business in the commercial sector, while the Federal Government is a ''self-insured entity.'' Taxes are paid by most commercial sources and received and used by the public sector. Assets are purchased from owners equity in the commercial sector, yet they are purchased by the taxpayer in the public sector. The Government may incur employee retained pay or save pay as a way of mitigating the adverse impacts of a management decision, without assessing these costs to the activity. The commercial sector passes these types of costs on to the customer. These and other differences necessitate cost comparison requirements that equalize the systems to reflect the total alternative costs to the Government and the taxpayer. Such costs may or may not be fully reflected by agency accounts.

4. The procedures set forth in this Part recognize the absence of a uniform accounting system throughout the Federal Government and are intended to establish a practical level of consistency to assure that all substantive factors are considered.

**B. Organization**

1. Part II is divided into five chapters.

2. Chapter 2 provides the generic principles and procedures for developing the cost of in-house performance to the Government. The principles and procedures of Chapter 2 represent a competitive cost comparison.

3. Chapter 3 provides the generic principles and procedures for developing the cost of contract or ISSA performance to the Government. The principles and procedures of Chapter 3 represent a competitive cost comparison.

4. Chapter 4 provides procedures for computing the minimum conversion differential, calculating the financial advantages to the Government associated with Government or contract performance and the cost comparison decision.

5. Chapter 5 provides an alternative cost comparison methodology for activities involving 65 in-house FTE or less at the time of study announcement. While the principles and procedures of Chapter 5 represent a competitive cost comparison, this non-mandatory alternative approach is provided to minimize the administrative costs associated with cost comparisons, ensure timely completion and preserve the equity and cost comparability requirements of this Supplement.

# Chapter 2—Developing the Cost of Government Performance

## A. General

1. *Overview.*—

a. This Chapter provides the policies and procedures that will be used when the Government determines that a cost comparison between in-house (agency), contract or interservice support agreement (ISSA) performance is warranted.

b. The procedures of Part I of this Supplement regarding cost comparison waivers, the certification of the Government's MEO, review by an Independent Review Officer and the Administrative Appeals process apply. Cost comparisons will be based upon the same scope of work and performance requirements contained in the Performance Work Statement (PWS).

c. Cost comparisons are conducted in accordance with this guidance, modified to the extent applicable by Chapter 5 of this Part. The procedures differ for the conversion of work from contract or ISSA to in-house performance, however, in four basic areas: (1) the identification of *new* or *increased* in-house costs, (2) one-time conversion costs and (3) the calculation of the minimum cost differential, and (4) certain other adjustments that may be necessary if an ISSA is being considered.

2. *Standard Cost Factors.*—Standard cost factors are to be used as prescribed in this Part. Agencies are encouraged to collect agency or sector-specific data to update and improve upon the standard cost factors provided herein. The official in paragraph 9.a. of the Circular, or designee, may develop alternative agency-wide or sector-specific standard cost factors, including overhead, for approval by OMB.

3. *Common Costs.*—Costs that would be the same for in-house, contract or ISSA performance, without organizational, workload, or responsibility changes need not be computed or entered into the cost comparison. Common costs or ''wash'' items will be identified in the Management Plan for review.

4. *Retained and Save Pay.*—Retained and save pay are not included in the in-house cost estimates. Agencies are encouraged to seek their Most Efficient Organization (MEO), without penalty of historical inefficiencies. Agencies cost only the *''positions''* in the MEO.

5. *Cost of Conducting a Cost Comparison.*—The cost of conducting a cost comparison is not added to the in-house cost estimate or contract price. This is an administrative expense associated with good management practices and is irrelevant to the cost of performance.

6. *Proration of Performance Periods.*—Cost comparisons are conducted using not less than three years of proposal/cost data, submitted by the Government and commercial sources. In-house cost estimates and contract prices will reflect the same multi-year basis. If permitted by statute and the Federal Acquisition Regulations (FAR), performance periods for cost comparisons in excess of five years may be approved by the official in paragraph 9.a. of the Circular, or designee. Multi-year procurement or pre-priced renewal options provide advantages such as continuity of operations, the possibility of lower prices, and reduced turbulence and disruption. However, in extending the performance period, the official in paragraph 9.a. of the Circular, or designee, must certify that no known cost comparison advantage be conveyed to the in-house, contract or ISSA bid by the extension.

7. *In-House Costs.*—

a. The competitive cost of in-house performance includes all significant performance costs associated with the activity that are not common to the in-house, contract or ISSA options. The in-house cost estimate is based upon the following:

—Personnel Costs
—Materials and Supply Costs
—Other Specifically Attributable Costs
  —Depreciation
  —Cost of Capital
  —Rent
  —Maintenance and Repair
  —Utilities
  —Insurance
  —Travel
  —MEO Subcontracts
  —Other Costs
—Overhead Costs
—Additional Costs

b. In addition to costs generally associated with the in-house performance of an activity, including personnel, material and overhead costs, a conversion from contract or ISSA performance to in-house performance may require increased costs for facilities and equipment. The cost of all capital assets not currently provided to the contractor will be computed using the depreciation and cost of capital methods provided in this Chapter. Increases for the rent, maintenance and repair, utilities, travel and

their associated overhead is also calculated. Government costs that would be the same for in-house, contract or ISSA operation, should be identified, but need not be computed.

8. *Minimum Cost Differentials.*—

a. This Supplement establishes a minimum threshold of undefined costs that must be exceeded prior to a conversion to or from in-house, contract or ISSA performance. The minimum differential is also established to ensure that the Government will not undertake a conversion for marginal estimated savings.

b. An activity will not be converted to or from in-house, contract or ISSA performance, on the basis of a cost comparison, unless the minimum cost differential is met. The minimum cost differential is the lesser of 10 percent of in-house personnel-related costs (Line 1) or, $10 million over the performance period. Factors such as decreased productivity, and other costs of disruption that cannot be easily quantified at the time of the cost comparison are included in this differential.

c. Whenever a cost comparison involves a mix of existing in-house, contract, new or expanded requirements, or assumes full or partial conversions to in-house performance, each portion is addressed individually and the total minimum differential is calculated accordingly.

9. *Rounding Rule.*—Round all line entries on the Cost Comparison Form (CCF) to the nearest dollar.

10. *Inflation.*—

a. Agencies will use the annual inflation guidance developed annually for the President's Budget and provided by OMB for use in cost comparisons conducted in accordance with this Supplement.

b. In preparing cost estimates, all known or anticipated increases incurred before the end of the first performance period; e.g., salary increases for Government employees, are included in each cost element—prorated as appropriate. For subsequent periods, the cost of anticipated changes in the scope of work, as described in the PWS, is determined. Inflation factors for pay and non-pay categories will then be applied to the estimated year-end costs for the first year of performance. There are some exceptions to the inflation adjustments as discussed later, such as personnel costs subject to economic price adjustment clauses of the Service Contract Act, Davis-Bacon Act, depreciation costs for facilities and equipment, and the cost of minor items.

c. To calculate out-year costs: (1) determine the cost elements affected by inflation during each performance period. For each period, ensure that the number of months in the period and the changes in the PWS for each period have been considered; (2) multiply each cost element for each performance period by the respective salary/wage or material cost inflation factors to the applicable performance period, and (3) once adjusted for inflation, calculate the total cost of that CCF Line item.

11. *Other ISSA Adjustments.*—

a. It is not the intent of this Supplement to require an ISSA offeror to significantly alter its methods of operation to provide unique or site specific services. While such services may meet agency missions and may legitimately be included in the solicitation, additional adjustments to the ISSA cost estimate may be necessary to reflect differences in in-house and contractor bids.

b. Agencies should identify the minor differences between the requirements of the solicitation (contractor bid) and the ISSA cost estimate. The agency determines if any item or combination of items will impact the agency's ability to perform. If the agency's ability to perform would be adversely impacted, the ISSA cost estimates may be rejected as non-responsive. If the differences will have minimal agency performance implications, and/or can continue to be performed by agency personnel, the ISSA cost estimates will be adjusted for purposes of comparison with the contractor and MEO offers, based upon the comparable costs contained in the agency's MEO.

c. A complete record of all adjustments to the contractor and ISSA cost estimates should be maintained and made available to the public upon request.

**B. Personnel—**Line 1

1. This Line includes the cost of all direct in-house labor and supervision necessary to accomplish the requirements specified in the PWS. Included are salaries, wages, fringe benefits, and other entitlements, such as uniform allowances and overtime. To determine Line 1 Personnel costs, identify the in-house staffing estimate and proper wage/grade classifications as described in the Management Plan.

2. In-house cost estimates that assume a mix of in-house labor and existing contract support should include the cost of labor for the Government's administration and in-house inspection of those support contracts on Line 1. Table 3–1, of this Part, may be used to estimate contract administration costs, based upon the estimated number of contract employees involved. The cost of the support contracts themselves, including the cost of related Government furnished equipment and facilities not provided to

the contractor under this cost comparison, should be entered on Line 3 Other Specifically Attributable costs.

3. Line 1 includes all competitive costs that could change if performance is converted to or from in-house, contract or ISSA. Thus, Line 1 may also include certain management and oversight activities, such as personnel support, environmental or OSHA compliance management, legal or other direct administrative support costs.

4. The conclusion that an activity may be performed by contract or ISSA also reflects a decision that the work need not be accomplished by military or other uniformed Government personnel. The cost of military labor in a cost comparison, even if the work will remain military if retained in-house, will be determined by the composite rate for uniformed personnel established by the DOD or other applicable Comptroller.

5. Generally, in-house staffing should be expressed in terms of productive work hours. With the establishment of the number of productive work hours required, a conversion to the number of full-time equivalents (FTE) is needed. For full-time and part-time positions, estimate the total hours required by skill and divide by 1,776 annual available hours to determine the number of FTE positions required. For intermittent positions to be expressed in FTE, estimate total hours required by skill and divide by 2,007 annual available hours to determine the number of FTE positions required. The military agency comptroller will establish comparable productive hours for military personnel included in an MEO as military positions. The productive hours exclude annual leave, sick leave, administrative leave, training and other nonproductive hours. The factors result from differences in nonproductive time between types of positions.

6. The following considerations are used to compute personnel costs:

a. *Position Title or Skill*—Identify the job. Example: carpenter, driver, janitor, supervisor, foreman, administrative clerk or department head.

b. *Grade*—Identify the appropriate GS/FWS grade for each position title or skill.

c. *Number of FTE Required*—Identify the FTE required for each grade. Identify the temporary and intermittent employee work years. This is important for later fringe benefit calculations, since intermittent and temporary employees get fewer benefits than full-time or part-time employees.

d. *Annual Salary/Wages*—Pay information can be obtained from the personnel or finance office. Use current pay rates based on the Government-wide representative rate of step 5 for GS and step 4 for FWS employees. Multiply that pay rate by the number of FTE, except for intermittent positions where actual hours are used. As a rule, GS salary is expressed as an annual rate of pay and the FWS salary is expressed as an hourly rate. For positions to be used on a prearranged regularly scheduled tour of duty, this hourly rate is multiplied by 2,087 (the number of hours employees are paid annually).

e. *Other Entitlements*—Include entitlements that will also earn fringe benefits. Work closely with the personnel office to make sure all entitlements are considered and to obtain current factors. Examples include: night differential pay for FWS employees, environmental differential pay and premium pay for Federal civilian fire fighters and law enforcement officers.

f. *Fringe Benefits or FICA*—The following fringe benefit factors are estimated according to the Federal Accounting Standards for Liabilities-Exposure. Multiply the following Governmentwide standard factors by the appropriate basic pay:

(1) Full or part-time permanent Federal civilian employees:

(a) The standard retirement cost factor represents the Federal Government's complete share of the weighted CSRS/FERS retirement cost to the Government, based upon the full dynamic normal cost of the retirement systems; the normal cost of accruing retiree health benefits based on average participation rates; Social Security, and Thrift Savings Plan (TSP) contributions. The current (1996) rate is 23.7 percent of base payroll for all agencies. The comparable retirement cost factors for special class employees are 32.3 percent for air traffic controllers and 37.7 percent for law enforcement and fire protection employees.

(b) The cost factor to be used for Federal employee insurance and health benefits, based on actual cost, is 5.6 percent, plus an additional 1.45 percent for Medicare.

(c) The cost factor to be used for Federal employee miscellaneous fringe benefits (workmen's compensation, bonuses and awards, and unemployment programs) is 1.7 percent.

(2) Intermittent or temporary Federal civilian employees.—The Federal Insurance Contribution Act (FICA) employer cost factor of 7.65 (or the current rate established by law) will be applied to civilian employees not covered by either of the two civilian

civil service retirement systems (normally intermittent and temporary employees). Apply the FICA rate only to wages and salaries subject to the tax; there is an annual salary limitation for FICA tax.

g. *Other Pay*—Include entitlements that do not earn fringe benefits. Some examples are night differential pay for GS employees, overtime, holiday, awards, bonuses, and uniform allowances.

h. *Personnel Cost*—Add Basic Pay, Fringe Benefits or FICA and other pay for all positions and total for both Federal Wage System (FWS) and General Schedule (GS) categories. This figure can now be used as a basis to compute the annual personnel costs for each performance period.

7. Adjustments to annual personnel costs for each performance period are made to reflect anticipated pay increases.

8. All in-house wages, salaries and other costs are adjusted for inflation consistent with the economic assumptions used in the President's most recent Budget, through the end of the first year of performance. Federal wages and salaries for contracts that contain an economic adjustment clause or are subject to the Service Contract Act (SCA) (41 USC 351–357) or the Davis-Bacon Act (DBA) (40 USC 276a—276a–7) are inflated to the end of the first performance period. However, when using the Department of Labor criteria, certain potential contract positions may not be covered under the SCA/DBA provisions; accordingly, the in-house related costs for such positions are escalated through the end of the cost comparison period.

**C. Material and supply—**Line 2

1. Material and supply costs are incurred in each performance period for goods such as raw materials, parts, subassemblies, components and office supplies. Material costs are calculated only if the materials are used by the activity and will not be provided to the contractor or ISSA provider by the Government.

2. Review the PWS to determine the materials required for in-house performance that will not be furnished to the contractor or ISSA provider. Normally, the contractor or ISSA provider will be expected to provide the supplies and materials necessary to perform the work described in the PWS. The policy regarding contractor or ISSA use of Government provided supplies and materials is set forth in FAR 51.101. Adjust historical material use and cost data to reflect the requirements of the PWS.

3. Determine if materials can be obtained on the open market at less cost than from other Government agencies. Material cost includes material, transport, handling and availability/delay costs. If so, obtain any necessary waivers from the other Government agency(s) to purchase materials on the open market. Include established allowances for normal scrap, spoilage, overruns and defective work. List required material by quantity needed, unit price, escalation for out-years and total cost. A single entry may be made for miscellaneous items such as office supplies.

4. If the furnishing agency establishes and certifies that all costs of acquiring, managing, storing and transporting its material are included in its pricing structure, including overhead, no material mark-up is required. If not, escalation factors based upon the principles and procedures of this Supplement should be developed.

5. Material and supply costs are projected for all performance periods, including adjustments for inflation, consistent with the economic assumption contained in the President's most recent Budget and the rate of transition to the contractor or ISSA provider, as provided in the PWS. Ensure that unit prices are calculated to the end of the first performance period. Future performance period material costs may not be inflated, if the PWS includes an escalation or economic adjustment clause. Such a clause enables a contractor or ISSA provider to be reimbursed for future price increases. The Management Plan shows the computations used to derive the entries for all performance periods.

**D. Other specifically attributable—**Line 3

1. *Overview.*—Personnel and material costs are normally the primary sources of Government costs. The remaining elements of competitive cost are also attributable to the activity. When requirements differ by period due to changes in the PWS or the Transition Plan, additional adjustments will be necessary. Ensure that such adjustments are made before applying inflation factors, if appropriate. Costs that would be the same regardless of the eventual decision, should be identified for each cost element.

| Elements of Cost | Paragraph |
|---|---|
| Depreciation | 2D2 |
| Cost of Capital | 2D3 |
| Rent | 2D4 |
| Maintenance and Repair | 2D5 |
| Utilities | 2D6 |
| Insurance | 2D7 |
| Travel | 2D8 |
| MEO Subcontracts | 2D9 |
| Other Costs | 2D10 |

2. *Depreciation.*—

a. Depreciation represents the cost of ownership and the consumption of an asset's useful life.

b. Unless an asset is fully depreciated, the Federal Accounting Standards for Property, Plant and Equipment will be used. If an applicable asset is fully depreciated, is to be used by the MEO during the performance period and is not to be provided to the contractor or ISSA provider, extend the life of the asset through the end of the performance period. The cost of depreciation is then recalculated using the extended life and original acquisition cost.

c. Individual assets costing less than $5,000 are considered minor items and will not be depreciated, but will be added to *other costs* (see paragraph D.10). The joint use of minor items need not be prorated to the function under study. Assets costing more than $5,000 are major items for depreciation.

d. If an in-house activity shares an asset with another activity not under review or cost comparison and that asset will not be provided for use by the contractor or ISSA, allocate depreciation to the in-house estimate on the basis of use or other appropriate methodology. If the activity is converted to contract or ISSA performance, the asset's life and utilization rate may change.

e. To find the cost of depreciation added to each option year, subtract the residual value from the total of the acquisition cost plus any capital improvements and, then, divide by the estimated useful life of the asset. Include the resultant annual depreciation for each year of the cost comparison. If the asset was acquired through transfer, seizure or forfeiture, an industry specific standard or engineering appraisal may be used to establish the market or ''acquisition'' value of the asset at transfer.

f. Facilities are generally categorized as permanent, semi-permanent or temporary and the useful life will be standardized for the entire grouping. The useful life expectancies listed below may be used by type of facility. If useful life has been exceeded, obtain an engineering projection of anticipated remaining useful life. These costs will be prorated to the activity under study by a unit of measure that varies directly with consumption (e.g., floor space, type of facility, number of telephones). Estimates of expenses to be incurred for the first year of performance should be based on current experience, appropriately adjusted for anticipated requirements. Engineering estimates should be used when historical data are not available. All estimates should be appropriately documented with supporting detail.

| Facility Category | Useful Life |
|---|---|
| Permanent (P) | 75 years |
| Semi-Permanent (S) | 50 years |
| Temporary (T) | 25 years |

3. *Cost of Capital.*—

a. The annual cost of capital is added to the depreciation cost of any asset costing more than $5,000 acquired by the Government if: (1) not provided for the contractor's or ISSA provider's use, (2) is purchased less than two years prior to the cost comparison date or (3) is scheduled for purchase within the performance period.

b. The cost of capital is defined as an imputed charge on the Government's investment in capital assets necessary for the activity to provide the product or service.

c. To estimate the annual cost of capital, it is necessary to identify the total depreciable acquisition cost of new assets or, if acquired by transfer, forfeiture or seizure, the market value of the assets. The total cost results from the value of the asset, transportation costs (if not already included in the purchase price) and any installation costs to place the asset in operation. The cost of capital will be computed by applying the nominal rate provided by OMB Circular A–94 to the determined total cost of the asset.

4. *Rent.*—Rent is incurred for the use, operation and maintenance of land, building space, plant and machinery, etc., by the activity under study. Compute only those costs that are associated with the MEO, on an allocated basis, not provided to the contractor or ISSA provider.

5. *Maintenance and Repair.*—This cost is incurred to keep buildings and equipment in normal operating condition. It does not include capital improvements that add value to an asset and are accounted for under depreciation. Allocate maintenance and repair costs for those assets that will not be furnished to the contractor or ISSA provider but are: (1) needed for MEO performance and (2) are not covered by rental fees.

6. *Utilities.*—This category includes charges for fuel, electricity, telephone, water and sewage services, etc., that will not be furnished to the contractor or ISSA provider by the Government but are needed for in-house performance of the activity. The amount of these costs applicable to the activity under study will be determined either on a metered or allocated basis of consumption.

