**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC | § | |
| A Mississippi Limited Liability | § | |
| Corporation | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 08-CV-00062-MCW |
| | § | Judge Williams |
| THE UNITED STATES | § | |
| Defendant. | § | |

**RKR'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY TO DEFENDANT'S RESPONSE TO RKR'S PARTIAL MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................1

II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS IN ITS BRIEF ........................2

A. *The Government's Foundational Premise is Unsupported*...............................................2

B. *The MEO's Price Could be Adjusted* ....................................................................3

C. *The Government Does Not Defend the CO's Other Alleged Rationales Beyond Restating Them in Conjunction with it Erroneous Foundational Premise*..........................4

D. *RKR Does Not Concede the Alleged Reasons for Voluntary Dismissal Stated on Page 8 of the Government's Brief*..........................................................................4

E. *The Government Mischaracterizes RKR's Position on the Solicitation's Requirements*..........................................................................................5

III. RESPONSE TO DEFENDANT'S STANDARDS OF REVIEW ...........................................7

A. *The Court's Reading of the Solicitation Warrants no Deference to the Government* ..........7

B. *The Discretion of the CO is Not Implicated*..........................................................7

C. *The Standard of Review in This court Does Not Permit the Government to Cancel on Mere Possibilities*…………………………………….............................................8

D. *Cancellation is Disfavored in Any Procurement, Particularly for the Reasons given in* Great Lakes Dock & Dredge Co. v. U.S., *60 Fed. Cl. 350, 360 (2004), Which Applies Here. Dkt # 41 at 5 & n.7.* ..........................................................8

E. *RCFC 52.1 Does Not Limit the Equitable Authority of the court to Look Beyond the Record When Fashioning Relief* ..................................................................9

IV. RESPONSE TO DEFENDANT'S JURISDICTIONAL ARGUMENT .................................9

A. *RKR's Objection to a Proposed Award Provides Jurisdiction* .........................................10

B. *Objections to a Proposed Award Provide Bid Protest Jurisdiction to Review Corrective Action Under ADRA*...............................................................................11

C. *RKR Has Also Alleged Violation of Statutes and Regulations*...........................................13

D. *The Solicitation Itself Provides a Basis for Jurisdiction*..................................................15

V. RESPONSE TO DEFENDANT'S ARGUMENT ON THE PREJUDICE ISSUE ................15

VI. RESPONSE TO DEFENDANT'S ARGUMENT ON MOOTNESS ....................................18

VII. RESPONSE TO DEFENDANT'S ARGUMENTS ON THE MERITS ................................19

VIII. RESPONSE TO DEFENDANT'S ARGUMENT REGARDING INJUNCTIVE RELIEF ........................................................................................................29

A. *RKR Has Shown the Lack of Adequate Remedy at Law and Therefore Has Shown Irreparable Harm*...........................................................................................29

B. *Injunctive Relief Is in the Public Interest* ..........................................................30

IX. CONCLUSION........................................................................................................30

CERTIFICATE OF SERVICE ........................................................................................31

TABLE OF AUTHORITIES

Case Law:

*AmerisourceBergen Drug Corp. v. United States*, 60 Fed.Cl. 30 (2004) .....................................13

*Argencord Mach. & Equip., Inc. v. U.S.*, 68 Fed.Cl. 167 (2005) (Williams, J.)..............................8

*Calif Marine Cleaning v. U.S.*, 43 Fed. Cl. 724 (1999) ..............................................................17

*Chao v. Rivendell Woods*, 415 F.3d 342 (4th Cir. 2005)..............................................................10

*Chevron v. NRDC*, 467 U.S. 837 (1984)..........................................................................................7

*Cygnus Corp., Inc. v. U.S.*, 72 Fed.Cl. 380 (2006) ...................................................10, 13

*Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388 (1999) .................................................29

*Great Lakes Dock & Dredge Co. v. U.S.*, 60 Fed. Cl. 350 (2004)......................................8, 28, 29

*Gentex v. U.S.*, 58 Fed. Cl. 634 (2003) (Williams, J.) ..................................................................13

*Gould v. U.S.*, 935 F.2d 1271 (Fed. Cir. 1991)..............................................................................10

*Griffy's Landscape Maintenance LLC v. U.S.*, 51 Fed.Cl. 667 (2001) ..................................10, 13

*Hunt Building Co., Ltd. v. U.S.*, 61 Fed. Cl. 243 (2004) (Williams, J.) ..................9, 13, 15, 17, 29

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed.Cir.2001)......................................................................................7, 13

*Int'l Graphics v. U.S.,* 5 Cl.Ct 100 (1984).......................................................................11

*Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974).................................. 13

*Kenney Orthopedic, LLC v. U.S.*, 2008 WL 3319793 (Fed.Cl. Aug. 7, 2008)...............................1

*Klinge Corp. v. U.S.*, 82 Fed.Cl. 127 (2008).......................................................................29, 30

*L-3 Communications Integrated Systems, L.P. v. U.S.*, 79 Fed. Cl. 433 (2005) (Williams, J.) ..........................................................................................................9, 11

*Magellan Corp. v. United States*, 27 Fed.Cl. 446 (1993) ..........................................................29

*ManTech Telecommunications and Information Systems Corp. v. U.S.*, 49 Fed.Cl. 57 (2001)..........................................................................1, 9, 13

*Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306 (1998).......................................................13, 14

*MVM v. United States*, 46 Fed. Cl. 126 (2000)........................................................................7 , 27

*Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728 (2000) ......................................................29

*PBGA LLC v. U.S.*, 389 F.3d 1219 (Fed. Cir. 2004) ...........................................................9, 12

*R.R. Donnelley & Sons, Co. v. U.S.*, 38 Fed.Cl. 518 (1997) .......................................................10

*Serco Inc. v. United States*, Nos. 07-691C, et al., 81 Fed.Cl. 463 (2008) ....................................29

*Weeks Marine, Inc. v. U.S.*, 79 Fed.Cl. 22 (2007) .........................................................8, 29

<u>Statutes, Regulations, and Other Authorities</u>:

10 U.S.C. § 2461 ...................................................................................2, 5, 27, 28
10 U.S.C. §2461.......................................................................................................14
28 U.S.C. § 1491..............................................................1, 8, 9, 10, 11, 12, 14, 19, 28, 29,
31 U.S.C. § 501........................................................................................................14
41 U.S.C. § 401........................................................................................................14

32 C.F.R. § 169a.15(d)...............................................................................................14
48 C.F.R. §15.206(a) ..................................................................................................26

48 C.F.R. § 15.206(e)(1) .......... 26
48 C.F.R. § 52.215-1(f)(2) .......... 24
48 C.F.R. § 52.249-6 .......... 24

FAR 52.207-2 .......... 15
FAR 15.306(e) .......... 13, 15
FAR 15.206(e) .......... 4
FAR 52.215-1(f)(1) .......... 12

OMB Revised Supplemental Handbook (1999) Ch.3.H.3(d)(e) and Ch. 3.I.3(a) .......... 15
OMB A-76 Revised Supplemental Handbook .......... 15
OMB Circular A-76 .......... 4, 15

RCFC 52.1 .......... 9

AFI 38-203 .......... 15

## ACRONYMS

ADRA – Administrative Dispute Resolutions Act
AFB – Air Force Base
AFI – Air Force Instruction
AFNETOPS – Air Force Network Operations
APA – Administrative Procedures Act
BOS – Base Operating Support
CO – Contracting Officer
D&F – Decisions and Findings
FAR – Federal Acquisition Regulation
FTE – Full Time Equivalent
GAO – Government Accountability Office
MAJCOM – Major Command
MEO – Most Efficient Organization
NCC – Network Control Center
NOSC – Network Operations and Security Center
OMB – Office of Management and Budget
PRD - Performance Requirements Document
RCFC – Rules of Court of Federal Claims
RFP – Request for Proposals
RKR – RKR Joint Venture, LLC
SOF – Statement of Facts

