**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability<br>Corporation<br>Plaintiff, | §<br>§<br>§<br>§<br>§ | |
| VS. | §<br>§ | NO. 08-CV-00062-MCW<br>Judge Williams |
| THE UNITED STATES<br>Defendant. | §<br>§ | |

**RKR'S REPLY TO DEFENDANT'S COUNTERSTATEMENT OF FACTS**

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

Plaintiff RKR JOINT VENTURE, LLC ("RKR") files this its Reply to Defendant's Counterstatement of Facts, Dkt #46, and would show the Court as follows:

Defendant's Counterstatement of Facts contains significant argument and certain errors that RKR must reply to. RKR will address only those facts where the Defendant has expressed relevant disagreement and/or made argument in its Counterstatement. RKR does not concede the applicability of any positions taken by the Defendant's Counterstatement, or any positions that the Defendant's Counterstatement presumes RKR has taken, or that are counter to any position taken or fact stated by RKR.

I. THE SOLICITATION

*A. Subject Matter, Applicable Evaluation Procedures, Term, and Pricing*

1. On August 16, 2002, Defendant United States Department of the Air Force ("Air Force") issued Solicitation F41689-02-R-0049 ("the solicitation"), a contract for a Base Operating Support Cost Study (Little BOS) at Keesler Air Force Base, MS. A0001.

Defendant's Response: Disagree. The solicitation was issued on March 14, 2003. AR 1.

RKR Reply: The Notice to Offerors was issued on August 16, 2002. A1029.

5. The solicitation contains a five month mobilization period, a one year basic performance period, nine option years, and a six month option to extend. The total potential duration of the contract is just under eleven years; the total non-optional duration is seventeen months. A0003 ¶ B1, A0026 ¶ F12.

Defendant's Response: Disagree. The periods are not measured from date of award. All periods have firm dates as stated in the solicitation. The mobilization period was set for May 1, 2006 through September 30, 2006. The basic period of performance was to occur October 1, 2006 through September 30, 2007. The annual options followed the basic period on the same October 1 through September 30 schedule. Performance could not have extended beyond September 30, 2016. A more accurate statement would be that the total potential duration was just under eleven years, but would be a lesser time if any award were made now.

RKR Reply: The dates were expressly linked to the BigBOS cost study. A0036. The contract for the BigBOS solicitation has now been awarded, for the full 10 year term (and an initial five month mobilization period), and has not been confined to the original schedule in the solicitation. Susan Griggs, *Town Hall Meetings Provide Overview of A-76's Future*, KEESLER NEWS (Oct. 17, 2007), *available at* http://www.keesler.af.mil/news/story.asp?id=123072184 (noting mobilization period, initial year, and nine option years).

9. The government's acquisition strategy was based upon a "snapshot in time," meaning it had decided to freeze, or stop updating, the solicitation with

amendments, and to evaluate proposals and prices based upon a specified date-in-time. Depo. of Ron Mortag at 109-110; Joint Decl. Attachment 4 at 2.

Defendant's Response: Disagree. The solicitation was amended numerous times to provide the most updated requirements. The parties were required to bid the solicitation requirements established in the solicitation. AR 1154. The document cited to by RKR does not refer to the Little BOS solicitation, but rather, to another solicitation for base operating services at Keesler AFB. We also note that by "Joint Decl.," RKR appears to be referring to the First Declaration of Dale Patenaude, filed on July 3, 2008.

RKR Reply: The reference is now to the First Declaration of Dale Patenaude. Attachment 4 to that declaration contains a news article about the A-76 process for the Big and Little BOS at Keesler AFB. Page 2 of that news article explains why the government stopped updating the Big and Little BOS solicitations after Hurricane Katrina, and made an express finding at A2110 that no further updates were necessary. The quotation is not limited to the Big BOS.

11. The government specifically instructed offerors, on September 25, 2003, to base their proposal staffing and prices only on existing requirements, and not on future changes to the requirements. A1154. The solicitation contains no language directing the offerors to include anything other than the existing date in time requirements set forth. RKR's offer was in terms of the existing "date in time" requirements.