7. *Insurance.*—

a. Operation of any Government activity involves risks and potential costs from property losses (fire, flood, accident, etc.) and liability claims. These risks are normally covered by insurance included in any commercial cost estimate.

b. To the extent assets are not provided to the contractor or to the extent that property losses may be assessed against a contractor who uses Government space, facilities or equipment, in-house casualty premiums must be computed. Generally, the Government's casualty premium equivalent cost will be computed by multiplying .005 times the net book value of Government's equipment and/or facilities, plus the average value of material and supplies.

c. Insurance to be computed on assets will depend on the requirements of the Performance Work Statement (PWS). If the contractor or ISSA provides special casualty insurance on all Government furnished assets, compute insurance for *all* assets used by the activity under study. If the contract does not require the contractor to furnish special casualty insurance, e.g., the Government will self indemnify, compute casualty insurance on *only* those assets to be used by the activity under study that would not be provided to the contractor or ISSA provider, as appropriate.

d. Personnel liability losses will be computed by multiplying .007 times the Government's total personnel-related costs on Line 1. Additional liabilities assigned to the contractor or ISSA provider by the PWS that are not associated with personnel will also be computed by applying the standard .007 factor to the estimated liability ceiling identified in the PWS and included in the in-house cost estimate.

8. *Travel.*—This category covers the expected cost of in-house travel that would not continue in the event of contract or ISSA performance. These costs should be readily available from budgeted amounts of per diem and transportation cost for the activity under study.

9. *MEO Subcontract Costs.*—Solicitations that include work currently performed by contract and by Federal employees, should include the MEO cost of labor for the Government's administration and inspection of the continued support contracts on Line 1. The cost of the support contract itself, including the cost of related Government furnished equipment and facilities not provided to the contractor or ISSA, should be entered on Line 3. Escalate to each performance period as appropriate. Support contract costs should also be adjusted (downward) to offset for potential Federal income tax revenue to the Government. This is done by applying the appropriate tax rates in Appendix 4 of this supplement.

10. *Other Costs.*—

a. Other Costs is a general category for specifically attributable costs that do not properly fit into one of the other cost elements, but would change in the event of contract or ISSA performance. Some examples are purchased services packaging and crating (if not already a part of material and supplies); transportation costs; and royalties. Ensure these costs are not also covered in Line 4 overhead costs.

b. Include the cost of *minor items* that are not immediately consumed by the activity and not provided to the contractor or ISSA provider. This includes items such as overhead projectors, office equipment, tools, chairs, desks, cabinets, etc. Estimate the cost of minor items for each performance period by allocating 10 percent of the total estimated replacement cost of all such items. Should the supply source markup increase the item's cost to more than $5,000, it will still be considered a minor item.

**E. Overhead—**Line 4

1. While direct labor, supervision and material costs are prorated, as appropriate, to Lines 1 and 2, overhead expenses, which include general management and administrative expenses, are entered on Line 4.

2. Line 4 includes two major categories of cost. The first is *operations overhead* and is defined as those costs that are not 100 percent attributable to the activity under study, but are generally associated with the recurring management or support of the activity. The second is *general and administrative overhead* and includes salaries, equipment, space and other activities related to headquarters management, accounting, personnel, legal support, data processing management and similar common services performed outside the activity, but in support of the activity. These costs are affected by the conversion of work to or from in-house, contract or ISSA.

3. For each year of the cost comparison, Line 4 is calculated by multiplying Line 1, including fringe, by 12 percent (.12) and entering the total on Line 4. If military personnel are included in Line 1, apply the 12 percent factor to civilian MEO Line 1 costs only. The composite military rate should include all military related overhead.

**F. Additional—**Line 5

1. This cost element includes costs not otherwise properly classified on Lines 1 through 4. This cost category should reflect those additional costs result-

ing from unusual or special circumstances that may be encountered in particular comparisons. Examples include office and plant rearrangements, transport, employee recruitment, training, relocation, and other expenses.

2. Amounts entered on Line 5 should be supported by a definition of the type of cost reported, a justification for its inclusion in the cost comparison, an explanation of the underlying assumptions, and methods of computation.

3. The additional costs of an expansion, new requirement or conversion from contract or ISSA to in-house performance, which are added to the in-house costs, should be made on Line 5 in consultation with engineering, production, management and contracting personnel.

a. New investment by the Government in facilities and equipment should not be included as one-time costs. The costs incurred in acquiring facilities or equipment and installing the equipment should be included in the capitalized cost of in-house performance.

b. Government facilities and equipment will not normally be expanded to accommodate new or expanded work if cost-effective contract or ISSA facilities and equipment are available. Likewise, agency ownership shall not preclude a contractor or an ISSA provider from competing for the service. If in-house operation is dependent upon the Government's purchase or construction of new facilities or other major capital asset purchases, the cost comparison and conversion to in-house performance will be delayed until the approval to purchase or construct such items is obtained, subject to the cost comparison.

**G. Total cost—in–house performance—**Line 6

Enter the sum of Lines 1 through 5 on Line 6.

# Chapter 3—Developing the Cost of Contract Performance

**A. General**

This Chapter provides guidance for the determination of the cost to the Government of obtaining a commercial product or service by contract or interservice support agreement (ISSA). It includes a determination of not only the amount to be paid to the contractor/provider (price) but also a determination of the additional costs to the taxpayer that would be incurred in the event of a conversion.

**B. Contract price—**Line 7

1. *Overview.*—The contract or ISSA price reflects the cost to perform the requirements of the PWS as presented by the offeror selected to compete with the in-house work force. The solicitation for bids or proposals will notify the offerors that a comparison will be made between the cost of contracting, the cost of the in-house performance and, if appropriate, the cost of performance through an ISSA. A contract may or may not be awarded as a result.

2. *Contract Types.*—

a. In determining the amount to be recorded as the contract price, consider the contract type. The following guidance is provided in this regard.

b. In the case of a sealed bid, firm fixed price contract, the price of the low responsible, responsive offeror will be entered. If a firm fixed price contract is to be negotiated, the negotiated price will be entered.

c. If a cost-reimbursement or cost-sharing type contract is proposed, enter the low negotiated estimate.

d. If a contract with an incentive or award fee is proposed, enter 65 percent of the potential maximum incentive or award fee plus the contract costs of the most advantageous offer to the Government.

e. If a time and material or labor-hour contract is proposed, enter the estimated total cost of performance. Alternatively, comparable rates can be developed for the Government cost estimate, developed in accordance with this Supplement, and the comparison can be made on the basis of rates, rather than costs.

3. *Tax Exempt Organizations.*—

a. If the apparent low contract offeror is a tax-exempt organization, the tax-exempt's contract price is adjusted by an amount equal to the estimated Federal income taxes that the lowest non tax-exempt offeror would pay. This adjustment is necessary to determine which offeror has the lowest overall cost to the Government.

b. Calculate the Federal tax adjustment by using the procedures in paragraph G of this Chapter. Add the Federal taxes calculated to the tax-exempt's offer for comparison with other non tax-exempt offerors.

c. Compare the tax-exempt's adjusted offer to the low non tax-exempt offer. The lowest cost offeror, after this comparison, will then compete against the Government's in-house cost estimate and any ISSA proposals. If the tax-exempt's adjusted offer is lower than the low non tax-exempt offer, enter the *unadjusted* tax-exempt's offer on Line 7.

4. *Procurement Preference Eligible Organizations.*—

a. If a preference eligible contractor meets the requirements of an unrestricted solicitation, and is an otherwise fully responsive offeror, the preference eligible may compete with non-preference eligible offerors. This is accomplished by adding 10 percent of each non-preference eligible's offer to their offer for initial comparison purposes only. The lowest offer, after adjustment, will be chosen to compete with the Government's in-house cost estimate and ISSA offers.

b. If the preference eligible's offer is lower than all other commercial sources—after adjustments—enter the preference eligible's price on Line 7. If the non-preference eligible's adjusted price is lower, enter the *unadjusted* non-preference eligible's price on Line 7.

**C. Contract administration—**Line 8

1. Contract administration costs are incurred in administering a contract or ISSA. It includes the cost of reviewing compliance with the terms of the contract, processing payments, negotiating change orders, and monitoring the closeout of contract operations. It does not include inspection and other administrative requirements that would be common to contract and Government performance to assure acceptable performance.

2. The contract administration costs entered on Line 8 are limited to the personnel shown at Table 3–1.

3. Table 3–1 represents the estimated additional cost to administer a contract or ISSA over and above the cost to administer the same work performed by in-house employees.

4. Contract administration organization and grade structure should be certified as being in compliance with all applicable personnel regulations.

**Table 3–1. Contract Administration Factors**

| MEO Staffing | Contract Administration FTE |
|---|---|
| 10 or less | .5 |
| 11–20 | 1 |
| 21–50 | 2 |
| 51–75 | 3 |
| 76–100 | 4 |
| 101–120 | 5 |
| 121–150 | 6 |
| 151–200 | 7 |
| 201–250 | 8 |
| 251–300 | 9 |
| 301–350 | 10 |
| 351–450 | 11 |
| 451 and above | 2.5 percent of in-house MEO staffing |

**D. Additional—**Line 9

1. This cost element includes any additional costs to the Government such as transportation or purchased services resulting from unusual or special circumstances that may be encountered in particular cost comparisons.

2. The supporting documentation for additional costs should describe the nature of the cost item and indicate the reason the additional cost will not be incurred if the activity is performed with the agency's in-house resources.

3. The costs entered on Line 9 should be supported by a definition of the type of cost reported, justification for inclusion, methods of computation, and, if applicable, a detailed listing of the cost components.

4. When an in-house activity is terminated in favor of contract or ISSA performance and the agency elects to hold MEO equipment and facilities on standby, solely to maintain performance capability, the standby costs are not to be charged to the cost of the contract.

**E. One–time Conversion—**Line 10

1. *Overview*—When the Government converts to or from in-house, contract or ISSA performance, there are usually one-time costs incurred as a result of the conversion.

2. *Material Related Cost—*

a. A conversion may result in certain items of Government material or equipment, that would otherwise have been used by the in-house MEO, becoming excess and available for transfer to another in-house activity or to the contractor.

b. It should be possible to transfer the material to the contract or ISSA offeror. In this case, it may be appropriate to conduct a special joint physical inventory and include the Government's cost of conducting the joint inventory (costs may be shared with the winning bidder) on Line 10.

c. If the transfer of existing materials to the contract or ISSA offeror is feasible, and the agency elects not to provide the material, no charge for conducting the inventory is permitted.

3. *Labor-Related Costs—*

a. A conversion will also normally result in certain one-time labor-related expenses. These may include health benefit costs, severance pay, homeowner assistance, relocation and retraining expenses and initial contractor security clearance requirements.

b. Estimated severance pay is calculated at four percent of the annual basic pay (performance period 1 only) entered on Line 1, without fringe benefits.

c. If there is a requirement for the commercial source to have access to classified information or other security clearances under existing agency directives, only those costs that would be necessitated by the conversion may be calculated. Recurring requirements necessitated by in-house attrition or by employees that may be hired under the Right-of-First-Refusal will not be included.

4. *Other Costs.*—A conversion to contract or ISSA performance may require an agency to take certain actions that would not be necessary if the activity were continued in-house. Agencies have an obligation to mitigate these costs and justify why such costs are necessary. For example, it may not be possible to terminate a rent or lease agreement without a penalty fee, or it may be necessary to move materials that are not associated with the activity under study to another location in order to facilitate conversion or the contractor's or ISSA's use of a facility. Such termination, penalty or facilitation costs are also costs caused by the conversion.

5. *One-Time Cost Computation.*—Supporting documentation should clearly state the type of cost anticipated, justification for inclusion or exclusion and methods of computation.

**F. Gain from disposal/transfer of assets—**Line 11

1. As the Government develops its MEO, certain assets may be found to be no longer needed. These assets may be disposed of or transferred without consideration in a cost comparison. The cost comparison is concerned with comparing the Government's MEO with that of the best commercial or ISSA provider. Therefore, only those assets that are to be used by the Government's MEO and not made available to the contractor or ISSA are considered on Line 11.

2. The Government should not dispose of or transfer MEO assets unless there is an economic advantage to the Government to do so. If the cost of transfer exceeds the net book value of the asset, such that there is a net loss, no such losses are assessed against the contractor or ISSA. Management has made a decision not to make such assets available to the contractor or ISSA irrespective of the economic costs related to such a decision.

3. The net gain generated to the Government as a result of a conversion to a contract or ISSA and a decision not to provide certain MEO assets to the contractor or ISSA should equate to the net book value of the asset less any costs incurred to remove the asset.

**G. Federal income tax—**Line 12

1. When developing the Government's cost of contract performance, the potential Federal income tax revenue should be considered. Since contract performance would provide the contractor with income subject to tax, an estimated amount of such taxes is an appropriate deduction from the net cost to the Government, unless the prospective contractor is a tax-exempt organization.

2. To simplify the tax computation, Appendix 4, prepared by the Internal Revenue Service, provides, by types of industry, appropriate tax rates in relation to business receipts. The industry groupings conform to the Enterprise Standard Industrial Classification issued by the Department of Commerce. To determine the amount of estimated Federal income tax, the contract price (Line 7 of the GCCF) for each performance period will be multiplied by the applicable tax rate. The estimated amount of Federal income tax will be entered on Line 12 as a deduction, i.e. negative, reducing the cost of contracting.

**H. Total cost—contract or ISSA performance—**Line 13

Add Lines 7, 8, 9 and 10. If there is a number in parenthesis, i.e., a deduction, in Line 11, add to Line 12 and subtract this total from the total of Lines 7 through 10 and enter the difference on Line 13.

# Chapter 4—Calculating the Cost Comparison Decision

**A. Conversion differential—**Line 14

1. A minimum cost differential of the lesser of; (1) 10 percent of personnel costs (line 1) or (2) $10 million over the performance period, has been established that must be met before converting to or from in-house, contract or interservice support agreement (ISSA) performance. The minimum differential is established to ensure that the Government will not convert for marginal estimated savings.

2. Whenever a cost comparison involves a mix of existing in-house, contract, new or expanded requirements, or assumes full or partial conversions to in-house performance, each portion is addressed individually and the total minimum differential is calculated accordingly.

**B. Adjusted total in-house cost—**Line 15

If the cost comparison is being conducted to determine if an activity should be converted from contract or ISSA performance to in-house operation, the conversion differential as calculated above (Line 14) is added to the In-house performance cost estimate (Line 6, Total Column only) and the sum is entered under Adjusted Total Cost of In-House Performance (Line 15). The amount in the Total Column for Line 13 is replicated on Line 16.

**C. Adjusted total contract or ISSA cost—**Line 16

If the cost comparison is being conducted to determine if an activity should be converted from in-house operation to contract or ISSA performance, the conversion differential as calculated above (Line 14) is added to the Contract performance cost estimate (Line 13, Total Column only) and the sum is entered under Adjusted Total Cost of Contract or ISSA Performance(Line 16). The amount in the Total Column for Line 6 is replicated on Line 15.

**D. The cost comparison decision—**Lines 17 and 18

Subtract Line 15 from Line 16 and enter the result on Line 17. A positive amount on Line 17 supports a decision to perform the activity with in-house resources. A negative amount on Line 17 supports a decision to accomplish the work with contract resources. Indicate in the appropriate block on Line 18 the decision supported by Line 17.

## ILLUSTRATION II–1

## THE GENERIC A–76 COST COMPARISON FORM (GCCF)

### IN-HOUSE VS. CONTRACT OR ISSA PERFORMANCE

| | Performance Periods | | | | | |
|---|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | Add'l | Total | Reference |
| **IN-HOUSE PERFORMANCE** | | | | | | |
| 1. Personnel | | | | | | |
| 2. Material and Supply | | | | | | |
| 3. Other Specifically Attributable | | | | | | |
| 4. Overhead | | | | | | |
| 5. Additional | | | | | | |
| 6. Total In-house | | | | | | |
| **CONTRACT OR ISSA PERFORMANCE** | | | | | | |
| 7. Contract/ISSA Price | | | | | | |
| 8. Contract Administration | | | | | | |
| 9. Additional | | | | | | |
| 10. One-time Conversion | | | | | | |
| 11. Gain on Assets | ( ) | ( ) | ( ) | ( ) | ( ) | |
| 12. Federal Income Taxes | ( ) | ( ) | ( ) | ( ) | ( ) | |
| 13. Total Contract or ISSA | | | | | | |
| **DECISION** | | | | | | |
| 14. Minimum Conversion Differential | | | | | | |
| 15. Adjusted Total Cost of In-house Performance | | | | | | |
| 16. Adjusted Total Cost of Contract or ISSA Performance | | | | | | |
| 17. Decision—Line 16 minum Line 15 | | | | | | |
| 18. Cost Comparison Decision: Accomplish Work | | | | | | |
| In-House (+) | | | | | | |
| Contract or ISSA (–) | | | | | | |

## THE GENERIC A–76 COST COMPARISON FORM (GCCF)

19. In-House MEO Certified By: ________________________ Date: _______

________________________

Office and Title

"I certify that, to the best of my knowledge and belief, the in-house organization reflected in this cost comparison is the most efficient and cost effective organization that is fully capable of performing the scope of work and tasks required by the Performance Work Statement. I further certify that I have obtained from the appropriate authority concurrence that the organizational structure, as proposed, can and will be fully implemented — subject to this cost comparison, in accordance with all applicable Federal regulations.

20. In-House Cost Estimate Prepared By: ________________________ Date: _______

21. Independent Reviewer: ________________________ Date: _______

________________________

Office and Title

"I certify that I have reviewed the Performance Work Statement, Management Plan, In-house cost estimates and supporting documentation available prior to bid opening and, to the best of my knowledge and ability, have determined that: (1) the ability of the in-house MEO to perform the work contained in the Performance Work Statement at the estimated costs included in this cost comparison is reasonably established and, (2) that all costs entered on the cost comparison have been prepared in accordance with the requirements of Circular A–76 and its Supplement.

22. Cost Comparison Completed By: ________________________ Date: _______

23. Contracting Officer: ________________________ Date: _______

24. Tentative Cost Comparison

Decision Announced By: ________________________ Date: _______

25. Appeal Authority (if applicable): ________________________ Date: _______

# Chapter 5—Streamlined Cost Comparisons for Activities with 65 FTE or Less.

**A. General**

1. This chapter provides procedures that may be used when the Government determines that a simplified cost comparison will serve the equity and fairness purposes of Circular A–76 for conversion to or from in-house, contract or interagency support agreement (ISSA). The methodology is limited to activities that meet the following criteria:

a. possible conversion to or from in-house, contract or ISSA performance involving 65 FTE or less;

b. activities that will compete largely on a labor and material cost basis such as, but not limited to, custodial, grounds, guard, refuse, pest control, warehousing and maintenance services;

c. activities for which significant capital asset purchases are not required or for which all equipment requirements will be Government Furnished/Contractor Operated (GOCO), and

d. activities that are commonly contracted by the Government and/or private sector, e.g., there are not less than four comparable agency contracts of the same general type and scope and the range of the existing service contract costs are reasonably grouped.

2. In no case, shall any commercial activity involving 66 or more FTE be modified, reorganized, divided or in any way changed for the purpose of circumventing the requirements of this section or other procedures of this Supplement.

3. A Streamlined Cost Comparison Form (SCCF) is provided at Illustration II–2.

**B. Procedure**

1. The streamlined A–76 cost comparison process assumes that the activity being considered is regularly performed by contract. Thus, it assumes that existing fixed price contracts can be used, with only minor modification, to define the scope of the competition and to avoid the need for the development of a new or original Performance Work Statement (PWS) or a formal solicitation.