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability<br>Corporation<br>Plaintiff, | §<br>§<br>§<br>§<br>§ | |
| VS. | §<br>§ | NO. 08-CV-00062-MCW<br>Judge Williams |
| THE UNITED STATES<br>Defendant. | §<br>§ | |

**RKR'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY TO DEFENDANT'S RESPONSE TO RKR'S PARTIAL MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

Plaintiff RKR JOINT VENTURE, LLC ("RKR") files this its Response and Reply to Defendant's Motion, Cross-Motion, and Response in Dkt #45, and would show the Court as follows:

## I. INTRODUCTION

Corrective action and final decisions of a contracting officer are reviewable, and unlawful action pursuant to either is remediable, in this Court. *E.g.*, *Kenney Orthopedic, LLC v. U.S.*, 2008 WL 3319793 at * 8 (Aug. 7, 2008) ("The United States Court of Federal Claims has jurisdiction over claims directly challenging a contracting officer's final decision"); *ManTech Telecommunications and Information Systems Corp. v. U.S.*, 49 Fed.Cl. 57, 65 & n.13 (2001) (cancellation) ("Nor is there any doubt that this court has jurisdiction to review such corrective action"); 28 U.S.C. § 1491(b)(2) (affording this Court its choice of remedies).

Distilled to a single sentence, the government argues that unlawful corrective action in response to a protest of a proposed award has no remedy in this Court. It repeatedly argues that cancellation makes unlawful action with respect to the underlying proposed award irrelevant;

thus a protestor could not show a substantial chance of an award unless the government previously agreed they were entitled to it (even when the underlying proposed award was the subject of appeals before the agency and is the subject of bifurcated claims before this Court). It then argues the protestor cannot show prejudice as to either the underlying proposed award or the cancellation, thus the cancellation is unreviewable, and, therefore, any harm is speculative and the Court cannot grant relief, even where, as here, unlawful action is the foundation of the cancellation itself.

Like Russian dolls, the government nests and repeats the foregoing arguments to obscure the empty center of their argument: their erroneous and unsupported foundational premise that AFNETOPS has a different effect on this solicitation than NCC Reengineering, and their erroneous argument that changes in future changes are the same as changes in solicitation requirements, which Congress has explicitly disagreed with:

> A function that is performed by the Department of Defense and is reengineered, reorganized, modernized, upgraded, expanded, or changed to become more efficient, but still essentially provides the same service, *shall not be considered a new requirement.*

10 U.S.C. § 2461(a)(2) (emphasis added).[1]

II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS IN ITS BRIEF

*A. The Government's Foundational Premise is Unsupported.*

In footnote 2 of its brief, the government alleges a difference between two future changes, NCC Reengineering and AFNETOPS. As RKR has noted in its motion, the record does not say what that difference is, because with respect to this solicitation, there isn't one. *E.g.*, Dkt #41 at 20 & fn. 14 & 16; *See also* RKR SOF ¶ 35-39. In footnote 2 and elsewhere, the

---

[1] RKR disputes the applicability of 10 U.S.C. § 2461 as a basis for cancellation, *infra*, Part VII, but notes the definition in § 2461(a)(2) directly and logically contradicts the government's litigation position regarding the interpretation of the solicitation.

government still cannot say what this alleged relevant difference is. In fact, the government abandons its significance test for the irrelevant comparison between AFNETOPS and the existing solicitation requirements as well. *Compare* Dkt #41 n.12 *with* Dkt #45 n.10. Reference to the cited conclusory statement of the CO at A1350 offers no clues as to the relevant comparison between NCC Reengineering and AFNETOPS. The content of A1350 does not even say what the government represents in footnote 2. Any implication of a comparison between the effect of NCC Reengineering and AFNETOPS at the base level is completely absent from A1350 or anywhere else. The government did not make the relevant comparison, its foundational premise is unsupported by the record, and its cancellation is arbitrary and capricious.

*B. The MEO's Price Could be Adjusted.*

At page 7, the government restates five alleged reasons for cancellation and asserts "the changes to the PRD were so significant that the contracting officer believed that he could not simply adjust the prices of the MEO to reflect these changes." RKR has shown the last four of the five alleged reasons to be pretextual bolstering. Dkt #41 at 21-34. As to the fifth alleged reason, because there is no difference between the effect of AFNETOPS and NCC Reengineering on this solicitation stated in the record, the government's other significance tests are irrelevant, and the only possible conclusion is that there is no significant change to the PRD from either of those two future changes. Dkt #41 at n.12. This is because, as discussed *infra*, part II.E, a change in a future change is not the same as a change in requirements, particularly given how this solicitation was designed. Therefore, once the unlawful cancellation is set aside, all that will remain is to finally require the government to adjust the MEO's staffing levels and price to reflect the PRD, as RKR has requested since this whole process started with the administrative appeal. A2144; Dkt #31 (First Amended Complaint) at ¶105.

*C. The Government Does Not Defend the CO's Other Alleged Rationales Beyond Restating Them in Conjunction With its Erroneous Foundational Premise.*

On pages 7-8, in addition to the "changes to the PRD" allegation, the government restates other alleged rationales from the CO's decision, including that cancellation was mandatory under FAR 15.206(e), the "more bidders" argument, and various other alleged "substantial changes" from changes in laws and policy that would resolve the government's delays against the offeror. RKR has refuted the argument that cancellation was mandatory under FAR 15.206(e), Dkt #41 at 34-37, and the "more bidders" argument, Dkt #41 at 29-32 and Dkt #41 Appx. Exh. 4 (Second Decl. of Dale Patenaude). RKR has also shown the insignificant effect of the changes in law and policy cited by the CO and the CO's own equivocation that any of those must be employed to any legal certainty. Dkt #41 at 21-34.

So much of the government's position on these points assumes its erroneous foundational premise. Certainly that is the case with respect to the Anti-Deficiency Act. *Cf*. Dkt #45 at 36 ("the amendments are necessary because of change in the Air Force's requirements"). Likewise, the alleged need to apply the new May 2003 A-76 OMB Circular would only apply if competition needed to be reopened, i.e., if there were some *other* reason to cancel and resolicit. The "more bidders" argument also assumes that the solicitation would be amended to remove the network operations workload, which again is only true if there is some *other* reason to amend or cancel. *Cf*. Dkt #45 at 29-30. Once that foundational premise is removed, the government is left arguing for a rule of law that arbitrary and capricious assumptions of the CO are always rational when enough time has passed, which is not the law.

*D. RKR Does Not Concede the Alleged Reasons for Voluntary Dismissal Stated on Page 8 of the Government's Brief.*

*E. The Government Mischaracterizes RKR's Position on the Solicitation's Requirements.*

The agency alleges "RKR's argument is essentially that the requirements of the solicitation included a similar NOSC-centric initiative, but offerors were not supposed to base their bids upon a NOSC-centric environment." Dkt#43 at 8. RKR drew a picture to show this was not its position. Dkt #41 at 8. A change in a future change is not the same as a change in a solicitation requirement. Configuration changes to the network to occur over the life of the contract are not requirements. The "requirements" set forth at A0147 ¶7.1.4.3 are for the offeror to be able to implement the configuration changes when the government says what they are during performance,[2] and it is clear in the context of this case that AFNETOPS or NCC Reengineering are not requirements of the PRD.[3] The government wants to presume that everything that may occur over the life of the contract is a requirement of the solicitation. Congress disagrees. 10 U.S.C. § 2461(a)(2).