Defendant's Response: Disagree. Offerors were instructed to base their proposal staffing and prices for communications and IT services upon Section 7.1 of the solicitations performance requirements document ("PRD"). AR 1154. Because all references to a

future NOSC-centric initiative had been removed from Section 7.1 of the PRD, offerors were instructed not to base their bids upon the NOSC-centric initiative. *Id*.

RKR Reply: By "existing" RKR means the "date in time" requirements stated in the solicitation, which removes any possible basis for the government to disagree with this fact.

12. Later, after award, workload and price changes would be accomplished through the operation of the cost-plus contract. A0036 ¶H938. Clause H-938 states:

> It is anticipated that adequate workload data will be available after the performance of the second option year for the service provided to predict a realistic cost to perform the remaining option years ... the resultant contract will be converted from cost plus award fee to fixed price award fee during the third option period. … The PCO [procuring contracting officer] and the service provided will negotiated a fair and reasonable price based on cost and workload data obtained in prior years.

A0036-A0037. The contracting officer ("CO") explained that this type of "Section H" clause was used to identify workload contingencies. Depo. of Ron Mortag at 28-29.

Defendant's Response: Disagree. The purpose of the clause was to inform offerors of the Air Force's intent to transition from a cost-plus award fee contract to a fixed-price award fee contract based upon the anticipation of workload data stabilizing for multi-functional requirements. Depo of Ron Mortag at 25-28.

RKR Reply: Defendant's response is not a disagreement but an attempt to rehabilitate the CO, who could not answer what was unknown with respect to communications and IT requirements at the time the solicitation was issued that would cause the government to insert such a cost-plus conversion provision. Depo. of Ron Mortag at 26-27. The CO then admitted, *id*. at 29:3-5, that the clause was inserted to account for such contingencies, including contingencies in communication and IT requirements. The CO would later

retreat from this answer, *id*. at 116:11-24, but that is a credibility issue for the Court to decide.

13. The CO admitted that the solicitation was written as a cost-plus contract with an initial two-year period to determine what the workload and its costs were going to be, and that then a fixed-price contract would be negotiated based upon the new workload and personnel cost data. Depo. of Ron Mortag at 116:11-14; A0232.

Defendant's Response: Disagree. The intent to convert to a fixed-price contract was based upon the established workload becoming stabilized. The CO stated that the two-year conversion period was not based upon the AFNETOPs transformation. Depo of Ron Mortag at 116:11-24.

RKR Reply: Same as the Reply for #12 above

15. The cost-plus-award-fee contract prescribed by the solicitation, A0036, A0055, A0064, is defined by FAR 16.405-2(a) as a cost-reimbursement contract, which FAR 16.301-1 in turn defines as a contract that provides for payment to the contractor of allowable incurred costs to the extent provided in the contract. FAR 16.301-2 emphasizes that cost-reimbursement contracts are used when requirements for contract performance are uncertain: "Cost-reimbursement contracts are suitable for use only when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract."

Defendant's Response: Disagree. For purposes of the solicitation at issue, the "uncertainties" upon which clause H-938 was based were associated with the reliability of workload data, not the identification of requirements. Depo of Ron Mortag at 116:11-24.

RKR Reply: Same as the Reply for #12, above.

18. Paragraph 4.4.2 of the Award Fee Plan indicates that the metrics may be modified "as the mission and priorities of the base evolve." A0255. This is consistent with operation of the cost-plus contract.

Defendant's Response: Disagree. The reference cited is in the Performance Management Plan ("PMP"), not the Award Fee Plan. The statement "[t]his is consistent with the operation of the cost-plus contract" is not accurate. The clause that RKR cites from the PMP refers to the modification of performance metrics, which would be required despite the type of contract.

RKR Reply: The statement is accurate. That the PMP may be consistent with other contexts does not make it inconsistent with this one. Further, if configuration changes to the network were not to be implemented at the direction of the government, and if the mission were not to evolve, the cited provision may well have read differently.

21. The cancelled solicitation included (1) existing requirements as of the date specified by the government, upon which the offerors were to propose a price, and (2) projected configuration changes to the network, which were to occur over the life of the contract, but upon which proposal prices were not to be based. A1154.