2. The employee participation and notification provisions of Part I apply.

3. The Government will base its in-house costs on the current organization.

4. The Government's in-house Labor and Material costs (Lines 1 and 2 of the Generic A–76 Cost Comparison Form) will be calculated in accordance with Chapter 2 of this Part. Overhead costs will be calculated as provided by Chapter 2 of this Part for Line 4. Any contract support costs normally included in Line 5 of the GCCF will be calculated. No other in-house costs will be calculated. The provisions for an Independent Review apply. Upon acceptance by the agency's A–76 IRO, the in-house cost estimate will be sealed and submitted to the contracting officer.

5. Upon receipt of the in-house cost estimate, the contracting officer will develop a range of contract cost estimates, based upon not less than four comparable service contracts or ISSA offers. Adjustments for differences in scope may be necessary. The contracting officer is not required to issue a solicitation for bids from the private sector. If, however, the contracting officer finds that four comparable contracts or ISSA offers are not available, the contracting officer may issue a solicitation for bids and the agency may conduct a cost comparison as otherwise provided by this Supplement.

6. At cost comparison, the in-house cost estimate will be compared with ISSA offers and the range of estimated contract costs developed by the contracting officer. The range of estimated contract costs will then be adjusted for the cost of contract administration (limited to Table 3–1) and Federal tax impacts. In calculating the Adjusted Total Costs, the minimum conversion differential shall be added to the total cost of contract or ISSA performance if the cost comparison is being conducted to determine if an activity should be converted from in-house operation to contract or ISSA performance. If the comparison is being conducted to determine if an activity should be converted from contract or ISSA performance to in-house operation, the differential is added to the total cost of in-house performance.

7. If the Government's Adjusted Total In-house Cost estimate is greater than the range of Adjusted Total Contract or ISSA Cost estimates, the contracting officer will announce a tentative decision to contract or enter into an ISSA. Upon notification of adversely affected Federal employees and publication of this tentative decision in the *Commerce Business Daily*, the A–76 Administrative Appeal process outlined in this Supplement will be initiated. With the A–76 Administrative Appeal Authority's confirmation of all costs entered on the SCCF and certification of the reasonableness of the contract and ISSA pricing adjustments made by the contracting officer, the contracting officer will solicit for award to contract or ISSA performance. The Right-of-First-Refusal will

be offered to employees adversely affected by the award.

8. If the Government's Adjusted Total In-house Cost estimate is below or within the range of Adjusted Total Contract or ISSA Cost estimates, the contracting officer will announce a tentative decision that the activity will be performed in-house. Again, upon notification of Federal employees and publication of the tentative decision in the *Commerce Business Daily,* the A–76 Administrative Appeal process will be initiated.

9. Activities to be performed or retained in-house as a result of a streamlined cost comparison should be submitted to Post-MEO Performance Review, in compliance with this Supplement. This recognizes that, for retained activities, the existing organization is assumed to be the MEO and no management plan is required.

## ILLUSTRATION II–2

## THE STREAMLINED A–76 COST COMPARISON FORM (SCCF)
## (LIMITED TO 65 FTE OR LESS)

### IN-HOUSE VS. CONTRACT OR ISSA PERFORMANCE

| | Performance Periods | | | | | |
|---|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | Add'l | Total | Reference |
| **IN-HOUSE PERFORMANCE** | | | | | | |
| 1. Personnel | | | | | | |
| 2. Material | | | | | | |
| 3. Overhead | | | | | | |
| 4. Other | | | | | | |
| 5. Total In-house | | | | | | |
| **CONTRACT OR ISSA PERFORMANCE** | | | | | | |
| 6. Contract and ISSA Price Range | | | | | | |
| 7. Contract Administration | | | | | | |
| 8. Federal Taxes (–) | | | | | | |
| 9. Total Contract and ISSA Price Range | | | | | | |
| **DECISION** | | | | | | |
| 10. Minimum Conversion Differential | | | | | | |
| 11. Adjusted Total Cost of In-house Performance | | | | | | |
| 12. Adjusted Total Cost of Contract or ISSA Performance | | | | | | |
| 13. Cost Comparison (Line 12 minus Line 11) | | | | | | |
| 14. Cost Comparison Decision: | | | | | | |
| Perform In-House | | | | | | |
| Convert to Contract or ISSA | | | | | | |

## THE STREAMLINED A–76 COST COMPARISON FORM (SCCF)
## (LIMITED TO 65 FTE OR LESS)

15. In-House Cost Estimate Prepared By: ________________________ Date: ______

16. Independent Reviewer: ___________________________________ Date: ______

________________________
Office and Title

"I certify that I have reviewed the proposed contract, in-house and ISSA cost estimates and contract prices and find them to be reasonable and calculated in accordance with the principles and procedures of Circular A–76 and its Supplement.

17. Cost Comparison Completed By: ____________________________ Date: _______

18. Contracting Officer: ____________________________ Date: _______

19. Tentative Cost Comparison
    Decision Announced By: ____________________________ Date: _______

20. Appeal Authority (if applicable): ____________________________ Date: _______

# APPENDIX 1

## Definition of Terms

***Administrative appeal authority.***—With receipt of an appeal, the official designated in paragraph 9.a. of the Circular A–76, or designee, assigns an official(s) to serve on an A–76 Administrative Appeal Authority for that appeal. The individual(s) selected must be: (a) independent of the activity under review or, (b) at least two organizational levels above the official who certified the Government's Management Plan and MEO. The Appeal Authority reviews appeals to ensure that all costs are properly accounted for in accordance with the principles and procedures of this Supplemental Handbook. The Authority shall also ensure that all participants have full and equal access to the decision process.

***Affected parties.***—Federal employees and existing Federal contractors that will or could be impacted by a decision to waive a cost comparison or have submitted bids to convert to or from in-house, contract or ISSA performance, as a result of a cost comparison, and their representatives are affected parties. Agencies or parts of agencies that have submitted formal bids or offers, in order to compete for the right to provide services through ISSAs, are also considered affected parties.

***Commercial activity.***—A commercial activity is the process resulting in a product or service that is or could be obtained from a private sector source. Agency missions may be accomplished through commercial facilities and resources, Government facilities and resources or mixes thereof, depending upon the product, service, type of mission and the equipment required.

***Commercial source.***—A commercial source is any business or other concern that is eligible for contract award in accordance with Federal Acquisition Regulations.

***Contract administration.***—Contract administration includes those inherently governmental activities performed by warranted contracting officers (CO), the contracting officer's technical representatives (COTR), and related payment evaluation staff. Contract administration is not to be confused with contract quality control, performance evaluation or inspection, which are defined as commercial activities by this Supplement and OFPP Policy Letter 92–1.

***Conversion to contract.***—A conversion to contract is the change of performance of a commercial activity from in-house performance by Federal employees to performance by a commercial source.

***Conversion from contract.***—Conversion from contract to in-house performance means the change of a commercial activity from performance by contract with a commercial source to performance by Federal employees with Government resources. It also includes the conversion of expansions and/or new requirements (work) from contract performance to in-house performance.

***Core capability.***—A core capability is a commercial activity operated by a cadre of highly skilled employees, in a specialized technical or scientific development area, to ensure that a minimum capability is maintained. The core capability does not include the skills, functions or FTE that may be retained in-house for reasons of National Defense, including military mobilization, security or rotational necessity, or to the patient care or research and development activities, as provided in Part I, Chapter 1 of this Supplement.

***Cost comparison.***—A cost comparison is the process whereby the estimated cost of Government performance of a commercial activity is formally compared, in accordance with the principles and procedures of this Circular and Supplement, to the cost of performance by commercial or ISSA sources.

***Expansion.***—An expansion is the modernization, replacement, upgrading or the enlargement of an in-house commercial activity or capability. If the expansion involves a 30-percent increase in the operating cost of the activity, a 30-percent increase in the total capital investment to perform the activity or an increase of 65 FTE or more, a cost comparison is required prior to authorizing in-house performance. A consolidation of two or more existing commercial activities is not an expansion, unless the total operating cost is 30 percent greater than the total of the individual components or it requires an increase of 65 FTE or more.

The above definition notwithstanding, pursuant to OMB Circular A–126 all aircraft purchase decisions should be justified through formal cost comparison, as provided by this Supplement.

***Exemption.***—An exemption is a determination, made in accordance with Circular A–76 and this Supplement, that a commercial activity may be converted to or from in-house, contract or ISSA performance,

without cost comparison and may be justified by reasons other than cost.

***Inherently governmental activity.***—An inherently governmental activity is one that is so intimately related to the public interest as to mandate performance by Federal employees. Activities that meet these criteria are not in competition with commercial sources, are not generally available from commercial sources and are, therefore, not subject to Circular A–76 or this Supplement. Guidance to avoid an unacceptable transfer of official responsibility to contract performance may be found in the Office of Federal Procurement Policy (OFPP) Policy Letter 92–1. See Appendix 5.

***Independent Review Officer (IRO).***—The agency official who certifies—prior to bid opening—that the Government's performance and cost comparison estimates have been prepared in accordance with Circular A–76 and this Supplement.

***ISSA.***—The provision of a commercial activity, in accordance with an interservice support agreement, on a reimbursable basis. This includes franchise funds, revolving funds and working capital funds.

***Management Plan.***—The Management Plan is the document that outlines the changes that will result in the Government's Most Efficient Organization (MEO) to perform a commercial activity in-house. It provides the staffing patterns and operating procedures that serve as a baseline for in-house cost estimates.

***Most Efficient Organization (MEO).***—The MEO refers to the Government's in-house organization to perform a commercial activity. It may include a mix of Federal employees and contract support. It is the basis for all Government costs entered on the Cost Comparison Form. The Most Efficient Organization (MEO) is the product of the Management Plan and is based upon the Performance Work Statement (PWS).

***National defense activity.***—A national defense activity is a commercial activity that is approved by the Secretary of Defense, or designee, as being subject to deployment in a direct military combat support role.

***National security.***—A national security activity is a commercial activity that is approved by the Director of Central Intelligence, or designee, as being necessary to meet the national security.

***New requirements.***—A new requirement is a newly established need for a commercial product or service.

***Overhead.***—Overhead is included in the in-house estimate and is defined as those costs that are not directly attributable to the activity under study.

***Performance measures.***—Performance measures provide a series of indicators, expressed in qualitative, quantitative or other tangible terms, that indicate whether current performance is reasonable and cost effective. Performance measures can include workload and output-to-cost ratios, transaction ratios, error rates, consumption rates, inventory fill rates, timeliness measures, completion and back order rates, etc. Quality service measures may include responsiveness rates, user satisfaction rates, etc.

***Performance standard.***—A performance standard reflects the minimum, sector-specific, Federal requirement for the performance of a commercial activity. It incorporates both quality measures and cost measures. Cost measures reflect the cost comparability procedures of Part II of this Supplement to assure equity in the comparison of performance standards with private industry standards.

***Performance Work Statement (PWS).***—A Performance Work Statement is a statement of the technical, functional and performance characteristics of the work to be performed, identifies essential functions to be performed, determines performance factors, including the location of the work, the units of work, the quantity of work units, and the quality and timeliness of the work units. It serves as the scope of work and is the basis for all costs entered on the Cost Comparison Form.

***Post-MEO performance review.***—When services are performed in-house, as a result of a cost comparison, including those involving an interservice support agreement, a formal review and inspection of the Most Efficient Organization (MEO) should be conducted. Typically, this review should be conducted following the end of the first full year of performance. Post-MEO Performance Reviews confirm that the MEO has been implemented in accordance with the Transition Plan, establish the MEO's ability to perform the services of the PWS and confirm that actual costs are within the estimates contained in the in-house cost estimate. Adjustments may be made for formal mission or scope of work changes.

***Preferential procurement programs.***—These are special ''commercial'' source programs, such as Federal Prison Industries and the workshops administered by the Committee for the Purchase from the Blind and Other Severely Handicapped under the Javits-Wagner-O'Day Act.

***Performance requirements summary (PRS).***—A PRS is a synopsis of the scope of work and output performance measurements that may be used in conjunction

with aviation cost comparisons that rely on the GSA FAMIS data system for identifying contract costs.

***Privatization.***—Privatization is the process of changing a public entity or enterprise to private control and ownership. It does not include determinations as to whether a support service should be obtained through public or private resources, when the Government retains full responsibility and control over the delivery of those services.

***Quality assurance surveillance.***—Quality Assurance Surveillance is the method by which Federal employees will supervise in-house or contract performance to ensure that the standards of the PWS are met within the costs bid.

***Reasonable or competitive prices.***—The expected range of prices resulting from experience obtained through the competitive free enterprise system for like or similar activities. Determinations are to be made by the contracting officer.

***Recurring commercial activity.***—A recurring commercial activity is one that is required by the Government on a consistent and long term basis. This definition does not imply an hourly, daily, monthly or annual requirement, but must, in a general sense, be repetitive in nature, wherein the expected workload can be reasonably estimated.

***Sector.***—Certain commercial activities are common to more than one agency. Many of these commercial activities can be aggregated. For example, an agency may inventory transportation acquisition, operations, maintenance and disposal as independent commercial activities.

***Severable expansion.***—A severable expansion is an expansion of currently contracted, in-house or interservice support agreement provided work that could be provided using the current approach or could, without severe additional administrative burden, be provided by another competitive offeror. Economies of scale are not justification for dismissing new or expanded work as severable, these economies will be tested through competitive offer.

***Start date.***—This term is used in two ways. First, it is the date when a cost comparison begins, generally defined as the date that a local Study Team is formed and actual work on the Performance Work Statement, Management Plan and in-house cost estimate begins. Second, it may refer to the actual date work is scheduled to begin under a contract, as provided in the solicitation.

# APPENDIX 2

## Commercial Activities Inventory

### A. Annual Inventory Submission

In accordance with the FAIR Act, Circular A–76 and this Handbook, each agency must submit to OMB, by June 30 of each year, a detailed Commercial Activities Inventory of all commercial activities performed by in-house employees, including, at a minimum, the following:

a. Organization unit.
b. State(s).
c. Location(s).
d. FTE.
e. Activity function code.
f. Reason code.
g. Year the activity first appeared on FAIR Act Commercial Activities Inventory (initial value will be 1999).
h. Name of a Federal employee responsible for the activity or contact person from whom additional information about the activity may be obtained.
i. Year of cost comparison or conversion (if applicable).
j. CIV/FTE savings (if applicable).
k. Estimated annualized Cost Comparison dollar savings (if applicable).
l. Date of completed Post-MEO Performance Review (if applicable).

Agencies have the discretion to automate and to structure the initial submission of the detailed inventory as they believe most appropriate, so long as the inventory includes each of these data elements. Agencies must transmit an electronic version of the inventory to OMB as well as two paper copies. The electronic version should be in a commonly used software format (commercial off-the-shelf spreadsheet, database or word processing format). OMB anticipates issuing additional guidance on the structure and format of future inventory submissions, based on the experience gained from the first annual review and consultation process.

### B. Reporting

The above is public information. The data may be summarized into reports for the Congress, the General Accounting Office (GAO), agency officials, OMB or the public.

### C. FTE

Enter the number of authorized full-time employees or FTE (as applicable) in the commercial activity function or functions as of the date of the inventory. Employees performing inherently Governmental activities are not reported in the Commercial Activities Inventory.

### D. A–76 Commercial activity functional codes

The Department of Defense has developed a comprehensive list of function codes for use in their A–76 inventory system. In applying these function codes Government-wide, the codes standardize the functional descriptions of activities and facilitate the aggregation of activities Government-wide and by agency.

### E. Reason codes

The following reason codes will be used in the Commercial Activities Inventory. Agencies may add additional sub-groupings (A1, A2 for example) within any reason code, as deemed necessary.

| Code | Explanation |
|---|---|
| A | Indicates that the function is performed by Federal employees and is specifically exempt by the agency from the cost comparison requirements of the Circular and this Supplement. |
| B | Indicates that the activity is performed by Federal employees and is subject to the cost comparison or direct conversion requirements of the Circular and this Supplement. |
| C | Indicates that the activity is performed by Federal employees, but is has been specifically made exempt from the provisions of the Circular and this Supplement by Congress, Executive Order or OMB. |
| D | Indicates that the function is currently performed by in-house Federal employees and is in the process of being cost compared or converted directly to contract or interservice support agreement performance. |
| E | Indicates that the function is retained in-house as a result of a cost comparison. |
| F | Indicates the function is currently being performed by Federal employees, but a review is pending force restructuring decisions (i.e., base closure, realignment, consolidation, etc.). |
| G | Indicates that the function is prohibited from conversion to contract because of legislation. |
| H | Waiver issued. |
| I | Indicates the function is being performed in-house as a result of a cost comparison resulting from a decision to convert from contract to in-house performance. |

**F. Maintenance of aggregate data**

Agencies should maintain aggregate program implementation data by fiscal year, to include: total number of studies, FTE and dollar savings by conversion to contract, conversion to in-house or otherwise retained in-house. Agencies should also track total FTE studied and MEO savings generated.

**G. Inventory Review and Publication; Challenges and Appeals.**

1. Review and Publication: In accordance with Section 2 of the FAIR Act, OMB will review the agency's Commercial Activities Inventory and consult with the agency regarding its content. After this review is completed, OMB will publish a notice in the Federal Register stating that the inventory is are available to the public. Once the notice is published, the agency will transmit a copy of the detailed Commercial Activities Inventory to Congress and make the materials available to the public through its Washington, D.C. or headquarters offices.

2. Challenges and Appeals: Under Section 3 of the FAIR Act, an agency's decision to include or exclude a particular activity from the Commercial Activities Inventory is subject to administrative challenge and, then, possible appeal by an ''interested party.'' Section 3(b) of the FAIR Act defines ''interested party'' as:

a. A private sector source that (A) is an actual or prospective offeror for any contract or other form of agreement to perform the activity; and (B) has a direct economic interest in performing the activity that would be adversely affected by a determination not to procure the performance of the activity from a private sector source.

b. A representative of any business or professional association that includes within its membership private sector sources referred to in a. above.

c. An officer or employee of an organization within an executive agency that is an actual or prospective offeror to perform the activity.

d. The head of any labor organization referred to in section 7103(a) (4) of title 5, United States Code that includes within its membership officers or employees of an organization referred to in c. above.

3. An interested party may submit to an executive agency an initial challenge to the inclusion or exclusion of an activity within 30 calendar days after publication of OMB's Federal Register notice stating that the inventory is available. The challenge must set forth the activity being challenged with as much specificity as possible, and the reasons for the interested party's belief that the particular activity should be reclassified as inherently Governmental (and therefore be deleted from the inventory) or as commercial (and therefore be added to the inventory) in accordance with OFPP Policy Letter 92–1 on inherently Governmental functions (see Appendix 5) or as established by precedent (such as when other agencies have contracted for the activity or undergone competitions for this or similar activities).

4. The agency head may delegate the responsibility to designate the appropriate official(s) to receive and decide the initial challenges. As mandated by the FAIR Act, the deciding official must decide the initial challenge and transmit to the interested party a written notification of the decision within 28 calendar days of receiving the challenge. The notification must include a discussion of the rationale for the decision and, if the decision is adverse, an explanation of the party's right to file an appeal.

5. An interested party may appeal an adverse decision to an initial challenge within 10 working days after receiving the written notification of the deci-

sion. The agency head may delegate the responsibility to receive and decide appeals to the official identified in paragraph 9.a of the Circular (or an equivalent senior policy official), without further delegation. Within 10 working days of receipt of the appeal, the official must decide the appeal and transmit to the interested party a written notification of the decision together with a discussion of the rationale for the decision. The agency must also transmit to OMB and the Congress a copy of any changes to the inventory that result from this process, make the changes available to the public and publish a notice of public availability in the Federal Register.