The first full paragraph on page 22 of the government's brief embodies its position. RKR is not saying that "the NOSC-centric initiative was included as part of the requirements of the

---

[2] Section 7.4 of the solicitation does contain significant general information regarding future changes, see Dkt. #41, at 18, and critical bid preparation and work requirements. The whole section gives specifics about workload and those matters the government will hold the contractor responsible for. By example, paragraph 7.4.13 contains about the RFP's sole reference to workload for the Wireless Local Area Network (LAN). However, when RKR says that future configuration changes were "anticipated" by the solicitation RKR SOF ¶ 51, or that the solicitation "included" existing requirements and future configuration changes, *id*. ¶ 21 the government has misinterpreted that to suggest that RKR is arguing that future configuration changes such as a NOSC-centric initiative were part of the requirements to be bid, which is not RKR's argument. *Cf*. Dkt #46 (Def's Counterstatement of Facts) at ¶ 21, 51.

[3] Paragraph 7.1.4.3 mandates that the service provider implement "configuration and security changes to comply with Air Force and MAJCOM directives" when requested over the life of the contract. A0147 ¶ 7.1.4.3; RKR SOF ¶ 59. AFNETOPS is an Air Force directive. A1352. The government admits NCC Reengineering was a MAJCOM directive. Dkt #45 at 3. Paragraph 7.1.4.3 requires the service provider to be able to implement either one, which is only logical considering the government has not shown a difference between them with respect to their effect on this solicitation.

solicitation." But the government wants to pretend that configuration changes to the network to occur over the life of the contract are requirements of the solicitation, in order to make the argument that AFNETOPS is a change in such requirements. *Cf*. Dkt #45 at 22.

However, the whole point of removing the future configuration changes from the requirements of the solicitation to be bid upon, while leaving the requirement to be able to implement them during performance, was because the government had not determined what those future configuration changes and any effect on this solicitation would be (and has yet to make the relevant comparison, which shows no effect from the grounds asserted here). Rather than wait, the government removed the future configuration changes as a requirement, kept the requirement for offerors to be able to implement them, and pressed forward:

> The reason we stopped updating it was that every time we put in an amendment to change a process, it caused extra costs to the bidders when they had to recalculate and restructure their bids," Mr. Mooers continued. "AETC and Keesler made a decision to freeze it so we could get through the process with a level playing field and get the bids on the table.

First Decl. of Dale Patenaude at ¶ 28 (quoting Attachment 4 to the declaration, Susan Griggs, "A-76-driven RIF moves to Sept. 30," Keesler News (Nov. 19, 2007), *available at* http://www.keesler.af.mil/news/story.asp?id=123076511 (last visited Aug. 4, 2008)).[4]

As RKR has diagrammed, the government's shell game is quite clear. Dkt #41 at 8 (Figure 1). In the government's view, if configuration changes to the network to occur over the life of the contract are requirements of the solicitation, then a change to those undefined future changes, whatever they are, can be called a new requirement. *Id*. But configuration changes to

[4] All references to the "Joint Declaration" in RKR's Motion and SOF, Dkt #s 41-42, which has been stricken by the Court, should now be read as referring to the First Declaration of Dale Patenaude. To the extent the Court declines to consider the Declarations, RKR requests that it take judicial notice of the government documents referenced therein and cited here, including the news article.

the network to occur over the life of the contract are not requirements of the solicitation, precisely because they are not yet defined. Therefore, analogizing a change in a future change to a change in a solicitation requirement, as the government does repeatedly, including with its citations to *MVM v. United States*, 46 Fed. Cl. 126 (2000), *cf*. Dkt #45 at 32-33, is completely off target here.

## III. RESPONSE TO DEFENDANT'S STANDARDS OF REVIEW

### *A. The Court's Reading of the Solicitation Warrants No Deference to the Government.*

The *Impressa* case cited by Defendant for the proposition that a "presumption of regularity" applies was a case where bad faith was alleged, and the Court limited the presumption to that context. *Cf*. Dkt #45 at 11. In all of the other cases cited, deference applies only after the government has shown a rational basis, which it cannot here. This is only logical, as when interpreting a statute under *Chevron v. NRDC*, 467 U.S. 837 (1984), the Courts will defer only after the government has proven its interpretation is reasonable. On this record, the government cannot prove its interpretation of the solicitation to purportedly justify cancellation, much less in a manner that is reasonable.

### *B. The Discretion of the CO is Not Implicated.*

Further, because the cancellation turns on the meaning of the solicitation, the discretion of the CO is not implicated. Dkt #41 n.10. Therefore, references to standards of review from cases where the CO's discretion was at issue are inappropriate. *Cf*. Dkt #45 at 12. The CO has no latitude and no discretion to say the solicitation means whatever they feel like, or has a meaning contrary to the plain language, or has multiple inconsistent meanings that shift over the course of the procurement. The government's litigation positions likewise are entitled to no deference. Dkt #41 n.10.

C. *The Standard of Review in This Court Does Not Permit the Government to Cancel on Mere Possibilities.*

The government cites a GAO case purporting to authorize cancellation "where the record contains plausible evidence or reflects a reasonable possibility that a decision not to cancel would be prejudicial to the government or the integrity of the procurement system." *Cf*. Dkt #45 at 13. The government has not alleged what that prejudice is—and obviously any such prejudice would rest on the government's erroneous foundational premise regarding unspecified differences between NCC Reengineering and AFNETOPS—but more importantly, plausibility or reasonable possibility is not the standard in this Court. Rather, the government's burden in response is to show that its decision is reasonable *on the record* under the APA standard in 28 U.S.C. § 1491(b)(4). This standard does not permit the government to rely on speculation, conclusory statements, or hypothetical events unsupported by the record. *See e.g*., *Weeks Marine, Inc. v. U.S*., 79 Fed.Cl. 22, 32 (2007) (government "must present a full and reasoned explanation of its decision [and] must set forth its findings and the grounds thereof, as supported by the agency record"). The D&F and the administrative record do not present such a reasoned explanation.

D. *Cancellation is Disfavored in Any Procurement, Particularly for the Reasons Given in* Great Lakes Dock & Dredge Co. v. U.S., *60 Fed. Cl. 350, 360 (2004), Which Applies Here. Dkt #41 at 5 & n.7.*

See also *Argencord Mach. & Equip., Inc. v. U.S.*, 68 Fed.Cl. 167, 176 n. 14 (2005) (Williams, J.) ("it would be inefficient and costly" to revise a defective solicitation that had not been timely objected to; it follows that the government's attempt to unlawfully reinterpret a valid solicitation after the fact imposes similar inefficiencies and costs).

*E. RCFC 52.1 Does Not Limit the Equitable Authority of the Court to Look Beyond the Record When Fashioning Relief.*

Contrary to the government's assertions at pages 14-15 of its brief, the comments to RCFC 52.1 specifically acknowledge the Court's authority to deal with an administrative record throughout a case.

> Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings.

Comment to RCFC 52.1. Indeed, in *PBGA LLC v. U.S.*, the Court of Federal Claims "held an evidentiary hearing in order to create a complete record regarding the consequences of granting or denying injunctive relief," and was affirmed by the Court of Appeals. 389 F.3d 1219, 1229 (Fed. Cir. 2004). Therefore, even if materials submitted by RKR are not admitted as part of the administrative record, they may be admitted for the purpose of fashioning relief. Dkt #41 n.1.[5]

## IV. RESPONSE TO DEFENDANT'S JURISDICTIONAL ARGUMENT

"This Court's bid protest jurisdiction is no longer premised on the theory of the breach of an implied-in-fact contract" under 28 U.S.C. § 1491(a). *Hunt Building Co., Ltd. v. U.S.*, 61 Fed. Cl. 243, 273 (2004) (Williams, J.); *see also L-3 Communications Integrated Systems, L.P. v. U.S.*, 79 Fed. Cl. 453, 461 (2005) (Williams, J.).

As RKR has stated, "unlike for sealed bids, there is no applicable FAR provision setting forth a concrete cancellation standard for a negotiated procurement." Dkt #41 at 4. Nonetheless, the Court has routinely reviewed cancellations of negotiated procurements in bid protests under the arbitrary and capricious standard since ADRA. *E.g.*, *ManTech Telecommunications and*

[5] However, if the Court holds such a hearing or admits extra-record materials to fashion relief, it should be wary of giving the government a third opportunity to offer post-hoc justifications for not proceeding with the solicitation, and the inherent accompanying delay.