Defendant's Response: Disagree. It is true that bidders were supposed to bid upon "date in time" requirements, AR 1350, but only to the extent that the requirements in Section 7.1 of the PRD reflected the requirements at the "date in time" of the solicitation. Id. at 1154. Bidders were to base the communications and IT portion of their bid upon Section 7.1 of the PRD, not ignore Section 7.1 of the PRD in favor of some other "date in time"

communications and IT requirements of which they were aware. Id. The specifics of "configuration changes" were not identified in the solicitation.

RKR Reply: Defendant's response mischaracterizes the fact. When RKR says the solicitation "included" projected configuration changes to the network, it is not saying that the unspecified future configuration changes were part of the date-in-time requirements to be bid; rather, RKR is merely saying that the solicitation accommodated those changes without the need for cancellation or amendment.

25. The government confirmed, in response to a question from RKR, that the configuration changes to the network referenced in the solicitation involved the NOSC-centric initiative. A1154.

Defendant's Response: Disagree. The Air Force's response to RKR's question clarified that Section 7.1 of the PRD, upon which offerors were supposed to base the communications and IT portion of the bids, did not include the NOSC-centric initiative. AR 1154. The specifics of "configuration changes" were not identified in the solicitation.

RKR Reply: The government's response to the question confirmed that the future configuration changes to the network that the solicitation accommodated were anticipated to relate to the NOSC-centric initiative. A1154. RKR agrees these were not to be part of the offers.

27. The solicitation's "requirements" concerning the initiative are set forth at A0147 ¶7.1.4.3, which mandates that the service provider "shall implement configuration and security changes to comply with Air Force and MAJCOM directives as necessary." The plain language states they are to be implemented throughout the life of the contract as they occur. *Id*.

Defendant's Response: Disagree. The Air Force specifically stated, in response to a question, that Section 7.1 of the PRD did not include the NOSC-centric initiative. AR 1154.

RKR Reply: Same as the Reply for #25 above.

28. The offerors knew, when formulating their proposals, that the staffing requirements would be reduced over time as a result of configuration changes to the network. A1352; Second Decl. of Ken Lee ¶ 5; Joint Declaration, Attachment 7.

Defendant's Response: Disagree. The Government was not aware of specific configuration changes at the time of proposal submissions for the subject solicitation. We also note that there is no declaration of Ken Lee in the administrative record, nor the subject of a pending motion to supplement the administrative record.

RKR Reply: The government's statement that it was not aware of specific configuration changes conflicts with the existence of NCC Reengineering and the internal announcement of AFNETOPS on July 3, 2003. RKR SOF ¶ 32. Whether any of those configuration changes require amendment or cancellation of this solicitation, which RKR denies, is another matter. Paragraphs 8-13 and 27, and Attachment 1 of the First Declaration of Dale Patenaude contain the supporting references.

30. AFNETOPS has been in the planning stages for many years, even as early as 1996. Depo. of Maj. Gen. John W. Maluda at 91:9-12.

Defendant's Response: Disagree. Gen. Maluda stated that "the first time we really got serious about working network operations was probably back in 1996, '97." Depo of Maj. General John W. Maluda at 91: 9-12. Network operations, in general, is not necessarily the same as the specific AFNETOPS transformation.

RKR Reply: The government has shown no difference between network operations (or any configuration change) and AFNETOPS on this record; indeed, neither General Maluda nor the CO could say what the specific changes from AFNETOPS were. Depo. of Maj. Gen. John W. Maluda at 141-142, 155:5-7; Depo. of Ron Mortag at 75-76 ("I'd have to get a technical adviser").

31. Air Force Instruction (AFI) 33-115, "Network Management" (May 24, 2006 ed.), is included in the solicitation as a directive required to be followed. A0174. AFI 33-115, at Figure 2.1, shows the AFNETOPS Command Relationship. This figure indicates that, from the local base-Network Control Center ("NCC") perspective, the transformations that have occurred and will occur are above the local NCC base-level and are in other states. A1599. The government admits these transformations are not yet complete. Depo. of Maj. Gen. John W. Maluda at 107-108, 132-133.