**H. Agency Review and Use of Inventory.**

Section 2(d) of the FAIR Act requires that each agency, within a reasonable time after the publication of the notice that its inventories are publicly available, review the activities on the detailed commercial activities inventory. Agencies will report to OMB on this process as part of the Report on Agency Management of Commercial Activities required under Paragraph I, below. In addition, Section 2(d)-(e) of the FAIR Act provides that, each time the head of the executive agency considers contracting with a private-sector source for the performance of an activity included on the inventory, the agency must use a competitive process to select the source and must ensure that, when a cost comparison is used or otherwise required for the comparison of costs, all costs are considered and the costs considered are realistic and fair. In carrying out these requirements, agencies must rely on the guidance contained in Circular A–76 and this Supplemental Handbook to determine if cost comparisons are required and what competitive method is appropriate. All competitive costs of in-house and contract performance are included in the cost comparison, when such comparison is required, including the costs of quality assurance, technical monitoring, liability insurance, retirement benefits, disability benefits and overhead that may be allocated to the function under study or may otherwise be expected to change as a result of changing the method of performance.

**I. Annual Report on Agency Management of Commercial Activities.**

As part of ongoing agency responsibility to manage their performance of commercial activities and ongoing OMB oversight, OMB will require agencies to report annually on such management. The content of the reports is likely to vary depending upon the progress made by each agency in reviewing their inventory and on the experience OMB gains from the first round of inventory submissions, review, challenges and appeals mandated by the FAIR Act. OMB anticipates issuing subsequent guidance if it determines that supplemental reports or other information is needed for future inventory submissions to assure that agencies have correctly implemented all of the provisions of the FAIR Act and taken advantage of the management information inherent in the detailed Commercial Activities Inventory.

## A–76 Commercial Activition Functional Codes

| | G—Social Services |
|---|---|
| G001 | Care of Remains of Deceased Personnel & Funeral Services |
| G008 | Commissary Store Operation |
| G009 | Clothing Sales Store Operations |
| G010 | Recreational Library Services |
| G011 | Morale, Welfare, and Recreation Services |
| G012 | Community Services |
| G900 | Chaplain Activities and Support Services |
| G901 | Housing Administrative Services |
| G904 | Family Services |
| G999 | Other Social Services |

| | H—Health Services |
|---|---|
| H101 | Hospital Care |
| H102 | Surgical Care |
| H105 | Nutritional Care |
| H106 | Pathology Services |
| H107 | Radiology Services |
| H108 | Pharmacy Services |
| H109 | Physical Therapy |
| H110 | Materiel Services |
| H111 | Orthopedic Services |
| H112 | Ambulance Services |
| H113 | Dental Care |
| H114 | Dental Laboratories |
| H115 | Clinics and Dispensaries |
| H116 | Veterinary Services |
| H117 | Medical Records |
| H118 | Nursing Services |
| H119 | Preventive Medicine |
| H120 | Occupational Health |
| H121 | Drug Rehabilitation |
| H999 | Other Health Services |

| | J—Intermediate, Direct or General Repair and Maintenance of Equipment |
|---|---|
| J501 | Aircraft Maintenance |
| J502 | Aircraft Engine Maintenance |
| J503 | Missiles |
| J504 | Vessels |
| J505 | Combat Vehicles |
| J506 | Noncombat Vehicles |
| J507 | Electronic and Communication Equipment Maintenance |
| J510 | Railway Equipment |
| J511 | Special Equipment |
| J512 | Armament |
| J513 | Dining Facility Equipment |
| J514 | Medical and Dental Equipment |
| J515 | Containers, Textile, Tents, and Tarpaulins |
| J516 | Metal Containers |
| J517 | Training Devices and Audiovisual Equipment |
| J519 | Industrial Plant Equipment |
| J520 | Test, Measurement and Diagnostic Equipment |
| J521 | Other Test, Measurement and Diagnostic Equipment |
| J522 | Aeronautical Support Equipment |
| J999 | Maintenance of Other Equipment |

## A–76 Commercial Activition Functional Codes—Continued

| | |
|---|---|
| | **K—Depot Repair, Maintenance, Modification, Conversion or Overhaul of Equipment** |
| K531 | Aircraft |
| K532 | Aircraft Engines |
| K533 | Missiles |
| K534 | Vessels |
| K535 | Combat Vehicles |
| K536 | Noncombat Vehicles |
| K537 | Electronic and Communication Equipment |
| K538 | Railway Equipment |
| K539 | Special Equipment |
| K540 | Armament |
| K541 | Industrial Plant Equipment |
| K542 | Dinning and Facility Equipment |
| K543 | Medical and Dental Equipment |
| K544 | Containers, Textile, Tents, and Tarpaulins |
| K545 | Metal Containers |
| K546 | Test, Measurement and Diagnostic Equipment |
| K547 | Other Test, Measurement and Diagnostic Equipment |
| K548 | Aeronautical Support Equipment |
| K999 | Other Depot Repair, Maintenance, Modification, Conversion or Overhaul of Equipment |
| | **P—Base Maintenance/Multifunction Contracts** |
| P100 | Installation Operation Contracts (Multi-function) |
| | **R—Research, Development, Test, and Evaluation (RDT&E) Support** |
| R660 | RDT&E Support |
| | **S—Installation Services** |
| S700 | Natural Resource Services |
| S701 | Advertising and Public Relations |
| S702 | Financial and Payroll Services |
| S703 | Debt Collection |
| S706 | Bus Services |
| S708 | Laundry and Dry Cleaning |
| S709 | Custodial Services |
| S710 | Pest Management |
| S712 | Refuse Collection and Disposal Services |
| S713 | Food Services |
| S714 | Furniture Repair |
| S715 | Office Equipment Maintenance and Repair |
| S716 | Motor Vehicle Operation |
| S717 | Motor Vehicle Maintenance |
| S718 | Fire Prevention and Protection |
| S719 | Military Clothing |
| S724 | Guard Service |
| S725 | Electrical Plants and Systems Operation and Maintenance |
| S726 | Heating Plants and Systems Operation and Maintenance |
| S727 | Water Plants and Systems Operation and Maintenance |
| S728 | Sewage and Waste Plants Operation and Maintenance |
| S729 | Air Conditioning and Refrigeration Plants |
| S730 | Other Utilities Operation and Maintenance |
| S731 | Supply Operations |
| S732 | Warehousing and Distribution of Publications |
| S740 | Transportation Management Services |
| S750 | Museum Operations |
| S760 | Contractor-Operated Parts Stores & Civil Engineering Supply Stores |

## A–76 Commercial Activition Functional Codes—Continued

| | |
|---|---|
| S999 | Other Installation Services |
| | **T—Other NonManufacturing Operations** |
| T800 | Ocean Terminal Operations |
| T801 | Storage and Warehousing |
| T802 | Cataloging |
| T803 | Acceptance Testing |
| T804 | Architect-Engineering |
| T805 | Operation of Bulk Liquid Storage |
| T806 | Printing and Reproduction |
| T807 | Visual Information |
| T808 | Mapping and Charting |
| T809 | Administrative Telephone Services |
| T810 | Air Transportation Services |
| T811 | Water Transportation Services |
| T812 | Rail Transportation Services |
| T813 | Engineering and Technical Services |
| T814 | Aircraft Fueling Services |
| T815 | Scrap Metal Operation |
| T816 | Telecommunication Centers |
| T817 | Other Communications and Electronics Systems |
| T818 | Systems Engineering and Installation of Communications Systems |
| T819 | Preparation and Disposal of Excess and Surplus Property |
| T820 | Administrative Support Services |
| T821 | Special Studies and Analysis |
| T900 | Training Aids, Devices, and Simulator Support |
| T999 | Other NonManufacturing Operations |
| | **U—Education and Training** |
| U100 | Recruit Training |
| U200 | Officer Acquisition Training |
| U300 | Specialized Skill Training |
| U400 | Flight Training |
| U500 | Professional Development Training |
| U510 | Professional Military Education |
| U520 | Graduate Education, Fully Funded, Full-time |
| U530 | Other Full-time Education Programs |
| U540 | Off-Duty (Voluntary) and On-Duty Education Programs |
| U600 | Civilian Education and Training |
| U700 | Dependent Education |
| U800 | Training Development and Support |
| U999 | Other Training Functions |
| | **W—Automatic Data Processing** |
| W824 | Data Processing Services |
| W825 | Maintenance of ADP Equipment |
| W826 | Systems Design, Development and Programming Services |
| W827 | Software Services |
| W999 | Other ADP Functions |
| | **X—Products Manufactured and Fabricated In-House** |
| X931 | Ordnance Equipment |
| X932 | Products Made From Fabric or Similar Materials |
| X933 | Container Products and Related Items |
| X934 | Preparation of Food and Bakery Products |
| X935 | Liquid, Gaseous and Chemical Products |
| X936 | Rope, Cordage, and Twine Products; Chains and Metal Cable Products |

## A–76 Commercial Activition Functional Codes—Continued

| | |
|---|---|
| X937 | Logging and Lumber Products |
| X938 | Communications and Electronic Products |
| X939 | Construction Products |
| X940 | Rubber and Plastic Products |
| X941 | Optical and Related Products |
| X942 | Sheet Metal Products |
| X943 | Foundry Products |
| X944 | Machined Parts |
| X999 | Other Products Manufactured and Fabricated In-House |
| | **Z—Maintenance, Repair, Alteration, and Minor Construction of Real Property** |
| Z991 | Maintenance and Repair of Family Housing Buildings and Structures |
| Z992 | Maintenance and Repair of Buildings and Structures Other Than Family Housing |
| Z993 | Maintenance and Repair of Grounds and Surfaced Areas |
| Z997 | Maintenance and Repair of Railroad Facilities |
| Z998 | Maintenance and Repair of Waterways |
| Z999 | Other Maintenance, Repair, Alteration, and Minor Construction of Real Property |

# APPENDIX 3

## Useful Life and Disposal Value

The attached useful life and disposal values are estimated by the Defense Logistics Agency. The disposal value factor, as a percent of acquisition cost, is based upon the rate of return.