*Information Systems Corp. v. U.S.*, 49 Fed.Cl. 57, 65 & n.13 (2001) ("Nor is there any doubt that this court has jurisdiction to review such corrective action"); *Cygnus Corp., Inc. v. U.S.*, 72 Fed.Cl. 380, 384 (2006). *R.R. Donnelley & Sons, Co. v. U.S.*, 38 Fed.Cl. 518, 522-524 (1997); *Griffy's Landscape Maintenance LLC v. U.S.*, 51 Fed.Cl. 667 (2001).[6]

Cognizant of the foregoing cases and statutory amendments, RKR brought this bid protest pursuant to 28 U.S.C. § 1491(b). Dkt #31 at 1 (First Amended Complaint).[7]

*A. RKR's Objection to a Proposed Award Provides Jurisdiction*

The First Amended Complant gives fair notice of RKR's protest of the underlying proposed award and the intervening unlawful corrective action (cancellation). All that Rule 8(a)(2) requires "is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gould v. U.S.*, 935 F.2d 1271, 1276 (Fed. Cir. 1991); *See also Chao v. Rivendell Woods*, 415 F.3d 342, 349 (4th Cir. 2005) ("sufficiency of complaint does not depend on whether it provides enough information to enable the defendant to prepare a defense, but merely whether the documents allegations are detailed and informative enough to enable defendant to respond"). One of RKR's factual contentions (Dkt #31, amended complaint ¶ 87) is that the MEO did not bid the requirements.

---

[6] The government itself contemplates review when it states "the same standard of review applies to protests of the cancellation of negotiated procurements both before and after a bidder's price has been released." Dkt #45 at 14.

[7] As set forth in ¶ 2 of the complaint, RKR is objecting to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement." *Id*. With respect to the clause conferring jurisdiction over all objections to "the award of a contract," an objection to unlawful corrective action or an unlawful non-award is necessarily subsumed within the clause. RKR objects that the award of a contract was precluded by unlawful corrective action, resulting in no award to an eligible offeror. RKR objects in the alternative that the lawful completion of the procurement process for the solicitation was precluded by unlawful corrective action, resulting in no award to an eligible offeror. The unlawful corrective action is an unlawful cancellation of the solicitation.

One of RKR's injuries (¶¶ 2 and 95) is that the lawful completion of the procurement process has not occurred, and another is the unlawful non-award to RKR, the aggrieved offeror (¶2-3).

Together, those assertions, along with the amended complaint's exhaustive histories of the agency and GAO protests and preceding case in this Court, as well as the claim to enjoin any award to the MEO (¶105), give notice that RKR is asserting its underlying protest of the proposed award to the MEO, and asserting that the MEO was improperly designated as the proposed awardee. *See* 28 U.S.C. § 1491(b)(1) (objection to proposed award gives Court jurisdiction); *see also* Dkt #45 at 40 (government's latest change in position asserting that the MEO now once again would be implemented as the awardee if cancellation were set aside). RKR's objection to the proposed award to the MEO confers jurisdiction on this Court to review any corrective action taken pursuant to that objection, including the unlawful cancellation here.

*B. Objections to a Proposed Award Provide Bid Protest Jurisdiction to Review Corrective Action Under ADRA*

ADRA "in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing," *L-3 Communications*, 79 Fed. Cl. at 461; *Int'l Graphics v. U.S.*, 5 Cl.Ct. 100, 107 (1984) (citing arbitrary deviation from A-76 Circular as implied in fact contract theory).

> The statute does not limit the legal theories on which such an "objection" to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

*L-3 Communications*, 79 Fed. Cl. at 461. An objection to unlawful corrective action is necessarily subsumed within a challenge to a proposed award, regardless of whether the unlawful corrective action occurs before or after a case is filed in this Court. No independent statutory or regulatory violation need be shown.

The procedural history of this case indicates the inappropriateness of the government's argument. If the government is correct, RKR should have demanded, in No. 07-630C, that the Court rule on RKR's arguments regarding the intent to award to the MEO before the CO issued his D&F and cancelled the solicitation. This Court cannot be divested of jurisdiction by the CO in that manner; nor would such a race between the Court and the CO have been an appropriate use of judicial resources.

In enacting ADRA, Congress clearly did not intend to remove challenges to RFP cancellations from the Court's jurisdiction or render unreviewable the government's determination that cancellation of an RFP is "in [its] interest" under FAR 52.215-1(f)(1). What ADRA actually did, instead of what the government alleges it did, illustrates why the government is wrong. ADRA divested the district courts of jurisdiction over bid protests as of January 1, 2001, and vested that jurisdiction exclusively in this Court. *PBGA LLC v. U.S.*, 389 F.3d 1219, 1227 (Fed. Cir. 2004). Thus, the government argues that RFP cancellations are unreviewable in *any Court* unless Congress or the Executive deign to craft some other standard of review in addition to the one Congress has already given *this Court* in 28 U.S.C. § 1491(b)(4). The government would evade this Court's jurisdiction over both RFP cancellation and award decisions merely by rescinding (or never promulgating) statutory or regulatory standards governing RFP cancellation and then cancelling the solicitation before the Court could rule on the merits of the award protest. This would enable the government to use the cancellation as a bar to review of the real underlying reason for the protest, much as it seeks here (because it knows the MEO did not bid the date-in-time requirements). Congress, when enacting ADRA, did not authorize the government to set up such nonsensical obstacles and trap doors to this Court's jurisdiction.

*C. RKR Has Also Alleged Violation of Statutes and Regulations*

As an independent basis for jurisdiction, the government's conduct by definition violates several FAR provisions, including among others, FAR 15.306(e), which provides that government personnel involved in the acquisition shall not engage in conduct that "[f]avors one offeror over another." *Gentex v. U.S.*, 58 Fed. Cl. 634, 653 (2003). Under the notice pleading standard, RKR's amended complaint states sufficient facts that the Court could find a violation of a statute or regulation with respect to the RKR's underlying protest of the proposed award to the MEO, as conduct that is arbitrary, capricious, and not in accordance with law violates FAR provisions too numerous to list. See *Hunt Building Co., Ltd. v. U.S.* 61 Fed. Cl. 243, 269 (2004) (Williams, J.) ("The protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law or procedure" and citing cases).

This Court has reviewed cancellations of negotiated procurements in award protests under the arbitrary and capricious standard of the Administrative Procedures Act. *E.g., ManTech Telecommunications and Information Systems Corp. v. U.S.*, 49 Fed.Cl. 57, 65 & n.13 (2001); *Cygnus Corp., Inc. v. U.S.*, 72 Fed.Cl. 380, 384 (2006). The Claims Court has found its determination regarding arbitrariness and capriciousness turns on whether (1) []; (2) there was no reasonable basis for the procurement decision; (3) []; or (4) pertinent statutes or regulations were violated. *Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998); *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203-04 (1974); *Griffy's Landscape Maintenance LLC v. U.S.*, 51 Fed.Cl. 667, 674 (2001); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001); *AmerisourceBergen Drug Corp. v. United States*, 60 Fed.Cl. 30, 35 (2004).

Additionally, RKR has alleged that the government unlawfully failed to adjust the MEO's offer to conform to the requirements, and specifically requests such relief. Dkt #31 ¶¶ 87, 105. As it did before the agency and GAO, A2144 & A0457, RKR challenges the government's cost comparison pursuant to the A-76 Circular which is necessary to support the proposed award to the MEO, Dkt #31 ¶¶9, 42, 87, 95, 100 & 105. The A-76 Circular and Handbook are part of the law to be applied in evaluating that claim, *see* 41 U.S.C. § 401, 31 U.S.C. § 501, 10 U.S.C. § 2462, 32 C.F.R. § 169a.15(d) (authorities for creation and use of A-76 documents), the government effectively treats them as binding, and thus they should be treated as "regulations" for purposes of 28 U.S.C. § 1491(b)(1). *See also* 34 No. 4 GOVTCONT ¶ 57 (Jan. 29, 1992).