Defendant's Response: Disagree. The May 24, 2006 edition of AFI 33-115 was not included in the solicitation. The solicitation referenced two versions of AFI 33-115VI, dated July 2, 1999 and November 15, 2002. AR 172, 174.

RKR Reply: RKR cited the latest version of AFI 33-115 for the language in the introductory section stating that the latest AFI 33-115 is the version that applies. This latest version shows, in Figure 2.1, configuration changes to the network due the government's initiatives, including NCC Reengineering and AFNETOPS, but none of them have been shown to affect the requirements of this solicitation, as they are occurring above the base level.

36. The government's decision to fold AFNOSC into AFNETOPS did not result in any additional amendment to the solicitation. At no time prior to the GAO bid

protest in July of 2007, *infra*, was there any indication that cancellation was warranted as a result of configuration changes due to AFNETOPS.

Defendant's Response: Disagree. In June 2007, Brigadier General Marvin T. Smoot, Jr. recommended cancelling the Little BOS solicitation, based upon AFNETOPs. See AR 1022-24. Additionally, it would be more accurate to say that cancellation was warranted based upon workload reductions and responsibilities due to AFNETOPs, not "configuration changes." Agree that the Government's decision to fold AFNOSC into AFNETOPS did not result in an additional amendment to the solicitation.

RKR Reply: Configuration changes to the network include workload reductions and changes in responsibilities, particularly where roles and responsibilities are shifted pursuant to a generally defined construct or concept. The requirement in ¶ 7.1.4.3 that "service providers shall implement configuration and security changes to comply with Air Force and MAJCOM directives as necessary," A0147, and the provision made in ¶ 7.4.5 that the government will "direct configuration changes to the network to either enhance security or improve communications," A0165, are not so limited as the government suggests. Configuration changes to the network necessarily result in changes in operational workload and responsibilities, so the government cannot pretend that one set of changes will occur without the other. The government plans far more than a run of the mill staffing reduction without changing the network; both the work and physical network will change. *See* A1352 (internal AFNETOPS announcement referencing "planning and force generation issues for supporting combatant commanders" and detailing staffing changes).

39. The GAO found that as between the "NOSC-centric initiative" and the "AFNETOPS" structure it was folded into, there was "no dispute that both terms refer, generally, to the same centralization concept." A0996 n.3.

Defendant's Response: Disagree. RKR misquoted the GAO by adding the word "same." AR 996 n.3.

RKR Reply: The GAO referred to a single centralization concept and there is no evidence that more than one such concept has ever existed, despite the changes in nomenclature.

40. The CO admitted he did not have "enough of a working knowledge of it [AFNETOPS] to have any idea what its relationship would be to the necessity to wait two years to go to a fixed price contract." Depo. of Ron Mortag at 28. He "couldn't say [he] was really familiar with the concept" of AFNETOPS. Depo. of Ron Mortag at 49. However, he believed the solicitation did include a contingency clause that talked about the potential impact of AFNETOPS. *Id.*

Defendant's Response: Agree. However, the clause the CO was referring to was 7.4.11 of the PRD, not H-938.

RKR Reply: Same as Reply to #12, above.

43. The "United States Air Force Network Operations Functional Concept," A1355 explains the time horizons:

> The migration from today's decentralized construct to the formation of a fully operational and funded end-state (i.e., AFNETOPS forces provided C2 [command and control] over terrestrial, airborne and space [communications] nets) is expected to be a multi-year endeavor. . . . The first step of this transformation occurred on 5 Jul 06 [when] the 67th Network Warfare Wing . . . was given authority over all forces and resources formerly assigned to the MAJCOM . . . NOSCs. . . . The next step is . . . directing consolidation of MAJCOM NOSC network security and enterprise core services into the I-NOSCs . . . targeted for 2008. . . .

> The final step—integration of most airborne and space networks—will occur in the 2012-2020 timeframe.

A1359; Depo. of John W. Maluda at 121.

Defendant's Response: Agree, but this heavily edited paragraph does not fully explain the time horizons. The Air Force was scheduled to reach initial operational capability for AFNETOPs by March 15, 2008 and final operational capability by December 31, 2010. AR 1407.