### Useful Life * and Disposal Value Table

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| | Guns, through 30mm | 15 | 3.15 |
| | Guns, over 30mm up to 75mm | | 1.18 |
| | Guns, 75mm through 125mm | 25 | 0.63 |
| | Guns, over 125mm through 200mm | | 2.14 |
| | Guns, over 200mm through 300mm | | 2.61 |
| 1040 | Chemical Weapons and Equipment | 16 | |
| | Launchers, Rocket and Pyrotechnic | 15 | 2.00 |
| 1080 | Camouflage and Deception Equipment | 10 | 1.75 |
| 1090 | Assemblies Interchangeable between Weapons in Two or More Classes | 25 | 2.25 |
| 1095 | Misc. Weapons | | 1.06 |
| 1135 | Fusing and Firing Devices Nuclear Ordnance | 16 | 0.08 |
| 1190 | Specialized Test and Handling Equipment, Nuclear Ordnance | 8 | 0.60 |
| 1220 | Fire Control Computing Sights and Devices | 8 | 0.29 |
| 1230 | Fire Control System, Complete | 11 | |
| 1240 | Optical Sighting and Ranging Equipment | 11 | 1.80 |
| 1250 | Fire Control Stabilizing Mechanisms | 11 | 1.76 |
| 1260 | Fire Control Designating and Indicating Equipment | 12 | 0.58 |
| 1265 | Fire Control Transmitting and Receiving Equipment, except Airborne | 11 | 0.39 |
| 1270 | Aircraft Gunnery Fire Control Components | | 0.22 |
| 1285 | Fire Control Radar Equipment, except Airborne | | 1.19 |
| 1290 | Misc. Fire Control Equipment | 19 | 0.79 |
| 1340 | Rockets, Rocket Ammo and Rocket Components | 18 | 3.62 |
| 1375 | Demolition Materials | | |
| 1377 | Cartridge and Propellant Activated Devices and Components | | 1.28 |
| 1398 | Specialized Ammo Handling and Servicing Equipment | 12 | 0.52 |
| 1410 | Guided Missiles | 19 | 1.55 |
| 1420 | Guided Missile Components | 15 | 0.13 |
| 1430 | Guided Missile Remote Control Systems | 19 | 0.45 |
| 1440 | Launchers, Guided Missile | 17 | 0.66 |
| 2450 | Guided Missile Handling and Servicing Equipment | 27 | 0.65 |
| 1560 | Airframe Structural Components | 20 | 2.48 |
| 1610 | Aircraft Propellers | 10 | 4.58 |
| 1615 | Helicopter Rotor Blades, Drive Mechanisms and Components | 10 | 3.52 |
| 1620 | Aircraft Landing Gear Components | 10 | 2.71 |
| 1630 | Aircraft Wheel and Brake Systems | 10 | 4.92 |
| 1650 | Aircraft Hydraulic, Vacuum and De-icing System Components | 10 | 2.19 |
| 1660 | Aircraft Air Conditioning, Heating and Pressurizing Equipment | 10 | 2.23 |
| 1670 | Parachutes; Aerial Pick Up, Delivery, Recovery Systems and Cargo Tie Down Equipment | 7 | 5.52 |
| 1680 | Misc. Aircraft Accessories and Components | 7 | 1.92 |
| 1720 | Aircraft Launching Equipment | 25 | 1.91 |
| 1730 | Aircraft Ground Servicing Equipment | 20 | 3.12 |
| 1740 | Airfield Specialized Trucks and Trailers | 6.37 | |
| 1905 | Combat Ships and Landing Vessels | 20 | 2.53 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 1915 | Cargo and Tanker Vessels | 30 | 8.54 |
| 1925 | Special Service Vessels | 25 | 8.54 |
| 1930 | Barges and Lighters, Cargo | 27 | 11.05 |
| 1935 | Barges and Lighters, Special Purpose | 30 | 19.83 |
| 1940 | Small Craft | 23 | 6.35 |
| 1945 | Pontoons and Floating Docks | 30 | 14.42 |
| 1990 | Misc. Vessels | | 8.74 |
| 2010 | Ship and Boat Propulsion Components | 20 | 10.26 |
| 2030 | Deck Machinery | | 3.31 |
| 2040 | Marine Hardware and Hull Items | 20 | 16.57 |
| 2050 | Buoys | | 11.05 |
| 2090 | Misc. Ship and Marine Equipment | | 4.81 |
| 2210 | Locomotives | 29 | 16.51 |
| 2220 | Rail Cars | 40 | 10.27 |
| 2230 | Right-of-Way Construction and Maintenance Equipment, Railroad | 20 | 18.69 |
| 2240 | Locomotive and Rail Car Accessories and Components | | 9.98 |
| 2250 | Track Materials, Railroad | | 41.00 |
| 2305 | Ground Effect Vehicles | 15 | |
| 2310 | Passenger Motor Vehicles | * | 17.00 |
| | Passenger Cars and Station Wagons | 6 | |
| | Buses (11 or more passengers) | 8 | |
| | Ambulances | 7 | |
| 2320 | Trucks and Truck Tractors, Wheeled | * | 17.96 |
| | Less than 12,500 (payload I ton and | 6 | |
| | less) 12,500 through 16,999 (payload, | | |
| | 1½ through 2½ tons) | 7 | |
| | 17,000 and over (payload, tons and (over) | 9 | |
| | Multiple Drive Vehicles | 6 | |
| 2330 | Trailers | 23 | 10.09 |
| 2340 | Motorcycles, Motor Scooters and Bicycles | 12 | 27.31 |
| 2350 | Combat, Assault and Tactical Vehicles, Tracked | 14 | 32.82 |
| 2410 | Tractors, Full Track, Low Speed | 14 | 27.62 |
| 2420 | Tractors, Wheeled | 13 | 22.70 |
| 2430 | Tractors, Track Laying High Speed | | 7.42 |
| 2510 | Vehicular Cab, Body and Frame Structural Components | 10 | 14.18 |
| 2520 | Vehicular Power Transmission Components | 12 | 16.22 |
| 2530 | Vehicular Brake, Steering, Axle, Wheel and Track Components | 12 | 12.17 |
| 2540 | Vehicular Furniture and Accessories | 18 | 6.95 |
| 2590 | Misc. Vehicular Components | 10 | 7.04 |
| 2805 | Gasoline Reciprocating Engines except Aircraft and Components | 7 | 5.68 |
| 2810 | Gasoline Reciprocating Engines, Aircraft and Components | | 3.43 |
| 2815 | Diesel Engines and Components | | 13.33 |
| 2835 | Gas Turbines and Jet Engines, except Aircraft and Components | 15 | 3.59 |
| 2840 | Gas Turbines and Jet Engines, Aircraft, and Components | | 1.77 |
| 2845 | Rocket Engines and Components | | 0.11 |
| 2910 | Engine Fuel System Components, Nonaircraft | | 8.01 |
| 2915 | Engine Fuel System Components, Aircraft | | 3.01 |
| 2920 | Engine Electrical System Components, Nonaircraft | | 10.32 |
| 2925 | Engine Electrical System Components, Aircraft | | 7.94 |
| 2930 | Engine Cooling System Components, Nonaircraft | | 21.96 |
| 2935 | Engine Cooling System Components, Aircraft | | 7.41 |
| 2945 | Engine Air and Oil Filters, Strainers and Cleaners, Aircraft | | 1.71 |
| 2950 | Turbosuperchargers | | 8.26 |
| 2990 | Misc. Engine Accessories, Nonaircraft | | 7.77 |
| 2995 | Misc. Engine Accessories, Aircraft | | 4.10 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 3010 | Torque Converters and Speed Changers | | 5.93 |
| 3020 | Gears, Pulleys, Sprockets and Transmission Chain | | 4.64 |
| 3040 | Misc. Power Transmission Equipment | | 3.22 |
| 3110 | Bearings, Antifriction, Unmounted | | 22.14 |
| 3120 | Bearings, Plain, Unmounted | | 4.78 |
| 3130 | Bearings, Mounted | | 7.80 |
| 3210 | Sawmill and Planing Mill Machinery | 15 | 28.41 |
| 3220 | Woodworking Machines | 15 | 27.37 |
| 3405 | Saws and Filing Machines | 20 | 30.87 |
| 3408 | Machining Centers and Way-Type Machines | 7.49 | |
| 3410 | Electrical and Ultrasonic Erosion Machines | 10 | 9.75 |
| 3411 | Boring Machines | 20 | 49.61 |
| 3413 | Drilling and Tapping Machines | 15 | 40.16 |
| 3414 | Gear Cutting and Finishing Machines | 10 | 29.58 |
| 3415 | Grinding Machines | 15 | 35.06 |
| 3416 | Lathes | 20 | 39.84 |
| 3417 | Milling Machines | 20 | 28.22 |
| 3418 | Planners and Shakers | 20 | 27.66 |
| 3419 | Misc. Machine Tools | 15 | 17.92 |
| 3422 | Rolling Mills and Drawing Machines | 10 | 68.35 |
| 3424 | Metal Heat Treating and Nonthermal Treating Equipment | 25 | 11.72 |
| 3426 | Metal Finishing Equipment | 20 | 6.63 |
| 3655 | Gas Generating and Dispersing Systems | 12 | 7.35 |
| | Industrial Size Reduction Machinery | 9 | 27.30 |
| 3680 | Foundry Machinery, Related Equipment and Supplies | 10 | 12.61 |
| 3690 | Specialized Ammo and Ordnance Machinery and Related Equipment | | 3.41 |
| 3693 | Industrial Assembly Machine | 0.45 | |
| 3694 | Clean Work Stations, Controlled Environment and Related Equipment | | 6.43 |
| 3695 | Misc. Special Industry Equipment | 4 | 7.58 |
| 3910 | Conveyors | 12 | 6.85 |
| 3920 | Materials Handling Equipment Nonself Propelled | 22 | 9.07 |
| 3930 | Warehouse Trucks and Tractors, Self Propelled | * | 18.60 |
| | *Gasoline* | | |
| | Fork Truck (2,000 pounds to 16,000 Pounds) | 8 | |
| | Fork Truck (over 6,000 pounds) | | 10 |
| | Tractor | 8 | |
| | Crane | 12 | |
| | Platform Truck | 8 | |
| | Straddle Truck | 15 | |
| | *Electric* | | |
| | All types | 15 | |
| 3940 | Blocks, Tackle, Rigging and Slings | | 9.61 |
| 3950 | Winches, Hoists, Cranes and Derricks | 13 | 10.23 |
| 3990 | Misc. Materials Handling Equipment | 30 | 8.71 |
| 4010 | Chain and Wire Rope | | 5.11 |
| 4020 | Fiber Rope, Cordage and Twine | | 6.81 |
| 4030 | Fittings for Rope, Cable and Chain | | 13.16 |
| 4110 | Refrigeration Equipment | 11 | 7.07 |
| 4120 | Air Conditioning Equipment | 10 | 3.82 |
| 4130 | Refrigeration and Air Conditioning Components | 16 | 4.26 |
| 4140 | Fans, Air Circulators and Blow Equipment | 4.79 | |
| 4210 | Fire Fighting Equipment | 14 | 6.55 |
| 4220 | Marine Lifesaving and Diving Equipment | 10 | 5.65 |
| 4230 | Decontaminating and Impregnating Equip. | 17 | 5.87 |
| 4240 | Safety and Rescue Equipment | 19 | 2.53 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 4310 | Compressors and Vacuum Pumps | 10 | 7.59 |
| 4320 | Power and Hand Pumps | 15 | 4.27 |
| 4330 | Centrifuges, Separators and Pressure and Vacuum Filters | 20 | 4.90 |
| 4410 | Industrial Boilers | 9 | 3.78 |
| 4420 | Heat Exchanges and Steam Condensers | 9.73 | |
| 4430 | Industrial Furnaces, Kilns, Lehrs and Ovens | 10 | 6.59 |
| 4440 | Driers, Dehydrators and Anhydrators | 10 | 4.55 |
| 4460 | Air Purification Equipment | 11 | 3.71 |
| 4510 | Plumbing Fixtures and Accessories | 15 | 5.91 |
| 4520 | Space Heating Equipment and Domestic Water Heaters | 8 | 8.36 |
| 4540 | Misc. Plumbing, Heating and Sanitation Equipment | 8 | 3.01 |
| 4610 | Water Purification Equipment | 14 | 4.55 |
| 4620 | Water Distillation Equipment, Marine and Industrial | 15 | 15.61 |
| 4710 | Pipe and Tube | | 7.79 |
| 4720 | Hose and Tubing, Flexible | | 6.13 |
| 4730 | Fittings and Specialties, Hose, Pipe and Tube | | 4.83 |
| 4810 | Valves, Powered | | 2.20 |
| 4820 | Valves Nonpowered | | 4.91 |
| 4910 | Motor Vehicle, Maintenance and Repair Shop Specialized Equipment | 11 | 6.63 |
| 4920 | Aircraft Maintenance and Repair Shop Specialized Equipment | 20 | 1.58 |
| 4925 | Ammo, Maintenance, Repair and Checkout Specialized Equipment | 21 | 1.67 |
| 4927 | Rocket Maintenance, Repair and Checkout Specialized Equipment | | |
| 4930 | Lubrication and Fuel Dispensing Equipment | 15 | 5.00 |
| 4931 | Fire Control Maintenance and Repair Shop Specialized Equipment | 9 | 1.18 |
| 4933 | Weapons Maintenance and Repair Shop Specialized Equipment | 15 | 1.91 |
| 4935 | Guided Missile Maintenance, Repair and Checkout Specialized Equipment | 19 | 0.40 |
| 4940 | Misc. Maintenance and Repair Shop Specialized Equipment | 20 | 4.48 |
| 5110 | Hand tools, Edged-Nonpowered | 10 | 9.26 |
| 5120 | Hand tools, Nonedged, Nonpowered | 21 | 5.53 |
| 5130 | Hand tools, Power Driven | 10 | 10.31 |
| 5133 | Drill Bits, Counterbores and Countersinks, Hand and Machine | 10 | 24.07 |
| 5136 | Taps, Dies and Collets, Hand and Machine | 10 | 8.08 |
| 5140 | Tool and Hardware Boxes | 20 | 26.42 |
| 5180 | Sets, Kits and Outfits of Hand Tools | 23 | 3.83 |
| 5210 | Measuring Tools, Craftsmen | 10 | 4.87 |
| 5220 | Inspection Gages and Precision Layout Tools | 12 | 3.17 |
| 5280 | Sets, Kits and Outfits of Measuring Tools | 25 | 1.01 |
| 5410 | Prefabricated and Portable Building | 8 | 2.48 |
| 5411 | Rigid Wall Shelters | 20 | 2.44 |
| 5420 | Bridges, Fixed and Floating | 17 | 7.25 |
| 5430 | Storage Tanks | 7 | 6.83 |
| 5440 | Scaffolding Equipment and Concrete Forms | 5 | 6.83 |
| 5445 | Prefabricated Tower Structures | 23 | 5.23 |
| 5450 | Misc. Prefabricated Structures | 25 | 1.30 |
| 5670 | Architectural and Related Metal Products | 10 | 59.16 |
| 5680 | Misc. Construction Materials | 69 | 9.59 |
| 5805 | Telephone and Telegraph Equipment | 23 | 2.37 |
| 5810 | Communications Security Equipment and Components | 16 | 0.40 |
| 5811 | Other Cryptologic Equipment and Components | 11 | 1.25 |
| 5815 | Teletype and Facsimile Equipment | 22 | 0.99 |
| 5820 | Radio and Television Communications Equipment, except Airborne | 8 | 2.44 |
| 5821 | Radio and Television Communications Equipment, Airborne | 24 | 1.01 |
| 5825 | Radio Navigation Equipment, except Airborne | 24 | 1.37 |
| 5826 | Radio Navigation Equipment, Airborne | 24 | 1.44 |
| 5830 | Intercommunication and Public Address Systems, except Airborne | 24 | 1.74 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 5831 | Intercommunication and Public Address Systems, Airborne | 25 | 0.61 |
| 5835 | Sound Recording and Reproducing Equipment | 22 | 1.43 |
| 5840 | Radar Equipment, except Airborne | 23 | 0.92 |
| 5841 | Radar Equipment, Airborne | 24 | 0.53 |
| 5845 | Underwater Sound Equipment | 13 | 1.14 |
| 5850 | Visible and Invisible Light Communication Equipment | 24 | 0.32 |
| 5855 | Night Vision Equipment, Emitted and Reflected Radiation | 25 | 1.18 |
| 5860 | Stimulated Coherent Radiation Devices, Components and Accessories | 25 | |
| 5865 | Electronic Countermeasures, Counter Countermeasures and Quick Reaction Capability Equipment | 20 | 0.27 |
| 5895 | Misc. Communications Equipment | 23 | 0.67 |
| 5905 | Resistors | 8 | 1.02 |
| 5910 | Capacitors | 8 | 2.32 |
| 5915 | Filters and Networks | 25 | 0.93 |
| 5920 | Fuses and Lightning Arrestors | 25 | 3.12 |
| 5925 | Circuit Breakers | 10 | 7.49 |
| 5930 | Switches | 10 | 1.55 |
| 5935 | Connectors, Electrical | 22 | 20.61 |
| 5940 | Lugs, Terminals and Terminal Strips | 8 | 1.66 |
| 5945 | Relays and Solenoids | 25 | 1.36 |
| 5950 | Coils and Transformers | 8 | 1.35 |
| 5955 | Piezoelectric Crystals | 8 | 0.65 |
| 5960 | Electron Tubes and Associated Hardware | 8 | 1.00 |
| 5961 | Semiconductor Devices and Associated Hardware | 8 | 1.04 |
| 5962 | Microcircuits, Electronic | 8 | 0.54 |
| 5963 | Electronic Modules | 8 | |
| 5965 | Headsets, Handsets, Microphones and Speakers | 24 | 4.28 |
| 5970 | Electrical Insulators and Insulating Materials | 8 | 34.93 |
| 5975 | Electrical Hardware and Supplies | 23 | 3.73 |
| 5977 | Electrical Contact Brushes and Electrodes | 8 | 2.08 |
| 5985 | Antennas, Waveguide and Related Equipment | 8 | 2.02 |
| 5990 | Synchros and Resolvers | 14 | 1.65 |
| 5995 | Cable, Cord and Wire Assemblies, Communications Equipment | 24 | 4.16 |
| 5999 | Misc. Electrical and Electronic Components | 20 | 1.01 |
| 6105 | Motors, Electrical | 10 | 5.31 |
| 6110 | Electrical Control Equipment | 8 | 2.45 |
| 6115 | Generators and Generator Sets, Electrical | 19 | 6.50 |
| 6116 | Fuel Cell Power Units, Components and Accessories | 15 | 22.88 |
| 6120 | Transformers: Distribution and Power | | |
| 6125 | Converters, Electrical, Rotating | 25 | 2.88 |
| 6130 | Converters, Electrical, Nonrotating | 22 | 1.75 |
| 6135 | Batteries, Primary | 15 | 2.51 |
| 6140 | Batteries, Secondary | 25 | 6.91 |
| 6145 | Wire and Cable, Electrical | 25 | 16.29 |
| 6150 | Misc. Electric Power and Distribution Equipment | 15 | 2.55 |
| 6210 | Indoor and Outdoor Electric Lighting Fixtures | 16 | 3.95 |
| 6220 | Electric Vehicular Light and Fixtures | 10 | 4.58 |
| 6230 | Electric Portable and Hand Lighting Equipment | 17 | 3.44 |
| 6240 | Electric Lamps | 10 | 6.92 |
| 6250 | Ballasts, Lampholders and Starters | 10 | 3.91 |
| 6310 | Traffic and Transit Signal Systems | 4 | 3.52 |
| 6320 | Shipboard Alarm and Signal Systems | 4 | 2.68 |
| 6350 | Misc. Alarm, Signal and Security Detection Systems | 6 | 1.38 |
| 6515 | Medical and Surgical Instruments Equipment and Supplies | 9 | 2.54 |
| 6520 | Dental Instruments, Equipment and Supplies | 8 | 7.66 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 6525 | X-Ray Equipment and Supplies: Medical Dental, Veterinary | 9 | 3.57 |
| 6530 | Hospital Furniture, Equipment, Utensils and Supplies | 10 | 4.18 |
| 6540 | Opticians' Instruments, Equipment and Supplies | 10 | 6.23 |
| 6545 | Medical Sets, Kits and Outfits | 10 | 5.60 |
| 6605 | Navigational Instruments | 15 | 0.87 |
| 6610 | Flight Instruments | 17 | 2.30 |
| 6615 | Automatic Pilot Mechanisms and Airborne Gyro Components | 25 | 1.17 |
| 6620 | Engine Instruments | 15 | 3.04 |
| 6625 | Electrical and Electronic Properties Measuring and Testing Instruments | 15 | 1.55 |
| 6630 | Chemical Analysis Instruments | 5 | 1.70 |
| 6635 | Physical Properties Testing Equipment | 13 | 6.62 |
| 6636 | Environmental Chambers and Related Equipment | 10 | 2.20 |
| 6640 | Laboratory Equipment and Supplies | 20 | 2.12 |
| 6645 | Time Measuring Instruments | 25 | 5.54 |
| 6650 | Optical Instruments | 8 | 2.31 |
| 6655 | Geophysical and Astronomical Instruments | 25 | 2.02 |
| 6660 | Meteorological Instruments and Apparatus | 20 | 1.05 |
| 6665 | Hazard-Detecting Instruments and Apparatus | 16 | 1.44 |
| 6670 | Scales and Balances | 18 | 4.77 |
| 6675 | Drafting, Surveying and Mapping Instruments | 19 | 2.44 |
| 6680 | Liquid and Gas Flow, Liquid Level and Mechanical Motion Measuring Instruments | 10 | 2.87 |
| 6685 | Pressure, Temperature and Humidity Measuring Controlling Instruments | 10 | 2.53 |
| 6695 | Combination and Misc. Instruments | 8 | 2.06 |
| 6710 | Cameras, Motion Pictures | 25 | 5.29 |
| 6720 | Cameras, Still Picture | 24 | 1.82 |
| 6730 | Photographic Projection Equipment | 25 | 3.52 |
| 6740 | Photographic Developing and Finishing Equipment | 24 | 3.32 |
| 6750 | Photographic Supplies | 25 | 8.64 |
| 6760 | Photographic Equipment and Accessories | 24 | 1.36 |
| 6780 | Photographic Sets, Kits and Outfits | 22 | 3.24 |
| 6910 | Training Aids | 20 | 0.96 |
| 6920 | Armament Training Devices | 20 | 3.22 |
| 6930 | Operation Training Devices | 21 | 0.62 |
| 6940 | Communication Training Devices | 21 | 0.79 |
| 7010 | ADPE Configuration | 8 | 0.73 |
| 7021 | ADP Central Processing Unit, Digital | 15 | 0.73 |
| 7022 | ADP Central Processing Unit, Hybrid | 15 | |
| 7025 | ADP Input/Output and Storage Devices | 13 | 1.01 |
| 7030 | ADP Software | 15 | 0.97 |
| 7035 | ADP Accessorial Equipment | 13 | 0.72 |
| 7040 | Punched Card Equipment | 15 | 0.87 |
| 7045 | ADP Supplies and Support Equipment | 11 | 1.50 |
| 7050 | ADP Components | 15 | 0.95 |
| 7105 | Household Furniture | 10 | 9.94 |
| 7110 | Office Furniture | 10 | 16.20 |
| 7125 | Cabinets, Lockers, Bins and Shelving | 20 | 9.47 |
| 7195 | Misc. Furniture and Fixtures | 10 | 6.17 |
| 7310 | Food Cooking, Baking and Serving Equipment | 12 | 5.40 |
| 7320 | Kitchen Equipment and Appliances | 18 | 5.60 |
| 7420 | Accounting and Calculating Machine | 12 Electric<br>15 Manual | 1.46 |
| 7439 | Typewriters and Office Type Composing Machines | 12 Electric<br>15 Manuaal | 6.10 |
| 7450 | Office Type Sound Recording and Reproducing Machines | 12 | 1.17 |

## Useful Life * and Disposal Value Table—Continued

| FSC No. | Nomenclature | Expected Useful Life (Years) | Disposal Value Factor as a Percent of Acquisition Cost |
|---|---|---|---|
| 7460 | Visible Record Equipment | | 2.26 |
| 7490 | Misc. Office Machines | 12 | 3.30 |
| 7710 | Musical Instruments | 12 | 14.67 |
| 7910 | Floor Polishers and Vacuum Cleaning Equipment | | 5.72 |
| 8140 | Ammo and Nuclear Ordnance Boxes, Packages and Special Containers | 15 | 12.33 |
| 8145 | Specialized Shipping and Storage Containers | 22 | 6.55 |
| 8340 | Tents and Tarpaulins | 5 | 4.86 |
| 8345 | Flags and Pennants | 5 | 8.30 |
| 8415 | Clothing, Special Purpose | 5 | 10.81 |
| 8820 | Live Animals, Not Raised for Food | 3 | 55.05 |
| 9320 | Rubber Fabricated Materials | 5 | 19.40 |
| 9340 | Glass Fabricated Materials | 5 | 4.14 |
| 9515 | Armor Plate | 10 | 19.00 |
| 9530 | Metal Bar | 10 | 47.51 |
| 9535 | Metal Plate | 10 | 52.44 |

* There is no expected useful life for those items left blank.

# APPENDIX 4

## Tax Tables

The estimated Federal income tax rates, presented for use in comparisons of commercial and in-house cost estimates, are derived from the Department of the Treasury's Internal Revenue Service 1988 Corporation Source Book of Statistics of Income, Publication 1053. The formula for estimating the tax rates is based upon total income before credits divided by the business receipts for each unique industry.

These tax rates will be updated periodically.

### Tax Rate Table *

| Code No. | Industry | Tax Rate (Percent) |
|---|---|---|
| | **Extractive Industries** | |
| 10–01–0400 | Agriculture Production | 0.8 |
| 10–01–0600 | Agricultural Services | 0.5 |
| 20–02–1010 | Mining Iron Ores | 3.8 |
| 20–02–1070 | Mining Copper, Lead, Zinc, Gold and Silver Ores | 8.3 |
| 20–02–1098 | Mining other Metals | 0.6 |
| 20–03–1150 | Coal Mining | 1.1 |
| 20–05–1430 | Sand, Gravel, Dimension, Crushed and Broken Stone | 2.2 |
| | **Construction** | |
| 30–06–1510 | General building (construction) | 0.4 |
| 30–06–1531 | Operative builders (construction) | 0.8 |
| 30–07–1600 | Heavy construction | 0.8 |
| 30–08–1711 | Plumbing, heating, air conditioning | 0.4 |
| 30–08–1731 | Electrical work | 0.5 |
| 30–08–1798 | Other special trades | 0.5 |
| | **Manufacturing** | |
| 40–09–2010 | Meat products | 0.5 |
| 40–09–2020 | Dairy products | 2.1 |
| 40–09–2030 | Preserved fruits and vegetables | 2.0 |
| 40–09–2040 | Grain mill products | 2.1 |
| 40–09–2050 | Bakery products | 1.1 |
| 40–09–2060 | Sugar and confectionery products | 1.9 |
| 40–09–2089 | Bottled soft drinks and flavorings | 2.1 |
| 40–09–2096 | Other food and kindred products | 0.9 |
| 40–12–2315 | Men's and boy's clothing | 1.5 |
| 40–12–2345 | Women's and children's clothing | 1.1 |
| 40–12–2388 | Other apparel and accessories | 0.5 |
| 40–12–2390 | Other fabricated textile products | 0.5 |
| 40–13–2415 | Logging, sawmills and planing mills | 2.1 |
| 40–13–2430 | Millwork, plywood, related products | 1.3 |
| 40–13–2498 | Other wood products | 0.5 |
| 40–14–2500 | Furniture and fixtures | 1.1 |
| 40–15–2625 | Pulp, paper and board mills | 2.8 |
| 40–15–2699 | Other paper products | 2.4 |
| 40–16–2710 | Newspapers (printing and publishing) | 3.7 |
| 40–16–2720 | Periodicals (printing and publishing) | 1.6 |
| 40–16–2735 | Books, greeting cards and miscellaneous publishing | 3.9 |
| 40–16–2799 | Commercial and other printing and printing trade services | 1.1 |
| 40–17–2815 | Industrial chemicals, plastics materials and synthetics | 3.3 |
| 40–17–2830 | Drugs | 5.9 |
| 40–17–2840 | Soap, cleaners and toilet goods | 2.1 |
| 40–17–2850 | Paints and allied products | 1.5 |
| 40–17–2898 | Agricultural and other chemical products | 1.6 |