The government admits that "the MEO appears to have been understated" and requires revision. A0772. This is an admission that the MEO not only acknowledged future configuration changes to the network from a NOSC-centric or similar initiative, *see* A1164, 1166-67, 1171, as the administrative appeal found, A2273, but also staffed its proposal in accordance with those configuration changes. A1154, A1350.[8]

This is a bifurcated proceeding, and the government's failure to adjust the MEO plays a role in both phases of the proceeding, the challenge to the cancellation and the underlying protest of the proposed award. As to the cancellation, the decision not to adjust the MEO's offer shows that the government failed to consider an important aspect, see *Metric Sys. Corp. v. U.S.*, 42 Fed.Cl. 306, 310 (1998): that holding the offers of RKR and the MEO to the same standard would have allowed proposal evaluation and thus the rest of the procurement to continue in a timely manner, and would have foreclosed many of the CO's erroneous make-weight cancellation arguments at A1019-1020 (more bidders, passage of time, new laws). Prior to the

8 *See* AR1037-1079 (detailed calculations and function-by-function breakdown of how the MEO's staffing proposal does not comply with the solicitation's requirements).

CO's decision, the government had many months of opportunity to adjust the MEO's offer to conform to the solicitation requirements, but failed to do so. This was arbitrary and capricious and contravened the government's legal duty, under OMB Revised Supplemental Handbook (1999) Ch.3.H.3(d)(e) and Ch. 3.I.3(a), to adjust the MEO's staffing proposal to conform to "date-in-time" requirements. The failure to treat the offers equally in accordance with FAR 15.306(e) and other FAR provisions can be seen as a producing cause of the unlawful corrective action announced before the GAO. The GAO in effect recognized this when it questioned why the government could not proceed to comply with the procedures even at the time of RKR's protest. A0940. When the government received this question from GAO, it refused to answer or to adjust the MEO's offer; instead, it announced its intent to cancel the procurement.

*D. The Solicitation Itself Provides a Basis For Jurisdiction*

In any case, the solicitation itself provides:

> This acquisition is a cost comparison study under OMB Circular A-76, as implemented by FAR 52.207-2, OMB A-76 Revised Supplemental Handbook, and AFI 38-203. To ensure *equity and fairness*, the Government must be satisfied that the selected industry/ISSA offeror's proposal and the in-house cost estimate are based on the same level of performance.

A0076 (emphasis added). The solicitation mandates equitable and fair procedures in the evaluation and selection process and specifically incorporates the A-76 documents. Just as in *Hunt Building Co., Ltd. v. U.S.*, 61 Fed. Cl. 243, 273 (2004) (Williams, J.), that provides "a legal basis to sustain this protest independent of any statutory or regulatory violations, so the applicability of [statutes] and the FAR is immaterial."

V. RESPONSE TO DEFENDANT'S ARGUMENT ON THE PREJUDICE ISSUE

The Defendant's argument on the prejudice issue ignores the bifurcated nature of this case and makes the unreasonable presumption underpinning Defendant's jurisdictional

argument—that is, if unlawful corrective action (here: cancellation) can be used as a trap door to bar judicial review of an underlying protest of a proposed award, then unlawful corrective action can also prevent the protestor from showing prejudice as a result of the underlying proposed award. The prejudice analysis applicable to the underlying proposed award is premature because the Court has to sort out what the solicitation actually required first, in order to determine that the government's fundamental premise underlying the cancellation is erroneous. However, RKR is prejudiced at this stage due to the fact that the unlawful corrective action deprived it of the opportunity for its bid to be fairly considered, as provided for in the solicitation. A0076. General Maluda himself stated that the solicitation met the needs of Air Force and that there was no significant change to cause cancellation, Depo. of Maj. Gen. John W. Maluda at 138-143, which is an admission of prejudice to RKR from the alleged corrective action, lawful or not.

A pre-award/cancellation protestor can hardly be expected to show a "substantial chance" of award until the Court says what the solicitation means in order to set aside the unlawful corrective action, particularly where, as here, the agency conducted the procurement with varying views of the solicitation's requirements. The Court cannot apply a "substantial chance" test based on a view of the requirements that deferred to the agency's litigation position, which is entitled to no deference.

Yet the government argues exactly that when it claims, incorrectly, that RKR must show it "would have received the award" in order for the Court to enjoin the cancellation, Dkt #45 at 39, and then cites its own administrative appeal determinations—*on the exact basis for RKR's underlying protest of the proposed award*—in support. In other words, the government says the protestor can't show prejudice to set aside a cancellation in this Court unless the government found in the protestor's favor during the administrative appeal.

"To establish prejudice," under the correct test, RKR "must show that there was a 'substantial chance' it would have received the award but for the alleged errors in the procurement process." *Hunt Building Co., Ltd. v. U.S.*, 61 Fed. Cl. 243, 270 (2004) (Williams, J.). As in *Hunt*, where this Court found prejudice, RKR was one of two final offerors. RKR was specifically selected as the sole private offeror to compete against the MEO. RKR SOF ¶ 71. The only difference between this case and *Hunt* with respect to the prejudice issue is that the government has cancelled the solicitation and is now attempting to use the cancellation to bar review of the underlying proposed award.[9]

A challenge to unlawful corrective action is subsumed within a challenge to a proposed award. Unlawful corrective action may be set aside if the protestor shows it is fairly traceable to an injury for which injunctive relief may be afforded. Dkt #41 at n.8. This Court can exercise its jurisdiction over the protest of the underlying proposed award. RKR was injured and was entitled to injunctive relief setting aside that proposed award. The unlawful corrective action the government has interposed flows, by definition as alleged "corrective action," from the protest of the underlying proposed award, and is thus fairly traceable to RKR's injury and remedies in the underlying award protest. That is how RKR is prejudiced by the cancellation and why the Court may set it aside.

To the extent the Court feels it needs to apply the "substantial chance" of award test at this stage, RKR satisfies it for the same reasons as in *Hunt*. RKR has a substantial chance of

---

[9] The government has *again* changed its position on whether award to the MEO would occur, now stating that it would. *Compare* Dkt #45 at 40 ("If the Court were to overturn the cancellation . . . the MEO, in some form, would likely be implemented") *with* No. 07-630 Dkt #19 at 5 n.4 ("the Air Force will not implement the proposed MEO structure based upon the solicitation as it stands") and No. 08-62 Dkt #13 at 3 n.1 ("RKR's allegations that the Air Force has awarded or will award the work to the MEO are spurious"). "The fact the agency changed its position twice militates against substantial justification." *Calif Marine Cleaning v. U.S.*, 43 Fed. Cl. 724, 729-730 (1999).

receiving the contract because the MEO's offer did not conform to the solicitation's "date in time" requirement, which the government explicitly instructed were the requirements to be proposed. If the MEO's offer is adjusted to conform to the solicitation, then its price will exceed RKR's. First Decl. of Dale Patenaude ¶ 29 and Attachment 5.

The government admits that "the MEO appears to have been understated" and requires revision. A0772. This shortcoming required that the Source Selection Authority and the IRO ensure that the government make all changes necessary to meet performance standards. A0939-940. The government's failure to do so was a violation of law and regulations and a failure to consider an important aspect of the problem by not following these procedures. This failure was acknowledged in the GAO's question to the Air Force as to why it could not proceed to comply with the procedures at the time of RKR's protest. A0940.