RKR Reply: The record gives no indication of where we are in the timeline cited by Defendant, or whether the dates cited are still even remotely accurate. The Court may take judicial notice of the fact that the formation of the CYBER Command is in question. The new Air Force Secretary is questioning establishing a CYBER Command at all and it is currently on hold.

51. The solicitation contains numerous references that indicate NOSC-centric changes like AFNETOPS are covered and anticipated. *See* ¶ 52-68 *infra*.

Defendant's Response: Disagree. None of the paragraphs cited below specifically reference a NOSC-centric initiative. The only paragraphs in the solicitation referencing a NOSC-centric initiative were 7.4.11 and 7.4.11.1 of the PRD. AR 168-69. Offerors were told that the NOSC-centric initiative was not a requirement of the solicitation. Id. at 1154.

RKR Reply: Same as Reply to #21, above.

58. Prior to amendment, the original solicitation specifically indicated the degree of labor reductions that would be associated with the net-centric initiative, as only a "caretaker" staff would be required for the Network Control Center. A0803.

Defendant's Response:

Agree, although the original solicitation did not state the exact degree of labor reductions

due to a NOSC-centric initiative.

RKR Reply: The exact degree of labor reductions is determinable based on a reasonable interpretation of "caretaker" staff. RKR would argue that this "caretaker" staffing level closely approximates what the MEO improperly based its offer on.

59. After amendment, the initiative was removed as a requirement, except for the provision under the "requirements" portion of the PRD in Paragraph 7.1.4.3, which mandates that the service provider implement "configuration and security changes to comply with Air Force and MAJCOM directives" when requested over the life of the contract. A0147 ¶ 7.1.4.3.

Defendant's Response: Disagree. The initiative was removed as a requirement, in its entirety, because all references to the NOSC centric initiative were removed from Section 7.1 of the PRD. AR 1154.

RKR Reply: The requirement to implement whatever future configuration changes the government decided to direct, including potentially a NOSC-centric initiative, was retained in Paragraph 7.1.4.3

60. AFNETOPS directs configuration changes. A1358; A1447 ¶ 4.411. All offerors were aware of the significant staffing reductions that would take place over the life of the contract as this initiative ripened and that they would be required to implement such reductions pursuant to Paragraph 7.1.4.3. Second Decl. of Ken Lee ¶ 5; Joint Declaration, Attachment 7.

Defendant's Response: Disagree. The Government was not aware of specific configuration changes at the time of proposal submissions for the subject solicitation. We

also note that there is no declaration of Ken Lee in the administrative record, nor the subject of a pending motion to supplement the administrative record.

RKR Reply: See Reply to #28 above. Also, the correct references are now to First Decl. of Dale Patenaude at ¶ 8-13 & 27 and Attachment 1.

64. Paragraph 7.4.5 thus directed RKR to assume, when submitting its proposal, that any configuration changes to the network, including changes involving existing Communications and Information Technology management positions or staff below them, would be directed by the government during the life of the contract.

Defendant's Response: Disagree. "[C]onfiguration changes" refers to changes to the network configuration, and does not directly reference changes to positions supporting the network. See, e.g., AR 148 (requiring the service provider to perform "initial hardware installation and configuration of network servers, routers, hubs, bridges, repeaters, servers, workstations, and peripherals").

RKR Reply: Same as Reply to #36 above.

76. The proposals as opened and made public were for RKR of $59,691,967 and for the MEO of $ 54,719,167. A1968-1970.

Defendant's Response: Disagree. Only RKR's total evaluated cost per performance period was made public. AR 1968-2068. The rest of RKR's proposal was not publicly opened or disclosed. If the solicitation were amended to reflect the Government's actual needs and period of performance, as well as new mandatory pricing evaluation factors (e.g., standardizing the contractors' contribution to employee retirement plans to match the amount the Government contributes, see 10 U.S.C. § 2461(a)(1)(G)), the prices proposed in 2005 would no longer be useful.

RKR Reply: The disclosure of the total evaluated cost still provides a vehicle for competitors to calculate RKR's overall cost structure with reasonable precision. There is no need to amend the solicitation, so the government's further argument regarding pricing is speculative.