## Tax Rate Table *—Continued

| Code No. | Industry | Tax Rate (Percent) |
|---|---|---|
| 40–18–2998 | Petroleum and coal products, not elsewhere classified | 1.3 |
| 40–19–3050 | Rubber products; plastics, footwear, hose and belting | 1.6 |
| 40–19–3070 | Miscellaneous plastics products | 1.0 |
| 40–20–3140 | Leather footwear | 1.3 |
| 40–20–3198 | Leather and leather products not elsewhere classified | 0.8 |
| 40–21–3225 | Glass products | 1.8 |
| 40–21–3240 | Cement, hydraulic | 0.8 |
| 40–21–3270 | Concrete, gypsum and plaster products | 1.4 |
| 40–21–3298 | Other nonmetallic mineral products | 2.3 |
| 40–22–3370 | Ferrous metal industries; miscella neous primary metal product | 1.2 |
| 40–22–3380 | Nonferrous metal industries | 1.1 |
| 40–23–3410 | Metal cans and shipping containers | 1.9 |
| 40–23–3428 | Cutlery, hand tools and hardware; screw machine products, bolts and similar products | 2.2 |
| 40–23–3430 | Plumbing and heating, except electric and warm air | 2.0 |
| 40–23–3440 | Fabricated structural metal products | 1.0 |
| 40–23–3460 | Metal forgings and stamping | 1.0 |
| 40–23–3470 | Casting, engraving and allied services | 1.0 |
| 40–23–3480 | Ordnance and accessories, except vehicles and guided missiles | 1.2 |
| 40–23–3490 | Miscellaneous fabricated metal products | 1.0 |
| 40–24–3520 | Farm machinery | 1.2 |
| 40–24–3530 | Construction and related machinery | 1.6 |
| 40–24–3540 | Metal working machinery | 1.1 |
| 40–24–3550 | Special industry machinery | 1.1 |
| 40–24–3570 | Office and computing machines | 5.2 |
| 40–24–3598 | Other machinery, except electrical | 1.7 |
| 40–25–3665 | Radio, television, communication equipment | 1.3 |
| 40–25–3670 | Electronic components and accessories | 2.4 |
| 40–25–3698 | Other electrical equipment | 2.2 |
| 40–26–3710 | Motor vehicles and equipment | 1.7 |
| 40–27–3725 | Aircraft, guided missiles and parts | 3.0 |
| 40–27–3730 | Ship and boat building and repairing | 0.8 |
| 40–27–3798 | Other transportation equipment, except motor vehicles | 1.3 |
| 40–28–3815 | Scientific instruments and measuring devices; watches and clocks | 4.0 |
| 40–28–3845 | Optical, medical and ophthalmic goods | 2.9 |
| 40–28–3860 | Photographic equipment and supplies | 2.5 |
| 40–29–3998 | Miscellaneous manufacturing and manufacturing not allocable | 1.4 |
| | **Transportation And Utilities** | |
| 50–30–4000 | Railroad transportation | 2.5 |
| 50–30–4100 | Local and interurban passenger transit | 0.4 |
| 50–30–4200 | Trucking and warehousing | 0.6 |
| 50–30–4400 | Water transportation | 1.2 |
| 50–30–4500 | Transportation by air | 2.0 |
| 50–30–4600 | Pipe lines, except natural gas | 10.5 |
| 50–30–4700 | Transportation services not else where classified | 0.4 |
| 50–31–4825 | Telephone, telegraph and other communication services | 3.1 |
| 50–31–4830 | Radio and Television broadcasting | 4.4 |
| 50–32–4910 | Electric services | 3.0 |
| 50–32–4920 | Gas production and distribution | 1.7 |
| 50–32–4930 | Combination utility services | 3.0 |
| 50–32–4990 | Water supply and other sanitary services | 2.7 |
| | **Wholesale Trade** | |
| 61–33–5004 | Groceries and related products | 0.3 |
| 61–34–5008 | Machinery, equipment and supplies | 0.6 |
| 61–35–5010 | Motor vehicles and automotive equipment | 0.6 |

## Tax Rate Table *—Continued

| Code No. | Industry | Tax Rate (Percent) |
|---|---|---|
| 61–35–5030 | Lumber and construction materials | 0.3 |
| 61–35–5050 | Metals and minerals, except petroleum and scrap | 0.7 |
| 61–35–5060 | Electrical goods | 0.5 |
| 61–35–5070 | Hardware, plumbing and heating | 0.5 |
| 61–35–5098 | Other durable goods | 0.5 |
| 61–35–5110 | Paper and paper products | 0.4 |
| 61–35–5129 | Drugs, chemicals and allied products | 0.5 |
| 61–35–5130 | Apparel, piece goods and notions | 0.6 |
| 61–35–5150 | Farm–product raw materials | 0.3 |
| 61–35–5170 | Petroleum and petroleum products | 0.3 |
| 61–35–5180 | Alcoholic beverages | 0.3 |
| 61–35–5190 | Miscellaneous nondurable goods; wholesale trade not allocable | 0.5 |
| | **Retail Trade** | |
| 62–36–5220 | Building materials dealers | 0.4 |
| 62–36–5251 | Hardware stores | 0.4 |
| 62–36–5265 | Garden supplies and mobile home dealers | 0.4 |
| 62–37–5300 | General merchandise stores | 1.1 |
| 62–38–5400 | Food stores | 0.3 |
| 62–39–5541 | Gasoline service stations | 0.2 |
| 62–39–5598 | Other automotive dealers | 0.3 |
| 62–40–5600 | Apparel and accessory stores | 1.1 |
| 62–41–5700 | Furniture and home furnishings stores | 0.8 |
| 62–42–5800 | Eating and drinking places | 0.6 |
| 62–43–5912 | Drug stores and proprietary stores | 0.6 |
| 62–43–5921 | Liquor stores | 0.2 |
| 62–43–5995 | Other retail stores | 0.6 |
| 63–44–5997 | Wholesale and retail trade not allocable | 0.3 |
| | **Services** | |
| 80–52–7000 | Hotels and other lodging places | 1.0 |
| 80–53–7200 | Personal services | 0.8 |
| 80–54–7310 | Advertising services | 0.7 |
| 80–54–7389 | Business services, except advertising | 0.8 |
| 80–55–7500 | Auto repair and services | 0.7 |
| 80–55–7600 | Miscellaneous repair services | 0.4 |
| | **Services** | |
| 80–56–7812 | Motion picture production, distribution and services | 1.8 |
| 80–56–7830 | Motion picture theaters | 1.1 |
| 80–56–7900 | Amusement and recreation services, except motion pictures | 1.4 |
| 80–57–8015 | Physicians' services | 0.2 |
| 80–57–8021 | Dentists' services | 0.1 |
| 80–57–8050 | Nursing and personal care facilities | 0.2 |
| 80–57–8071 | Medical Laboratories | 1.2 |
| 80–57–8099 | Other medical services | 0.7 |
| 80–57–8111 | Legal services | 0.2 |
| 80–57–8200 | Educational services | 0.5 |
| 80–57–8980 | Miscellaneous services, not elsewhere classified | 0.5 |

* Tax Rates are in relation to business receipts.
** Does not reflect revisions contained in the 1987 Standard Classification Manual.

# APPENDIX 5

## Office of Federal Procurement Policy (OFPP) Policy Letter 92–1, ''Inherently Governmental Functions''

September 23, 1992

**TO THE HEADS OF EXECUTIVE DEPARTMENTS AND ESTABLISHMENTS**

**SUBJECT:** Inherently Governmental Functions.

1. ***Purpose.*** This policy letter establishes Executive Branch policy relating to service contracting and inherently governmental functions. Its purpose is to assist Executive Branch officers and employees in avoiding an unacceptable transfer of official responsibility to Government contractors.

2. ***Authority.*** This policy letter is issued pursuant to subsection 6(a) of the Office of Federal Procurement Policy (OFPP) Act, as amended, codified at 41 U.S.C. § 405(a).

3. ***Exclusions.*** Services obtained by personnel appointments and advisory committees are not covered by this policy letter.

4. ***Background.*** Contractors, when properly used, provide a wide variety of useful services that play an important part in helping agencies to accomplish their missions. Agencies use service contracts to acquire special knowledge and skills not available in the Government, obtain cost effective services, or obtain temporary or intermittent services, among other reasons.

Not all functions may be performed by contractors, however. Just as it is clear that certain functions, such as the command of combat troops, may not be contracted, it is also clear that other functions, such as building maintenance and food services, may be contracted. The difficulty is in determining which of these services that fall between these extremes may be acquired by contract. Agencies have occasionally relied on contractors to perform certain functions in such a way as to raise questions about whether Government policy is being created by private persons. Also, from time to time questions have arisen regarding the extent to which *de facto* control over contract performance has been transferred to contractors. This policy letter provides an illustrative list of functions, that are, as a matter of policy, inherently governmental (see Appendix A), and articulates the practical and policy considerations that underlie such determinations (see para. 7).

As stated in paragraph 9, however, this policy letter does not purport to specify which functions are, as a legal matter, inherently governmental, or to define the factors used in making such legal determination. Thus, the fact that a function is listed in Appendix A, or a factor is set forth in paragraph 7(b), does not necessarily mean that the function is inherently governmental as a legal matter or that the factor would be relevant in making the legal determination.

5. ***Definition.*** As a matter of policy, an ''inherently governmental function'' is a function that is so intimately related to the public interest as to mandate performance by Government employees. These functions include those activities that require either the exercise of discretion in applying Government authority or the making of value judgements in making decisions for the Government. Governmental functions normally fall into two categories: (1) the act of governing, i.e., the discretionary exercise of Government authority, and (2) monetary transactions and entitlement.

An inherently governmental function involves, among other things, the interpretation and execution of the laws of the United States so as to:

(a) bind the United States to take or not to take some action by contract, policy, regulation, authorization, order, or otherwise;

(b) determine, protect, and advance its economic, political, territorial, property, or other interests by military or diplomatic action, civil or criminal judicial proceedings, contract management, or otherwise;

(c) significantly affect the life, liberty, or property of private persons;

(d) commission, appoint, direct, or control officers or employees of the United States; or

(e) exert ultimate control over the acquisition, use, or disposition of the property, real or personal, tangible or intangible, of the United States, including the collection, control, or disbursement of appropriated and other Federal funds.

Inherently governmental functions do not normally include gathering information for or providing advice, opinions, recommendations, or ideas to Government officials. They also do not include functions

that are primarily ministerial and internal in nature, such as building security; mail operations; operation of cafeterias; housekeeping; facilities operations and maintenance, warehouse operations, motor vehicle fleet management and operations, or other routine electrical or mechanical services.

The detailed list of examples of commercial activities found as an attachment to Office of Management and Budget (OMB) Circular No. A–76 is an authoritative, nonexclusive list of functions that are not inherently governmental functions. These functions therefore may be contracted.

6. ***Policy.***

(a) *Accountability.* It is the policy of the Executive Branch to ensure that Government action is taken as a result of informed, independent judgments made by Government officials who are ultimately accountable to the President. When the Government uses service contracts, such informed, independent judgment is ensured by:

(1) prohibiting the use of service contracts for the performance of inherently governmental functions (See Appendix A);

(2) providing greater scrutiny and an appropriate enhanced degree of management oversight (see subsection 7(f)) when contracting for functions that are not inherently governmental but closely support the performance of inherently governmental functions (see Appendix B);

(3) ensuring, in using the products of those contracts, that any final agency action complies with the laws and policies of the United States and reflects the independent conclusions of agency officials and not those of contractors who may have interests that are not in concert with the public interest, and who may be beyond the reach of management controls otherwise applicable to public employees; and

(4) ensuring that reasonable identification of contractors and contractor work products is made whenever there is a risk that the public, Congress, or other persons outside of the Government might confuse them with Government officials or with Government work products, respectively.

(b) *OMB Circular No. A–76.* This policy letter does not purport to supersede or otherwise effect any change in OMB Circular No. A–76, Performance of Commercial Activities.

(c) *Drafting of congressional testimony, responses to congressional correspondence, and agency responses to audit reports from an Inspector General, the General Accounting Office, or other Federal audit entity.* While the approval of a Government document is an inherently governmental function, its drafting is not necessarily such a function. Accordingly, in most situations the drafting of a document, or portions thereof, may be contracted, and the agency should review and revise the draft document, to the extent necessary, to ensure that the final document expresses the agency's views and advances the public interest. However, even though the drafting function is not necessarily an inherently governmental function, it may be inappropriate, for various reasons, for a private party to draft a document in particular circumstances. Because of the appearance of private influence with respect to documents that are prepared for Congress or for law enforcement or oversight agencies and that may be particularly sensitive, contractors are not to be used for the drafting of congressional testimony; responses to congressional correspondence; or agency responses to audit reports from an Inspector General, the General Accounting Office, or other Federal audit entity.

7. ***Guidelines.*** If a function proposed for contract performance is not found in Appendix A, the following guidelines will assist agencies in understanding the application of this policy letter, determining whether the function is, as a matter of policy, inherently governmental and forestalling potential problems.

(a) *The exercise of discretion.* While inherently governmental functions necessarily involve the exercise of substantial discretion, not every exercise of discretion is evidence that such a function is involved. Rather, the use of discretion must have the effect of committing the Federal Government to a course of action when two or more alternative courses of action exist (e.g., purchasing a minicomputer rather than a mainframe computer, hiring a statistician rather than an economist, supporting proposed legislation rather than opposing it, devoting more resources to prosecuting one type of criminal case than another, awarding a contract to one firm rather than another, adopting one policy rather than another, and so forth).

A contract may thus properly be awarded where the contractor does not have the authority to decide on the course of action to be pursued but is rather tasked to develop options to inform an agency decision maker, or to develop or expand decisions already made by Federal officials. Moreover, the mere fact that decisions are made by the contractor in performing his or her duties (e.g., how to allocate the contractor's own or subcontract resources, what techniques and procedures to employ, whether and

whom to consult, what research alternatives to explore given the scope of the contract, what conclusions to emphasize, how frequently to test) is not determinative of whether he or she is performing an inherently governmental function.

(b) *Totality of the circumstances.* Determining whether a function is an inherently governmental function often is difficult and depends upon an analysis of the facts of the case. Such analysis involves consideration of a number of factors, and the presence or absence of any one is not in itself determinative of the issue. Nor will the same emphasis necessarily be placed on any one factor at different times, due to the changing nature of the Government's requirements.

The following factors should be considered when deciding whether award of a contract might effect, or the performance of a contract has effected, a transfer of official responsibility:

(1) Congressional legislative restrictions or authorizations.

(2) The degree to which official discretion is or would be limited, i.e., whether the contractor's involvement in agency functions is or would be so extensive or his or her work product is so far advanced toward completion that the agency's ability to develop and consider options other than those provided by the contractor is restricted.

(3) In claims adjudication and related services, (i) the finality of any contractor's action affecting individual claimants or applicants, and whether or not review of the contractor's own is *de novo* (i.e., to be effected without the appellate body's being bound by prior legal rulings or factual determinations) on appeal of his or her decision to an agency official;

(ii) the degree to which contractor activities may involve wide-ranging interpretations of complex, ambiguous case law and other legal authorities, as opposed to being circumscribed by detailed laws, regulations, and procedures;

(iii) the degree to which matters for decision by the contractor involve recurring fact patterns or unique fact patterns; and

(iv) The contractor's discretion to determine an appropriate award or penalty.

(4) The contractor's ability to take action that will significantly and directly affect the life, liberty, or property of individual members of the public, including the likelihood of the contractor's need to resort to force in support of a police or judicial function; whether force, especially deadly force, is more likely to be initiated by the contractor or by some other person; and the degree to which force may have to be exercised in public or relatively uncontrolled areas. (Note that contracting for guard, convoy security, and plant protection services, armed or unarmed, is not proscribed by these policies.)

(5) The availability of special agency authorities and the appropriateness of their application to the situation at hand, such as the power to deputize private persons.

(6) Whether the function in question is already being performed by private persons, and the circumstances under which it is being performed by them.

(c) *Finality of agency determinations.* Whether or not a function is an inherently governmental function, for purposes of this policy letter, is a matter for agency determination. However, agency decisions that a function is or is not an inherently governmental function may be reviewed, and, if necessary, modified by appropriate OMB officials.

(d) *Preaward responsibilities.* Whether a function being considered for performance by contract is an inherently governmental function is an issue to be addressed prior to issuance of the solicitation.

(e) *Post-award responsibilities.* After award, even when a contract does not involve performance of an inherently governmental function, agencies must take steps to protect the public interest by playing an active, informed role in contract administration. This ensures that contractors comply with the terms of the contract and that Government policies, rather than private ones, are implemented. Such participation should be appropriate to the nature of the contract, and should leave no doubt that the contract is under the control of Government officials. This does not relieve contractors of their performance responsibilities under the contract. Nor does this responsibility to administer the contract require Government officials to exercise such control over contractor activities as to convert the contract, or portion thereof, to a personal service contract.

In deciding whether Government officials have lost or might lose control of the administration of a contract, the following are relevant considerations: the degree to which agencies have effective management procedures and policies that enable meaningful oversight of contractor performance, the resources available for such oversight, the actual practice of the agency regarding oversight, the duration of the contract, and the complexity of the tasks to be performed.

(f) *Management controls.* When functions described in Appendix B are involved, additional management attention to the terms of the contract and the manner of performance is necessary. How close the scrutiny or how extensive or stringent the management controls need to be is for agencies to determine. Examples of additional control measures that might be employed are:

(1) developing carefully crafted statements of work and quality assurance plans, as described in OFPP Policy Letter 91–2, Service Contracting, that focus on the issue of Government oversight and measurement of contractor performance;

(2) establishing audit plans for periodic review of contracts by Government auditors;

(3) conducting preaward conflict of interest reviews to ensure contract performance in accordance with objective standards and contract specifications;

(4) physically separating contractor personnel from Government personnel at the worksite; and

(5) requiring contractors to (a) submit reports that contain recommendations and that explain and rank policy or action alternatives, if any, (b) describe what procedures they used to arrive at their recommendations, summarize the substance of their deliberations, (d) report any dissenting views, (e) list sources relied upon, and/or (f) otherwise make clear the methods and considerations upon which their recommendations are based.

(g) *Identification of contractor personnel and acknowledgment of contractor participation.* Contractor personnel attending meetings, answering Government telephones, and working in other situations where their contractor status is not obvious to third parties must be required to identify themselves as such to avoid creating an impression in the minds of members of the public or the Congress that they are Government officials, unless, in the judgment of the agency, no harm can come from failing to identify themselves. All documents or reports produced by contractors are to be suitably marked as contractor products.

(h) *Degree of reliance.* The extent of reliance on service contractors is not by itself a cause for concern. Agencies must, however, have a sufficient number of trained and experienced staff to manage Government programs properly. The greater the degree of reliance on contractors the greater the need for oversight by agencies. What number of Government officials is needed to oversee a particular contract is a management decision to be made after analysis of a number of factors. These include, among others, the scope of the activity in question; the technical complexity of the project or its components; the technical capability, numbers, and workloads of Federal oversight officials; the inspection techniques available; and the importance of the activity. Current contract administration resources shall not be determinative. The most efficient and cost effective approach shall be utilized.

(I) *Exercise of approving or signature authority.* Official responsibility to approve the work of contractors is a power reserved to Government officials. It should be exercised with a thorough knowledge and understanding of the contents of documents submitted by contractors and a recognition of the need to apply independent judgment in the use of these work products.

8. ***Responsibilities.***

(a) *Heads of agencies.* Heads of departments and agencies are responsible for implementing this policy letter. While these policies must be implemented in the Federal Acquisition Regulation (FAR), it is expected that agencies will take all appropriate actions in the interim to develop implementation strategies and initiate staff training to ensure effective implementation of these policies.

(b) *Federal Acquisition Regulatory Council.* Pursuant to subsections 6(a) and 25(f) of the OFPP Act, as amended, 41 U.S.C. 405(a) and 421(f), the Federal Acquisition Regulatory Council shall ensure that the policies established herein are incorporated in the FAR within 210 days from the date this policy letter is published in the *Federal Register*. Issuance of final regulations within this 210-day period shall be considered issuance ''in a timely manner'' as prescribed in 41 U.S.C. § 405(b).

(c) *Contracting officers.* When requirements are developed, when solicitations are drafted, and when contracts are being performed, contracting officers are to ensure:

(1) that functions to be contracted are not among those listed in Appendix A of this letter and do not closely resemble any functions listed there;

(2) that functions to be contracted that are not listed in Appendix A, and that do not closely resemble them, are not inherently governmental functions according to the totality of the circumstances test in subsection 7(b), above;

(3) that the terms and the manner of performance of any contract involving functions listed in Appendix B of this letter are subject to adequate scrutiny and oversight in accordance with subsection 7(f), above; and

(4) that all other contractible functions are properly managed in accordance with subsection 7(e), above.

(d) *All officials.* When they are aware that contractor advice, opinions, recommendations, ideas, reports, analyses, and other work products are to be considered in the course of their official duties, all Federal Government officials are to ensure that, they exercise independent judgment and critically examine these products.