If the MEO's offer were adjusted to increase its staffing by 14 personnel, then its price would surpass RKR's price of $59,691,967. A1970. The MEO's annual cost per FTE (personnel full-time-equivalent) at the 1T9 classification is $73,181.75. A1973. The adjustment of 14 FTE's cost for just the 10-year period of performance (without the mobilization and transition period) is $10,245,445.00, which exceeds the current price difference between RKR and the MEO of $4,972,800.00. A1970. RKR, with the lower price, is the more likely to receive the award. First Decl. of Dale Patenaude ¶ 29 and Attachment 5.

## VI. RESPONSE TO DEFENDANT'S ARGUMENT ON MOOTNESS

The government's argument on mootness is itself moot because the Court has jurisdiction to hear this case. Cancellation does not make unlawful action irrelevant when unlawful action is the foundation of the cancellation itself, as opposed to being confined merely to the proposed award. *See e.g.*, Dkt #14. Nothing in Dkt #45 or any case prevents the Court from awarding bid

preparation and proposal costs when the Court declares a cancellation unlawful. 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper"). There is no case that says the Court must grant injunctive relief and set aside the unlawful cancellation before it can award bid preparation and proposal costs.

VII. RESPONSE TO DEFENDANT'S ARGUMENTS ON THE MERITS

RKR will respond to Defendant's merits arguments seritatim.

A change in a future change is not the same as a change in a solicitation requirement. The government's argument at 17-18 deliberately obfuscates this critical distinction. The government says the change in needs "is that AFNETOPs is going to cause a significant portion of the PRD to have to be re-written." *Id*. Instead of making the relevant comparison between future changes not included in the solicitation as requirements from the time the solicitation was issued until the time it was cancelled, i.e., between NCC Reengineering and AFNETOPS, the government makes an irrelevant comparison between AFNETOPS and the solicitation requirements. Yet now the government has even abandoned its irrelevant significance test for that latter comparison. *Id*. at 18 n.10 ("the percentage reduction is really irrelevant to the outcome of this case"). Not only did the government fail to provide the relevant comparison, but now it tells the Court to simply assume that its irrelevant comparison is significant enough to merit cancellation. *Id*.

Part III.A.1 of the government's brief is a complete mischaracterization of RKR's position and should be ignored for the reasons given, *supra*, at Part II.E.

The cost plus and conversion provisions, as well as other provisions of the solicitation, support RKR's reading of the solicitation, and foreclose the government's litigation positions, for the reasons given in Dkt #41 at 9-19 and RKR SOF ¶ 52-55.

The government complains that RKR's position will allow agencies to evade the FAR requirement to amend solicitations when requirements change significantly if they insert a provision stating "the service provider shall adapt to changing requirements of [agency]." But a change in a future change is not a change in requirements that results in a duty to amend the solicitation. Indeed, the whole point of separating future changes from solicitation requirements, while retaining a necessity to implement future changes, is to allow for the benefits of longer term contracts in fields like information technology that are constantly changing. Otherwise, the government could only promise offerors short performance periods for discrete tasks that had already been definitized. That, combined with the new A-76 policy of requiring fixed pricing, as opposed to negotiated pricing, *see* Second Decl. of Dale Patenaude at ¶ 32, and the duration of the procurement process, would make long term information technology contracts nearly impossible.[10]

The technological changes here were occurring during the bidding process itself. *See* First Decl. of Dale Patenaude at ¶ 28 (quoting Attachment 4 to the declaration). The agency determined that constant amendments were insufficient to keep up with those changes, which is why NCC Reengineering was removed from the solicitation requirements and placed outside the solicitation as a future change to be implemented at the direction of the agency. *See id.*; Dkt #41 at 8 (Figure 1). Thus, this 11-year contract, RKR SOF ¶5, requires a snapshot in time acquisition strategy that retains the agency's authority to direct implementation. RKR SOF ¶9 (date-in-time), ¶27 (implement chgs as directed, ¶7.1.4.3).

---

[10] Few firms would be willing to take a long term fixed price risk knowing that the government would almost certainly direct configuration changes as soon as technology changed, perhaps even before the award was made. This is the reason, the solicitation here incorporated cost-plus conversion and award fee provisions. RKR SOF ¶ 12-18. The future changes to the scope of work here would primarily be *reductions* in cost due to manpower reductions. *Id.* ¶ 28-29; A0147 (¶ 7.1.4.3).

In Part III.A.2 of its brief, the government posits that "General Maluda could not take into consideration any of his knowledge about the developments of AFNETOPS" during the administrative appeal. But, General Maluda most certainly did take his knowledge of AFNETOPS into consideration during the deposition ordered by the Court in this case. Depo. of Maj. Gen. John W. Maluda at 90-93. There, General Maluda reaffirmed:

1. There was no effect on the base level from AFNETOPS to date, *id*. at 133:1-4 ("I would say today whoever is running the network control center at Keesler is still doing whatever they did back in May of 2007 and as they did in May of 2006 and 2005.");

2. There was no change in the requirements of the solicitation due to a quantum leap in AFNETOPS between his administrative appeal decision in May 2007 and the announcement of intent to cancel in July 2007, *id*. at 141-142 ("I can't give you seven things that took place that made the decision that we had gone beyond where we were supposed to be. I just can't do it."); and

3. The alleged AFNETOPS "requirements" that would comprise a new solicitation are still undefined, *id*. at 155:5-7 ("I don't have knowledge of what those new requirements would specifically be at Keesler Air Force Base"); Depo. of Ron Mortag at 82:2-7 (resolicitation date unknown); A1016 ¶ 3, A1024 (resolicitation will not occur until transformation is complete).

General Maluda's testimony informs the Court why the intent to cancel was first announced by agency counsel and not the CO. "The fact that information precipitating the cancellation first surfaced during [the] GAO protest of the [underlying] decision to award to the MEO" is relevant. *Cf* Dkt #45 at 24. The government can't even get its story straight. *Compare* Dkt #45 Part III.A.4 *with* Depo. of Maluda at 136-137 & 108, 154:12-22 (Gen. Maluda agreeing that the ambiguity alleged before the GAO conflicts with his own decision in May 2007 that either RKR or the MEO could potentially perform the work and his opinion they could still perform today).[11] Just because the CO found no ambiguity in the solicitation in his D&F does

[11] The government now states there is no ambiguity, thereby negating its first justification for cancellation due to ambiguity as announced by General McClain on July 5, 2007. A1024.

not mean the CO is correct, that his interpretation is rational or that his interpretation is even relevant on the existing record with the ever changing positions of the government.[12] Nor does it lessen the fact that RKR was jerked around for seven months in a GAO process and in No. 07-630C while the government ultimately decided, in the D&F, to put forth an interpretation of the solicitation that was completely in conflict with the one General Maluda had taken in the administrative appeal (that the configuration changes could occur over the life of the contract):

> Q. In your estimation of what you know about this solicitation, did the manner in which this solicitation requests the bidders to do the work for Keesler Air Force Base, could it have kept up with those changes?
> A. Which changes are you referring to?
> Q. Your changes from the year before last to last year, last year to this year, this year to next year, this evolving process.
> A. Could the bidders or could the MEO? When you say "bidders," you are referring to both the MEO and the contractor?
> Q. Yes, sir.
> A. With what they bid on, *could they keep up with what's evolving from an AFNetOps standpoint*?
> Q. *Yes*.
> A. Based upon what I saw in each offering and based upon where we are technologically, *I would say both individuals could do the job*.
> But that's a personal assessment, okay, *and clearly you would have to see how they performed*.

Depo. of Maluda at 108-109 (emphasis added).

In part III.A.3, the government argues "both General Lord and AETC's technical analyst believe that AFNETOPS has been definitized sufficiently to allow them to conclude that changes to the requirements of the solicitation will be significant." But General Maluda has not concluded that. Depo. of Maluda at 155:5-7. General Maluda's answer as to what *might* change is decidedly vague and insufficient to support cancellation. *Id*. at 141-142. The government has never said, in this record, what the changes are—which tells the Court why the government has

[12] As argued by RKR, the government had already made inconsistent attempts to clarify any ambiguity that may have existed, and the D&F would merely reflect an additional one of those. Dkt #41 at 16-21.

never made the relevant comparison between AFNETOPS and NCC Reengineering: because on this record, there is none and it cannot be made.