93. In the July 9, 2007 response, the government had mentioned only that "there was, and is currently underway, an initiative that would centralize certain operations and will significantly change personnel requirements," and made no distinction between AFNETOPS and the NOSC-centric initiative. A0772.

Defendant's Response: Agree. However, the fact that the letter only generally referred to the ongoing initiative that would change requirements, without specifically distinguishing between AFNETOPs and the NOSC-centric initiative, does not mean that there is no distinction between AFNETOPS and the NOSC-centric initiative.

RKR Reply: The record does not demonstrate any distinction between the two that is relevant to this solicitation.

94. Rather than respond to the GAO's question, on August 2, 2007, agency counsel said it was moot because the government submitted a sixth and different alleged reason for cancellation. A0942 & n.1.

Defendant's Response: Agree. By the time this response was written, the Air Force was able to more definitively quantify the change in its requirements, and determine that the solicitation no longer reflected its needs. AR 944. Its decision to move towards cancellation based upon a change in requirements made the issues before the GAO moot, and there was no need to respond to other questions concerning reasons for cancellation.

Id. at 942 n.1. The GAO agreed with the Air Force's argument, and saw no need to seek further information before deciding to dismiss the protest. AR 993-96.

RKR Reply: See Reply to #93 above. A change in a future configuration change is not a change in requirements. The standards and judgment of the GAO are not controlling in this Court.

108. Based on the government's evaluation of their proposals, either RKR or the MEO could have kept up with evolving configuration changes to the network, including changes specifically due to AFNETOPS, over the life of the contract. Depo. of Maj. Gen. John W. Maluda at 108.

Defendant's Response: Disagree. It was General Maluda's personal opinion that either RKR or the MEO could have kept up with changes due to AFNETOPs, based solely upon what he saw as the administrative appeal authority. Depo. of Maj. Gen. John W. Maluda at 109:1-3. RKR presented no evidence that General Maluda would have been responsible for evaluating the service provider.

RKR Reply: General Maluda's deposition testimony acknowledges that the configuration changes to the network would be implemented over the life of the contract.

> A. With what they bid on, *could they keep up with what's evolving from an AFNetOps standpoint*?
> Q. Yes.
> A. Based upon what I saw in each offering and based upon where we are technologically, *I would say both individuals could do the job.*
> But that's a personal assessment, okay, *and clearly you would have to see how they performed*.

Depo. of Maluda at 108-109 (emphasis added).

109. There was no "quantum leap" or significant change in the evolution of AFNETOPS between the time of the administrative appeal decision and the time of cancellation. Depo. of Maj. Gen. John W. Maluda at 140-142.

Defendant's Response: Disagree. RKR mischaracterizes the facts by using words used only by its counsel in his deposition questions. The terms "quantum leap" and "significant change" appeared only in counsel's questions, Depo. of Maj. Gen. John W. Maluda at 140:12, 142:11. In response, Gen. Maluda stated that the question did not accurately characterize the way he could quantify or identify changes that had occurred. *Id*. at 140:16-22, 141:1-2. RKR's counsel again used the term "quantum leap," stating that it didn't sound like there had been any. *Id*. at 141:10-11. General Maluda responded "[n]ot necessarily," *id.* at 141:15, and went on to state that things could change at the base level because AFNETOPs "significantly impacts the way we are going to do business." *Id*. at 141:20-22, 142:1-2.

RKR Reply: General Maluda could not identify any changes, and his response was vague as to any changes that had occurred. *See* Depo. of Maj. Gen. John W. Maluda at 141-142 ("I can't give you seven things that took place that made the decision that we had gone beyond where we were supposed to be. I just can't do it."); and *id*. at 155:5-7 ("I don't have knowledge of what those new requirements would specifically be at Keesler Air Force Base").

DATED August 21, 2008.

Respectfully submitted,

/s/

David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 500

San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded in compliance with the Federal Rules of Civil Procedure to all counsel of record as set out below, on this the 21st day of August, 2008, as follows:

Will Rayel
Trial Attorney
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 12100
Washington, DC 20530 (20005 for FedEx)
phone: (202) 616-0302
facsimile: (202) 307-0972

***VIA E-FILING***

/s/
David F. Barton