9. ***Judicial review.*** This policy letter is not intended to provide a constitutional or statutory interpretation of any kind and it is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person. It is intended only to provide policy guidance to agencies in the exercise of their discretion concerning Federal contracting. Thus, this policy letter is not intended, and should not be construed, to create any substantive or procedural basis on which to challenge any agency action or inaction on the ground that such action or inaction was not in accordance with this policy letter.

10. ***Information contact.*** For information regarding this policy letter contact Richard A. Ong, Deputy Associate Administrator, the Office of Federal Procurement Policy, 725 17th Street, N.W., Washington, DC 20503. Telephone (202) 395–7209. (*UPDATED 8/1995—contact the Budget Analysis and Systems Division, Office of Management and Budget, 725 17th Street, N.W., Washington, DC 20503. Telephone (202) 395–6104.*)

11. ***Effective date.*** This policy letter is effective 30 days after the date of publication.

Signed by

ALLAN V. BURMAN
*Administrator*

## Appendix A to OFFP Policy Letter 92–1

The following is an illustrative list of functions considered to be inherently governmental functions: [1]

1. The direct conduct of criminal investigations.

2. The control of prosecutions and performance of adjudicatory functions (other than those relating to arbitration or other methods of alternative dispute resolution).

3. The command of military forces, especially the leadership of military personnel who are members of the combat, combat support or combat service support role.

4. The conduct of foreign relations and the determination of foreign policy.

5. The determination of agency policy, such as determining the content and application of regulations, among other things.

6. The determination of Federal program priorities or budget requests.

7. The direction and control of Federal employees.

8. The direction and control of intelligence and counter-intelligence operations.

9. The selection or nonselection of individuals for Federal Government employment.

10. The approval of position descriptions and performance standards for Federal employees.

11. The determination of what Government property is to be disposed of and on what terms (although an agency may give contractors authority to dispose of property at prices within specified ranges and subject to other reasonable conditions deemed appropriate by the agency).12. In Federal procurement activities with respect to prime contracts,

(a) determining what supplies or services are to be acquired by the Government (although an agency may give contractors authority to acquire supplies at prices within specified ranges and subject to other reasonable conditions deemed appropriate by the agency);

(b) participating as a voting member on any source selection boards;

(c) approval of any contractual documents, to include documents defining requirements, incentive plans, and evaluation criteria;

(d) awarding contracts;

(e) administering contracts (including ordering changes in contract performance or contract quantities, taking action based on evaluations of contractor performance, and accepting or rejecting contractor products or services);

(f) terminating contracts; and (g) determining whether contract costs are reasonable, allocable, and allowable.

13. The approval of agency responses to Freedom of Information Act requests (other than routine responses that, because of statute, regulation, or agency policy, do not require the exercise of judgment in determining whether documents are to be released or withheld), and the approval of agency responses to the administrative appeals of denials of Freedom of Information Act requests.

14. The conduct of administrative hearings to determine the eligibility of any person for a security clearance, or involving actions that affect matters of personal reputation or eligibility to participate in Government programs.

15. The approval of Federal licensing actions and inspections.

16. The determination of budget policy, guidance, and strategy.

17. The collection, control, and disbursement of fees, royalties, duties, fines, taxes and other public funds, unless authorized by statute, such as title 31 U.S.C. § 952 (relating to private collection contractors) and title 31 U.S.C. § 3718 (relating to private attorney collection services), but not including:

(a) collection of fees, fines, penalties, costs or other charges from visitors to or patrons of mess halls, post or base exchange concessions, national parks, and similar entities or activities, or from other persons, where the amount to be collected is easily calculated or predetermined and the funds collected can be easily controlled using standard cash management techniques, and

(b) routine voucher and invoice examination.

18. The control of the treasury accounts.

19. The administration of public trusts.

[1] With respect to the actual drafting of congressional testimony, of responses to congressional correspondence, and of agency responses to audit reports from an Inspector General, the General Accounting Office, or other Federal audit entity, please see special provisions in subsection 6.c of the text of the policy letter, above.

## Appendix B to OFFP Policy Letter 92–1

The following list is of services and actions that are not considered to be inherently governmental functions. However, they may approach being in that category because of the way in which the contractor performs the contract or the manner in which the Government administers contractor performance. When contracting for such services and actions, agencies should be fully aware of the terms of the contract, contractor performance, and contract administration to ensure that appropriate agency control is preserved.

This is an illustrative listing, and is not intended to promote or discourage the use of the following types of contractor services:

1. Services that involve or relate to budget preparation, including workload modeling, fact finding, efficiency studies, and should-cost analyses, etc.
2. Services that involve or relate to reorganization and planning activities.
3. Services that involve or relate to analyses, feasibility studies, and strategy options to be used by agency personnel in developing policy.
4. Services that involve or relate to the development of regulations.
5. Services that involve or relate to the evaluation of another contractor's performance.
6. Services in support of acquisition planning.
7. Contractors' providing assistance in contract management (such as where the contractor might influence official evaluations of other contractors).
8. Contractors' providing technical evaluation of contract proposals.
9. Contractors' providing assistance in the development of statements of work.
10. Contractors' providing support in preparing responses to Freedom of Information Act requests.
11. Contractors' working in any situation that permits or might permit them to gain access to confidential business information and/or any other sensitive information (other than situations covered by the Defense Industrial Security Program described in FAR 4.402(b)).
12. Contractors' providing information regarding agency policies or regulations, such as attending conferences on behalf of an agency, conducting community relations campaigns, or conducting agency training courses.
13. Contractors' participating in any situation where it might be assumed that they are agency employees or representatives.
14. Contractors' participating as technical advisors to a source selection board or participating as voting or nonvoting members of a source evaluation board.
15. Contractors' serving as arbitrators or providing alternative methods of dispute resolution.
16. Contractors' constructing buildings or structures intended to be secure from electronic eavesdropping or other penetration by foreign governments.
17. Contractors' providing inspection services.
18. Contractors' providing legal advice and interpretations of regulations and statutes to Government officials.
19. Contractors' providing special non-law enforcement, security activities that do not directly involve criminal investigations, such as prisoner detention or transport and non-military national security details.

# APPENDIX 6

## Aviation Competitions

**A. General**

1. This Appendix provides guidance for use in cost comparisons involving the provision of aircraft or aviation management support services. It has been prepared to ease completion of cost comparisons conducted in accordance with OMB Circular A–76 and OMB Circular A–126, ''Improving the Management and Use of Government Aircraft,'' dated May 22, 1992.

2. In accordance with OMB Circular A–126, agencies should conduct approved cost comparisons before retaining, purchasing or otherwise providing Federal aircraft or aviation services not otherwise exempt from Circular A–76 (see Part I). In reviewing aviation programs, agencies should consider that although an activity or mission may be inherently governmental, the tools needed to perform the activity are not necessarily inherently governmental. Related aviation support services should be reviewed, in accordance with this Supplement, for possible conversion to or from in-house, contract or interservice support aggreement (ISSA) performance. Leases for aircraft of 90 days or more are subject to these principles and procedures.

3. Agencies may estimate lease, charter, or other contract aviation support costs through the General Services Administration's (GSA) Federal Aviation Management Information System (FAMIS) or other pre-approved data sources. This approach avoids the need for formal solicitations to acquire commercial bids for comparison with an in-house Government cost estimate. Other aspects of the process described in this Supplement are maintained.

4. When an aviation cost comparison is conducted, the agency will notify affected Federal employees and announce the tentative cost comparison decision in the *Commerce Business Daily*. The announcement will initiate the A–76 Administrative Appeal process. The Performance Requirements Summary, the Management Plan, including the calculation of commercial costs, and the aviation cost comparison form will be made available to the public upon request.

5. Appeals of tentative aviation cost comparison decisions will be directed to the agency's A–76 Administrative Appeal Authority, who will conduct the appeal as provided in Part I and Part II of this Supplement.

6. These instructions incorporate the cost element definitions used elsewhere in Parts I and II of this Supplement. In addition, there are several cost definitions that pertain to only aircraft and aviation services as provided by this Appendix.

7. Agencies will provide copies of each aircraft or aviation cost comparison to the GSA Office of Aircraft Management Division, when completed, and to the Office of Management and Budget (OMB) upon request or as required by OMB Circular A–11 to justify aircraft purchases.

**B. Policy**

1. Agencies should rely on commercial airline or other aviation services to meet their aviation mission and transportation support needs.

2. In general, the operations of aircraft and aviation services are commercial in nature and are not inherently governmental. Certain Government officials or missions may require enhanced levels of security, both on the ground and in the air. In most cases, however, the aviation industry can accommodate the Government's need for services and for onboard security devices, special flight profiles, testing equipment, etc.

3. The number of aircraft owned or leased by an agency may not exceed the number necessary to carry out direct mission requirements and, then, only where commercial operations are not as cost effective or are not available, as demonstrated by the procedures of this Supplement.

4. The size and capacity of agency aircraft acquired or leased should not exceed that necessary to cost-effectively meet mission requirements, including the crew and equipment for the mission flight profiles.

**C. The Aviation Management Plan**

1. The Management Plan for aircraft or aviation support services should conform to the principles and procedures in Part I of this Supplement. The Management Plan is structured to identify the lowest overall cost to the taxpayer and to fully consider Government Owned Contractor Operated (GOCO) options.

2. A Performance Work Statement (PWS) or a Performance Requirements Summary (PRS) is a part of the Management Plan. It should define the scope of services, workload data and performance criteria needed to meet agency mission requirements. It may

not describe a specific kind or make or model of aircraft.

3. Agencies should determine if equipment and/or personnel can be fitted to a contract or charter/rental aircraft agreement that results in a lower total service cost to the Government. Equipment requirements include, but are not limited to, aircraft, unique navigation, secure communication, and flight test devices.

4. GSA FAMIS data assume that the contractor will provide all related equipment, including aircraft. Agencies that wish to use these aircraft cost comparison procedures, under a GOCO arrangement, may need to solicit adjusted rate schedules from a variety of sources. If acceptable information sources are not available, a formal competition with commercial and/or ISSA sources may be necessary.

5. If the scope of the competition includes non-aviation support (ground support activities), the cost of such in-house, contract or ISSA support is calculated as provided in Part II of this Supplement.

**D. The cost of government performance**

All labor, material and fuel costs are estimated and escalated as provided in Part II of this Supplement.

**E. Standard aviation operation cost elements—variable**

The variable costs of operating aircraft are those costs that vary depending on how much the aircraft are used. The specific variable cost elements include:

1. ***Fuel and other fluids.*** These are the costs of aviation gasoline, jet fuel, and other fluids, e.g., engine oil, hydraulic fluids, and water-methanol, consumed by aircraft. Fuel costs are the cost per gallon times gallons per hour. Engine oil and other lubricants can be estimated using manufacturers' estimates or on the basis of an historic percentage of engine fuel cost per hour.

2. ***Crew.*** The crew costs that vary according to aircraft usage consist of travel expenses, particularly reimbursement of subsistence, i.e., per diem and miscellaneous expenses, overtime charges, and wages plus benefits of crew members hired on an hourly or part-time basis.

3. ***Aircraft lease or rental.*** When aircraft are obtained under an open-ended arrangement, such as an on-call (hourly/availability rate) basis, the associated lease or rental costs are considered variable costs.

4. ***Landing and tie down fees (if applicable).*** Landing and tie down fees that are not common costs and are associated with aircraft usage are considered variable costs. Tie down fees for storing an aircraft at its base of operations should be considered a fixed cost. Include the historic fees paid or assessed per landing, times landings, divided by projected flight hours.

5. ***Variable maintenance and spares.***

All maintenance activities and parts costs based on aircraft use are variable costs. All non-scheduled maintenance and all non-scheduled maintenance inspections are also variable costs. Maintenance and inspection activities scheduled on a calendar interval basis will be considered fixed. In addition to the costs of normal maintenance activities, variable maintenance costs include aircraft refurbishment, such as painting and interior restoration, and costs of or allowances for performing overhauls and modifications required by service bulletins and airworthiness directives.

a. *Maintenance labor.* All labor expended by mechanics, exclusive of the overhaul or major repair of components and engines.

b. *Maintenance parts.* This includes materials and parts consumed in aircraft maintenance and inspections, exclusive of materials and parts for engine overhaul, aircraft refurbishment, and/or repair of major components. Typical items in this category are tires, instruments, avionics, generators, relays, pumps, brakes, filters, airframe hardware, windows, interiors, paint, shafting, and bearings not inside components covered under an overhaul.

c. *Maintenance contracts.* This includes all contracted costs for unscheduled maintenance and for maintenance scheduled on a flying hour basis or based on the condition of the part or component.

d. *Engine overhaul, aircraft refurbishment, and major component repairs.* These are the materials and labor costs of overhauling engines, refurbishing aircraft, and/or repairing major aircraft components.

e. Reserves. This is for overhauling components of engines, and other major work including painting, refurbishment of the aircraft interior, and expenses not recognized in other maintenance accounts.

f. Add lines 5a through 5e and enter on line 5f for the total cost of direct variable maintenance and spares.

6. Add lines 1 through 4 and 5f to find the total direct operations cost per flight hour.

7. Enter the annual number of flight hours from the PWS/PRS.

8. Multiply the total direct operating cost per flight hour (line 6) by the number of flight hours (line 7) to find the total direct operating cost.

**F. Standard aviation operation cost elements—fixed**

The fixed costs of operating aircraft are those that result from owning and supporting the aircraft and do not vary according to aircraft usage.

9. ***Crew.*** Federal pilots/crew are often paid whether or not the aircraft are flown. These fixed crew costs include the salaries, benefits, and training costs of crew members who perform minimal aircraft maintenance or other administrative tasks that could be impacted by a conversion to contract performance. Also included in fixed crew costs are the costs of their charts, personal protective equipment, uniforms, and other personal equipment when the agency is authorized to purchase such items. Non-aviation activities performed by pilots/crew that would continue even if operations were converted to contract should not be included.

10. ***Fixed maintenance.***

Maintenance and inspection activities are scheduled on a calendar interval basis and take place regardless of whether or how much the aircraft are flown. These are fixed costs, including labor and material.

a. *Maintenance labor.* This includes all projected labor expended by mechanics, technicians, and inspectors associated with maintenance scheduled on a calendar interval basis. This category also includes costs associated with non-allocated maintenance labor expenses; i.e., associated salaries, benefits, travel expenses, and training costs. These costs should be evenly allocated over the number of aircraft in the fleet.

b. *Maintenance parts.* This includes all parts and consumables used for maintenance scheduled on a calendar interval basis.

c. *Maintenance contracts.* This includes all contracted costs for maintenance or inspections scheduled on a calendar interval basis.

11. ***Aircraft lease.*** When aircraft are leased for 90 days or more, with a known fee, utilization rate or minimum reimbursement guarantee, the associated lease costs are considered fixed. Include the entire amount paid.

12. ***Depreciation.***

As provided in Part II of this Supplement, aircraft and other major asset (hangar) depreciation costs are added to each option year. Aircraft have finite economic or useful service lives. Depreciation is the method used to spread the acquisition cost, less residual value, over an asset's useful life. Although these costs are not direct outlays as is the case with most other costs, it is important to recognize them for analysis. Subtract the residual (not market) value from the total of the acquisition cost plus any capital improvements and, then, divide by the remaining estimated useful life of the asset—not less than the cost comparison period.

a. The acquisition cost is the value initially recorded on agency property/accounting records at the time of acquisition. If the aircraft is acquired through an interagency transfer, the acquisition cost is the greater of the aircraft net book value plus the cost of returning the aircraft to an airworthy, mission ready condition or the commercial retail value of that aircraft in average condition, as established by the *Aircraft Bluebook Price Digest* or other industry standard. If it is a military aircraft without a direct commercial equivalent, the acquisition cost is equal to the most comparable commercial equivalent plus the cost of returning the aircraft to an airworthy, mission ready condition. The following explains the relevant terms:

b. *Useful life.* Useful life is the estimated period during which the aircraft will be used. If a new aircraft has an airframe with a design life of 10,000 hours and the agency expects to fly the aircraft 500 hours per year, the useful life is twenty years.

c. *Residual value.* Residual value reflects the historically expected condition of the asset at the end of its useful life. It is the dollar value below which the asset will not be depreciated. Residual value is established at the time of acquisition. Agencies will select the lessor of the following methods to calculate the residual value of aircraft:

(1) Assume a 10 percent residual value for purposes of calculating the depreciable value of the aircraft and annual depreciation expenses.

(2) Select the average of the historic resale value of similar aircraft by age and type, as provided by GSA.

d. *Reconstructions, conversions, refurbishment, and certification of ex-military aircraft.* These maintenance efforts add value or prolong the life of aircraft. They are capital improvements that add to the Net Book Value of the asset (acquisition cost less accumulated depreciation). This revised total value should then be depreciated over the remaining or extended useful life of the asset.

e. *Fully depreciated assets.* If an asset has been fully depreciated or has exceeded its expected useful life, recalculate the depreciation schedule through the end of the cost comparison period.

13. ***Self insurance costs.***

Aviation activity involves risks, potential casualty losses and liability claims. These risks are covered in the commercial sector by purchasing insurance, the costs for which are captured within the GSA FAMIS system. Actual or historic agency costs are not comparable with the costs included in the commercial bid (FAMIS) or representative of the overall cost to the Government as a whole.

a. Agencies should calculate annual in-house hull aircraft casualty insurance costs by multiplying the ''Blue Book'' or market value of the aircraft by the insurance factors provided annually by the General Services Administration's Aircraft Management Division. Enter these cost estimates on line 13a.

b. Agencies should calculate annual Federal aircraft liability insurance costs on the basis of the number of aircraft seats the agency has or will install, including pilots, over the course of the cost comparison period. Enter the aircraft liability cost developed using data provided annually by the General Services Administration's Aircraft Management Division on line 13b.

c. All other insurance costs incurred in the performance of the aviation service under study are calculated in accordance with Part II and entered on Line 13a or 13b, as appropriate.

d. Enter the total for all insurance (sum of lines 13a through 13c) on Line 13d.

14. ***Overhead.*** This includes all costs associated with operational and administrative overhead. As described in Part II of this Supplement, aviation management overhead costs shall be calculated by applying the standard overhead cost factor of 12 percent to the total of lines 2, 5.a, 9 and 10.a of the Aircraft and Aviation Cost comparison Form. Enter the total of this calculation on Line 14.

15. ***Cost of capital or finance expense.***

a. The cost of capital is the annual cost to the Government of acquiring the funds necessary for capital investments. The cost of capital is applied to the outstanding balance of the aircraft purchase price for each year of the performance period.

b. The annual cost of capital is included for any depreciable asset acquired less than two years prior to or after the cost comparison that will be used as a part of the MEO. The cost of capital is only applicable to assets required by the MEO that will not be provided (GOCO) to the commercial source.

c. The cost of capital is calculated by applying OMB Circular A–94 ''Discount Rates to be Used in Evaluating Deferred Costs and Benefits,'' plus any capital improvements.

d. If the purchase price is unknown, as in the case of a forfeited asset or interagency transfer, the acquisition cost is the greater of the aircraft net book value plus the cost of returning the aircraft to an airworthy, mission ready condition or the commercial retail value of that aircraft in average condition, as established by the *Aircraft Bluebook Price Digest* or other industry standard. If it is a military aircraft without a direct commercial equivalent, the acquisition cost is equal to the most comparable commercial equivalent plus the cost of returning the aircraft to an airworthy, mission ready condition.

e. Aircraft acquired through lease/purchase arrangements are not be burdened with the cost of capital. The cost of capital is assumed to exist in the lease/purchase agreement. At the transfer of title, depreciation expenses, calculated from the then existent market price of the aircraft, will be incurred.

16. ***Total fixed operating costs.*** Add lines 9 through 15 and enter on line 16.

17. ***Total in-house MEO performance costs.*** Add lines 8 and 16 and enter on line 17.