The government also argues that its irrelevant and indeterminable comparison between an as-yet-undefinitized AFNETOPS and the solicitation requirements merits an indefinite delay of resolicitation. Again this assumes the government's shell game diagrammed at Dkt #41 at 8 (Figure 1), which cannot be supported. AFNETOPS is not a new requirement. AFNETOPS is, if anything, a change in a future change (NCC Reengineering) whose scope is undefined in the record. AFNETOPS is not a change in the requirements of this solicitation.

General Maluda made it clear that offerors can perform the solicitation today and keep up with AFNETOPS evolution. Depo. of Maluda at 108-109 & 154:12-22. Just because the government claims it knows some of what the future changes are now (but which are not in the record), it should not be permitted to cancel and wait indefinitely until other future changes are known, at which time, other unknown future changes will have been identified, and on and on. *Cf*. A1016 ¶3 & A1024 (no intention to resolicit until AFNETOPS transformation is "complete"). Cancellation is only possible if the government can avoid the language of the solicitation it wrote for the very purpose of not having to amend and cancel every time technology changed. First Decl. of Dale Patenaude at ¶7-17, 27 & 28 (quoting Attachment 4 to the declaration).

The solicitation accommodates future configuration changes to the network. Its cancellation is a pretext to bar review of the underlying proposed award. If RKR could have received a fair review of the underlying proposed award, it would have prevailed and would be performing the contract right now, keeping up with AFNETOPS' evolution as General Maluda anticipated. The intent to cancel devised by agency counsel, announced at GAO, carried through

to the CO's D&F, and continued in this litigation, is simply a method of delaying review of the underlying proposed award until the government can reorganize the deck chairs at Keesler AFB enough to make it appear as though the requirements have changed. In actuality, the natural progression of business implementing future changes would have occurred whether a contract had been awarded pursuant to this solicitation or not. Dkt #41 at 20-21; Depo. of. Maluda at 125-126.

The government's argument in Part III.A.5 that mere uncertainty in the new requirements provides a sufficient basis for cancellation still assumes the foundational error that a change in a future change is the same as a change in a solicitation requirement. Of course the future changes are uncertain. The government can't even define them for AFNETOPS. The government would excuse that by incorporating 48 C.F.R. § 52.215-1(f)(2), A0055, authorizing it to "reject any or all proposals if such action is in the Government's interest," *cf*. Dkt #45 at 12, and/or the termination for convenience clause, 48 C.F.R. § 52.249-6, A0043, *cf*. Dkt #45 at 44. The plain irony of applying such provisions to uncertain future changes, however, is that the government's interest cannot be determined. The irony doubles in magnitude in this case, where the solicitation reads that future changes are not requirements and the government's interest is to implement the future changes over the life of the contract, but where the government, as the foundation of its unlawful cancellation, advances a contrary, irreconcilable reading. Uncertainty in future changes cannot be used to defeat language of a solicitation designed to accommodate them.

In part III.A.6 of its brief, the government seeks to use that very uncertainty from continuous technological change to justify the CO's conclusory allegation that more bidders would bid on a new solicitation. The CO's allegation assumes that a new solicitation is warranted, yet the CO has not shown the prices of RKR or the MEO to be unreasonable such that

there would be any benefit to the government assuming that (1) the solicitation was cancelled for the sole, independent reason of securing more bidders; (2) competition were reopened; and (3) more offers were received. For its part, the government repeats its erroneous foundational premise that a change in a future change is equivalent to a change in solicitation requirements by asserting that the GAO's decision in *VSE*, which applies only to changes in solicitation requirements, applies here, when it does not.

The CO's allegation also lacks record support because the relevant comparison was not made and there is no support beyond sheer speculation. The CO made an apples to oranges comparison of the number of attendees at the Sheppard AFB *pre-bid conference* (ten) with the number of *actual bidders* five years prior at Keesler AFB (two). A1019-1020. The actual number of attendees at the Keesler AFB *pre-bid conference* was twenty. Second Decl. of Dale Patenaude at ¶ 7 & Exh. 4-1 (list of pre-bid conference attendees showing twenty distinct small businesses).[13] A relevant comparison shows the CO's comparison to lack a rational basis. The government attempts to confine the Court to the record it made, which does not reflect all of the facts before the CO or which the CO should have been aware of, as explained by RKR in its second motion to supplement Dkt #40 and reply, Dkt #48. The government argues that the CO should be permitted to "rely" on faulty memory and then have the record confined to that "reliance." *See e.g.*, Depo. of Ron Mortag at 15:7-10 (unable to recall number of attendees at Shepard pre-bid conference); 16:11-20 & 18:16-20 & 19:5-10 (did not evaluate potential of attendees to bid or whether they were related); 17:11-18 (can't recall number of Keesler attendees for Little BOS relative to Big BOS).

[13] The CO in fact knew, as a result of a direct meeting with RKR Joint Venture members, that RKR comprised four of the small businesses on the list and one of the large bidders, which then made up only one bidder. Dkt #41 at 29-32 and Dkt #41 Appx. Exh. 4 (Second Decl. of Dale Patenaude).

The performance period and property list issues raised in footnote 16 of the government's brief affect both offers equally.[14] The performance period issue is irrelevant because, at least in the initial years, the price was to be negotiated yearly. RKR SOF ¶ 12-17 (cost plus and award fee plan). The solicitation contains nine option years. *Id*. at ¶5. Because government's foundational premise is incorrect—there has only been a change in a future change, not a change in the solicitation's requirements—year one of the solicitation is still year one of the solicitation, and the requirement in Paragraph 7.1.4.3 of the solicitation to implement changes at the direction of the agency still applies on day one, to the extent the agency wishes to implement the changes that have accrued during the delay in performance it has caused. *See* Depo. of Maj. Gen. John W. Maluda at 104-105 (general evolution of AFNETOPS between Oct. 2006 and May 2008); *see also* Dkt #41 at 25-26. The property list issue is irrelevant because the allegedly dispositive change due to AFNETOPS is in staffing, not equipment, and for the reasons given in Dkt #41 at 28-29. There is no record of equipment to be changed in the record, nor could there be.

In part III.B.1 of its brief, the government argues that the CO had a rational basis that the test from the regulation at 48 C.F.R. 15.206(a) was satisfied.[15] Either the regulation's test was satisfied or it wasn't, and it wasn't. Saying the CO had a rational basis to make a legal

[14] The Big BOS, sister solicitation of civil engineering requirements to this Little BOS, was awarded on or about February 8, 2008 with its numerous property list changes due to Hurricane Katrina's destruction of buildings and a late award date that neither coincided with the performance dates in the solicitation or with the Little BOS award and start dates as originally planned. *See* A0036 (linkage identified in Little BOS solicitation).

[15] The government presents all of its arguments in Part III.B in terms of 48 C.F.R. § 15.206(a), which defines when amendment is mandatory, and ignores the regulation the CO actually cited, 48 C.F.R. § 15.206(e)(1), A1016, which defines when cancellation is mandatory. The government must present its arguments it terms of amendment because it has again switched its position on whether award to the MEO would occur if the cancellation were overturned. *See* Note 9, *supra*.

conclusion is the same thing as deferring to an agency's litigation position, i.e., what the CO's decision really is, which is unlawful. Dkt #41 at 7 n.10.