**G. Standard aviation operation cost elements—developing the cost of contract performance**

18. ***Contract cost.***

a. The comparable cost of contract performance is to be calculated on the Aviation CCF.

b. The most efficient commercial cost of meeting the service requirement is to be entered if a solicitation was issued requesting formal bids. If GSA/FAMIS data is being used to estimate contract costs, this figure is established by reviewing existing contracts and rental/charter flight rate information provided by FAMIS or from other GSA approved sources.

c. Enter the estimated trip costs times the number of trips/missions or the hourly rate for that aircraft times the number of estimated flight hours from the PWS/PRS on line 19. If FAMIS does not reflect the aircraft services requirements, and reasonably accurate costs cannot be constructed by extrapolation from the FAMIS database, agencies may utilize other approved data sources.

19. ***Cost construction to meet PWS/PRS.***

There may be other adjustments necessary to estimate the cost of contract performance using GSA/FAMIS data. The following are other costs that may be considered and entered—to the extent that they are not common costs or costs included in the published/developed rates. All such costs will be fully justified and made available for public review.

a. Daily Availability/Standby/Guarantee Hours.

b. Additional Pilot and Crew Charges.
c. Additional Maintenance Support.
d. Airframe Alteration/Equipment Installation.
e. Equipment Not Provided by the Government.
f. Additional Ground Service Support.
g. Travel and Per Diem.
h. Service Equipment Mileage.
i. Airport Fees.
j. Other.

20. ***Contract administration.*** There will be costs that the agency incurs in administering the contract. These costs are relevant only if they differ between in-house and contract alternatives. Agencies should refer to Part II, Chapter 3, Table 3–1 for guidance.

21. ***One-time conversion costs.*** See Part II, Chapter 3 of this Supplement.

22. ***Gain from disposal/transfer of assets.*** See Part II Chapter 3 of this Supplement.

23. ***Federal income tax.*** Multiply line 19 as provided in Appendix 5 and enter as a savings/revenue to the Government caused by the conversion to contract performance.

24. ***Total estimated cost of contract performance.*** This element reflects the total of lines 18 through 24.

**H. Aviation cost comparison of in-house versus contractor or ISSA performance.**

25. ***In-house performance costs.*** Data is taken from Line 17—for each year of performance as established in the PRS, but not less than three years.

26. ***Contract or ISSA performance.*** Data is taken from line 24—for each year of performance.

27. ***Conversion differential.*** As provided in Part II of this Supplement, a conversion differential equal to the lesser of; (1) 10 percent of the in- house personnel related costs (total of Lines 2, 5.a, 9 and 10.a.) or (2) $10 million over the performance period, is added to the total cost of current method of performance. Enter the result of this calculation on Line 27.

28. ***Adjusted total cost of in-house performance.*** If the cost comparison is being conducted to determine if an aircraft or aviation service should be converted from contract or ISSA performance to in-house operation, the conversion differential as calculated above (Line 27) is added to the In-house performance cost estimate (Line 25, Total Column only) and the sum is entered under Adjusted Total Cost of In-House Performance (Line 28). The amount in the Total Column for Line 26 is replicated on Line 29.

29. ***Adjusted total cost of contract performance.*** If the cost comparison is being conducted to determine if an aircraft or aviation service should be converted from in-house operation to contract or ISSA performance, the conversion differential as calculated above (Line 27) is added to the Contract performance cost estimate (Line 26, Total Column only) and the sum is entered under Adjusted Total Cost of Contract Performance(Line 29). The amount in the Total Column for Line 25 is replicated on Line 28.

30. ***Decision.*** Subtract Line 28 from Line 29 and enter the result on Line 30. A positive amount on Line 30 supports a decision to perform the aircraft and aviation support activity with in-house resources. A negative amount on Line 30 supports a decision to accomplish the work with contract resources.

31. ***Cost comparison decision.***

Indicate in the appropriate block on line 31 the decision supported by line 30.

a. If the result of the comparison is a decision to accomplish the work with contract resource and that decision is affirmed after adjustments by the public review, the agency will:

(1) Expand the Performance Requirements Summary developed under the aviation methodology to meet the requirements of a Performance Work Statement.

(2) Issue a formal solicitation for bids from the commercial sector and convert to contract.

b. If the decision of the aviation cost comparison is to accomplish the work with in-house resources, and that decision is affirmed after adjustments by the public review, the agency will announce the final decision in the *Commerce Business Daily*. The results will be recorded in the OMB Circular A–76 tracking system.

## THE A–76 AIRCRAFT AND AVIATION COST COMPARISON FORM

**DIRECT OPERATION COST PER FLIGHT HOUR (PFH)**

1. Fuel and and Other Fluids $ ________
2. Crew (PFH) ________
3. Aircraft Lease or Rental ________
4. Landing and Tie-Down Fees (If applicable) ________
5. Variable Maintenance and Spares ________
   a. Maintenance Labor @ $___ per hour multiplied by ___ man-hours PFH ________
   b. Maintenance Parts ________
   c. Maintenance Contracts ________
   d. Engine over-haul, etc. ________
   e. Reserves ________
   f. Total variable maintenance cost ________
6. Total Direct Operating Cost Per Flight Hour ________
7. Flight Hours for PWS ________
8. TOTAL DIRECT OPERATING COST (line 6 x line 7) $ ________

**FIXED OPERATING ANNUAL COST**

9. Crew
10. Fixed Maintenance ________
    a. Maintenance Labor ________
    b. Maintenance Parts ________
    c. Maintenance Contracts ________
11. Aircraft Lease ________
12. Depreciation ________
13. Self Insurance ________
    a. Hull ________
    b. Liability ________
    c. Other
       c1. Casualty ________
       c2. Personnel Liability ________
    d. Total Self-Insurance ________
14. Overhead ________
15. Cost of Capital or Finance expense ________
16. TOTAL FIXED OPERATING ANNUAL COST (Lines 9 thru 15) ________
17. TOTAL IN-HOUSE PERFORMANCE COST (Lines 8 + 16) ________

**CONTRACT AVIATION OPERATIONS COST WORKSHEET** ________

18. Contract (PFH times number of hours) ________
19. Cost construction to meet PWS
    a. Daily availability/guarantee hours ________
    b. Additional pilot and crew charges ________
    c. Additional maintenance support ________
    d. Airframe alteration/equipment installation ________
    e. Equipment not provided by Government ________
    f. Additional ground service support ________
    g. Travel and per diem ________
    h. Service equipment mileage ________
    i. Airport fees ________
    j. Other ________
20. Contract Administration ________
21. One-time Conversion ________
22. Gain on Disposal/Transfer of Assets (deduct) (________)
23. Federal income tax (deduct) (________)
24. TOTAL CONTRACT PERFORMANCE COST ________

## IN-HOUSE VERSUS CONTRACT PERFORMANCE

| | Performance periods | | | | |
|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | Add'l | Total |
| 25. In-house performance | $ ______ | $ ______ | $ ______ | $ ______ | $ ______ |
| 26. Contract performance | $ ______ | $ ______ | $ ______ | $ ______ | $ ______ |
| 27. Conversion Differential | | | | | $ ______ |
| 28. Adjusted Total Cost of In-House Performance | | | | | $ ______ |
| 29. Adjusted Total Cost of Contract Performance | | | | | $ ______ |
| 30. Decision—Line 29 minus Line 28: | | | | | $ ______ |
| 31. COST COMPARISON DECISION: Accomplish Work | | | | | |
| In-house (+) | | | | | $ ______ |
| Contract (−) | | | | | $ ______ |

32. In-House MEO Certified By: ______________________ Date: ________

______________________

Office and Title

"I certify that, to the best of my knowledge and belief, the in-house organization reflected in this cost comparison is the most efficient and cost effective organization that is fully capable of performing the scope of work and tasks of the PWS/PRS. I further certify that I have obtained from the appropriate authority concurrence that the organizational structure, as proposed, can and will be fully implemented — subject to this cost comparison, in accordance with all applicable Federal regulations.

33. In-House Cost Estimate Prepared By: ________________ Date: ________

34. Independent Reviewer: ____________________________ Date: ________

Office and Title

"I certify that I have reviewed the PWS/PRS, Management Plan, In-house and GSA/FAMIS cost estimates and supporting documentation available prior to bid opening and to the best of my knowledge and ability have determined that: (1) the ability of the in-house MEO to perform the work contained in the PWS/PRS at the estimated costs included in this cost comparison is reasonably established, (2) that the selection and inclusion of contract performance costs are reasonable and, (3) that all costs entered on the cost comparison have been prepared in accordance with the principles and procedures of Circular A–76 and its Supplement.

35. Cost Comparison Completed By: ____________________ Date: ________

36. Contracting Officer: ____________________ Date: ________

37. Tentative Cost Comparison
Decision Announced By: ____________________ Date: ________

38. Appeal Authority (if applicable): ____________________ Date: ________

# APPENDIX 7

## Motor Vehicle Competitions

**A. General**

This Appendix provides joint guidance by OMB and The General Services Administration (GSA) for use in cost comparisons involving the provision of motor vehicle fleet management services. It apples to conversions to or from in-house, contract or inter-service support agreement (ISSA). Agencies should consider the costs, benefits and feasibility of using the agency's fleet management system, the GSA Interagency Fleet Management System (IFMS), other ISSA providers and qualified commercial management providers.

**B. Specific**

1. Cost comparisons will comply with Part I and Part II of this Supplement, and as discussed in this Appendix.

2. Cost comparisons should distinguish between the benefits of centralized Government vehicle acquisition and the potential benefits of fleet acquisition, operation, maintenance, and disposal management support services. Solicitations should permit or may require offerors to compete vehicle asset costs separately from fleet management services.

3. In accordance with Part I, Chapter 2 of this Supplement, all Government offerors will certify that their performance cost estimates or reimbursable rates are calculated in accordance with this Supplement.

4. Agencies may include all of their fleet requirements, including those currently being met by the GSA/IFMS or the private sector. Vehicles currently provided by the GSA/IFMS may be included in the agency's in-house cost estimate as IFMS vehicles.

**C. Developing the requesting agency's in-house motor vehicle fleet management costs**

1. The requesting agency's in-house costs are calculated as provided in Parts I and II of this Supplement and entered on Lines 1 through 7 as appropriate. Care should be taken to separate vehicle asset costs (cost of vehicles) from vehicle acquisition and other administrative management support costs.

**D. Developing comparable motor vehicle fleet costs**

1. Competitions between a requesting agency, private sector offeror, the GSA/IFMS or another ISSA offeror may require that the requesting agency make certain adjustments in scope and cost to ensure that the cost comparison is equitable. These scope and cost adjustments, as discussed below, include:

—Contract Price
—Contract Administration Costs
—Additional Costs
—One-time Conversion Costs
—Gain/Loss on Disposal/Transfer of Assets
—Federal Income Taxes
—Other Adjustment Costs
—Minimum Differential

2. Contract Price (Line 9 and Line 16).—The contract price is the price proposed by the lowest priced, fully qualified commercial offeror, IFMS or ISSA offeror. This will be obtained by issuing a solicitation requesting offers. The agency should be careful that the solicitation accurately describes its fleet management needs.

3. *Contract administration costs* (Line 10 and Line 17).

Include costs, as appropriate from Part II Table 3–1.

4. *One-time conversion costs* (Line 11 and Line 18).

a. One-time conversion costs may result when a contractor, IFMS or ISSA offeror takes over the operation of the fleet. This can involve the costs of the transfer of Government-owned supplies or temporary labor costs incurred to facilitate the transition to a new fleet manager.

b. When items of material become available for transfer to the contractor, IFMS or ISSA, material related conversion costs may result. If materials consumed as a part of the requesting agency's MEO are clearly identified in the PWS to be transferred to the contractor, IFMS or ISSA, the value of those materials and supplies are common costs and not considered a part of the comparison.

c. If, however, those same materials are not to be provided to the contractor, IFMS or ISSA offeror, but are instead to be transferred to another agency location or excessed, the value of that material should be subtracted from the contract, IFMS or ISSA offers as a net savings to the Government resulting from the conversion.

5. *Gain on disposal of assets* (Line 12 and Line 19).

a. If an agency requires the contractor, IFMS or ISSA to replace existing Government (agency) owned

vehicles (assets) by a specific date, the projected fair market value of those existing assets, as established by generally available industry guides, are *subtracted* from the contractor's, IFMS or ISSA's cost estimates. These values represent a net ''savings'' caused by conversion.

b. Agencies may provide that vehicle replacement by the contractor, IFMS or ISSA offeror will be in accordance with the Government's existing or MEO replacement schedule. In this case, all parties to the competition should assume replacement at the same rate. Values from existing fleet to the Government apply to all alternatives equally.

c. Agencies may also continue to provide vehicles for contractor, IFMS or ISSA fleet management. No adjustments are necessary.

d. Finally, agencies may require replacement by the contractor, IFMS or ISSA offeror and may allow the IFMS or ISSA offeror to simply assume ownership of the existing fleet as Federal agencies. In this case, the agency, IFMS or ISSA offeror receives a gain—and a considerable competitive advantage over the contract bid—estimated at the fair market value of the existing fleet. An amount equal to the fair market value of the existing fleet is *added* to the agency, IFMS or ISSA offeror bid at Line 19 for cost comparison purposes.

6. *Federal income tax* (Line 13 and Line 20).

a. Agencies should recognize the current contract support identified in Line 6, above. Calculate the total Federal Income Tax, based upon the contractor's offer (Line 9) and Appendix 5, Tax Rate Table. Subtract from the contractor's estimated tax liability the Federal taxes paid within the in- house cost estimate (estimated from the appropriate share of Line 6 and as described in the Management Plan) and enter the remainder.

b. The same treatment may be afforded to the GSA/IFMS or ISSA offer, if the offeror certifies the value of its contract support contained within its overall cost estimate. This estimate must be available to the requesting agency's Independent Review Officer for review and concurrence.

7. *Conversion differential* (Line 7, Line 14 and Line 21).

The standard minimum differential, as provided in Part II of this Supplement, shall be applied to the contract, IFMS and ISSA offers. If the cost comparison is being conducted to determine if motor vehicle fleet management services should be converted from contract, IFMS or ISSA performance to in-house agency operation, the conversion differential is added (on Line 7) to the in-house performance cost estimate. If the cost comparison is being conducted to determine if motor vehicle fleet management services should be converted from in-house operation to contract, IFMS or ISSA performance, the conversion differential is added (on Line 14 and Line 21) to the contract, IFMS or ISSA performance cost estimates.

8. *Other IFMS/ISSA Scope Adjustments* (Line 22).

a. It is not the intent of this Supplement to require the IFMS or other potential ISSA offerors to alter their methods of operation to provide unique or site specific services. While such services may meet agency missions and may legitimately be included in the solicitation, additional adjustments to the IFMS/ISSA cost estimate may be necessary to reflect differences in the bids. Examples of such services include: dispatching, vehicle transition, maintenance work warranties, certain disposal services/costs, accessory installations and removals, tire replacements, etc.

b. Agencies should identify the differences between the requirements of the solicitation (contractor bid) and the IFMS/ISSA cost estimate. The agency determines if any item or combination of items will impact the agency's ability to perform. If the agency's ability to perform would be adversely impacted, the IFMS/ISSA cost estimates may be rejected as non-responsive. If the differences will have minimal agency performance implications, and/or can continue to be performed by agency personnel, the IFMS/ISSA cost estimates will be adjusted for purposes of comparison with the contractor and MEO offers, based upon the comparable costs contained in the agency's MEO.

c. A complete record of all adjustments to the contractor's, IFMS and ISSA's cost estimates should be maintained and made available to the public upon request.

## E. Motor vehicle cost comparison

1. A Motor Vehicle Cost Comparison Form (MVCCF) has been developed. Use of this form will help agencies move through the cost comparison in a structured manner. The Form has been set up with five sections. Each section relates to a different set of costs or to the evaluation itself. Within each section, the appropriate cost elements have been shown.

2. Each cost listed is projected for all periods of the cost comparison. The first year will reflect current estimated costs. For each of the following years, the inflation factors provided by this Supplement shall be used for each element of cost that is affected

by inflation. A minimum of one year and three option years will be used for comparative purposes.

3. With the completion of the MVCCF, the agency may evaluate the alternatives. In order to do this, the total Lines (Lines 8, 15 and 23) should be entered on Lines 24, 25 and 26, respectively. The decision is based upon the lowest overall cost to the Government over the minimum five-year cost comparison period. Enter the decision as appropriate.

## THE A–76/MV COST COMPARISON FORM FOR MOTOR VEHICLE FLEETS

| | Performance Periods (Fiscal Years) | | | | | |
|---|---|---|---|---|---|---|
| | Base Year | Option Yr 1 | Option Yr 2 | Option Yr 3 | Option Yr 4 | Total |
| **A. DEVELOPMENT OF IN-HOUSE COSTS** | | | | | | |
| 1. Personnel | | | | | | |
| 2. Material | | | | | | |
| 3. Other Direct | | | | | | |
| 4. Cost of Capital | | | | | | |
| 5. Overhead | | | | | | |
| 6. Additional | | | | | | |
| 7. Conversion Differential | | | | | | |
| 8. Total In-house | | | | | | |
| **B. DEVELOPMENT OF CONTRACT COSTS** | | | | | | |
| 9. Contract Price | | | | | | |
| 10. Contract Administration | | | | | | |
| 11. One-time Conversion | | | | | | |
| 12. Gain on Disposal | | | | | | |
| 13. Federal Income Taxes | ( ) | ( ) | ( ) | ( ) | ( ) | ( ) |
| 14. Conversion Differential | | | | | | |
| 15. Total Adjusted Contract Price | | | | | | |
| **C. DEVELOPMENT OF IFMS OR ISSA COSTS** | | | | | | |
| 16. IFMS/ISSA cost estimate | | | | | | |
| 17. Contract Administration | | | | | | |
| 18. One-time Conversion | | | | | | |
| 19. Gain on Disposal | | | | | | |
| 20. Federal Income Taxes | ( ) | ( ) | ( ) | ( ) | ( ) | ( ) |
| 21. Conversion Differential | | | | | | |
| 22. Other Scope Adjustments | | | | | | |
| 23. Total Adjusted IFMS or ISSA Price | | | | | | |
| **D. COST COMPARISON** | | | | | | |
| 24. In-House | | | | | | ______ |
| 25. Contract | | | | | | ______ |
| 26. IFMS and/or ISSA | | | | | | ______ |

**E. DECISION**

_____ Retain In-House

_____ Contract

_____ Consolidate to GSA/IFMS or ISSA

_____ Convert from Contract to: *In-house* , *IFMS or ISSA*

## THE A–76/MV COST COMPARISON FORM FOR MOTOR VEHICLE FLEETS

27. In-House MEO Certified By: _________________________ Date: _______

_________________________
Office and Title

"I certify that, to the best of my knowledge and belief, the in-house organization reflected in this cost comparison is the most efficient and cost effective organization that is fully capable of performing the scope of work and tasks required by the Performance Work Statement. I further certify that I have obtained from the appropriate authority concurrence that the organizational structure, as proposed, can and will be fully implemented—subject to this cost comparison, in accordance with all applicable Federal regulations.

28. In-House Cost Estimate Prepared By: _______________________ Date: ________

29. Independent Reviewer: ________________________ Date: ________

________________________
Office and Title

"I certify that I have reviewed the PWS, Management Plan, In-house, GSA/IFMS or ISSA cost estimates and supporting documentation available prior to bid opening and, to the best of my knowledge and ability, have determined that: (1) the ability of the in-house MEO to perform the work contained in the Performance Work Statement at the estimated costs included in this cost comparison is reasonably established and, (2) that all costs entered on the cost comparison have been prepared in accordance with the requirements of Circular A–76 and its Supplement.

30. Cost Comparison Completed By: ________________________ Date: ________

31. Contracting Officer: ________________________ Date: ________

32. Tentative Cost Comparison
    Decision Announced By: ________________________ Date: ________

33. Appeal Authority (if applicable): ________________________ Date: ________