The government's reliance on *MVM, Inc. v. United States*, 46 Fed. Cl. 126, 127 (2000), which does not apply here, just repeats its foundational error of treating changes in future changes as changes in solicitation requirements. In *MVM*, the location of the court security officers was a date-in-time requirement that determined performance from day one of the contract. Either there was going to be a court security officer in the Northern District of Florida on the first day under the *MVM* contract or there wasn't, and the government decided, prior to award, that there wasn't. Here, unlike in *MVM*, there is no modification to the solicitation's date-in-time requirements. The government is arguing that AFNETOPS is the new date-in-time requirement, *see* Dkt #41 at 8 (Figure 1), which should be rejected, for among other reasons given in RKR's briefing, that (1) the government cannot define the present AFNETOPS changes that would form the new requirements of a new or amended solicitation. RKR SOF ¶ 27, 52-68; *See also* discussion, *supra*, at 2-3, 5-7, and 20; (2) the government cannot make the relevant comparison and define the change in future change between AFNETOPS and NCC Reengineering, which was to be phased in during the contract; and, (3) the solicitation accommodated all such future changes through an implementation process (¶ 7.1.4.3) that can be applied on day one of performance even though the offers were restricted to date-in-time requirements.

In part III.B.2 of its brief, the government argues that solicitation amendments are independently required to comply with new source selection criteria and analytical obligations in 10 U.S.C. § 2461. First, the provision does not even apply, due to its suspension clause and the current war/national emergency. *Id*. § 2461(d) ("The provisions of this section shall not apply

during war or during a period of national emergency declared by the President or Congress").[16] The statute, by definition, supports no change in *requirement* that would merit cancellation from future configuration changes to the network, as changes that "reenginee[r] reorganiz[e], moderniz[e], upgrade[s] expan[d]," or make staffing more efficient. 10 U.S.C. § 2461(a)(2). Thus, there is no need to apply new source selection criteria.[17] Finally, there is no evidence Congress intended this statute to apply to solicitations issued under the old 1999 A-76 Circular, since the statute assumes its analysis will occur under the 2003 version. *Id.* § 2461(a)(1)(B).

With respect to Section 8021 of the Defense Appropriations Act and the Anti-Deficiency Act, the government's argument in part III.B.3 of its brief simply resolves the effects of the government's delay and unlawful positions against the offeror. It also improperly assumes that amendment of the solicitation is warranted. The Court may order the government to adhere to a legal interpretation of the solicitation, and may order the government to correct the errors in the MEO's bid, pursuant to 28 U.S.C. § 1491(b)(2). Such Court orders do not result in "amendments" to the solicitation such that either Section 8021 or the Anti-Deficiency Act would apply. *See e.g., Great Lakes Dredge & Dock Co. v. U.S.*, 60 Fed. Cl. 350, 361-362 & 370-371 (2004) (rejecting government contentions that solicitation specifications were unnecessarily restrictive or that the solicitation overstated the government's needs and ordering government to

---

16 *See e.g.*, EO 13466 (Jun. 26, 2008) (N. Korea); EO 13460 (Feb. 13, 2008) (Syria); EO 13303 (Iraq); Proclamation 7463 (Sept. 14, 2001); EO 13233 (Sept. 14, 2001). To RKR's knowledge all of these national emergency declarations have been continued and are currently in effect. Moreover, RKR states for the record that a "war" exists within the meaning of the statute.

17 The government has had and will have at least until the end of September another statutory authority it could use to avoid 10 U.S.C. § 2461. The authority in Section 336 of the Fiscal Year 2004 National Defense Authorization Act authorized the award of IT contracts at costs that may be higher than government performance if such an award would provide the greatest overall benefit. *See* 50 NO. 22 Government Contractor ¶ 210, "DOD Did Not Use Special A-76 Authority For IT Services, GAO Says." (citing http://www.gao.gov/new.items/d08753r.pdf); 10 U.S.C. § 2461 Note.

proceed with original solicitation as interpreted by the Court to the exclusion of any bid but the protestor's, which was the lowest responsive bid).

## VIII. RESPONSE TO DEFENDANT'S ARGUMENT REGARDING INJUNCTIVE RELIEF

A. *RKR Has Shown the Lack of an Adequate Remedy at Law and Therefore Has Shown Irreparable Harm.*

> It is well established in this court when considering the issue of irreparable injury that the question is whether the "plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed.Cl. 446, 447 (1993); *see also Serco Inc. v. United States*, Nos. 07-691C, et al., 81 Fed.Cl. 463, 501-02 (2008); *Weeks Marine, Inc. v. United States*, 79 Fed.Cl. 22, 36 (2007). The only other relief available in a bid protest is bid preparation costs. Bid preparation costs have been held inadequate for two reasons: loss of opportunity to earn profits on the contract, *Great Lakes*, 60 Fed.Cl. 350, 369-70 (2004), and/ or failure to have a bid "fairly and lawfully considered." Id. at 370 (citing e.g., *Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728, 744 n. 25 (2000); *Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388, 398 (1999)).

*Klinge Corp. v. U.S.*, 82 Fed.Cl. 127, 138 (2008).

Here, unlawful corrective action in the form of an arbitrary, capricious, and unlawful cancellation denied RKR the opportunity to have its bid "fairly and lawfully considered." "That injury is irreparable outside of injunctive relief." *Klinge Corp. v. U.S.*, 82 Fed.Cl. at 138.

On pages 42-44 of its brief, the government repeats, particularly in the context of "lost profits," its flawed prejudice argument, which hardly merits a response. 28 U.S.C. § 1491(b)(2) provides equitable remedies, including injunctive relief, for the unlawful corrective action here. RKR has shown prejudice because the unlawful corrective action the government has interposed flows, by definition as alleged "corrective action," from the protest of the underlying proposed award, and is thus fairly traceable to RKR's injury and remedies in the underlying award protest. *See* discussion, *supra*, Part V. RKR has also shown a substantial chance of receiving the contract. *Id.*; Dkt #41 at 5 n.8; *Hunt Building Co., Ltd. v. U.S.*, 61 Fed. Cl. 243, 270 (2004). The

foregoing shows irreparable harm due to a substantial chance of lost profits if the unlawful corrective action is not set aside. See e.g., *Klinge Corp. v. U.S.*, 82 Fed.Cl. 127, 138 (2008). Independently, RKR has been harmed by not having its bid fairly and lawfully considered and by having its pricing and proposal disclosed. Dkt #41 at 37-38. The government cited cases to argue that "economic harm is not sufficient to establish irreparable injury," on page 43 of its brief, that do not concern cancellation or other corrective action. They do not consider the harm necessary to set aside a cancellation in order to obtain review of the underlying proposed award, which is the subject of the underlying protest. The harm necessary is that described by RKR above.

*B. Injunctive Relief Is in the Public Interest*

The government says on pages 45-46 of its brief that it shouldn't have to procure what it doesn't need, but it has left the incumbent government personnel in place, at staffing levels far higher than either RKR or the MEO bid to perform the date in time requirements. *See* First Decl. of Dale Patenaude ¶ 29 & Attachment 5 (analysis of RKR and MEO staffing levels showing them both to be lower than the incumbent), *also see* Dkt #41 at 38.

For that same reason, the balance of harms tips in favor of RKR, the offeror.

## IX. CONCLUSION

RKR reurges the request for relief made in Dkt #41 and requests that the Court in all respects deny Defendant's Motion to Dismiss, and in the Alternative, Cross-motion for Judgment upon the Administrative Record and reject the assertions of the government contained in Defendant's Response to RKR's Partial Motion for Judgment upon the Administrative Record and Defendant's Counterstatement of Facts. RKR again respectfully requests that the Court rule orally at hearing on September 24, 2008, if at all possible, with written opinion and any further proceedings to follow.

DATED August 21, 2008.

Respectfully submitted,

/s/
David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 500
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded in compliance with the Federal Rules of Civil Procedure to all counsel of record as set out below, on this the 21st day of August, 2008, as follows:

Will Rayel
Trial Attorney
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 12100
Washington, DC 20530 (20005 for FedEx)
phone: (202) 616-0302
facsimile: (202) 307-0972

***VIA E-FILING***

/s/
David F. Barton